IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 7 |
| PHOENO WINE COMPANY, INC. et al., | ) ) | Case No. 23-10554-KBO |
| Debtors.[1] | ) ) | (Jointly Administered) |
| | ) ) ) ) ) ) ) | **Response Deadline: September 6, 2023 at 5:00 p.m. (EST)**<br>**Hearing Date: September 13, 2023 at 10:30 a.m. (EST)** |

**MOTION OF THE AD HOC GROUP OF WINE CUSTOMERS
FOR AN ORDER DIRECTING THE TRUSTEE TO RELEASE
NON-ESTATE WINE AND FOR RELATED RELIEF**

The Ad Hoc Group of Wine Customers (the "Customer Group"), the individual members of which are set forth in Appendix 1 to this motion, move for entry of an Order (i) authorizing the Customer Group to reclaim their wine stored by consolidated debtors Phoeno Wine Company, Inc. ("Phoeno") and Underground Enterprises, Inc. DBA Underground Cellar ("Underground Enterprises") (and jointly, the "Debtor"), (ii) directing Don A. Beskrone, the duly appointed Chapter 7 Trustee of Debtor (the "Trustee"), to release to the Customer Group the wine held by Debtor; (iii) directing the Trustee to release to the Customer Group the records of Debtor as to the wines owned by Customers; and (iv) for relief from stay to the extent necessary to effect the Order. In support of this Motion, the Customer Group respectfully state as follows:

**PRELIMINARY STATEMENT**

1.  Debtor was in the business of acting as a "marketplace" for wineries to sell wines

---

[1] The last four digits of the Debtor's federal tax identification number are 5273.

to customers. Debtor entered into arrangements with wineries for the wineries to offer their wines for sale on Debtor's website through bulk sales at retail prices. Debtor would earn fees from the wineries for each purchase. In this manner, Debtor was not dissimilar to many other internet-based wine marketplaces.

2. Debtor, however, offered a secondary service to entice customers and increase sales. Debtor would, rather than have the winery ship the wine directly to the customer, have the winery ship the wine to Debtor's warehouse in Napa, California. Debtor would store the wine for free in a climate-controlled warehouse until the customer requested delivery of the wine. Thus, Debtor's customers could order more wine, as they were no longer limited by the constraints of the size of their wine rack.

3. As Debtor never owned the wine, it never had title to the wine. Title passed directly from the selling winery to the customer, with Debtor acting solely as bailee of the wine for the period it was held in Debtor's warehouse.

4. Property held in bailment is not property of the bankruptcy estate. Despite this, the Trustee has refused to return the wine or otherwise inform the Customer Group of his intentions. The passage of time increases the risk of damage to the wine or of other creditors asserting claims to it. Accordingly, the Customer Group is entitled to an order directing the Trustee to return the wine to the Customer Group.

## JURISDICTION AND VENUE

5. On or about May 1, 2023 (the "Petition Date"), Phoeno and Underground Enterprises each filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code, §§ 101, *et seq.* (the "Bankruptcy Code").

6. On May 30, 2023, the Court entered an order consolidating the cases of Phoeno

and Underground Enterprises for procedural purposes only [Dkt. No. 35].

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 362, and 541 of the Bankruptcy Code.[2]

## BACKGROUND

8. Debtor, operating under the business name of Underground Cellar, was in the business of operating a marketplace for the sale of wine through the internet to individual customers throughout the United States and storing that wine until requested by the customer.

9. The Debtor would enter into an agreement with wineries for the winery to sell a certain number of bottles on Debtor's marketplace at retail value. However, a customer's purchase of wine might randomly be upgraded to a much more expensive bottle. Thus a customer might purchase a $40 bottle, but the customer would be upgraded to a bottle worth $70 at retail. In some rare cases, the upgrade could be of a significantly greater value, such as upgrading a $40 bottle to a $500 bottle. (See FAQ, How Do Upgrades Work, Ex E).

10. In order to enable customers to purchase volumes of wine in excess of what a normal customer could store, Debtor provided a service known as its "CloudCellar" to its customers.

11. Debtor described the CloudCellar service as follows:

> When you buy bottles of wine on Underground Cellar, we store them for you in our temperature and humidity controlled facility here in Napa Valley. We call this the CloudCellar. Anytime you'd like to have them shipped to you, just login to your account, click

---

[2] Pursuant to Del. Bankr. L.R. 9013-1(f), the Customer Group consents to entry of final orders by this Court.

"CloudCellar" at the top, and select which bottles you want shipped by clicking the "Add to Shipment" button.

(*See* Declaration of Andrew Priestes in Support of Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Non-Estate Wine and for Related Relief [hereinafter, "Priestes Decl."], Ex. A, June 8, 2017 Email).

12. The CloudCellar service was operated by Phoeno and the wine is held in a leased space within a warehouse located at 1166 Commerce Blvd., Suite C&D, American Canyon, California. (Under Enterprises Schedule G, Line 2.3 [Dkt. 1]). The lessor is Biago Bros ("Landlord"), a large landlord in Napa, California. *Id*. The monthly rent, pursuant to Trustee, is $101,954.00. (Motion to Use Cash Collateral at p.5 [Dkt. No. 113]).

13. The purpose of the CloudCellar was to "expand your wine collection." Thus, a consumer could not only hold more wine than the consumer could otherwise physically store for the consumer's near-term use, the consumer could also, if they so choose, purchase and collect wine for future consumption as it was maintained in "ideal temperature/humidity" conditions. Debtor in fact at one point suggested it may allow consumers to trade wine with each other, but the feature was never implemented.

14. One key aspect of the CloudCellar service was that Debtor would ship any stored wine on demand to its customers. (*See* Priestes Decl., Ex. B, May 8, 2016 Email ("then whenever you want -- POOF! -- we ship the bottles you want from your collection directly to your door!")).

15. Debtor was never profitable, and on May 1, 2023, the Debtor filed for Chapter 7 bankruptcy.

16. The Customer Group is informed there are approximately 25,000 customers who held wine in the CloudCellar at the Petition Date. The number of bottles currently held, pursuant to Trustee, is between 500,000 and 550,000. (Motion to Use Cash Collateral at p.2 [Dkt. No. 113]). The Debtor scheduled the value of the wine held in the CloudCellar with a fair market value

of $11,109,408.00.  (Phono Schedule A, Line 23 [Dkt. No. 1]).

17.     The Customer Group are owners of wine currently held in the CloudCellar (the "Stored Wine").  Each member of the Customer Group is scheduled as a "Customer" in Phoeno's Schedules.

18.     Pursuant to the Phono's Schedules:

> A "Customer" as identified in the Schedules and SOFA as any retail client of the Debtor. Where "Customer" is used alone on Schedule F, it indicates that the Customer is storing wine that was purchased and is owned by the Customer at the Debtor's facility. The amount shown as the "claim" for such Customer on Schedule F is the amount paid by the Customer for the purchased wine.

(Phono Explanatory Notes for Schedules [Dkt. No. 1]).

19.     The Customer Group represents 34 separate customers holding "Customer" claims, with scheduled claims ranging from $1,928.00 to $66,884.00.  The total scheduled debt for the Customer Group is $537,136.00.

20.     The Customer Group has various levels of documentation as to what wine is owned by each customer and stored in the CloudCellar.  Some members were able to download a list of their holdings before or shortly after the Debtor filed bankruptcy.  Others did not and the information was taken down after the Petition Date.  The Customer Group does not concede that the scheduled "Customer" claim represents an accurate accounting of the amount paid for their Stored Wine.

21.     The Customer Group, through counsel, requested from the Debtor that the spreadsheet or other data setting forth the bottles being held as to each customer, along with relevant contracts, be voluntarily provided to assist them in determining how to proceed with their claims.

22.     The Debtor informed the Customer Group, thorough counsel, that all such

information has been transmitted to the Trustee.

23. To date, the Trustee has refused to provide any documents of any sort to the Customer Group on a voluntary basis. Nor will the Trustee provide any information as to his intent regarding Debtor, except for a general statement that he is trying to arrange a sale to parties of unknown identity. The Trustee has not provided assurances that any such sale, if it occurs, will require the owner to return the Stored Wine.

24. To the best of the Customer Group's knowledge, the rent owed to Landlord is not being paid on a monthly basis from at least July 2023 forward.

25. As this chapter 7 case is four months old and the Trustee has failed to provide any information as to how the Stored Wine will be returned or otherwise dealt with, and as the passage of time raises the risks of damage to the wine or demands by other parties on the wine, the Customer Group thus has no choice but to bring this motion to secure the recovery of the Stored Wine and to protect its interest in its property.

## RELIEF REQUESTED

### A. The Stored Wine is Not Property of the Estate

26. The filing of a bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The question of what constitutes the property of the estate is a question determined by state law. *In re Flintkote Co.*, 486 B.R. 99, 119 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014) (*citing Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

27. Property held by the estate as a bailee is not property of the bankruptcy estate under section 541. *In re Guild & Gallery Plus, Inc.*, 72 F.3d 1171, 1180 (3d Cir. 1996); *see also In re Crouthamel Potato Chip Co. Inc.*, 6 B.R. 501, 507 (Bankr. E.D. Pa. 1980)

28. The terms of the agreement between Debtor and its customers were set forth in a Terms of Service (the "Terms") posted to Debtor's website. (*See* Declaration of Bernard J. Kornberg in Support of Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Non-Estate Wine and for Related Relief [hereinafter, "Kornberg Decl."] Ex. D, Terms).

29. The Terms provide that "your relationship with Underground Cellar under the Terms, shall be governed by the laws of the State of Delaware without regard to its conflict of laws provisions." (Kornberg Decl., Ex. D, Terms at § 21.7). Thus, Delaware law controls as to legal rights of Debtor and the Customer Group as to the Stored Wine.

30. A bailment is defined under Delaware law as "as a delivery of personal property by one person, the bailor, to another, the bailee, who holds the property for a certain purpose, usually under an express or implied-in-fact contract." *Waters v. Delaware Moving & Storage, Inc.*, 2023 WL 4247357, at *7 (Del. Super. Ct. June 28, 2023).

31. Debtor holds itself out as a "marketplace" for the sale of wine. (Kornberg Decl., Ex. D, Terms at "Returns & Refunds").

32. A marketplace is defined as "an open square or place in a town where markets or public sales are held." ("Marketplace," Merriam-Webster[3]). In the context of an internet business, a marketplace is a company which connects buyers and sellers of goods or services through its website.

33. For example, the popular Facebook Marketplace "is a destination on Facebook where people can discover, buy and sell items. People can browse listings, search for items for sale

---

[3] https://www.merriam-webster.com/dictionary/marketplace (August 23, 2023).

7

in their area or find products available for shipping."[4]  Airbnb describes itself as a "a people-to-people marketplace."[5]  Lending Club describes itself as "America's largest online credit marketplace, and the first marketplace bank connecting borrowers and investors."[6]

34. By calling itself a marketplace, Debtor asserted that its business is to connect buyers and sellers, rather than acts as a direct seller itself.

35. Debtor earned its revenue not from sales, but from the shipping and fulfillment side. Debtor entered into agreements with the various wineries to take a percentage of the revenue from each sale, along with certain fees per bottle sold. (*Underground Cellar Is A Wine-Buying Site That Rewards You With "Better" Bottles For Free*, Techcrunch, January 15, 2015[7] (quoting Jeff Shaw, the then CEO of Debtor)).

36. The Terms also provide that Debtor's sole role was to connect buyer and sellers, rather than act as a direct seller.

37. The Terms begin by stating that they govern "your use of Underground Cellar's services and web site (referred to collectively as the 'Services')." (Kornberg Decl., Ex. D, Terms

---

[4] "https://www.facebook.com/business/help/289268564912664?id=2427773070767892 (August 23, 2023).

[5] https://news.airbnb.com/a-people-to-people-marketplace/ (August 23, 2023).

[6] https://www.lendingclub.com/institutional-investing/overview (August 23, 2023).

[7] https://techcrunch.com/2015/01/15/underground-cellar-is-a-wine-buying-site-that-rewards-you-with-better-bottles-for-free/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAMMZUbE6FdtcV_VKm4f8YbVaKK8uT1cF5WkLfzP_sdhj2pGZmSIpPcj6Q3B_5S-9m282KnvMS77gHx5KJCzmuZYOzLDw0LScGoikzYlN_vpz8KInekJmhGk1ZTWQ38_LVH9q6UFrU8XnTYBMa_mtCev5XyM65KNltRG37YnoTQ0O (August 23, 2023).

8

at § 1.1). They do not include any language regarding the legal rights and obligations as to the sale of wine or otherwise describe Debtor as a seller in any manner.

38. The Terms expressly provide that the "Services" offered include the purchase of wine through third parties, stating that "[w]hen you use the Services, you may (as a result of, or through your use of the Services) . . . purchase goods, which are provided by another person or company." (Kornberg Decl., Ex. D, Terms at § 21.1).

39. Further, the Terms provide that "[a]ny products obtained through the *use of the services* is done at your own discretion." (Kornberg Decl., Ex. D, Terms at § 14.4).

40. Similarly, the Terms provide that Debtor does not sell wine itself, but uses third-party vendors.

> Underground Cellar relies *upon a network of independent vendors and manufacturers ("Vendors") who sell the goods advertised through the Services* and ships them directly to you. If you *wish to purchase any product or service made available by a Vendor through the Services* (each such purchase, a "Transaction") you may be asked to supply certain information relevant to your Transaction.

(Kornberg Decl., Ex. D, Terms at § 3.1).

41. As to the CloudCellar storage, the Terms expressly state that CloudCellar is a service for the storage of wine: "You may enjoy free use of our CloudCellar *wine storage services* for as long as you are an 'Active Member' of the Underground Cellar community." (Korberg Decl., Ex. D, Terms at § 6.1). (emphasis added)). Accordingly, the service provided through CloudCellar is solely for storage of goods.

42. This is otherwise known as acting as a warehouse.

43. The legal relationship between the Customer Group and Debtor is clear. Debtor would provide a marketplace for the purchase of wines by Customer Group through third parties. Upon a purchase of a bottle by a member of the Customer Group from a third-party vendor, the

third-party vendor would ship the wine to Debtor, to "store" the wine until requested by the customer. Debtor would, until it ceased operations, ship the wine to the members of Customer Group upon request.

44. Thus, the Terms constitute an express contract for hire of the Stored Wine, and the relationship of Debtor and Customer Group member is of bailee and bailor.

### B. Legal Title is Vested in the Customer Group

45. Certain parties have indicated that they assert that legal title to the Stored Wine is vested in the Debtor. Any such argument bears no weight.

46. The UCC provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his or her performance with reference to the physical delivery of the goods." Del. Code Ann. tit. 6, § 2-401(2). Thus, the latest title can pass to a third-party is upon physical delivery of the goods. *See In re Johnson*, 230 B.R. 466, 468 (Bankr. D.D.C. 1999) ("nor can the passage of title be delayed until after shipment or delivery of the goods to the buyer").

47. In this case, the seller is the winery which sells the wine on Debtor's "marketplace." The obligation of the third-party vendor regarding physical delivery to the Customer Group was complete upon the delivery of the wines to the CloudCellar for storage.[8]

48. As Debtor never purchased and resold the wine, but only acted as a shipping and fulfillment company for the wineries, it never had any title to transfer. Rather, the delivery to the

---

[8] It may in fact have been complete upon shipment, depending on the type of delivery required by the contracts between Debtor and its vendors. Del. Code Ann. tit. 6, § 2-401(2). The Customer Group is not privy to these contracts. But in any event, payment was due by the customer upon physical delivery. (Priestes Decl., Ex. C, Purchase Email). Thus under the UCC, barring highly unusual contractual terms, title passed upon delivery.

10

Debtor was a delivery to the bailee of the customers.

49. When the physical delivery is made to the bailee of the buyer, title passes as if delivered to the buyer directly. *Salt River Project Agr. Imp. & Power Dist. v. City of Phoenix,* 132 Ariz. 337, 338 (Ct. App. 1982) ("The nature of F.O.B. shipment implies that the seller delivers possession of the goods when they are placed in the hands of a common carrier acting as an agent/bailee for the buyer. . . . In effect, we hold that title and possession were transferred at the same time under the facts of this case."); *Ninth St. E., Ltd. v. Harrison*, 5 Conn. Cir. Ct. 597, 600 (1968) (holding that upon delivery to a bailee, "[t]itle to the goods, and the right to possession, passed to defendant").

50. Upon the delivery of the wine to CloudCellar, title vested in the Customer Group as to the Stored Wine.

### C. The Court Should Direct the Trustee to Return the Stored Wine

51. "Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished." *Waters*, 2023 WL 4247357, at *7.

52. The Bankruptcy Code provides that "the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been disposed of under another section of this title." 11 U.S.C. § 725. "[Section] 725, expressly provides that the trustee, as part of his administrative duties, may dispose of the property 'after notice and hearing' that the debtor holds, inter alia, as a bailee." *Matter of Ralph A. Veon, Inc.*, 12 B.R. 186, 189 (Bankr. W.D. Pa. 1981).

53. Numerous other cases equally hold that a Trustee has a duty to return property to a bailee so long as the contract of bailment allows for such return. *See Guild & Gallery Plus*, 72

F.3d at 1180 ("Upon satisfaction of bailment agreement, the painting—which the estate never claimed as its own—had to be returned"); *L C Smith & Bro Typewriter Co v. Alleman*, 199 F. 1, 6 (3d Cir. 1912) ("Notwithstanding such consideration, the contract, being a bailment in its inception, so remained at the time of the bankruptcy, and the trustee of the Franklin Company is not entitled to retain possession of the machine"); *In re STN Enterprises, Inc.*, 47 B.R. 315, 318 (Bankr. D. Vt. 1985) ("[I]f property was in a debtor's hands as bailee or agent, the trustee (in this case the debtor by virtue of § 1107) holds it as such, and the bailor can recover the property or its proceeds.").

54. The Customer Group is entitled to the return of the wine. Debtor promised that wine will be shipped from the CloudCellar "within 2 business days". (Korberg Decl., Ex. F, Shipping Policies; *see also* Priestes Decl., Ex. B, May 8, 2026 Customer Email ("We get them for you straight from the source, store them for you for free, and then whenever you want -- POOF! -- we ship the bottles you want from your collection directly to your door!")). The Court should thus direct the Trustee to return the Stored Wine to the Customers.

55. Further, while the Stored Wine is not property of the bankruptcy estate, the automatic stay applies to the contract between Debtor and the Customer Group. *Guild & Gallery Plus*, 72 F.3d at 1180. As the Stored Wine has no benefit to the estate, the Court should lift the stay to allow the return of the Stored Wine to the Wine Group Members.

## **CONCLUSION**

56. Based on the foregoing, the Customer Group is entitled to the relief requested herein to recover the Stored Wine.

WHEREFORE, the Customer Group respectfully requests the entry of an order (i) authorizing the Customer Group to reclaim their non-estate personal property stored by Debtor,

(ii) directing the Trustee to release to the Customer Group their wine held by Debtor; (iii) directing the Trustee to release to the Customer Group the records of Debtor as to the wines owned by Customers; and (iv) for relief from automatic stay to the extent necessary to effect the Order.
.

                                          Respectfully submitted,

Dated: August 30, 2023               /s/ Daniel M. Pereira
                                        Julie M. Murphy, Esq.
                                        Daniel M. Pereira, Esq.
                                        Stradley Ronon Stevens & Young, LLP
                                        1000 N. West Street, Suite 2600
                                        Wilmington, DE 19801
                                        Tel: (302) 295.3805
                                        Fax: (302) 295.4801
                                        Email: jmmurphy@stradley.com
                                                  dpereira@stradley.com

                                        Bernard J. Kornberg, Esq.
                                        Practus, LLP
                                        58 West Portal Ave PMB 782
                                        San Francisco, CA 94127
                                        Tel:  (341) 234.6629
                                        Email:  bernard.kornberg@practus.com
                                        (*Pro Hac Vic Pending*)

                                        *Attorneys for the Ad Hoc Group of Wine Customers*