**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 7 |
| PHOENO WINE COMPANY, INC., *et al.,* | Case No. 23-10554 (KBO) |
| Debtors.[1] | (Jointly Administered) |
|  | Hearing Date: September 13, 2023 at 10:30 a.m. (ET) |
|  | Objection Deadline: September 6, 2023 at 5:00 p.m. (ET) |
|  | Related Docket No.: 161 & 167 |

**OPPOSITION OF TRIPLEPOINT CAPITAL
TO CUSTOMERS' MOTION FOR AN ORDER DIRECTING
THE TRUSTEE TO RELEASE WINE AND FOR RELATED RELIEF**

TriplePoint Private Venture Credit Inc.; TriplePoint Venture Growth BDC Corp.; and

TriplePoint Venture Lending Fund, LLC (collectively, "TriplePoint") file this opposition

("Opposition") to the *Motion of the Ad Hoc Group of Wine Customers for an Order Directing the*

*Trustee to Release Wine and for Related Relief* [D.I. 161] ("Customer Motion").[2]  In support of

this Opposition, TriplePoint submits the Declaration of Kevin Thorne[3] and states as follows:

### I.    PRELIMINARY STATEMENT[4]

1.        TriplePoint is the largest single creditor in these cases, with a claim of

approximately $8.3 million secured by a perfected, first priority, unavoidable lien on, among other

---

[1]        The debtors consist of Phoeno Wine Company, Inc. ("Phoeno") and Underground Enterprises, Inc. DBA Underground Cellar ("Underground Enterprises", and together with Phoeno, the "Debtors").

[2]        Capitalized terms not otherwise defined herein shall have the same meaning given to them in the Customer Motion.  On September 5, 2023, Robert Floyd filed a *Joinder to Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Wine and for Related Relief* [D.I. 167] ("Floyd Joinder").  This Opposition is also an opposition to the Floyd Joinder and other joinders filed to the Customer Motion, if any.

[3]        The Customers also submitted the *Declaration of Andrew Priestes in Support of Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Non-Estate Wine and for Related Relief* (the "Priestes Declaration") [D.I. 161-2] and the *Declaration of Bernard J. Kornberg in Support of Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Non-Estate Wine and for Related Relief* (the "Kornberg Declaration") [D.I. 161-3].

[4]        Capitalized terms used in the Preliminary Statement are defined below.

property, the wine at issue in the Customer Motion, i.e., the "Stored Wine." At all times during the borrower-lender relationship between the Debtors and TriplePoint, the Debtors consistently represented that they—not the Customers—owned the Stored Wine. The Debtors made these representations both verbally and in writing, on numerous calls with TriplePoint; in the Perfection Certificate submitted in connection with the financing, where the Debtors represented and warranted that the Stored Wine was TriplePoint's collateral; and in the Debtors' financial statements, where they listed the Stored Wine as inventory, an asset of the Debtors (and not the Customers) worth millions of dollars. It was only when they filed these cases that the Debtors' officers and directors, perhaps worried about ongoing government investigations and the risk of being sued for fraud by thousands of Customers, suddenly took the factually and legally dubious position that the Stored Wine was owned by the Customers, rather than the Debtors.

2.      The fact that the Stored Wine is owned by the Debtors, and is thus TriplePoint's collateral, is fully supported by applicable law. Under the UCC as adopted in both Delaware and California,[5] unless otherwise agreed in writing, title passes to the Customers only upon completion of delivery to the Customer—that is, when the wine ultimately is delivered to the Customers at their homes. Because the Debtors and the Customers never modified the default title transfer mechanism under the UCC, title to the Stored Wine, which wine is still located in the Debtors' California warehouse, never left the Debtors. Consequently, the Stored Wine is owned by the Debtors, subject to TriplePoint's first priority perfected unavoidable security interest.

3.      None of the Customers' arguments changes these realities. The Customers' principal argument is that the Debtors were merely bailees with respect to the Stored Wine, but this argument is wholly inconsistent with the UCC and the Debtors' terms of service on their

---

[5]      For purposes of this Opposition, the result is the same whether California law, the law selected under the Loan Agreement, or Delaware law, the law proffered by the Customers, applies. Loan Agreement ¶ 20(m); ToS ¶ 21.7.

website ("ToS").  For a transaction to qualify as a bailment, the bailee must be obligated to return to the bailor the "identical product" that was given to the bailee.

4.        But this was not the case with the Stored Wine, in several respects.  First, as the Customer Motion acknowledges, the wine the Customers paid for was not necessarily the wine that they would receive; the wine was sometimes "upgraded" and, in certain circumstances, the Customers could lose access to the wine they had selected.  Customer Motion ¶ 9, Kornberg Decl. ¶ 8, Exhibit D, ToS 6.1, 6.2 (discussing the requirements of Active Membership, and impacts of failure to maintain Active Membership); ¶ 9, Exhibit E ("How Do Upgrades Work?").  Second, the Customers were never in privity with the Vendors that sold the Stored Wine to the Debtors. Third, the Customers never paid sales tax (which is due upon transfer of title).  Fourth, the Customers assert general unsecured claims against the Debtors.  Each of these positions is entirely inconsistent with a bailment relationship.

5.        Accordingly, for the reasons set forth herein, the Court should deny the Customer Motion, and find that the Stored Wine is property of the Debtors' estates.

## II.    BACKGROUND

### A.  Overview of the Debtors' Business.

6.        From approximately 2015 to May 1, 2023 ("Petition Date"), the Debtors operated an online wine store for the discovery and purchase of premium wines by members, which store would reward buyers with occasional free upgrades to rare and private-stash bottles from prestigious wineries.  As part of their business model, the Debtors offered a free wine storage service, called "CloudCellar," for customers who ordered wine through the Debtors' website. After placing an order, Customers were able to designate wines from the CloudCellar and at a time designated by the Customers have the wine shipped to their homes or other designated location.

7.        The Stored Wine at issue here is stored at a climate-controlled wine storage warehouse that is owned and operated by a third party, and located at 1166 Commerce Blvd Std.

D, American Canyon, CA 94503 ("Warehouse").  The Debtors (not the Customers) are obligated

to pay the monthly rent for the Warehouse, and the risk of loss or damage to the Stored Wine is

covered by insurance obtained by and paid for by the Debtors, under which the Stored Wine is

covered up to $10.5 million.  The Debtors have no other material property at the Warehouse.

### B.  TriplePoint and the Debtors Enter into the Loan Agreement

8.        On May 18, 2022, the Debtors into entered that certain *Plain English Growth

Capital Loan and Security Agreement* ("Loan Agreement") between TriplePoint, as lender, and

the Debtors, as borrowers.  Thorne Decl. ¶ 6, **Exhibit A**.  Under the Loan Agreement, TriplePoint

committed to make certain loans, including an initial commitment of $8,000,000, subject to the

completion of certain milestones by the Debtors.  *Id.* The Debtors never satisfied those milestones,

defaulted under the Loan Agreement in April of 2023 and, as of the Petition Date, owed TriplePoint

approximately $8.3 million.  *Id.*

9.        Under the Loan Agreement, the Debtors granted TriplePoint a first priority security

interest in, and lien upon, all of the Debtors' assets, whether then owned or subsequently acquired

(as further described and defined in the Loan Agreement, the "Collateral").  *Id.* ¶ 7, **Exhibit A**,

Loan Agreement ¶ 8.  Pursuant to the Loan Agreement, the Collateral specifically includes all

Inventory (as defined in the Loan Agreement) and all Goods (as defined in the Loan Agreement).

*Id.* On May 19, 2022, UCC-1 financing statements were recorded on behalf of TriplePoint against

both Debtors, *i.e.*, Phoeno and Underground Enterprises.  *Id.* ¶ 7, **Exhibit B** (UCC-1 for Phoeno)

and **Exhibit C** (UCC-1 for Underground Enterprises).  Each UCC-1 "covers all personal property

of the Debtor, whether now owned or hereafter acquired and wherever located."  *Id.*  No other

UCC-1s were filed against either Debtor.

10.        In connection with the Loan Agreement, Debtor Underground Enterprises, as the

authorized representative of both Debtors, executed a Certificate of Perfection ("Perfection

Certificate") for the benefit of TriplePoint.  *Id.* ¶ 8, **Exhibit D**.  In the Perfection Certificate,

Underground Enterprises, as borrower representative for both Debtors, represented that the only location of Collateral was 1166 Commerce Blvd Std. D, American Canyon, CA 94503, which is the address of the Warehouse, where no material assets of the Debtors other than the Stored Wine are located. *Id.*

11.    Further, in connection with the Loan Agreement, the lessor of the Warehouse, Biagi Bros., Inc., and the Debtors executed a *Plain English Landlord Representation and Waiver Agreement* (the "Landlord Waiver"), pursuant to which the Debtors "informed" the landlord that they "intend[ed] to keep personal property at the Premises," which included the Stored Wine. *Id.* ¶ 9, **Exhibit E**. The Landlord Waiver expressly recognized TriplePoint's security interest in all of the Debtors' personal property. *Id.*

12.    Additionally, in connection with the Loan Agreement, the Debtors on multiple occasions provided TriplePoint with certain financial reporting, which included balance sheets for both Debtors. *See id.* ¶ 10, **Exhibit F** (Phoeno's balance sheet dated as of end of February 2023) and **Exhibit G** (Underground Enterprises' balance sheet dated as of end of February 2023). Notably, Debtor Phoeno repeatedly and consistently showed on its balance sheet as an asset "inventory" valued at between $9 million and $11.6 million between January 2022 and February 2023.[6] *Id.* The value of this "inventory" included all Stored Wine. *Id.* This is consistent with the Debtors' insurance coverage, which included coverage for "$10,500,000" in "Business Personal Property" at the Debtors' warehouse. *Id.* ¶ 10 **Exhibit H**. At all times prior to the Petition Date, the Debtors maintained that they owned the Stored Wine and expressly represented the same to TriplePoint. *Id.*

---

[6]    The Stored Wine is owned by Debtor Phoeno. Debtor Underground Enterprises apparently did not own any of the Stored Wine held at the warehouse.

**C. The Debtors File Chapter 7 Cases and the Trustee Is Appointed.**

13.     On the Petition Date, each Debtor filed a voluntary chapter 7 petition.  After the Petition date, the United States Trustee for the District of Delaware appointed Don A. Beskrone to serve as chapter 7 trustee of both Debtors ("Trustee").  The Debtors' cases were ordered to be jointly administered on May 30, 2023 [D.I. 35].

14.     In connection with their chapter 7 petitions, each Debtor filed with this Court a Statement of Financial Affairs ("SOFA") and Schedule of Assets and Liabilities ("Schedules"). [D.I. 1].  In the Explanatory Notes for their Schedules and SOFA, the Debtors, for the first time, described ownership of the Stored Wine as follows:

> A "Customer" as identified in the Schedules and SOFA is any retail client of the Debtor. Where "Customer" is used alone on Schedule F, it indicates that the Customer is storing wine that was purchased and is owned by the Customer at the Debtor's facility. The amount shown as the "claim" for such Customer on Schedule F is the amount paid by the Customer for the purchased wine.

D.I. 1 at 10.

15.     On August 30, 2023, the Customers filed the Customer Motion, in which the Customers assert that they, and not the Debtors, own the Stored Wine and that the Stored Wine should be turned over to them.[7]  As set forth below, any such characterization is simply wrong; the Debtors own the wine, subject to TriplePoint's blanket and properly perfected security interest.

### III.    ARGUMENT

16.     Prior to the Petition Date, the Debtors consistently maintained that they owned the Stored Wine and that the Stored Wine was subject to TriplePoint's blanket lien.  This position is consistent with their multiple verbal and written representations and applicable law.  Only after filing these cases did the Debtors, in an apparent attempt to escape the scrutiny of a pending federal

---

[7]     On that same date, the Customers filed an amended appendix listing their claims against the Debtors (the "Customer Claims' Appendix) [D.I. 163].

investigation and imminent fraud suits from their former Customers, suddenly assert that the Stored Wine is owned by the Customers.  The discussion below will demonstrate that the Customer Motion suffers from numerous defects, procedural, factual, and legal, and should be denied.

### A.  The Debtors and Their Estates Own the Stored Wine.

#### 1.  Under the Uniform Commercial Code, Title to the Stored Wine Is in the Debtors because the Stored Wine Was Never Delivered to the Customers.

17.     Under the Uniform Commercial Code, unless otherwise explicitly agreed in writing, title to goods offered for sale passes to the buyer at the time and place at which the seller completes the performance with physical delivery of the goods.  Cal. Com. Code § 2401(2); 6 Del. C. § 2-401(2).  When there is nothing in a written agreement to establish a contrary intent, title to goods passes from the seller to the buyer only upon delivery, without regard to when payment is made or due.  *People v. Randono*, 32 Cal. App. 3d 164 (Cal. Ct. App. 1973).  If the contract requires delivery at a destination specified by the customer, then title passes on delivery at the destination.  Cal. Com. Code, § 2401(2)(b); 6 Del. C. § 2-401(2)(b).

18.     Application of these principles to the Debtors' business is straightforward.  The Customers ordered wine from the Debtors.  While the Customers paid for wine when it arrived for storage at the Debtors' Warehouse, under the UCC, title remained with the Debtors unless and until the wine was received by the applicable Customer, not when it arrived at the Warehouse.  Title would pass to the Customers only when the wine was delivered to the address designated by the Customer for delivery—this is when Debtors would have completed their physical delivery of the wine.  Additionally, nothing in the ToS or elsewhere in any documentation submitted by the Customers (or reviewed by TriplePoint) provides, explicitly or otherwise, for title to pass other than as contemplated under the standard mechanisms of the UCC.  With respect to the Stored Wine at issue here, this transfer of title to the Customers never occurred and thus title to the Stored Wine remains with the Debtors, subject to TriplePoint's liens.

19.    The title transfer mechanism under the UCC is entirely consistent with the verbal and written representations the Debtors made to TriplePoint prior to the Petition Date, as well as the Debtors' prepetition balance sheets.  Prior to the Petition Date, the Debtors understood (and represented to TriplePoint) that they held title to the Stored Wine.  The Debtors further represented to TriplePoint that all Collateral, including the Stored Wine, was located at the Warehouse; the Debtors included the value of the Stored Wine as Inventory on their balance sheets; and the Debtors agreed with TriplePoint that the Debtors, rather than the Customers, owned the Stored Wine.  Only after filing chapter 7 did the Debtors' story change.

20.    In the Customer Motion, the Customers attempt to turn the title transfer provisions of the UCC on their head, asserting that they purchased directly from vendors that supplied wine to the Debtors, and that delivery was complete when the wines were shipped from the vendor to the Warehouse.  But that isn't the delivery that is relevant: the Debtors controlled the entire process, not the Customers.  The Debtors, and not the vendors, were the sellers for purposes of the UCC.  The *Debtors*, not the Customers, ordered from the Vendors.  The Customers include no contracts directly with any Vendor (and they can't because the subject contracts are between the *Debtors* and the Customers).  The relevant delivery is from the Debtors to the Customers.

21.    Accordingly, under the Uniform Commercial Code, title to the Stored Wine would only pass to the Customers when they actually received the wine they had ordered.  Because this never happened with the Stored Wine, title remains with the Debtors.

**2. The Debtors Were Not "Bailees" with Respect to the Stored Wine.**

22.    In the Customer Motion, the Customers attempt to change their legal relationship from buyers to bailors, such that, if they were right, the Debtors held the Stored Wine as bailees while the Customers held title.[8] This interpretation of the facts and law is simply wrong.

23.    Both California and Delaware state law define a bailment as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it." *Marvel v. Clay*, No. 94C-11-002, 1995 WL 465322, at *3 (Del. Super. Ct. June 15, 1995), aff'd, 676 A.2d 905 (Del. 1996); *Gebert v. Yank*, 172 Cal. App. 3d 544, 550 (Cal. Ct. App. 1985) ("In a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men.").

24.    While state law governs, the U.S. Supreme Court has opined on whether a contract is for a sale or for a bailment:

> The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed. The transaction is a sale.

*Sturm v. Boker*, 150 U.S. 312, 329 (1893).

---

[8]    Nor are the Customers "consignors" under the UCC. In order for the transactions at issue here to qualify as consignments under the UCC, *the Customers would have had to have held title and to deliver the wine to the Debtors for the Debtors to sell as inventory*. U.C.C. § 9-102 ("'Consignment' means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale."). Even under their faulty recitation of the circumstances, the Customers did not do this. At most, in the Customers' view, the Debtors held the wine pending direction on where to ship it. Moreover, if the transactions at issue here were true consignments, the Customers would have had to file UCC-1s financing statement in order to have priority over TriplePoint's security interest, which they did not do. *E.g.*, *Id.* § 9-322 (establishing priority for conflicting security interests).

25.    "Accordingly, in distinguishing bailments from sales, the test of a bailment is that

the identical thing is to be returned in the same or some altered form." *In re Miami Metals I, Inc.*,

603 B.R. 727, 735 (Bankr. S.D.N.Y. 2019) (discussing Florida and New York law).

26.    The Customers' contention that their relationship with the Debtors was one of

bailor/bailee is belied by the facts:

- The wine purchased was not always the wine delivered. The Customers make much of the fact that in some cases, the Debtors would "upgrade" the wines that the Customers paid for. *E.g.* Customer Motion ¶ 9, Kornberg Decl. ¶ 9, Exhibit E. The ToS included with the Customer Motion note that "Specific vintages may not be available. If a chosen vintage is no longer available, a comparable vintage of the same wine may be substituted" and that "[s]pecific bottles may become unavailable due to vendor error, damage, poor quality, or other reasons. In these cases, our [the Debtors'] in house wine experts will use their best judgment to substitute bottles with similar wines of equal or greater value." Kornberg Decl. ¶ 8, Exhibit D, ToS Section 3.3, 3.4. This is a critical fact and demonstrates that the Debtors had control over what product was ultimately delivered to the Customers. Under the Debtors' ToS, Customers were not purchasing specific wine. Because the wine ordered by the Customers was not necessarily the same as the wine delivered, there was no bailment.

- Customers could lose their right to have wine delivered if they did not make annual purchases from the Debtors. Under the Debtors' ToS, in order to be eligible to use the CloudCellar, Customers had to be an "Active Member" of the Underground Cellar community. Kornberg Decl. ¶ 8, Exhibit D, Section 6.1. "Active Membership" required annual purchases from the Debtors' website. *Id.* If a Customer's Active Membership expired, then such Customer forfeited its rights to receive any wine and all rights remained with the Debtors. *Id.* This is inconsistent with a bailment relationship or title vesting in anyone other than the Debtors.

- The Customers purchased wine from the Debtors, not the Vendors.. A fundamental assumption underlying the Customers' "bailee" theory is that they purchased wine directly from Vendors. But this is not possible for two reasons. First, if wine had been sold directly from vendors to Customers, it would have been subject to sales tax. Cal. Rev. & Tax. Code § 6006 (a). But, on information and belief, neither Customers, the Debtors, nor Vendors paid sales tax on the Stored Wine. Until the Stored Wine is actually delivered to the Customers, title did not transfer, and sales tax was not owed. Second, the Customers were not in privity with the Vendors. The Customer Motion is devoid of any evidence of any communications between Customers and Vendors, not to mention any contracts between Vendors and the Customers. The *Debtors, not the Customers,* contracted with the vendors for the acquisition of the wine that the Debtors (not the vendors)

then offered for sale to the Customers on their website.  There was and is no communication or contractual relationship between the Customers and the vendors.

27.    Fundamentally, wine purchased was not necessarily the same wine that was delivered to the Warehouse or, ultimately, to the Customers.  This fact alone precludes a finding of a bailor/bailee relationship.  Similarly, the fact the Customers did not directly contract with any of the vendors for the purchase of wine precludes a finding of a bailment.  Without owning the specific wine delivered—an impossibility under the ToS and without a contract between the subject vendor and the Customer—there was no delivery of identical and identified goods subject to a bailment.

### 3.    Referring to the Debtors' website as a "marketplace" has no legal relevance.

28.    The Customers make much of the fact that the Debtors referred to their online store as a "marketplace."  They cite no authority for their implication that, by calling their store a "marketplace," title didn't transfer in accordance with the Uniform Commercial Code.  And, as set forth above, nothing in the actual contractual arrangements here deviated from a straightforward application of section 2-401 of the UCC.

### 4.    In the unlikely event the Customer Motion is granted, the estates should not be responsible for any costs associated with the Stored Wine.

29.    While TriplePoint believes that the Customer Motion is meritless, in the unlikely event it is granted, the estates should not be responsible for costs of insuring, storing, shipping or otherwise picking, handling and packing the wine.  The Customers cite no authority that would place these costs on the estates. As a practical matter, who is going to pay these administrative costs?  If the Customer Motion is granted, the Trustee should work with the Warehouse to make the Stored Wine available for pickup or other disposition at the sole cost of the Customers.

## IV.    RESERVATION OF RIGHTS

30.    This Opposition is submitted without prejudice to, and with a full reservation of, all of TriplePoint's rights, claims, causes of action, defenses, and remedies, at law or in equity, under the Loan Agreement, all related documentation, and in any way with respect to the Debtors, the Customers, the Trustee, or otherwise, including, without limitation, the right to object to any claims submitted by any Customer or scheduled by the Debtors.  TriplePoint reserves the right to amend, modify, or supplement this Opposition in writing or orally at any hearing, to respond to any pleadings filed by any other party, and to introduce evidence at or prior to any hearing relating to the Customer Motion.

## V.    CONCLUSION

WHEREFORE, TriplePoint respectfully requests that the Court deny the Customer Motion in full, and grant such other and further relief as the Court deems warranted.

Dated: September 6, 2023
        Wilmington, Delaware

**DLA PIPER LLP (US)**

 /s/  Stuart M. Brown
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email: stuart.brown@us.dlapiper.com

-and-

Eric D. Goldberg (admitted *pro hac vice*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
Email: eric.goldberg@us.dlapiper.com

*Counsel to TriplePoint*

## CERTIFICATE OF SERVICE

I, Stuart M. Brown, Esq., hereby certify that on September 6, 2023, a true and correct copy

of the *Opposition of Triplepoint Capital to Customers' Motion for an Order Directing the Trustee*

*to Release Wine and for Related Relief* was served via cm/ECF on all parties who are registered to

receive e-filing notifications in this case.

Dated: September 6, 2023                     */s/ Stuart M. Brown*
       Wilmington, DE                      Stuart M. Brown (DE 4050)