# Exhibit A

**(Proposed Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| PHOENO WINE COMPANY, INC., et al. | Case No. 23-10554 (KBO) |
| Debtors. | (Jointly Administered) |
| | D.I. _________ |

**ORDER GRANTING MOTION OF DON A. BESKRONE, CHAPTER 7 TRUSTEE, FOR AN ORDER (A) AUTHORIZING THE PRIVATE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING PURCHASER TO FULFILL EXISTING CUSTOMER ORDERS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) AUTHORIZING THE TRUSTEE TO SERVE NOTICE OF THIS MOTION ON CUSTOMERS BY EMAIL, AND (E) GRANTING RELATED RELIEF**

Upon consideration of the Motion of Don Beskrone, Chapter 7 Trustee (the "Trustee") of the above-captioned debtors (the "Debtors"), for an Order (A) Authorizing The Private Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Liquid Lotus Corporation (the "Purchaser") to Fulfill Existing Customer Orders, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing the Trustee to Serve Notice of this Motion on Customers by Email, and (E) Granting Related Relief [Docket No. ___] (the "Sale Motion"); the Court having held a hearing (the "Sale Hearing") on October 5, 2023, to consider the Sale Motion; the Court having reviewed the Motion and the record in the Debtors' Chapter 7 cases (collectively, the "Chapter 7 Case"); the Court having considered the statements of counsel to the Trustee and the Purchaser; and after due deliberation thereon and for good cause having been shown, the Court finds that the entry of this order (this "Sale Order") and granting the relief set forth herein are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. Findings of Fact and Conclusion of Law. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any findings of fact herein constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

B. Jurisdiction and Venue. The Court has jurisdiction to decide the Sale Motion, the transaction contemplated in the Asset Purchase Agreement, and the property of the Debtors' estates, including, without limitation, the Purchased Assets (as defined in the Asset Purchase Agreement) to be sold, transferred, or conveyed pursuant to the Asset Purchase Agreement, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. Basis for Relief. The statutory basis for the relief requested in the Sale Motion are (i) sections 105(a), 363, 365, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Bankruptcy Rules 2002(a)(2), 4001, 6004, 6006, 9007, 9008 and 9014, and (iii) Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court District of Delaware (the "Local Rules").

D. Final Order. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d) and Local Rule 6004-1(b), the Court expressly finds that there is no just reason for delay in the

implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

E. Adequate Notice of the Sale. As evidenced by the certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding: the Sale Motion, the Sale Hearing, and the transactions contemplated by that certain asset purchase agreement by and among the Trustee and Purchaser dated October __, 2023 (as subsequently supplemented, revised or amended, the "Asset Purchase Agreement"); notice of the sale of the Purchased Assets (the "Sale"), have been given to all Persons[1] entitled to notice, including, without limitation, the following: (i) all Persons who have requested notice in the Chapter 7 Case pursuant to Bankruptcy Rule 2002; (ii) all applicable federal, state, and local taxing and regulatory authorities; (iii) the Office of the United States Trustee; (iv) the Office of the United States Attorney for the District of Delaware; (v) the California Department of Alcoholic Beverage Control, and (vi) all applicable state attorneys general. The notice provided constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the Sale Motion, the Sale Hearing, and the entry of this Sale Order, under sections 102(1), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6006, and 9014, and the Local Rules. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale Motion, the Sale Hearing, the Sale, or the entry of this Sale Order need be given to any Person.

F. Adequate Notice of Contracts and Leases to Be Assigned and Assigned. As evidenced by the affidavit of service filed with the Court, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, a notice of

[1] "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including, without limitation, any Governmental Authority or any group of any of the foregoing.

potential assumption and assignment of executory contracts or unexpired leases that may be assumed and assigned (including those contracts with the federal government that may be the subject of novation, the "Assigned Contracts"), including the amount of cure costs related to each of the Assigned Contracts (the "Cure Notice") and a letter from the Purchaser providing adequate assurance of future performance (the "Adequate Assurance Letter") was served on ___________, 2023 , and the same constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding the Motion, and deadlines for the filing of objections to the proposed cure costs or adequate assurance of future performance pursuant to sections 102(1), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6006 and 9014, and the Local Rules. No other or further notice of regarding the assumption and assignment of the Assigned Contracts or the entry of this Sale Order need be given to any Person.

G. Exercise of Business Judgment. The Trustee has demonstrated a sufficient basis and compelling circumstances requiring the Trustee to sell the Purchased Assets under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of its reasonable business judgment and in the best interests of the Debtors, their estates, and their creditors.

H. Sale Process. Since the Petition Date, the Trustee has solicited interest from a number of parties ("Potentially Interested Partners" or "PIPs") to acquire the Debtors' assets and provide a solution to the Debtors' estates inability to fulfill existing Customer orders. As demonstrated by (i) testimony and other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing, the Trustee has (a) engaged in an extensive marketing of the Debtors' assets; (b) afforded interested potential purchasers a full, fair, and reasonable opportunity to submit their highest or otherwise best offer to purchase the Purchased Assets; (c) provided potential purchasers, upon request, sufficient due diligence

information to enable them to make an informed judgment on whether to submit an offer to the Trustee for the Purchased Assets.

I. Title to Purchased Assets. The Debtors are the sole and lawful owners of, and have clear and marketable title to, the Purchased Assets to be sold pursuant to the Asset Purchase Agreement, including, without limitation, all items of personal property and real property owned by the Debtors as identified in the Asset Purchase Agreement (collectively, the "Purchased Assets"). The Trustee has full power and authority to execute, deliver and perform under the Asset Purchase Agreement and to consummate all transactions contemplated thereby, without any further consent or approval required. No other consents or approvals, other than as may be expressly provided for in the Asset Purchase Agreement, are required by the Trustee. In the event that any of the Purchased Assets include any prepetition or postpetition privileged documents or communications with the Trustee's counsel or any other party that constitute in whole or part attorney work-product, as reasonably determined by the Trustee, nothing herein shall transfer or otherwise convey any of the Trustee's right or interest in privilege to the Purchaser, and such right and privilege shall be considered an Excluded Asset under the Asset Purchase Agreement.

J. Subject to the terms of the fulfilment notice attached as an exhibit to the Asset Purchase Agreement (the "Fulfillment Notice"), the Purchaser has offered to purchase the Purchased Assets free and clear of all Liens[2] and Claims (defined below), excluding any Assigned

[2] "Lien" means any mortgage, pledge, lien (statutory or otherwise), encumbrance, charge, security interest, option, right of first refusal, right of first offer, easement, interest, deed of trust, servitude, transfer restriction under any shareholder or similar agreement, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or a Debtor, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

Liabilities as provided in the Asset Purchase Agreement, to the fullest extent authorized under section 363(f) of the Bankruptcy Code and other applicable law. If the sale of the Purchased Assets to the Purchaser were not free and clear of all Liens and Liabilities, or if the Purchaser would, or in the future could, be liable for any Liens or Liabilities, the Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale or the transactions contemplated by the Asset Purchase Agreement, thus adversely affecting the Debtors, their estates, and their creditors.

K. Business Judgment to Consummate Sale. The Trustee's determination that the Sale to the Purchaser, pursuant to the Asset Purchase Agreement, provides the highest or otherwise best offer for the Purchased Assets, and its related decision to sell the Purchased Assets to the Purchaser, each constitutes a reasonable exercise of the Trustee's business judgment and each is in the best interests of the Debtors, their estates, and their creditors. The facts and circumstances stated in the Sale Motion demonstrate the exigent nature of the Debtors' business situation, and the Trustee has articulated sound business reasons for consummating the Asset Purchase Agreement through a private sale. It is a reasonable exercise of the Trustee's business judgment to execute, deliver, and consummate the Asset Purchase Agreement and consummate the transactions contemplated by the Asset Purchase Agreement, subject to this Sale Order.

L. Satisfaction of Section 363(f) Standards. The Trustee may sell the Purchased Assets free and clear of all encumbrances, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), interests, and liens, including the Excluded Liabilities, rights, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, possessory interests (including those under Bankruptcy Code section 365(h), other interests, leases, licenses, options, deeds of trust, security

interests, condition sale or other title retention agreements, pledges, other liens (including, without limitation, mechanics', materialmen's and other consensual and nonconsensual liens and statutory liens), judgments, demands, rights of first refusal, offsets, set-offs, contracts, rights of recovery, claim for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, tax liabilities, and other interests of any kind or nature whatsoever against the Debtors or the Purchased Assets, including, without limitation, any debts, arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employer pension or benefit plan claims for Taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory or possession thereof, or the District of Columbia), whether arising prior to or subsequent to the Petition Date, whether known or unknown, contingent or matured, liquidated or unliquidated, and whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way related to any of the Debtors' businesses before the effective time of Closing pursuant to the Asset Purchase Agreement (collectively, the "Claims"), because in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Without limiting the generality of the foregoing, "Claims" shall include any and all rights to payments, liabilities, contingent or otherwise, or obligations whatsoever arising under or out of, in connection with, or in any way relating to, (i) any employee benefit plan or pension plans contributed to or maintained by the Debtors, or multi-employer plan participated in by the Debtors prior to the or subsequent to the Petition Date, including, without limitation any employee benefit plan or any Claims related to unpaid contribution or current or

potential partial or complete withdrawal of termination liability with respect to the foregoing, (ii) the Worker Adjustment and Retraining Notification Act of 1988 ("WARN"), or (iii) the Debtors' current or former employees.

M. Free and Clear Sale. Those holders of Liens who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to entry of this Sale Order pursuant to section 363(f)(2) of the Bankruptcy Code. Each holder of a Lien is adequately protected by having its Lien, if any, attach to the net cash proceeds of the Sale ultimately attributable to the property against or in which it asserts a Lien, with the same validity and priority, and to the same extent, as existed before the Sale, and subject to the terms of the instruments that created such Lien and to any Liabilities and defenses the Debtors and their estates may possess with respect thereto. Not selling the Purchased Assets free and clear of all Liens would adversely impact the Debtors' estates, and any sale of the Purchased Assets other than one free and clear of all Liens would be of substantially less value to the Debtors' estates. Therefore, approval of the Agreement and consummation of the Sale free and clear of Liens and Liabilities, other than the Purchaser's obligations as set forth in the Fulfillment Notice, is appropriate pursuant to section 363(f) of the Bankruptcy Code.

N. Valid Contract. The Asset Purchase Agreement is a valid and binding contract among the Trustee and the Purchaser, which shall be enforceable according to its terms. From and after the Closing Date, the Asset Purchase Agreement, the Sale itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Trustee, the Debtors and their estates shall not be subject to rejection or avoidance by the foregoing Persons or any other Person. Except as specifically provided in the Asset Purchase Agreement (including the Fulfillment Notice), or this Sale Order, upon the Closing, the transfer of the

Purchased Assets to the Purchaser is a legal, valid, and effective transfer of the Purchased Assets and will vest the Purchaser on the Closing Date with all right, title, and interest of the Debtors in and to the Purchased Assets except those explicitly and expressly excluded by the Purchaser in the Asset Purchase Agreement or this Sale Order, free and clear of any and all Liens and Liabilities. The Purchaser shall not assume or become liable for any Liens or Liabilities relating to the Purchased Assets.

O. No Continuation or Insider Status. The sale and transfer of the Purchased Assets to the Purchaser or the Purchaser's occupation and use of the Purchased Assets will not subject the Purchaser to any liability (including successor liability) with respect to the operation of any of the Debtors' business prior to Closing or by reason of such transfer. The Purchaser is not holding itself out to the public as a continuation of the Debtors, and no common identity of directors, stockholders, members, or other equity holders exists between the Purchaser and the Debtors. The Purchaser is not a successor to any of the Debtors or their estates by reason of any theory of law or equity. The transactions contemplated by the Asset Purchase Agreement do not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates; there is no substantial continuity, common identity or continuation of enterprise between the Debtors and the Purchaser. The Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute an alter ego or a successor in interest to the Debtors or their estates. The principal of the Purchaser is a former officer and director of the Debtors.

P. Good Faith. The Asset Purchase Agreement and the transactions contemplated thereunder were negotiated and entered into in good faith within the meaning of section 363(m) of the Bankruptcy Code, based on arm's-length bargaining, and without collusion or fraud of any kind. Neither the Trustee nor the Purchaser have engaged in any conduct that would prevent the

application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Asset Purchase Agreement or to the consummation of the Sale and transfer of the Purchased Assets and the Assigned Contracts to the Purchaser. Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The Trustee is free to deal with any other Person interested in buying or selling on behalf of the Debtors' estates some or all of the Purchased Assets. Accordingly, the Purchaser is a Purchaser in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and, therefore, the Purchaser is entitled to all the protections of sections 363(m) and 363(n) of the Bankruptcy Code with respect to the Purchased Assets.

Q. Corporate Authority. The Trustee, acting by and through his agents and representatives has full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the consummation of the transactions and any related actions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

R. Assumption and Assignment of Contracts. The Trustee and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including, without limitation, sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the Sale and the assumption and assignment of the Assigned Contracts. The Purchaser has demonstrated adequate assurance of future performance with respect to all Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The assumption and assignment of the Assigned Contracts and the obligations under the Fulfilment Notice are integral to the Asset Purchase Agreement and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and represents the exercise of sound and prudent business

judgment by the Trustee.

S. Cure Notice and Adequate Assurance of Future Performance. As evidenced by the certificates of service filed with the Court, the Trustee served the Cure Notice and Adequate Assurance Letter upon each non-Debtor counterparty to the Assigned Contracts. The service of the Cure Notice and Adequate Assurance Letter was good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment (or novation, in the case of a Assigned Contract to which the federal government is a party), of the Assigned Contracts.

T. Cure Payments and Adequate Assurance. If an objection to the Cure Cost or adequate assurance (a "Contract Objection") is timely asserted and the Purchaser and the objecting party are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at a hearing (the "Supplemental Hearing") to be requested by the Trustee, the Purchaser, or the applicable Contract Counterparty. If no Contract Objection for a Assigned Contract is timely asserted by the non-Debtor counterparty, then: (a) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract; (b) the Contract Counterparty will be forever barred and estopped from asserting any objection to the propriety or effectiveness of the assumption and assignment of the Assigned Contract against the Debtors, the Purchaser, or the property of any of them; (c) the Cure Cost set forth on the Cure Notice for such Assigned Contract shall be controlling and the Contract Counterparty will be deemed to have consented thereto, notwithstanding anything to the contrary in the Assigned Contract or otherwise; and (d) the Contract Counterparty will be forever barred and estopped from objecting to the Cure Cost or asserting any claims, other than the Cure Costs, against the Debtors, the Purchaser, or the property

of any of them.

U. Actions in the Absence of Stay Pending Appeal. In the absence of a stay pending appeal, the Purchaser is acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Asset Purchase Agreement at any time on or after the entry of this Sale Order, and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

V. Consideration. The Asset Purchase Agreement was not entered into, and neither the Trustee nor the Purchaser have entered into the Asset Purchase Agreement or proposed to consummate the transactions contemplated thereby, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors. The total consideration provided by the Purchaser for the Purchased Assets – including the obligations set forth in the Fulfilment Notice - is the highest or otherwise best offer received by the Trustee, and the Purchase Price constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Voidable Transactions Act, and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

W. Time Is of the Essence. Time is of the essence in consummating the Sale. To maximize the value of the Purchased Assets, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the Asset Purchase Agreement. Accordingly, there is cause to determine inapplicable the stays contemplated by Bankruptcy Rules 6004 and 6006.

X. No Obligation Regarding Excluded Liabilities. The Purchaser has not agreed to assume and shall have no obligation with respect to any Claims, other than as expressly set forth

in the Asset Purchase Agreement. Other than the Assumed Liabilities, and except as expressly provided for by the terms of the Asset Purchase Agreement, the Purchaser (i) shall have no obligations with respect to any Excluded Liabilities, (ii) shall acquire all of the Purchased Assets free and clear of the Claims, other than the Purchaser's obligations as set forth in the Fulfillment Notice, and (iii) is released by the Debtor and all other Persons with respect to such Excluded Liabilities.

Y. Personally Identifiable Information. The Trustee, in connection with offering products or services, did not disclose any policy prohibiting the transfer or personally identifiable information with respect to the Purchased Assets, and, therefore, the Sale of the Purchased Assets may be approved by section 363(b)(1)(A) of the Bankruptcy Code without the appointment of a consumer privacy ombudsman, as defined in section 363(b)(1) of the Bankruptcy Code.

Z. Service By Electronic Mail. The Debtors had approximately 24,000 Customers, and the Debtors and the Customers regularly conducted business through e-mail and other online means and, therefore, the Customers, and pursuant to the Terms & Conditions that all Customers were required to agree to in order to purchase wine from the Debtors, each Customer agreed: "You agree that Underground Cellar may provide you with notices, including those regarding changes to the Terms, by email, regular mail, or postings on the Services." Accordingly, the Customers each had a reasonable expectation of communication via e-mail from the Debtors, and the Trustee's proposed notice of the sale via electronic mail is both reasonable and adequate notice under the circumstances.

AA. No Claims by the Debtors. Except as set forth herein and under the Asset Purchase Agreement, the Trustee agrees and acknowledges that the Estates have no Liabilities that could be asserted against the Purchaser.

BB. Local Rule. The Sale Motion complies with all aspects of Local Rule 6004-1.

CC. Compliance with Bankruptcy Code. The consummation of the transactions contemplated under the Asset Purchase Agreement is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of such transactions.

DD. Waiver of Bankruptcy Rules 6004(h) and 6006(d). The Asset Purchase Agreement must be approved and consummated promptly in order to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the transaction, and the Trustee and the Purchaser intend to close the transaction as soon as reasonable practicable, and in no event later than October 30, 2023. The Trustee has demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for the immediate approval and consummation of the transaction contemplated by the Asset Purchase Agreement. Accordingly, there is cause to lift the stay contemplated by Bankruptcy rules 6004(h) and 6006(d) with respect to the transactions contemplated by the Sale Order.

**IT IS HEREBY ORDERED THAT:**

1. The Sale Motion is GRANTED to the extent set forth herein.

2. Objections. Except to the Contract Objections, if any, being continued until the Additional Assumption Hearing or as provided to the contrary herein, all objections to the Sale Motion or the relief provided herein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled and denied on the merits with prejudice.

3. Notice. Notice of the Sale Hearing, including notice of Customers by electronic mail, was fair, equitable, proper, and sufficient under the circumstances and complied in all

respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Local Rules

4. Transfer of Purchased Assets. The Trustee, in transferring the Purchased Assets pursuant to this Sale Order and section 363 of the Bankruptcy Code, is deemed to have authority to and will transfer the property pursuant to this Sale Order.

5. Consideration. The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement, including the obligations under the Fulfillment Notice (i) is fair and adequate, (ii) constitutes reasonably equivalent value, fair consideration, and fair value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and similar laws), and (ii) will provide an equal or greater recovery for the Debtors' creditors, including the Customers, than would be provided by any other reasonably practicable available alternative.

6. Approval of the Asset Purchase Agreement. The Asset Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved. The failure specifically to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impact the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

7. Authorization. The Trustee and his authorized signatories, agents, representatives, and attorneys are hereby authorized to fully perform under, consummate, and implement the terms of the Asset Purchase Agreement, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Asset Purchase Agreement, this Sale Order, and the Sale of the Purchased Assets contemplated thereby

including, without limitation, assignments, and other instruments of transfer, and to take all further actions as may be necessary for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession any or all of the Purchased Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement, forthwith and without any further corporate action or orders of the Court. Neither the Purchaser nor the Trustee shall have any obligation to proceed with the closing of the Asset Purchase Agreement unless and until all conditions precedent to the Purchaser's and the Trustee's respective obligations thereunder have been met, satisfied, or waived by the Purchaser or the Trustee, as the case may be. All persons are prohibited from taking any action to adversely affect or interfere with the Trustee's ability to transfer the Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Order.

8. Authorization to Execute Related Documents for Asset Purchase Agreement. The Trustee, the Purchaser and each other Person having duties or responsibilities under the Asset Purchase Agreement, any agreements related thereto, or this Sale Order, and their respective directors, officers, employees, authorized signatories, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Asset Purchase Agreement: to carry out all of the provisions of the Asset Purchase Agreement; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Asset Purchase Agreement; to take any and all actions contemplated by the Asset Purchase Agreement, any related agreements, or this Sale Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to

perform such other acts and execute and deliver such other documents, as are consistent with and necessary or appropriate to implement, effectuate, and consummate the Asset Purchase Agreement, any related agreements, this Sale Order, and the transactions contemplated thereby and hereby, forthwith and all without further application to or order of the Court. In the event of conversion or dismissal following the Closing, the Purchaser is granted power of attorney for the limited purpose of executing any document necessary or appropriate to implement, effectuate, and consummate the Asset Purchase Agreement, any related agreements, this Sale Order, and the transactions contemplated thereby.

9. Authorization to Pay Expenses and Costs. The Trustee is hereby authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid to consummate the Sale or perform its obligations under the Asset Purchase Agreement.

10. Authorization for Governmental Filings. The authorized signatories, agents, representatives, and attorneys of the Trustee shall be, and hereby are, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, or enforceable). The Trustee and the Purchaser are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements, or this Sale Order, including, without limitation, amended and restated certificates or articles of incorporation and bylaws, or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as the Trustee

and the Purchaser may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such Persons to so act.

11. Authorization of Purchaser for Licenses. The Purchaser shall be authorized, as of the Closing Date, to: (a) operate any property or any other business transacted with respect to the Purchased Assets under all licenses, permits, registrations, and governmental authorizations and approvals; and (b) facilitate the fulfillment of Customer orders until such time that the Purchaser is able to obtain replacement licenses and permits.

12. Cooperation Regarding Licenses. The Trustee shall: (a) reasonably cooperate in updating government records to reflect any unreported stock transfers or change in directors or officers of the Debtor; (b) execute and deliver such documentation and certificates as are necessary or required to operate as a third party service provider for the fulfillment of Customer orders, surrender and/or cancel the licenses and permits; and (c) not engage in any acts that would interfere with the Purchaser's acquisition of new licenses or permits. The Trustee shall maintain all liquor-related licenses and permits of the Debtors for a period not to exceed 1 year following entry of this Order, and at the Purchaser's expense the Trustee shall undertake all actions necessary, including executing the documents to surrender and/or cancel any and all required liquor-related licenses and permits to the Purchaser or required for Purchaser to obtain new or replacement license and permits under the California Department of Alcoholic Beverage Control.

13. Transfer of Purchased Assets. All of the Debtors' interests in the Purchased Assets to be purchased by the Purchaser under the Asset Purchase Agreement shall be, as of the Closing Date, transferred to and vested in the Purchaser. Upon the occurrence of the Closing Date, this Sale Order shall be considered and constitute for any and all purposes a full and complete general

assignment, conveyance, and transfer of the Purchased Assets Purchased by the Purchaser under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser. In the event and to the extent that any of the Purchased Assets include any prepetition or postpetition communications with the Trustee's counsel or include documents or communications that constitute in whole or part attorney work-product, as reasonably determined by the Trustee, nothing herein shall transfer or otherwise convey any of the Debtors' right or interest in privilege to the Purchaser, and such right and privilege shall be considered an Excluded Asset under the Asset Purchase Agreement. Notwithstanding the foregoing, the transfer of the Purchased Assets is subject to the Purchaser's obligations under the Fulfillment Notice.

14. Authority to Transfer Alcoholic Beverages. The terms of the Fulfillment Notice are a material term of the Agreement, including returning products to Customers, and the Purchaser and/or the Trustee are expressly authorized to facilitate the return of products (e.g., wine, etc.) to Customers as a third-party service provider during the pendency of Purchaser's applications for all necessary licenses and permits pursuant to Section 7.1 of the Agreement.

15. No Liability of Purchaser. Except as otherwise provided for herein and in the Asset Purchase Agreement, the transfer of the Purchased Assets and the assumption and assignment of the Assigned Contracts does not and will not subject the Purchaser and/or its affiliates, designees, assignees, successors, directors, officers, employees, equity holders, authorized signatories, members, agents, representatives, attorneys (each a "Protected Party," and all such Persons collectively and together with the Purchaser, the "Protected Parties") or any of their respective property or assets to any Claim by reason of such transfers and assignments under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or

indirectly, on any theory of law or equity, including, without limitation, any theory of successor or transferee liability.

16. No Assumption of Liabilities. Except as provided in or pursuant to the Asset Purchase Agreement, the Buyer is not assuming and is not deemed to assume, and the Buyer shall not be, nor shall any affiliate or director of the Buyer be, in any way liable or responsible for, as a successor or otherwise, any Liens or Liabilities of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership, possession, control, sale, or use of the Purchased Assets prior to the consummation of the transactions contemplated by the Asset Purchase Agreement, or any liabilities calculable by reference to the Debtors or their operations, or to any or all of the Purchased Assets, or relating to continuing, or other conditions or obligations existing on or prior to consummation of the transactions contemplated by the Asset Purchase Agreement, which Liens and Liabilities are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Buyer or any of its affiliates or directors. Notwithstanding the foregoing, the transfer of the Purchased Assets is subject to the Buyer's obligations under the Fulfillment Notice.

17. No Successor Liability. To the fullest extent permitted by applicable law, neither the Purchaser nor its affiliates, directors, successors, or assigns shall, as a result of the consummation of the transactions set forth in the Asset Purchase Agreement: (a) be an alter ego, mere continuation, or a successor in interest to the Debtors or the Debtors' estates; (b) have, *de facto* or otherwise, merged or consolidated with or into the Debtors or the Debtors' estates; (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors; or (d) be a joint employer or co-employer with, or successor employer, of the Debtors. The Purchaser shall not assume, nor be deemed to assume or in any way be responsible for, any Claim of the Debtors

or their estates. Except as specifically provided by the Asset Purchase Agreement, the Purchaser shall not assume, be deemed to assume, or in any way be responsible for any Liens or Liabilities of the Debtors and/or their respective estates, including, without limitation, pursuant to any successor liability or other theory of liability or responsibility for any Claim against the Trustee, the Debtors, against an insider of the Debtors, against the Purchased Assets, the Debtors' assets, or similar liability.

18. Transfer of Purchased Assets Free and Clear of Liens and Liabilities. Subject to the Purchaser's obligations under the Fulfillment Notice, pursuant to sections 105, 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets in accordance with the terms of the Asset Purchase Agreement and the Purchased Assets shall be transferred to the Purchaser and, upon Closing, such transfer shall (i) be valid, legal, binding and effective, (ii) vest the Purchaser with all right, title and interest of any of the Debtors in the Purchased Assets, and (iii) upon payment of the Purchase Price, be free and clear of any Claims in accordance with Bankruptcy Code section 363(f). Any such Claims shall attach to the proceeds of the Sale of the Purchased Assets with the same priority, validity, force, and effect (if any) as existed with respect to the Purchased Assets as of the Petition Date.

19. Liability Regarding Employees Prior to Closing. The Purchaser shall not be deemed to be a joint employer, single employer, co-employer, or successor employer with the Debtors for any purpose or under the laws of the United States, any state, territory, or possession thereof, and the Purchaser shall not have any obligation to pay any past wages, benefits, or severance pay or extend or make any benefits or benefit programs, including, without limitation, the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations,

to any of the Debtors' employees or former employees, including, without limitation, any such employees who may become employees of the Purchaser.

20. Release of Liens. All Persons (a) holding Claims on the Purchased Assets, (b) that have filed financing statements, mortgages, or other documents or instruments evidencing Liens against the Purchased Assets, or (c) otherwise asserting Claims against the Purchased Assets shall, and hereby are directed to, execute and deliver to the Purchaser such releases or termination statements to effectuate the Sale of the Purchased Assets to the Purchaser free and clear of any and all Claims, and all Persons hereby are forever barred, estopped, and permanently enjoined from asserting such Persons' Claims against the Purchaser or its affiliates. Upon consummation of the transactions set forth in the Asset Purchase Agreement, if any Person that has filed financing statements, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims or Liens against or in the Purchased Assets, has not delivered to the Trustee prior to closing under the Asset Purchase Agreement, in proper form for filing and executed by the appropriate Persons, termination statements, instruments of satisfactions, releases of all Liens that such Person has with respect to the Purchased Assets (unless otherwise assumed in the Asset Purchase Agreement), or otherwise, then: (a) the Trustee is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature. For the avoidance of doubt, to the extent necessary, upon consummation of the transactions set forth in the Asset Purchase Agreement, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice

filings, or financing statements recorded to attach, perfect, or otherwise notice any Lien that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code. Notwithstanding the foregoing, the Purchaser shall be obligated by the terms forth in the Fulfillment Notice.

21. Claims After Closing Date. Effective on the Closing Date, and subject to the Purchaser's obligations under the Fulfilment Notice, all Persons asserting Liens, Claims and/or contract rights against the Debtors and/or any of the Purchased Assets are hereby permanently enjoined and precluded from, with respect to such Liens, Liabilities, and/or contract rights: (a) asserting, commencing, or continuing in any manner any action against the Protected Parties, or against any Protected Party's assets or properties, including, without limitation, against the Purchased Assets; (b) the enforcement, attachment, collection, or recovery, by any manner or means, of any judgment, award, decree, or order against the Protected Parties or any properties or Purchased Assets of the Protected Parties; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Protected Parties or any properties or Purchased Assets of the Protected Parties, including, without limitation, the Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Protected Parties; and (e) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order or the Asset Purchase Agreement.

22. Interference with Purchased Assets. All Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors or the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement or this Sale Order.

23. Self-Executing Order. The provisions of this Sale Order authorizing the Sale of the Purchased Assets free and clear of Liens and Liabilities shall be self-executing, notwithstanding any requirement for approval or consent by any Person, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the foregoing provisions of this Sale Order; provided, however, that this paragraph shall not excuse such Persons from performing any and all of their respective obligations under this Sale Order or the Asset Purchase Agreement, and the Debtors and the Purchaser, and each of their respective directors, officers, employees, authorized signatories, members, agents, representatives, and attorneys are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Sale Order.

24. Highest and Best Offer. The Sale of the Purchased Assets, the terms and conditions of the Asset Purchase Agreement, the offer by the Purchaser, and the transactions contemplated thereby and all of the terms and conditions thereof, are the highest and best offer received by the Trustee for the Purchased Assets and hereby are authorized and approved in all respects.

25. Approval of Asset Purchase Agreement and Other Contracts. The Asset Purchase Agreement, substantially in the form attached hereto as Exhibit 1, is hereby approved pursuant to section 363(b) of the Bankruptcy Code, and the Trustee is authorized to consummate and perform all of his obligations under the Asset Purchase Agreement and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Asset Purchase Agreement. The Asset Purchase Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented in accordance with the terms thereof without further order of the Court.

26. Authorization Pursuant to Bankruptcy Code. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Sale of the Purchased Assets to the Purchaser under the Asset Purchase Agreement and the transactions related thereto, upon the Closing, are authorized and approved in all respects, and the Trustee shall be, and hereby is, authorized and empowered to sell such Purchased Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Sale Order.

27. Order Binds Successors. The terms of this Sale Order shall be binding on in all respects upon: (a) the Purchaser and its successors and assigns; (b) any successor of the Debtors; (c) all known and unknown creditors of, and holders of equity interests in, the Debtors, including, without limitation, any holders of Liens and Liabilities; (d) all non-Debtor counterparties to the Assigned Contracts; (e) state licensing authorities; and (f) all other parties in interest in the Chapter 7 Case and their successors and assigns (collectively, the "Bound Parties"). This Sale Order shall survive any dismissal of the Chapter 7 Case. The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement, and any actions taken pursuant hereto or thereto as of the date of entry of such order shall survive the entry of any order that may be entered dismissing the Chapter 7 Case, and the terms and provisions of the Asset Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Asset Purchase Agreement shall continue in this or any superseding case and shall be binding upon the Bound Parties.

28. Order Binds Government Authorities. This Sale Order shall be binding upon and govern all acts of all Persons, governmental units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code), and all holders of Liens and Liabilities, including, without limitation,

federal, state, and governmental agencies and departments, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report, insure any title or state of title in or to any lease, and each of the foregoing Persons, is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

29. Good Faith Purchaser. The Purchaser is a good faith purchaser and is hereby granted and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code to a good faith Purchaser, including, without limitation, with respect to the transfer of the Assigned Contracts as part of the Sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Sale Order.

30. Validity and Enforceability. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of the Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any transfer under the Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and, notwithstanding any reversal, modification, or vacatur, the validity and enforceability of any transfer under the Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Sale Order shall be governed in all respects by the original provisions of this Sale Order and the Asset Purchase Agreement, as applicable.

31. Transfer of Title. With respect to the transactions consummated pursuant to this Sale Order, this Sale Order shall be the sole and sufficient evidence of the transfer of title to the Purchaser, and the sale transaction consummated pursuant to this Sale Order shall be binding upon and shall govern the acts of all Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Sale Order, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of such Persons is hereby directed to accept this Sale Order as sole and sufficient evidence of such transfer of title and shall rely upon this Sale Order in consummating the transactions contemplated hereby.

32. Purchaser's Use and Enjoyment. All Persons, presently, or on or after the Closing Date, in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets directly to the Purchaser or its designees on the Closing Date or at such time thereafter as the Purchaser may request. Following the Closing under the Asset Purchase Agreement, no holder of any Liens against the Purchased Assets shall have any basis to interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Trustee may take in the Chapter 7 Case, and no Person may take any action to prevent, interfere with, or otherwise impair consummation of the transactions contemplated in or by the Asset Purchase Agreement or this Sale Order.

33. Enforcement of Sale Order. Pursuant to section 105 of the Bankruptcy Code, creditors of either of the Debtors are prohibited from taking any actions against the Purchaser or

the Purchased Assets; provided, however, that nothing in this paragraph shall prevent any Person from seeking to enforce against the Purchaser any applicable rights or obligations under the Asset Purchase Agreement including the Fulfillment Notice.

34. Enforcement of Fulfillment Notice. Notwithstanding the terms of any agreement between the Debtors and any of the Customers, the terms of the Fulfillment Notice shall be binding on the Purchaser and each of the Customers.

35. Release. Subject to and upon the Closing Date, the Trustee hereby waives any and all claims held by the Estates related to, and hereby release, the Purchaser and the property of Purchaser (including, without limitation, the Purchased Assets), and, as applicable, its shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, managers, principals, officers, employees, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such, from, any and all claims of any kind held by the Estates, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, except to the extent assumed or established under the Asset Purchase Agreement or this Sale Order.

36. Missing Provisions / No Impact on Enforceability. The failure to include specifically any particular provisions of the Asset Purchase Agreement or any of the documents, agreements, or instruments executed in connection therewith in this Sale Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court, the Debtors, and the Purchaser, that the Asset Purchase Agreement and each provision,

document, agreement, and instrument be authorized and approved in its entirety with such amendments thereto as may be made in conformity with this Sale Order prior to the Closing Date.

37. Authorization for Assumption and Assignment of Assigned Contracts. Subject to the terms of the Asset Purchase Agreement and the occurrence of the Closing Date thereunder, and expressly subject to the right of a Contract Counterparty to object to the cure amount or adequate assurance of future performance under section 365 of the Bankruptcy Code, the Trustee is hereby authorized to assume each of the Assigned Contracts and assign such Contracts and Leases to the Purchaser. The Trustee is hereby authorized to take all actions necessary to cause all Assigned Contracts to be assumed by the Trustee and assigned to the Purchaser in accordance with section 365 of the Bankruptcy Code.

38. Consent to Assumption and Assignment. Unless a Contract Counterparties timely files an objection to the cure amount of adequate assurance of future performance, each Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, section 365(e)(2)(A)(ii) of the Bankruptcy Code, and otherwise, and the Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable effective date of assumption and assignment without the necessity of obtaining such Person's written consent to the assumption or assignment of such Assigned Contract.

39. No Assumption and Assignment if Transaction Does Not Close. In the event that the Closing does not occur, none of the Contracts or the Leases shall be assumed or rejected by virtue of this Sale Order, and all of the Contracts and Leases shall remain subject to further administration in the Chapter 7 Case.

40. [Reserved.]

41. Cure Costs. All defaults or other obligations under the Assigned Contracts arising prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs, and the Contract Counterparties to the Assigned Contracts to be assumed and assigned to the Purchaser shall be forever barred and estopped from asserting or claiming against the Trustee, the Debtors or the Purchaser that any amounts are due or other defaults exist under such contracts.

42. After Payment of Cure Costs. Payment of the Cure Costs to the Contract Counterparties in the amount set forth on the Cure Notice shall be deemed to discharge all of the Debtors' obligations to: (a) cure, or provide adequate assurance that the Debtors will promptly cure, any defaults under the Assigned Contracts; and (b) compensate, or provide adequate assurance that the Debtors will promptly compensate, any non-Debtor counterparties to the Assigned Contracts for any actual pecuniary loss resulting from any default under the Assigned Contracts.

43. Previously Omitted Contracts. If it is discovered that a Contract or Lease should have been listed on the Contract Schedule but was not listed on the Contract Schedule (any such Contract or Lease, a "Previously Omitted Contract"), the Trustee shall, immediately following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), (a) notify the Purchaser of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract and (b) at the Purchaser's expense file a motion with the Bankruptcy Court on notice to the non-Debtor counterparties to such Previously Omitted Contract seeking entry of an order (the "Omitted Contract Motion") requesting that the Bankruptcy Court

fix the Cure Costs and authorize the assumption and assignment or rejection of such Previously Omitted Contract.

44. [Reserved.]

45. Rights of Purchaser Pursuant to Assigned Contracts. Upon the effective date of the assumption and assignment of each Assigned Contract to be assumed and assigned to the Purchaser, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all rights, title, and interest in and to each such Assigned Contract. The Trustee is authorized to take all actions reasonably necessary to effectuate the foregoing. In accordance with section 365(b)(2) and 365(f) of the Bankruptcy Code, upon assignment of the Assigned Contracts to the Purchaser, (a) the Purchaser shall have all of the rights of the Debtors thereunder and each provision of such Assigned Contracts shall remain in full force and effect for the benefit of the Purchaser notwithstanding any provision in any such Assigned Contract or in applicable law that prohibits, restricts, or limits in any way such assignment or transfer, and (b) no Assigned Contract may be terminated, or the rights of any Person modified in any respect, including, without limitation, pursuant to any "change of control" clause, by any other Person thereto as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement.

46. Prohibitions Under Assigned Contracts Unenforceable. Non-Debtor counterparties to the Assigned Contracts shall be prohibited from charging any rent acceleration, assignment fees, increases, or other fees to the Purchasers as a result of the assumption and assignment of any Assigned Contract.

47. No Waiver. The failure of the Trustee or the Purchaser to enforce, at any time, one of more terms or conditions of any Assigned Contract shall not be a waiver of such terms and

conditions or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assigned Contracts.

48. Liabilities Under Assigned Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Trustee and the Debtors shall have no Liabilities arising or relating to or accruing post-Closing under any of the Assigned Contracts.

49. Suspension or Revocation of Permits and Licenses. To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Chapter 7 Case or the consummation of the Sale. .

50. Avoidance of Sale. The Sale of the Purchased Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code or other applicable law or statute.

51. Bulk Sale Laws. No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the transactions contemplated by the Asset Purchase Agreement.

52. Inconsistencies. To the extent there are any inconsistencies between the terms of this Sale Order, the Asset Purchase Agreement, and any prior order or pleading with respect to the Sale Motion in the Chapter 7 Case, the terms of this Sale Order shall govern.

53. Non-Severability. The provisions of this Sale Order are non-severable and mutually dependent without the express written consent of the Purchaser.

54. Provisions in Subsequent Orders. Nothing contained in any subsequent order of this Court shall alter, conflict with, or derogate from the provisions of the Asset Purchase Agreement or this Sale Order, and to the extent of any conflict or derogation between this Sale Order or the

Asset Purchase Agreement and the terms of this Sale Order, the Asset Purchase Agreement shall control.

55. No Relief From Stay Necessary. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the preceding sentence.

56. Order Is Effective Immediately. Notwithstanding the provisions of Rules 6004(h), 6006(d), and 7062 of the Bankruptcy Rules, this Sale Order shall not be stayed after entry and shall be effective immediately upon entry, and its provisions shall be self-executing, and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order. The Purchaser has acted in "good faith," and, in the absence of any Person obtaining a stay pending appeal, if the Trustee and the Purchaser close under the Asset Purchase Agreement, then the Purchaser shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Asset Purchase Agreement if this Sale Order or any authorization contained herein is reversed or modified on appeal.

57. Sale Order Survives Dismissal. In the event of the dismissal of one or more of the Chapter 7 Case, the terms of this Sale Order shall remain in effect notwithstanding section 349 of the Bankruptcy Code.

58. Purchaser Is Party in Interest. The Purchaser is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale, and any issues related to or otherwise connected to the Asset Purchase Agreement and the Sale.

59. Exclusive Jurisdiction. The Court shall retain exclusive jurisdiction to enforce the terms and provisions of the Asset Purchase Agreement, and this Sale Order in all respects and to decide any disputes concerning this Sale Order and the Asset Purchase Agreement, or the rights and duties all Persons hereunder or thereunder, as applicable, or any issues relating to this Sale Order or the Asset Purchase Agreement, including, without limitation, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assigned Contracts, and all issues and disputes existing in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens and Liabilities.

**Exhibit 1**
**Asset Purchase Agreement**

**Final**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") dated as of August ___, 2023 is made by and between **LIQUID LOTUS CORPORATION**, a Delaware corporation (the "Purchaser") and **DON A. BESKRONE**, Chapter 7 Trustee (the "Trustee" or "Seller") of Underground Enterprises, Inc. d/b/a Underground Cellar ("Underground") and Phoeno Wine Company, Inc. ("Phoeno"; and together with Underground, the "Debtors").

## RECITALS

**WHEREAS**, on May 1, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition on May 1, 2023 ("Underground Petition Date"), for relief under Chapter 7 of title 11, United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), thereby commencing bankruptcy cases 23-10553 and 23-10554 (collectively the "Bankruptcy Cases");

**WHEREAS**, on May 2, 2023, the Trustee was appointed to administer the Debtors' estates (the "Estates").

**WHEREAS**, the Debtors' businesses (collectively, the "Business") involved the facilitation of the purchase and storage of wine by retail customers, including establishing accounts, ordering wine held by Phoeno or from third party suppliers, store such wine at the Facility, and ship wine to such customer when requested;

**WHEREAS**, Purchaser desires to purchase certain assets of the Debtors, free and clear of all claims, liens, interests, and encumbrances from the Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser such assets pursuant to the terms and conditions of this Agreement; and

**WHEREAS**, the Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the assumption and assignment of certain Assigned Contracts under Section 365 of the Bankruptcy Code.

**NOW THEREFORE**, for and in consideration of the mutual agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

## ARTICLE I
## INTERPRETATION

1.1. Definitions. In this Agreement, the following terms shall have the meanings set out below unless the context requires otherwise:

**Final**

(1) *"Affiliate"* means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate. A Person shall be deemed to control a Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the term "controlled" shall have a similar meaning.

(2) *"Agreement"* means this Asset Purchase Agreement, including the Exhibits and the Schedules to this Agreement, as it or they may be amended or supplemented from time to time.

(3) *"Ancillary Documents"* means all agreements, certificates and other instruments contemplated by or delivered pursuant to or in connection with this Agreement.

(4) *"Applicable Law"* means, with respect to any Person, property, transaction, event or other matter, any Law relating or applicable to such Person, property, transaction, event or other matter. Applicable Law also includes, where appropriate, any interpretation of the Law (or any part) by any Person having jurisdiction over it, or charged with its administration or interpretation.

(5) "*Approval Order*" means an order of the Court, certified by the clerk of the Court as a true and correct copy of such order, reasonably satisfactory in form and substance to Purchaser, Seller and their respective counsel, approving this Agreement and the transactions contemplated herein, entered after a hearing conducted with adequate notice given relating to the sale of the Assets and the assumption and assignment of the Assigned Contracts.

(6) *"Asset Claims"* means claims with respect to damaged, destroyed or missing Assets.

(7) *"Assets"* means the following properties, assets, interests and rights of the Debtors, but excluding in all circumstances the Excluded Assets, as to:

(a) the Physical Assets;

(b) the warranty claims related to the Assets and Asset Claims, including billed and unbilled amounts and submitted and unsubmitted claims against insurance companies and other third party obligors;

(c) all rights and interests under or pursuant to all warranties, representations and guarantees, express, implied or otherwise, of or made by suppliers or others in connection with the Assets or otherwise related to the Business;

(d) all goodwill and intangible assets related to the Business, including all Trademarks, patents, copyrights, trade secrets, brand names, the present telephone numbers, internet addresses (domain names) and other communications numbers and addresses of the Business, including social media accounts, as well as all customer lists, vendor lists, developed technology including all software code and data repositories, and advertising materials including all design and brand elements;

(e) all Asset Claims;

(f) all Inventory;

(g) all wine, champagne and similar consumable alcoholic beverages stored at the Facility (the "Wine");

(h) all cash equivalents, including, but not limited to, accounts receivable, non-marketable securities and short term investments;

(i) all deposits and all prepaid charges and expenses of Debtors, including (i) security deposits and prepayments for goods or services with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) deposits in transit, (iii) rebates, (iv) tenant reimbursements, and (v) pre-payments, but excluding any Tax assets of the Debtors;

(j) all Permits of every kind necessary to operate the Business to the extent transferrable, including, but not limited to, the CDBC License(s);

(k) all rights of the Debtors in the Assigned Contracts;

(l) all proceeds of any or all of the foregoing received or receivable after the Closing and any claims of Debtors against any third party, whether choate or inchoate, known or unknown, contingent or non-contingent.

(8) *"Assigned Contracts*" means all contractual rights of the Debtors, whether oral or in writing, relating to the operation of the Business, that are assigned by the Seller and assumed by the Purchaser, as provided on <u>Schedule 1.1(8)</u> hereto.

(9) "*Assumed Liabilities*" shall mean (a) all Cure Amounts (as defined in section 2.3; (b) all liabilities under the Assigned Contracts relating to the Business accruing on or after the Closing Date; and (b) all liabilities for damages to third parties or their property arising out of the performance or operation of the Business by Purchaser on or after the Closing Date.

(10) "*Bankruptcy Code*" shall have the meaning given to it in the recitals hereof.

(11) "*Bankruptcy Cases*" shall have the meaning given to it in the recitals hereof.

(12) *"Business"* shall have the meaning given to it in the recitals hereof.

(13) *"Business Day"* means any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of Delaware.

(14) "*CDBC License(s)*" means License Number 634167, comprising license types 09-Beer and Wine Importer, 14- Public Warehouse, 17-Beer and Wine Wholesaler and 20- Off-Sale Beer and Wine and/or any and all required California Department of Alcoholic Beverages Control (ABC) other governmental required license and/or permits, including but not limited to Alcohol and Tobacco Tax and Trade Bureau (TTB) permit required by Purchaser.

(15) *"Closing"* means the completion of the purchase and sale of the Assets in accordance with the provisions of this Agreement.

(16) *"Closing Date"* means the date that is the first Business Day that is at least one (1) Business Day after the conditions of Purchaser and Seller specified in Sections 3.3 and 3.5 have been satisfied or waived by the Party entitled to the benefit thereof, or at such other time and at such place as mutually agreed upon by the Parties.

(17) *"Consents and Approvals"* means all consents and approvals required to be obtained by the Seller in connection with the execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement.

(18) "*Court*" shall have the meaning given to it in the recitals hereof.

(19) "*Customer*" means any retail client of one or more of the Debtors.

(20) "*Customer With Deferred Credit*" means any Customer that has credit on an account with the Debtors based on gift card purchases and gifting to other Customers, credits for damaged shipments, credits granted to new clients to encourage their first purchase of wine, and other "good will" credits issued by the Debtors.

(21) "*Deficit Customer*" means any Customer who has paid for more wine than is currently being stored for that Customer at the Facility.

(22) "*Delivery Notice Period*" shall have the meaning given to it in Section 7.1.

(23) [Reserved]

(24) *"Employee"* means an individual who is employed by the Debtors in the Business, and, unless the context specifically requires otherwise, "Employees" means every Employee.

(25) *"Employee Plan"* means employee benefit, health, welfare, supplemental unemployment benefit, bonus, pension, profit sharing, deferred compensation, stock

compensation, stock purchase, retirement, hospitalization insurance, medical, dental, legal, disability and similar plans or arrangements or practices relating to the Employees or former Employees which are currently maintained or under which the Debtors have any obligations to any Employee or former Employee.

(26) *"Excluded Assets"* means mean (a) the corporate charter, seals, minute books, stock transfer books and other documents relating solely to the organization, maintenance and existence of the Debtors as corporations; (b) all contracts which are not Assigned Contracts; (c) any rights of Seller under this Agreement and any other agreements or instruments relating to the sale or transfer of any of the Assets; (d) all books and records relating to the foregoing; (e) all claims against third parties related to the foregoing, and such other assets as may be listed on Schedule 1.1(26) hereof; (f) all cash held by the Debtors or their Estates including the Purchase Price; (g) all claims and causes of action against any former director or officer of the Debtors other than Jeffrey Shaw, whether choate or inchoate, known or unknown, contingent or non-contingent, except as may be released by the Trustee on behalf of the Estates pursuant to the Approval Order; (h) all claims and causes of action held or assertable by the Trustee on behalf of the Estates arising under Chapter 5 of the Bankruptcy Code and equivalent state Law except as may be released by the Trustee on behalf of the Estates pursuant to the Approval Order, however notwithstanding the foregoing, any claims or causes of action for turnover of estate property taken from the Facility shall be transferred to the Purchaser; and (i) any Employee Plan.

(27) *"Excluded Liabilities"* means all Liabilities of the Debtors, including, but not limited to, those Liabilities specifically described in Section 2.5.

(28) "*Facility*" means the warehouse facility located at 1166 Commerce Blvd., Suite C & D, American Canyon, CA 94503.

(29) *"Inventory"* means the goods owned by the Debtors intended for resale to their customers, whether sold or unsold, and whether in the Debtors possession or the possession of any third-party.

(30) *"Law"* means any law, rule, statute, regulation, order, judgment, decree, treaty or other requirement having the force of law.

(31) *"Liabilities"* means all costs, expenses, charges, debts, liabilities, claims, demands and obligations, whether primary or secondary, direct or indirect, fixed, contingent, absolute or otherwise, under or in respect of any contract, agreement, arrangement, lease, commitment or undertaking, Applicable Law and Taxes.

(32) *"Lien"* means any lien, mortgage, charge, hypothecation, pledge, security interest, prior assignment, option, warrant, lease, sublease, right to possession, encumbrance, charge, title retention, conditional sale or other security arrangement, claim, right or restriction which affects, by way of a conflicting ownership interest or otherwise, the right, title or interest in or to any particular property.

(33) *"Material Adverse Effect"* means a material averse effect on the Assets or the Business, results of operation, financial condition, assets or liabilities of the Business, taken together as a whole.

(34) *"Notices"* means the notices required to be given to any Person under Applicable Law or pursuant to any contract or other obligation to which any Debtor is a party or by which any Debtor is bound or which is applicable to any of the Assets, in connection with the execution and delivery of this Agreement or the completion of the transactions contemplated by this Agreement.

(35) *"Party"* means a party to this Agreement and any reference to a Party includes its successors and permitted assigns; and "Parties" means every Party.

(36) *"Person"* is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, a limited liability company, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

(37) *"Permits"* shall mean all permits, licenses, consents and approvals of any kind necessary to operate the Business.

(38) "*Petition Date*" shall have the meaning given to it in the recitals hereof.

(39) [Reserved]

(40) [Reserved]

(41) *"Physical Assets"* means all equipment, plant and machinery including forklifts, furniture, computers, electronics (including servers), supplies, appliances including freezers, fixtures including storage racking, and other tangible personal property used in connection with the Business and owned by any Debtor.

(42) *"Purchase Price"* shall have the meaning given to it in Section 2.2.

(43) *"Tax"* means any federal, state, local or foreign net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, paid-up capital, profits, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such tax.

**Final**

(44) *"Trademarks"* means all service marks, trademarks, and logos of the Debtors used in connection with the Business; including, but not limited to, "Phoeno" and "Underground Cellar" and "Underground Enterprises" and such other additional marks listed on Schedule 1.1(44) hereof

1.2. Headings and Table of Contents. The division of this Agreement into Articles and Sections, the insertion of headings, and the provision of any table of contents are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.3. Number and Gender. Unless the context requires otherwise, words importing the singular include the plural and vice versa and words importing gender include all genders.

1.4. Section and Schedule References. Unless the context requires otherwise, references in this Agreement to Sections, Exhibits or Schedules are to Sections, Exhibits or Schedules of this Agreement.

## ARTICLE II
## PURCHASE OF ASSETS

2.1. Agreement to Purchase and Sell. At the Closing, subject to the terms and conditions of this Agreement, the Seller shall sell, transfer, convey and/or assign and the Purchaser shall purchase and acquire the Debtors' entire right, title and interest in, to and under the Assets, free and clear of all Liens provided, however, that the Trustee shall have no obligation to deliver any Assets which the Trustee, after good faith efforts, does not have in his possession, control or legal authority to transfer as of the Closing Date; provided, further, however, that if the Trustee comes into possession, control or legal authority to transfer any Assets after the date of Closing, the Trustee shall reasonably promptly transfer such Assets to Purchaser, at the expense of Purchaser. Notwithstanding anything contained in this Agreement to the contrary, on the Closing Date and by virtue of entry of the Approval Order, Purchaser will acquire the Assets free and clear of all Liens but subject to section 7.1 hereof and, provided however, that solely with respect to the Wine, and effective upon the Closing, Purchaser shall have all rights of custody, control, possession and authority to comply with section 7.1 hereof free and clear of any Lien, however, title shall pass to Purchaser only upon expiration of the Election Notice Period (as defined in section 7.1 hereof) and only with respect to the Forfeited Wine (as defined in section 7.1 hereof). Excluded Assets shall not be included in such sale.

2.2. Amount and Payment of Consideration. The aggregate purchase price payable by the Purchaser to the Seller for the Assets shall be equal to an aggregate amount of Six Hundred Thousand Dollars ($600,000.00) (the "Purchase Price"), payable as follows:

(1) A deposit in the amount of Sixty Thousand Dollars ($60,000.00), payable upon execution hereof; and

**Final**

(2) An amount equal to Five Hundred Forty Thousand Dollars ($540,000.00), payable by wire transfer of immediately available funds at the Closing.

2.3 Assigned Contracts. No later than the Closing Date, Purchaser shall designate all contracts that shall become Assigned Contracts, and assume and undertake to pay, perform and discharge when due or required to be performed all of the Debtors' obligations under the Assigned Contracts relating the Business and all Liabilities related thereto. If there exists on the Closing Date any default in such Assigned Contracts, in addition to the Purchase Price, Purchaser shall be responsible to pay directly to the non-debtor party to each Assigned Contract, the cure amount ("Cure Amounts") set forth by the order of the Court as a condition to the assumption and assignment of such contract, subject to modification of such Assigned Contract or agreement for other treatment by the Purchaser and non-debtor party to each Assigned Contract.

2.4 Excluded Assets. Notwithstanding anything to the contrary contained herein, the Assets transferred pursuant to this Agreement shall not include and Seller shall retain all its rights, title and interests in and to, and shall not sell, transfer, assign and deliver to Purchaser, any of the Excluded Assets.

2.5 Liabilities Not Assumed. For greater certainty, the Purchaser does not and shall not assume or otherwise be responsible for any Liabilities, including without limitation any of the following liabilities or obligations of the Debtors:

(1) Liabilities or obligations related to or arising from or in connection with Employees arising in respect of or relating to their employment with the Debtors or an Affiliate of any Seller or any Employee Plan prior to the Closing Date, including without limitation salary, bonuses, commissions, unused sick leave, vacation pay or severance entitlements;

(2) Any liability with respect to insurance of the Assets with respect to any period prior to or on the Closing Date;

(3) Any litigation or claim arising out of the ownership of the Assets on or prior to the Closing Date, including, but not limited to, product liability and warranty claims, tort liability and any liability for violations of any Law or breach of contract;

(4) Liabilities with respect to Taxes of the Debtors of any and all kinds including those related to the Business and the ownership of the Assets on or before the Closing Date; and

(5) Any indebtedness of the Seller, whether incurred under any loan agreement, indenture, stock or asset acquisition agreement or otherwise including accounts payable arising from the Business prior to or on the Closing Date;

(6) any Liability of any Seller or its Affiliates for performance under this Agreement or the Ancillary Agreements;

(7) any Liability for any accounts payable or other accruals related to the Business arising prior to the Closing Date, but excluding the Assumed Liabilities;

(8) any Liability relating to the Excluded Assets;

(9) any Liabilities relating to any Deficit Customer or Customer With Deferred Credit

(10) any Liabilities relating to any Customers, subject to Purchaser's obligations described in section 7.1 of this Agreement, and further subject to the limitation that Purchaser will not have any obligation to any Customer for wine that is not transferred to the Purchaser as part of this sale; and

(11) any Liability relating to any environmental claim or environmental condition or other environmental liabilities relating to any operations of the Business or arising out of any ownership, use or operation of the Assets prior to the Closing.

## ARTICLE III
## CONDITIONS TO OBLIGATION OF PARTIES AT CLOSING

3.1 [Reserved]

3.2 Bankruptcy Court Matters. This Agreement is subject to, and conditioned upon, approval of the Bankruptcy Court. Subject only to Seller's duties and obligations under the Bankruptcy Code to accept the highest and best offer for the Assets, Seller agrees to use his best efforts to obtain Bankruptcy Court approval and any other approvals and orders necessary for the consummation of the transactions contemplated hereby. Trustee further agrees to use its best efforts to obtain from the Bankruptcy Court a waiver of the fourteen-day stay period under Fed.R. Bankr. P. 6004(h). Although the proposed sale of the Assets shall be submitted by Seller to the Bankruptcy Court as a private sale, Purchaser acknowledges and agrees that Seller, as a trustee subject to the oversight and under the jurisdiction of the Bankruptcy Court, may be required to accept a higher and better bid for the Assets, and that an auction may be required to obtain higher or better bids for the Assets. If, prior to a Sale Hearing, Seller receives a higher and better offer for all or certain of the Assets, as Seller may determine in his sole discretion, Purchaser understands and agrees that Seller may convene an auction or some other process to obtain the highest and best bid for the Assets, provided that in no event shall Seller accept a higher and better offer for the Assets without affording Purchaser the right to submit a topping bid(s) at an auction or otherwise.

3.3 Conditions to Obligations of Purchaser. Purchaser shall not be obligated to close hereunder or perform any other obligations under this Agreement hereof unless the following conditions have been satisfied by Seller or waived by Purchaser in writing:

(1) Seller shall have fulfilled the Seller's covenants set forth in this Agreement.

(2) Subject to waiver by the Purchaser, the Approval Order be in in a form and content satisfactory to Purchaser, shall have been entered and shall have become a Final Order, unless the Approval Order affords Purchaser and Seller the protections of Sections 363(m) and (n) of the Bankruptcy Code and Purchaser elects to Close prior to the date on which the Approval Order becomes a Final Order. Such order shall authorize the transfer of the Assets free and clear of all Liabilities in accordance with this Agreement

(3) The Purchaser and the landlord for the Facility shall have agreed on an assumption and assignment of the existing lease or a new commercial lease for the Facility, on such terms as the Purchaser may find reasonably acceptable.

(4) The representations and warranties of the Seller contained herein shall be accurate, true and correct in all material respects on the Closing Date and the Seller shall have performed and complied with his respective agreements and undertakings hereunder.

(5) No action, suit or proceeding by any governmental agency or other person shall have been instituted or threatened to restrain, prohibit or otherwise challenge the legality of the transactions contemplated hereby.

(6) Since the execution date of this Agreement, there shall not have been a Material Adverse Effect with respect to the Debtors, the Assets or the Business.

3.4 Condition of Purchaser Not Fulfilled; Termination. If any condition in Section 3.3 has not been fulfilled at or before the Closing Date, then the Purchaser in its sole discretion may, without limiting any rights or remedies available to the Purchaser at law or in equity, either (a) terminate this Agreement by notice to the Seller, in which event the Purchaser shall be released from its obligations under this Agreement to complete the purchase of the Assets or (b) waive compliance with any such condition without prejudice to its right of termination in the event of non-fulfillment of any other condition.

3.5 Conditions to Obligations of Seller. Seller shall not be obligated to close hereunder or perform any other obligations under this Agreement hereof unless the following conditions have been satisfied by Purchaser or waived by Seller in writing:

(1) Purchaser shall have fulfilled its covenants set forth in this Agreement.

(2) The Approval Order shall have been entered by the Bankruptcy Court.

(3) The representations and warranties of the Purchaser contained herein shall be accurate, true and correct in all material respects on the Closing Date and the Purchaser shall have performed and complied with its respective agreements and undertakings hereunder.

(4) No action, suit or proceeding by any governmental agency or other person shall have been instituted or threatened to restrain, prohibit or otherwise challenge the legality of the transactions contemplated hereby.

3.6 Condition of Seller Not Fulfilled; Termination. If any condition in Section 3.5 has not been fulfilled at or before the Closing Date, then the Seller in its sole discretion may, without limiting any rights or remedies available to the Seller at law or in equity, either (a) terminate this Agreement by notice to the Purchaser, in which event the Seller shall be released from its obligations under this Agreement to complete the purchase of the Assets or (b) waive compliance with any such condition without prejudice to its right of termination in the event of non-fulfillment of any other condition.

3.7 Other Termination**.** In addition to Sections 3.4 and 3.6, this Agreement may be terminated at any time prior to the Closing Date:

(1) by mutual written consent of the Seller and the Purchaser;

(2) by the Seller, if not in material breach of its obligations under this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Purchaser and such breach has not been cured within ten (10) days after written notice of such breach to the Purchaser;

(3) by the Purchaser if Seller shall have accepted or selected and the Court shall have approved, the bid or bids of any Person or Persons other than Purchaser to purchase all or a substantial portion of the Assets and the Seller shall have closed the sale of all or a substantial portion of the Assets to any Person or Persons other than the Purchaser;

(4) by the Purchaser, if not in material breach of its obligations under this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Seller and such breach has not been cured within ten (10) days after written notice of such breach to the Seller; or

(5) by Seller or Purchaser if the Closing has not occurred on or prior to September 15, 2023 unless extended by mutual agreement of the Parties.

In the event of termination of this Agreement as provided in this Section 3.7 or pursuant to Sections 3.3 and 3.5, this Agreement will forthwith become void and there will be no liability or obligation on the part of the Seller or the Purchaser or their respective officers, directors or shareholders, unless such termination results from the breach by a party hereto of any of its representations, warranties, covenants or agreements set forth in this Agreement. Upon such termination, the Deposit shall be refunded to the Purchaser; provided, that the Seller shall have the right to receive such Deposit paid by the Purchaser hereunder if such termination is pursuant to 3.7(2) hereof.

## ARTICLE IV
## CLOSING ARRANGEMENTS

4.1. Closing. The Closing shall take place at 10:00 a.m. (EST) on the Closing Date at such place as may be agreed by the Seller and the Purchaser.

4.2. Delivery of Assets. At the Closing, the Seller shall deliver or cause to be delivered to the Purchaser possession of the Assets.

4.3. Seller's Closing Deliveries. In addition, Seller shall deliver or cause to be delivered to the Purchaser the following items at Closing:

(1) All deeds of conveyance, bills of sale, assurances, transfers, assignments, consents, and such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the transactions provided for in this Agreement;

(2) All additional documents and instruments that Purchaser may reasonably determine are necessary for the proper consummation of the transactions contemplated in this Agreement.

4.4. Purchaser's Closing Deliveries. At the Closing, the Purchaser shall deliver or cause to be delivered to the Seller:

(1) Cash via wire transfer pursuant to instructions to be provided by Seller in the amount of Five Hundred Forty Thousand Dollars ($540,000.00), payable to the Seller;

(2) All additional documents and instruments that the Seller may reasonably determine are necessary for the proper consummation of the transactions contemplated in this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.1. Representations and Warranties of the Seller. The Seller acknowledges that the Purchaser is relying on the following representations and warranties in connection with the transactions contemplated by this Agreement. The Seller represents and warrants to the Purchaser based on his review of the Debtors' schedules of assets and liabilities and other limited information provided to him, but not based on his personal knowledge, as follows:

(1) *Existence and Power.* The Debtors are each a corporation, duly formed under the laws of the State of Delaware, and is duly organized, validly subsisting and in good standing under such laws.

(2) *Due Authorization*. The Seller has all necessary power, authority and capacity to enter into this Agreement and all Ancillary Documents to be executed by it as contemplated by this Agreement and to carry out their respective obligations under this Agreement and all Ancillary Documents to which each is a party.

(3)

*Title to Assets*. The Assets are being sold on an **"AS IS, WHERE IS" BASIS, WITH ANY AND ALL FAULTS**.

(4) *Consents and Approvals.* Except for approvals by the Court, no consent or approval of any Person is required in connection with the execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement or to permit the Purchaser to carry on the Business after the Closing as such business is currently carried on by the Debtors.

5.2. Representations and Warranties of the Purchaser. The Purchaser represents and warrants to the Seller as follows:

(1) *Formation and Power*. The Purchaser is a corporation duly incorporated under the laws of the State of Delaware, and is duly organized, validly subsisting and in good standing under such laws.

(2) *Due Authorization*. The Purchaser has all necessary power, authority and capacity to enter into this Agreement and all Ancillary Documents to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and all Ancillary Documents to which it is a party. The execution and delivery of this Agreement and all Ancillary Documents have been duly authorized by all necessary corporate action on the part of the Purchaser.

(3) *Enforceability of Obligations*. This Agreement and all Ancillary Documents to which the Purchaser is a party constitute valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with their terms subject, however, to limitations on enforcement imposed by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of the rights of creditors or others and to the extent that equitable remedies such as specific performance and injunctions are only available in the discretion of the court from which they are sought.

(4) *Consents and Approvals*. No consent or approval of any Person is required to be obtained by the Purchaser in connection with the execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement.

(5) *Absence of Conflicting Agreements*. The execution, delivery and performance of this Agreement by the Purchaser and the completion of the transactions contemplated by this Agreement do not and will not result in or constitute any of the following: (i) a default, breach or violation or an event that, with notice or lapse of time or both, would be a default, breach or violation of any of the terms, conditions or provisions of the articles or by-laws of the Purchaser; or (ii) a material violation of any Applicable Law applicable to or affecting the Purchaser.

(6) *Litigation.* There is no action, suit, proceeding, claim, application, complaint or investigation in any court or before any arbitrator or before or by any regulatory body or governmental or non-governmental body pending or threatened by or against the Purchaser affecting the transactions contemplated by this Agreement and there is no factual or legal basis which could result in any such action, suit, proceeding, claim, application, complaint or investigation.

## ARTICLE VI
## TERMINATION OF COVENANTS, REPRESENTATIONS, AND WARRANTIES

The covenants, representations, and warranties made by Seller and/or Purchaser herein shall terminate as of the Closing. Purchaser shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation and/or warranty or any covenant made by Seller herein or in any other document, certificate or instrument entered into by Seller in connection herewith, except with respect to the Excluded Liabilities. Seller shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation and/or warranty or any covenant made by Purchaser herein or in any other document, Certificate or instrument entered into by Purchaser in connection herewith, except with respect to the Article VII.

## ARTICLE VII
## POST-CLOSING COVENANTS AND ARRANGEMENTS

7.1. Return of Wine. Within ten (10) days of the Closing Date, the Purchaser shall deliver a notice to the Customers by first class mail and electronic mail (e-mail) to the addresses provided by the Seller. Such notice shall be substantially in the form attached hereto as "Exhibit A" (the "Fulfillment Notice"). Through the Fulfillment Notice, Purchaser shall give Customers notice of their right to elect (a "Customer Election") on or before November 15, 2023 (the "Delivery Notice Period") to either (i) arrange for the Customer to schedule the pick up of its Wine without charge by Purchaser, (ii) arrange for the Customer to have Purchaser (with Seller assistance) deliver any Wine (at the Customer's cost charged by the Purchaser) and, or (iii) agree for the Purchaser to continue to store such Wine at such Customer's expense. These options are pursuant to the terms and conditions described in the Fulfillment Notice. Any shipment or delivery of Wine to a customer shall be subject to local and state law applicable to shipments of alcohol, and to the prepayment by the Customer of all reasonably incurred costs for such shipment or delivery. Upon the expiration of the Delivery Notice Period, any Wine not subject to a timely received and valid Customer Election (the "Forfeited Wine") shall thereafter be retained by Purchaser free and clear of any further rights of, or obligations to, any Customers who did not timely submit a Customer Election and Purchaser shall be under no further obligation with respect to any customer who did not timely submit a valid Customer Election. Notwithstanding the foregoing, Purchaser shall only be responsible for sending the Fulfillment Notice to the addresses of Customers provided by the Seller, and Purchaser shall not be responsible for delivery, shipment, or storage of Wine that (i) Purchaser has no record of the Customer purchasing, (ii) Wine previously ordered by such Customer that was not in the Seller's possession as of the Closing Date, or (iii) to any Customer who has already received

credit or refund from a credit card company. Further, by and through the Seller's motion to approve the sale, the Seller shall specifically request a finding that, in the event that a Customer has not timely responded to the Fulfillment Notice prior to the expiration of the Delivery Notice Period, such Wine shall be property of the Purchaser free and clear of all claims, liens, encumbrances, or interests.

7.2. Further Assurances. Each Party shall promptly do, execute, deliver or cause to be done, executed and delivered all further acts, documents and things in connection with this Agreement that the other Party may reasonably require, for the purposes of giving effect to this Agreement.

7.3 Further Post-Closing Obligations. Notwithstanding the foregoing, Purchaser understands and acknowledges that certain information contained, set forth or referenced in the Assets may be required by the Trustee for purposes of the administration of the Bankruptcy Cases, and thus Purchaser shall make such information available to the Trustee and his professionals upon the request thereof.

## ARTICLE VIII

## GENERAL

8.1. Expenses. Each Party shall be responsible for its own legal and other expenses (including any Taxes imposed on such expenses) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the transactions contemplated by this Agreement and for the payment of any broker's commission, finder's fee or like payment payable by it in respect of the purchase and sale of the Assets pursuant to this Agreement.

8.2. [Reserved]

8.3 Public Announcements. The Purchaser shall have the right to publicly announce the transaction following Closing.

8.4. Notices.

(1) Any notice, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other similar means of electronic communication, in each case to the applicable address set out below:

if to the Seller, to:

Don A. Beskrone, Chapter 7 Trustee
P.O. Box 272
Wilmington, DE 19899
Phone: (302) 654-1888
Email: dbeskronetrustee@gmail.com

with a copy to counsel for Seller:

Gregory Taylor, Esquire
Ashby & Geddes, LLC
500 Delaware Avenue, Suite 800
Wilmington, DE 19801
Phone: (302) 654-1888
Email: gtaylor@ashbygeddes.com

if to the Purchaser, to:

Liquid Lotus Corporation
580 Howard St Unit 500, SF, CA 94105

With a copy to:

Morris James LLP
Jeffrey R. Waxman, Esq.
Brian Ellis, Esq.
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

(2) Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:30 p.m. on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt.

8.5. Time of Essence. Time shall be of the essence of this Agreement in all respects.

8.6. Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no conditions, warranties, representations or other agreements between the Parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as specifically set out in this Agreement.

8.7. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

8.8. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and shall be treated, in all respects, as a Delaware contract.

8.9. Waiver of Right to Trial by Jury. Each party to this Agreement waives the right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

8.9. Successors and Assigns. This Agreement shall inure to the benefit of, and be binding on, the Parties and their respective successors (including successors by merger) and permitted assigns. Neither party may assign or transfer, whether absolutely, by way of security or otherwise, all or any part of its respective rights or obligations under this Agreement without the prior written consent of the other party.

8.10. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument. Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties; provided, however, that any party providing its signature in such manner shall promptly forward to the other party an original of the signed copy of this Agreement which was so faxed.

9.12. Cooperation and Audits. Purchaser and Seller will cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes without fee or charge.

9.13. No Presumption. The parties to this Agreement agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations. Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party or parties on the grounds that the party or parties drafted or was more responsible for drafting the provisions. References herein to "including" mean "including, without limitation."

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date hereof.

**SELLER:**

____________________________________
Don A. Beskrone, solely in his capacity as Chapter 7 Trustee for Underground Enterprises, Inc. and Phoeno Wine Debtors, Inc

**PURCHASER:**

**LIQUID LOTUS CORPORATION**

DocuSigned by:

By: Jeffrey Shaw
9DEDE8E67C22474...
Name: Jeffrey Shaw
Title: President

**Final**

## Schedule 1.1(8)

<u>Assigned Contracts</u>

**Final**

**Schedule 1.1(8)**

Assigned Contracts[1]

| **Non-Debtor Counterparty** | **Description of Agreement** | **Proposed Cure Amount** |
|---|---|---|
| Oracle NetSuite | ERP | $0.00 |
| Nappjo | ERP developers | $0.00 |
| Microsoft Azure | Webservers | $0.00 |
| Microsoft 365 | Email and software | $0.00 |
| Google Workspace | Collaboration and file sharing | $0.00 |
| Slack | Collaboration and chat | $0.00 |
| Klaviyo | Email marketing software | $2,700 |
| CloudFlare | Webserver infrastructure | $0.00 |
| Vercel | Webserver infrastructure | $0.00 |
| Dialpad | VOIP phone system | $0.00 |
| Zendesk | Customer support software | $0.00 |
| Liberty Mutual Insurance | Commercial Property, Inland Marine and General Liability Policy | $0.00 |
| Liberty Mutual Insurance | Commercial Umbrella | $0.00 |
| Liberty Mutual Insurance | Business Auto | $0.00 |
| Biagi Bros. Inc. | Sub-Sublease (as modified by agreement) for Warehouse located at 1166 Commerce Boulevard in American Canyon (Napa County), CA | $0.00 |
| UPS Store Mailbox | Mail receiving services | $0.00 |
| Bay Alarm | Security services regarding Warehouse | $0.00 |

[1] The Trustee and the Purchaser reserve all rights to remove any purported executory contract or unexpired lease from Schedule 1.1(8) to the APA prior to the Closing.

**Final**

## Schedule 1.1(26)

Additional Excluded Assets

**Final**

## Schedule 1.1(44)

Additional Trademarks

**Final**

# EXHIBIT A

Fulfillment Notice

FULFILLMENT NOTICE

Phoeno Wine Company, Inc.

PHOENO

**Re: Liquidation of Assets of Phoeno Wine Company, Inc. and Your Right to Reclaim Stored Wine**

---

Pursuant to the bankruptcy proceedings and subsequent asset acquisition of Phoeno Wine Company, Inc. ("Debtor"), Liquid Lotus Corporation ("Purchaser", "we", or "LLC") wishes to inform you of the opportunity and procedures to reclaim your stored wine. This notice provides crucial information for your benefit and requires your attention and action.

---

**YOUR OPTIONS**

**1. SCHEDULE A PICK-UP**: After submission of a valid Customer Election, you will be provided with available dates and procedures to arrange for pick-up of your wine at no additional cost from Liquid Lotus Corporation warehouse located in California.

**2. SHIPMENT**: You may elect to have Liquid Lotus Corporation facilitate a shipment of your wine to an address of your choice. All shipping and handling costs will be borne by you and are subject to local and state laws governing the shipment of alcohol.

**3. CONTINUED STORAGE**: If you wish, you may request that Liquid Lotus Corporation to continue storing your wine. Storage charges will be in accordance with our rates, as detailed below.

**STORAGE RATES**:

- Up to 4 cases of wine: $39/mo
- Up to 8 cases of wine: $69/mo
- Any quantity of wine over 8 cases: $99/mo

Please note that these rates are waived until March 31, 2024. They are also subject to change at any time without notice.

**PROCEDURES**:

1. **CUSTOMER ELECTION**: A refundable deposit of $5.00 is required for processing fees. This deposit will be refunded once you submit a valid reclaim request and pick up your wine at the designated warehouse at your scheduled time.
2. **VALID ELECTION**: Submission of transaction records with Phoeno Wine Company and a list of wines to be reclaimed is required. If you lack these records, please select "I do not have this information" and we will endeavor to assist based on the records in our possession.
3. **SHIPPING PAYMENT**: If you choose shipment, you must provide a check payable to Liquid Lotus Corporation, calculated based on Exhibit A – a table indicating shipping fees as per the recipient's zipcode.
4. **RESPONSE DEADLINE**: You have until **December 15, 2023** to make a valid Customer Election.

**TERMS, CONDITIONS, AND WAIVERS**:

**A. LIABILITY WAIVER**:

By participating in the wine reclaim program, the Customer ("you") hereby release, waive, discharge, and covenant not to sue Liquid Lotus Corporation ("LLC"), its officers, directors, stockholders, employees, agents, or representatives (collectively, "Releasees"), from any and all liability, claims, demands, actions, and causes of action whatsoever arising out of or related to any loss, damage, or injury that may be sustained by the Customer, or to any property belonging to the Customer, WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES, or otherwise.

**B. SHIPPING RISKS**:

While LLC will facilitate the shipping of wines on your behalf, all risks related to the shipping, including but not limited to breakage, loss, misdelivery, or delay, are the sole responsibility of the Customer. You acknowledge that you bear all risk upon electing for shipment.

**C. COMPLIANCE WITH LOCAL LAWS**:

You are responsible for ensuring that you are in compliance with all local and state laws governing the possession and shipment of alcohol. You assume all risks and liabilities related to non-compliance, and LLC shall not be held accountable for any legal repercussions or fines resulting from non-compliance. LLC shall not be required to make any shipment that it believes to be in violation of local and state law, and you will be required to provide an alternate delivery option.

**D. STORAGE TERMS:**

Wine storage with LLC after March 31, 2024, is subject to the rates mentioned in the Fulfillment Notice. If storage fees accrue and are not paid within 90 days, LLC reserves the right to dispose of, or sell, the stored wine to recover costs, without any compensation to the Customer.

**E. FORFEITURE:**

In the event a Customer fails to make a timely and valid Customer Election by the stipulated date of December 15, 2023, any wine related to that Customer shall be deemed forfeited and becomes the exclusive property of LLC without any obligations to the Customer.

**F. DISCREPANCY IN RECORDS:**

Any discrepancy regarding the wines you claim to have stored with the Phoeno Wine Company and the records provided by LLC will be resolved at the sole discretion of LLC.

**G. LIMITATION OF DAMAGES**:

To the extent permitted by law, LLC's liability, if at all, shall be limited to the amount paid to LLC by the Customer for the service. In no event shall LLC be liable for indirect, incidental, special, consequential, or punitive damages, whether foreseen or unforeseen.

**H. WAIVER OF CLASS ACTION**:

By participating in the wine reclaim program, you hereby waive any right to commence or be a party to any class or collective actions against LLC, regardless of whether such actions are initiated by you or by a third party.

**I. DISPUTE RESOLUTION:**

Any disputes arising from this agreement or the wine reclaim program shall be settled by arbitration in San Francisco, California, under the rules of the American Arbitration Association. The decision rendered by the arbitrator will be binding and may be entered as a judgment in any court of competent jurisdiction.

**J. INDEMNITY**: You agree to indemnify, defend, and hold harmless the Releasees from and against any and all losses, liabilities, claims, damages, costs, and expenses, including attorney's fees, arising out of or related to any breach of these terms, conditions, and waivers.

**K. GOVERNING LAW**:

This agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of law rules.

**L. ENTIRE AGREEMENT**:

These terms and conditions, combined with the Fulfillment Notice and Customer Election form, represent the entire agreement between you and LLC regarding the wine reclaim program. They supersede all prior negotiations, representations, or agreements, whether written or oral.

**FULFILLMENT NOTICE**
Phoeno Wine Company, Inc.

PHOENO

**CUSTOMER ELECTION FORM**

[Please fill out in full with details on file]

**Please provide your account information:**

FULL NAME: ____________________________
ADDRESS: ____________________________
PHONE NUMBER: ____________________________
EMAIL ADDRESS: ____________________________

**Please indicate your election**:

☐ SCHEDULE A PICK-UP (Include check payable to Liquid Lotus Corporation for $5.00 - refundable)
BOTTLE COUNT: __________

☐ SHIPMENT (Include check payable to Liquid Lotus Corporation based on below calculation)
CASE COUNT: __________ (See Exhibit A for calculation details)
CASE RATE: __________ (See Exhibit A for calculation details)
CHECK AMOUNT: __________ (Case Count x Case Rate)

☐ CONTINUED STORAGE (Provide credit card details below)

| **Credit Card Information** |
| --- |
| Card Type: ☐ MasterCard ☐ VISA ☐ Discover ☐ AMEX ☐ Other ______________________________ |
| Cardholder Name (as shown on card): ______________________________ |
| Card Number: ______________________________ CVV: __________ |
| Expiration Date (mm/yy): ______________________________ |
| Cardholder ZIP Code (from credit card billing address): ______________________________ |

This credit card form may only be used for customers electing for continued storage.

**Attach to this election form the following:**

1) List of bottles you wish to reclaim
2) Transaction records evidencing bottles you wish to reclaim

☐ I do not have this information.

---

**Please mail your completed form with payment to:**

Liquid Lotus Corporation
182 Howard Street, Suite 301
San Francisco, CA 94105

By completing and sending this form, you agree to the terms, conditions, and waivers as outlined above. This document serves as a legally binding contract between you and Liquid Lotus Corp.

For any queries, please contact support@reclaimmywine.com

Exhibit A

**Calculating Your Shipping Cost**

It's completely free to pick up your wine at our Napa warehouse. If instead you'd like to have your wine delivered to your door, we're happy to facilitate that for you at a reasonable cost to cover the expenses incurred.

The cost to ship a bottle is between $2.97 and $7.75 based on how far away your delivery address is from our warehouse in Napa.

To calculate your cost, you'll need to determine two things:

1) **Case Count**: Determine how many cases will be shipped based on how many bottles you want to have delivered. Any bottles you reclaim that you don't ship now, can continue to be stored in your CloudCellar until you're ready for them. Each case can include a maximum of 12 bottles. To determine how many cases you'll need, simply decide how many bottles you want delivered, divide by 12, and round up to the next whole number. For example, if you want 22 bottles delivered, divide that by 12 *(22/12=1.833)*, which rounds to 2 cases. If you want 4 bottles delivered, this rounds to 1 case *(4/12=0.33)*. This is your case count.

2) **Case Rate**: Determine your shipping cost per case based on your delivery zip code. In the table below, look up the first 3 digits of your zip code to find your associated shipping cost per case. For example, if your zip code is *94105*, your first 3 digits are *941*, which is contained in the range of *"936-954"* in the table below, with a shipping cost per bottle of *$2.97* and *$35.64* as your Case Rate.

Please note:

- Large format bottles larger than a standard 750ml bottle (such as 1.5L magnums) can be accommodated for shipping but will require special handling. Please contact us for rates and availability.
- Shipping may not be available to certain states including, but not limited to: Alabama, Arkansas, Kentucky, Mississippi, and Utah, as well as PO Boxes, APO, AFT, DPO, or FPO addresses.
- Shipments to Alaska and Hawaii may be possible, please contact us for rates and availability.
- Someone over 21 must be available to sign for your package.
- These rates are subject to change at any time and without notice.

## Destination Zip Code Case Rate Lookup Table

| FIRST 3 DIGITS OF ZIP CODE | SHIPPING COST PER BOTTLE | CASE RATE |
|---|---|---|
| **010-374** | $7.75 | $93.00 |
| **375-375** | $6.94 | $83.28 |
| **376-379** | $7.75 | $93.00 |
| **380-381** | $6.94 | $83.28 |
| **382-385** | $7.75 | $93.00 |
| **386-387** | $6.94 | $83.28 |
| **388-499** | $7.75 | $93.00 |
| **500-509** | $6.94 | $83.28 |
| **510-513** | $6.11 | $73.32 |
| **514-529** | $6.94 | $83.28 |
| **530-534** | $7.75 | $93.00 |
| **535-540** | $6.94 | $83.28 |
| **541-543** | $7.75 | $93.00 |
| **544-569** | $6.94 | $83.28 |
| **570-579** | $6.11 | $73.32 |
| **580-582** | $6.94 | $83.28 |
| **583-593** | $6.11 | $73.32 |
| **594-599** | $5.12 | $61.44 |
| **600-609** | $7.75 | $93.00 |
| **610-617** | $6.94 | $83.28 |
| **618-618** | $7.75 | $93.00 |
| **619-667** | $6.94 | $83.28 |
| **668-678** | $6.11 | $73.32 |
| **679-679** | $5.12 | $61.44 |
| **680-699** | $6.11 | $73.32 |
| **700-704** | $7.75 | $93.00 |
| **705-706** | $6.94 | $83.28 |
| **707-709** | $7.75 | $93.00 |
| **710-729** | $6.94 | $83.28 |
| **730-732** | $6.11 | $73.32 |
| **733-733** | $6.94 | $83.28 |
| **734-738** | $6.11 | $73.32 |
| **739-739** | $5.12 | $61.44 |
| **740-745** | $6.94 | $83.28 |
| **746-746** | $6.11 | $73.32 |
| **747-762** | $6.94 | $83.28 |
| **763-763** | $6.11 | $73.32 |
| **764-767** | $6.94 | $83.28 |
| **768-769** | $6.11 | $73.32 |
| **770-787** | $6.94 | $83.28 |
| **788-788** | $6.11 | $73.32 |
| **789-789** | $6.94 | $83.28 |
| **790-797** | $6.11 | $73.32 |
| **798-832** | $5.12 | $61.44 |
| **833-833** | $4.60 | $55.20 |
| **834-835** | $5.12 | $61.44 |
| **836-837** | $4.60 | $55.20 |
| **838-839** | $5.12 | $61.44 |
| **840-849** | $4.60 | $55.20 |
| **850-859** | $5.12 | $61.44 |
| **860-864** | $4.60 | $55.20 |
| **865-880** | $5.12 | $61.44 |
| **881-882** | $6.11 | $73.32 |
| **883-888** | $5.12 | $61.44 |
| **889-893** | $4.60 | $55.20 |
| **894-897** | $4.15 | $49.80 |
| **898-929** | $4.60 | $55.20 |
| **930-935** | $4.15 | $49.80 |
| **936-954** | $2.97 | $35.64 |
| **955-955** | $4.15 | $49.80 |
| **956-959** | $2.97 | $35.64 |
| **960-961** | $4.15 | $49.80 |
| **970-974** | $4.60 | $55.20 |
| **975-976** | $4.15 | $49.80 |
| **977-979** | $4.60 | $55.20 |
| **980-985** | $5.12 | $61.44 |
| **986-987** | $4.60 | $55.20 |
| **988-992** | $5.12 | $61.44 |
| **993-993** | $4.60 | $55.20 |
| **994-994** | $5.12 | $61.44 |

If you have any questions or need assistance with calculating your shipping cost, please contact us at support@reclaimmywine.com