**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| PHOENO WINE COMPANY, INC., *et al.,* | Case No. 23-10554 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | Hearing Date: October 5, 2023 at 3:00 p.m. (ET) |
| | Objection Deadline: September 26, 2023 at 4:00 p.m. (ET) |
| | Related Docket No.: 183 |

**OPPOSITION OF TRIPLEPOINT CAPITAL**
**TO TRUSTEE'S MOTION TO SELL ASSETS FREE AND CLEAR**

Secured creditors TriplePoint Private Venture Credit Inc.; TriplePoint Venture Growth BDC Corp.; and TriplePoint Venture Lending Fund, LLC (collectively, "TriplePoint") file this opposition ("Opposition") to the *Motion of Don A. Beskrone, Chapter 7 Trustee, for an Order (A) Authorizing the Private Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Purchaser to Fulfill Existing Customer Orders, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing the Trustee to Serve Notice of this Motion on Customers by Email, and (E) Granting Related Relief* [D.I. 183] ("Sale Motion").[2]  In support of this Opposition, TriplePoint submits the accompanying Declaration of Kevin Thorne and respectfully states as follows:

---

[1]    The debtors consist of Phoeno Wine Company, Inc. ("Phoeno") and Underground Enterprises, Inc. DBA Underground Cellar ("Underground Enterprises", and together with Phoeno, the "Debtors").

[2]    Capitalized terms not otherwise defined herein shall have the same meaning given to them in the Sale Motion.

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................1

II.    BACKGROUND ................................................................................4

    A.    Overview of the Debtors' Business. ..........................................4

    B.    TriplePoint and the Debtors Enter into the Loan Agreement. ................4

    C.    The Debtors File Chapter 7 Cases, the Trustee Is Appointed, and the Customers Dispute Ownership of the Stored Wine. ..........................................6

    D.    TriplePoint Files Secured Proofs of Claim. ....................................7

    E.    The Trustee's Sale Motion. ....................................................7

III.    ARGUMENT ................................................................................8

    A.    The Trustee Cannot Sell the Assets Free and Clear of TriplePoint's Security Interests. ................................................................................8

        1.    TriplePoint's Interest in the Stored Wine Is Not Subject to a Bona Fide Dispute as Contemplated by Section 363(f)(4) of the Bankruptcy Code. ...9

        2.    The Trustee Has Not Established that TriplePoint's Interest in the Assets to be Sold Is Subject to Any Other Provision of Section 363(f) of the Bankruptcy Code. ....................................................11

    B.    The Sale Motion Includes Additional, Extraordinary Relief that Cannot Be Approved................................................................................12

    C.    The Debtors and Their Estates Own the Stored Wine. ..........................13

        1.    Under the Uniform Commercial Code, Title to the Stored Wine Is in the Debtors because the Stored Wine Was Never Delivered to the Customers. ................................................................................13

        2.    The Debtors Were Not "Bailees" with Respect to the Stored Wine..........15

IV.    RESERVATION OF RIGHTS ..............................................................17

V.    CONCLUSION................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Blixseth*,
2010 WL 716198 (Bankr. D. Mont. Feb. 23, 2010) ................................................14

*In re Ferris Properties, Inc.*,
2015 WL 4600248 (Bankr. D. Del. July 30, 2015)...........................................10, 13

*Gebert v. Yank*,
172 Cal. App. 3d 544 (Cal. Ct. App. 1985) ...........................................................17

*In re Grassi*,
2011 WL 6096509 (B.A.P. 1st Cir. Nov. 21, 2011) ...............................................10

*In re Haskell, L.P.*,
321 B.R. 1 (Bankr. D. Mass. 2005) .......................................................................13

*In re Interiors of Yesterday, LLC*,
2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007) .................................................11

*Marvel v. Clay*,
No. 94C-11-002, 1995 WL 465322 (Del. Super. Ct. June 15, 1995), aff'd, 676
A.2d 905 (Del. 1996) .............................................................................................16

*In re Miami Metals I, Inc.*,
603 B.R. 727 (Bankr. S.D.N.Y. 2019) (discussing Florida and New York law).....................17

*People v. Randono*,
32 Cal. App. 3d 164 (Cal. Ct. App. 1973) .............................................................15

*In re PW, LLC*,
391 B.R. 25 (B.A.P. 9th Cir. 2008)........................................................................13

*In re Rodeo Canon Dev. Corp.*,
362 F.3d 603 (9th Cir. 2004) .................................................................................11

*Sturm v. Boker*,
150 U.S. 312 (1893).................................................................................................17

*In re WDH Howell, LLC*,
298 B.R. 527 (D.N.J. 2003) ...................................................................................13

*In re Whitehall Jewelers Holdings, Inc.*,
2008 WL 2951974 (Bankr. D. Del. July 28, 2008).................................................11

**Statutes**

6 Del. C. § 2-401(2) ................................................................................................15

6 Del. C. § 2-401(2)(b) ...........................................................................................15

11 U.S.C. § 363(f)(5) ..............................................................................................13

*Bankrupcty Code § 363(f)(1)* .................................................................................13

Bankruptcy Code section 363 ..................................................................................11

Bankruptcy Code section 363(b) ..............................................................................11

Bankruptcy Code section 363(f) ........................................................................ *passim*

*Bankruptcy Code § 363(f)(2)* ..................................................................................13

Bankruptcy Code section 363(f)(3) ..........................................................................13

Bankruptcy Code section 363(f)(4) .................................................................... *passim*

Bankruptcy Code section 363(m) ..........................................................................9, 14

*Bankruptcy Code section 363(n)* ..........................................................................9, 14

Cal. Com. Code § 2401(2) .......................................................................................15

Cal. Com. Code, § 2401(2)(b) .................................................................................15

Cal. Rev. & Tax. Code § 6006(a) .............................................................................18

Chapter 7 ...........................................................................................................6, 7, 16

U.C.C. § 9-102 ........................................................................................................16

Uniform Commercial Code .............................................................................2, 15, 16

**Other Authorities**

Fed. R. Bankr. P. 7001(2) ..........................................................................................2

## I.   PRELIMINARY STATEMENT[3]

1.   TriplePoint is the largest single creditor in these cases, with a claim of approximately $8.3 million secured by a perfected, first priority, unavoidable lien on the wine that the Trustee proposes to sell pursuant to the Sale Motion, i.e., the "Stored Wine," as well as other assets subject to the proposed sale.   The central issue in these cases is a dispute regarding ownership of the Stored Wine: certain Customers, through their now withdrawn Customer Motion, contend that they own the wine, while TriplePoint contends that the Debtor owns the Stored Wine, subject to TriplePoint's properly perfected, valid, unavoidable liens.

2.   TriplePoint's position on ownership of the Stored Wine did not arise in a vacuum. At all times during the borrower-lender relationship between the Debtors and TriplePoint, the Debtors consistently represented that they—not the Customers—owned the Stored Wine. The Debtors made these representations both verbally and in writing; on numerous calls with TriplePoint; in the Perfection Certificate submitted in connection with the financing, where the Debtors represented and warranted that the Stored Wine was TriplePoint's collateral; and in the Debtors' financial statements, where they listed the Stored Wine as "inventory" that was an asset of the Debtors (and not the Customers) worth millions of dollars.   It was only when they filed these cases that the Debtors' officers and directors, perhaps worried about regulatory agencies and being sued for fraud by thousands of Customers, suddenly took the factually and legally dubious position that the Stored Wine was owned by the Customers, rather than the Debtors.

3.   The fact that the Stored Wine is owned by the Debtors, and is thus TriplePoint's collateral, is fully supported by applicable law and the Debtors' terms of service ("ToS").[4]   Under

---

[3]   Capitalized terms used in the Preliminary Statement are defined below.

[4]   A copy of the ToS is attached to the Sale Motion as **Exhibit C**.

the UCC as adopted in both Delaware and California,[5] unless otherwise agreed in writing, title passes to the Customers only upon completion of delivery to the Customer—that is, when the wine ultimately is delivered to the customer's home. Because the Debtors and the Customers never modified the default title transfer mechanism under the UCC, title to the Stored Wine, which wine is still located in the Debtors' California warehouse, never left the Debtors. Consequently, the Stored Wine is owned by the Debtors, subject to TriplePoint's first priority perfected unavoidable security interest. And now, under the Trustee's proposed sale, at least one of the targets of this malfeasance, Jeffery Shaw, the Debtors' founder and former owner, board member, and President, would obtain a broad release from the estate in exchange for no value whatsoever.

4.      Through the Sale Motion, the Trustee puts the crate (of wine) before the horse.  The Trustee seeks authority to sell substantially all of the Debtors' assets, including the Stored Wine, free and clear of all interests, including TriplePoint's lien on substantially all of the Debtors' assets, without making any necessary showing under section 363(f).  TriplePoint does not consent to such sale and the Sale cannot otherwise proceed over TriplePoint's objection.  To the extent there is a legitimate dispute over the ownership of the Stored Wine, such dispute can be resolved only through an adversary proceeding.  *See* Fed. R. Bankr. P. 7001(2).

5.      In an effort to manufacture compliance with the strictures of section 363(f) of the Bankruptcy Code (specifically, section 363(f)(4)) and to try to sell the Stored Wine, which may be the Debtors' most valuable tangible asset, free and clear of TriplePoint's lien, the Trustee contends that it can sell the Stored Wine because estate ownership is subject to a *bona fide* dispute.  But this is not the *bona fide* dispute that justifies a sale free and clear under section 363(f)(4).  Courts distinguish between a *bona fide* dispute over the validity of the *nondebtor party's interest* in the

---

[5]    For purposes of the dispute regarding ownership of the Stored Wine, the result is the same whether California law, the law selected under the Loan Agreement, or Delaware law, the law proffered by the Customers, applies. Loan Agreement ¶ 20(m); ToS ¶ 21.7.

estate property, which is subject to the provisions of section 363(f)(4) of the Bankruptcy Code, and a *bona fide* dispute over the *debtor's interest* (which isn't).

6.      The Stored Wine is not the only asset being sold.  The proposed sale extends to substantially all of the Debtors' other assets, including their intellectual property, which is also subject to TriplePoint's perfected security interest.  The Trustee cannot—and does not even try to—justify a sale free and clear with respect to these assets because none of the provisions of section 363(f) are satisfied and the sale cannot be approved over TriplePoint's objection.

7.      The problems with the Trustee's Sale Motion go further.  The Trustee seeks to grant a release, freedom from successor liability, and a good faith finding to the Debtors' founder and former Board Member and President, Jeffrey Shaw, who also happens to be the principal of the proposed Buyer here.  The Debtors, under Shaw's control, made representations to TriplePoint that are diametrically opposed to the position they took in the Schedules regarding ownership of the Stored Wine, and are the subject of at least one class action lawsuit.  The Trustee makes no effort to justify (or value) the extraordinary protections it seeks to give to Shaw, and the Sale Motion is devoid of any evidence or argument as to whether the Trustee has conducted any investigation or even attempted to value the claims from which the Trustee proposes to release Mr. Shaw; this, too, is fatal to the Trustee's sale efforts.

8.      Inevitably, the Trustee will attempt to appeal to practical solutions: if TriplePoint does not consent to the Trustee's proposed sale of the Stored Wine (and other assets), what does it want?  TriplePoint believes that the best way to resolve the dispute regarding title to the Stored Wine is before this Court through an expedited adversary proceeding.  TriplePoint believes that, through the Customer Motion, interested parties briefed the issues (subject to the Customers' right to submit a reply) and that it should be promptly resolved to prevent further delay or accrual of administrative costs.  All parties are before the Court and this Court has the relevant evidence before it.  This Court is best suited to promptly resolve the competing interests in the Stored Wine.

9.      Accordingly, for the reasons set forth herein, the Court should deny the Sale Motion.

## II.      BACKGROUND

### A.  Overview of the Debtors' Business.

10.      From approximately 2015 to May 1, 2023 ("Petition Date"), the Debtors operated an online wine store for the discovery and purchase of premium wines by members, which store would reward buyers with occasional free upgrades to rare and "private-stash" bottles from prestigious wineries.  As part of their business model, the Debtors offered a free wine storage service, called "CloudCellar," for customers who ordered wine through the Debtors' website. After placing an order, Customers were able to designate wines from the CloudCellar and, at a time designated by the Customers, have the wine shipped to their homes or other location designated by the Customer.

11.      The Stored Wine is stored by producer and vintage, rather than by customer, i.e., it is co-mingled, rather than segregated by Customer.  The Stored Wine is presently located at a climate-controlled wine storage warehouse owned and operated by a third party at 1166 Commerce Blvd Std. D, American Canyon, CA 94503 ("Warehouse").  The Debtors are obligated to pay the monthly rent for the Warehouse, and the risk of loss or damage to the Stored Wine is covered by insurance obtained by and paid for by the Debtors, under which the Stored Wine is covered up to $10.5 million.  The Debtors have no other material property at the Warehouse.

### B.  TriplePoint and the Debtors Enter into the Loan Agreement.

12.      On May 18, 2022, the Debtors entered into that certain *Plain English Growth Capital Loan and Security Agreement* ("Loan Agreement") between TriplePoint, as lender, and the Debtors, as borrowers.  Thorne Decl. ¶ 6, **Exhibit A**.  Under the Loan Agreement, TriplePoint committed to make certain loans, including an initial commitment of $8,000,000, subject to the completion of certain milestones by the Debtors.  *Id.*  The Debtors never satisfied those milestones,

defaulted under the Loan Agreement in April of 2023 and, as of the Petition Date, owed TriplePoint approximately $8.3 million.  *Id.*

13.    Under the Loan Agreement, the Debtors granted TriplePoint a first priority security interest in, and lien upon, all of the Debtors' assets, whether then owned or subsequently acquired (as further described and defined in the Loan Agreement, the "Collateral").  *Id.* ¶ 7, **Exhibit A**, Loan Agreement ¶ 8.  Pursuant to the Loan Agreement, the Collateral specifically includes all Inventory, all Goods, and all Intellectual Property.  *Id.*  On May 19, 2022, UCC-1 financing statements were recorded on behalf of TriplePoint against both Debtors.  *Id.* ¶ 7, **Exhibit B** (UCC-1 for Phoeno) and **Exhibit C** (UCC-1 for Underground Enterprises).  Each UCC-1 "covers all personal property of the Debtor, whether now owned or hereafter acquired and wherever located." *Id.*  No other UCC-1s were filed against either Debtor.

14.    In connection with the Loan Agreement, Debtor Underground Enterprises, as the authorized representative of both Debtors, executed a Certificate of Perfection ("Perfection Certificate") for the benefit of TriplePoint.  *Id.* ¶ 8, **Exhibit D**.  In the Perfection Certificate, Underground Enterprises, as borrower representative for both Debtors, represented that the only location of Collateral was 1166 Commerce Blvd Std. D, American Canyon, CA 94503, which is the address of the Warehouse, where no material assets of the Debtors other than the Stored Wine are located.  *Id.*  The Perfection Certificate also included "a current listing of all Patents, Patent applications, Patent Licenses, Trademarks, Trademark applications, Trademark Licenses, Copyrights, Copyright applications and Copyright Licenses" owned by the Debtors as a schedule. *Id.*  The IP Schedule lists certain trademarks owned by the Debtors.  *Id.*

15.    Further, in connection with the Loan Agreement, the lessor of the Warehouse, Biagi Bros., Inc., and the Debtors executed a *Plain English Landlord Representation and Waiver Agreement* (the "Landlord Waiver"), pursuant to which the Debtors "informed" the landlord that they "intend[ed] to keep personal property at the Premises," which included the Stored Wine.  *Id.*

¶ 9, **Exhibit E**.  The Landlord Waiver expressly recognized TriplePoint's security interest in all of the Debtors' personal property.  *Id.*

16.    Additionally, in connection with the Loan Agreement, the Debtors on multiple occasions provided TriplePoint with certain financial reporting, which included balance sheets for both Debtors.  *See id.* ¶ 10, **Exhibit F** (Phoeno's balance sheet dated as of end of February 2023) and **Exhibit G** (Underground Enterprises' balance sheet dated as of end of February 2023).  Notably, Debtor Phoeno repeatedly and consistently showed on its balance sheet as an asset "inventory" valued at between $9 million and $11.6 million between January 2022 and February 2023.[6] *Id.*  The value of this "inventory" included all Stored Wine.  *Id.*  This is consistent with the Debtors' insurance coverage, which included coverage for "$10,500,000" in "Business Personal Property" at the Debtors' warehouse.  *Id.* ¶ 10 **Exhibit H**.  At all times prior to the Petition Date, the Debtors maintained that they owned the Stored Wine and expressly represented the same to TriplePoint.  *Id.*

### C. The Debtors File Chapter 7 Cases, the Trustee Is Appointed, and the Customers Dispute Ownership of the Stored Wine.

17.    On the Petition Date, each Debtor filed a voluntary chapter 7 petition.  After the Petition Date, the United States Trustee for the District of Delaware appointed Don A. Beskrone to serve as chapter 7 trustee of both Debtors ("Trustee").  The Debtors' cases were ordered to be jointly administered on May 30, 2023 [D.I. 35].

18.    In connection with their chapter 7 petitions, each Debtor filed with this Court a Statement of Financial Affairs ("SOFA") and Schedule of Assets and Liabilities ("Schedules").  [D.I. 1].  In the Explanatory Notes for their Schedules and SOFA, the Debtors, for the first time, described ownership of the Stored Wine as follows:

> A "Customer" as identified in the Schedules and SOFA is any retail client of the Debtor. Where "Customer" is used alone on Schedule F, it indicates

---

[6]    The Stored Wine is owned by Debtor Phoeno.  Debtor Underground Enterprises apparently did not own any of the Stored Wine held at the warehouse.

> that the Customer is storing wine that was purchased and is owned by the
> Customer at the Debtor's facility. The amount shown as the "claim" for
> such Customer on Schedule F is the amount paid by the Customer for the
> purchased wine.

D.I. 1 at 10.

19.    On August 30, 2023, certain customers filed a motion ("Customer Motion")
asserting that they, and not the Debtors or their estates, owned the Stored Wine and requested that
the Stored Wine be turned over to them at no expense [D.I. 161].  TriplePoint objected to the
Customer Motion, providing significant evidence and dispositive legal argument that title to the
Stored Wine rested with the Debtors, subject to TriplePoint's blanket and properly perfected
security interest [D.I. 169, 170].  On September 11, 2023, after TriplePoint filed its objection
thereto, the Customers withdrew the Customer Motion [D.I. 193].

### D.  TriplePoint Files Secured Proofs of Claim.

20.    TriplePoint has filed secured proofs of claim against Phoeno (Claim No. 15-1), and
Underground Enterprises (Claim No. 8-1), in each case asserting a fully secured claim in the
amount of no less than $8,342,543.61.  No objection has been filed to either proof of claim.

### E.  The Trustee's Sale Motion.

21.    On September 12, 2023, the Trustee filed the Sale Motion.  While nominally a "sale
motion," the relief requested extends beyond a straightforward sale.  At a high level, the Sale
Motion provides for the following:

a.    ***Consideration***.  $600,000 in exchange for acquired or purchased assets.
APA § 2.2.  In the Sale Motion, the Trustee does not propose to turn over
any of these proceeds to TriplePoint despite its blanket lien on the assets
being sold.

b.    ***Purchased Assets***.  The Assets (sometimes referred to in various documents
filed by the Trustee as "Purchased Assets") being sold pursuant to the APA
include substantially all the Debtors' assets, including, the "Wine" (defined
as "all wine, champagne and similar consumable alcoholic beverages stored
at the [Warehouse]"), all Inventory, and all intellectual property.  *See* APA
§§ 1.1(7) (definition of "Assets"); 2.1.

7

    c. ***Fulfillment Rights***.  The Trustee attempts to nullify the title issues that plagued the Customer Motion by conveying to the purchaser certain order fulfillment rights.  As further set forth in section 7.1 of the proposed APA and a Fulfillment Notice, Customers will have until November 15, 2023 to elect for disposition of the Stored Wine.  According to the Trustee, title will only pass to the purchaser after an opportunity for Customers to claim wine in accordance with the Fulfillment Notice.

    d. ***Release of Jeffrey Shaw***.  The purchaser is owned by the Debtors' founder and former executive, Jeffrey Shaw ("<u>Shaw</u>"), and the sale contemplates a release of Shaw of all estate and certain Customer[7] claims and causes of action, whether known or unknown.  *See* APA § 1.1(26) (excluding from the sold assets "all claims and causes of action against any former director or officer of the Debtors *other than Jeffrey Shaw*, whether choate or inchoate, known or unknown, contingent or noncontingent, except as may be released by the Trustee on behalf of the Estates pursuant to the Approval Order."); Sale Order ¶ 35 (releasing the Purchaser and a number of related persons from "any and all claims of any kind held by the Estates . . .").  The Sale Motion does not include a description of potential claims against Shaw or other parties being released or the potential value of any such claims.  There is no evidence of any investigation performed by the Trustee into any such claims.

    e. ***Findings and Protections of a Good Faith Purchaser***.  The Sale Order contemplates granting the Purchaser the protections afforded to a good faith purchaser under section 363(m) of the Bankruptcy Code and other protections under section 363(n).  APA § 3.3(2); Sale Order ¶¶ P, U, 29, 30, 56.

    f. ***Findings regarding Successor Liability***.  The proposed sale order includes numerous putative protections against Successor Liability.  Sale Order ¶¶ O, AA, 15, 16, and 17.

## III.    ARGUMENT

### A.  The Trustee Cannot Sell the Assets Free and Clear of TriplePoint's Security Interests.

    22.    Pursuant to the Sale Motion, the Trustee seeks to sell substantially all the Debtors'

Assets, excluding *de minimis* and customary excluded assets, free and clear of all liens, claims,

encumbrances and other interests, including TriplePoint's valid, perfected, unavoidable lien on

---

[7]    Customers who elect to participate in the fulfillment process agree to "release, waive, discharge, and covenant not to sue [the purchaser], its officers, directors, stockholders, employees, agents, or representatives (collectively, "<u>Releasees</u>"), from any and all liability, claims, demands, actions, and causes of action whatsoever arising out of or related to any loss, damage, or injury that may be sustained by the Customer, or to any property belonging to the Customer, WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES, or otherwise." Fulfillment Notice ¶ A (Liability Waiver).

substantially all of the Debtors' assets.  Section 363(f) of the Bankruptcy Code permits the sale of the Debtors' assets free and clear of TriplePoint's liens only if the Trustee can satisfy one of the enumerated subsections of section 363(f) of the Bankruptcy Code.  *In re Ferris Properties, Inc.*, 2015 WL 4600248 at *2 (Bankr. D. Del. July 30, 2015).  The Trustee bears the burden on this showing.[8]  *See In re Grassi,* 2011 WL 6096509, at *5 (B.A.P. 1st Cir. Nov. 21, 2011) ("The burden is on the moving party to 'show that one of the provisions of § 363(f)(1)-(5) is applicable to each lien or interest from which the sale is to be free and clear.'"(internal citations omitted)).

23.    The Trustee contends that only two sections apply, and then with respect to only certain of the purchased assets.  As set forth below, the Trustee cannot satisfy his burden.

### 1. TriplePoint's Interest in the Stored Wine Is Not Subject to a *Bona Fide* Dispute as Contemplated by Section 363(f)(4) of the Bankruptcy Code.

24.    The Trustee contends that he can sell the Stored Wine (the most valuable asset subject to the proposed sale) free and clear pursuant to section 363(f)(4) of the Bankruptcy Code because "the relative ownership interest as between the Debtors and the Customers is subject to bona fide dispute and, thus, any interest of the Prepetition Lenders in the Stored Wine is likewise subject to bona fide dispute."[9]  Sale Motion ¶ 28.  This is not the sort of *bona fide* dispute implicated by section 363(f)(4) of the Bankruptcy Code; courts distinguish between a *bona fide* dispute over the validity of the nondebtor party's interest in the estate property, which is subject to the provisions of section 363(f)(4) of the Bankruptcy Code, and a *bona fide* dispute over the

---

[8]    Section 363(f) of the Bankruptcy Code states that a debtor or trustee may sell property under subsection (b) or (c) free and clear of any interest of an entity other than the estate only if "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

[9]    Paradoxically, the Trustee's proposed sale order includes findings that all assets, including the Stored Wine, are property of the Debtors' estates.  Sale Order ¶ I ("The Debtors are the sole and lawful owners of, and have clear and marketable title to, the Purchased Assets to be sold pursuant to the Asset Purchase Agreement, including, without limitation, all items of personal property and real property owned by the Debtors as identified in the Asset Purchase Agreement.").  If the assets, including the Stored Wine, are property of the Debtors' estates, then they are subject to TriplePoint's liens and such liens must be satisfied in connection with any sale of the Stored Wine.

*debtor's interest. See In re Rodeo Canon Dev. Corp.*, 362 F.3d 603, 605–06 (9th Cir. 2004) (discussing the need to resolve disputed title issues prior to authorizing a 363 sale) (withdrawn based on parties' subsequent stipulation that operative facts on which court based its opinion were not correct); Collier on Bankruptcy ¶ 363.06 (Richard Levin & Henry J. Sommer eds., 16th ed.) (explaining that courts "distinguish[] between a bona fide dispute over the validity of the nondebtor party's interest in the property and a dispute over the debtor's interest. In the latter, the court may not authorize a sale under section 363 until the court resolves the dispute and determines that the debtor has an interest that can be sold. Until that occurs, section 363 does not even apply.").

25.     The Trustee bears the burden of establishing that the property to be sold is property of the estate under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *7 (Bankr. D. Del. July 28, 2008) (requiring resolution of a dispute related to consignment prior to authorizing a 363 sale). A sale under section 363 of the Bankruptcy Code "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate.'" *In re Interiors of Yesterday, LLC*, 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007) (quoting *In re Claywell*, 341 B.R. 396, 398 (Bankr. D. Conn. 2006)). *See also Rodeo Canon*, 362 F.3d at 605–06 (A bankruptcy court "may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property.").

26.     The Trustee has not established that the Stored Wine is property of the estates; in fact, he contends that such a determination does not need to be made in order to authorize the sale. This is not how 363 sales work under applicable law. The Trustee can only sell *estate* property, but it acknowledges here that *estate ownership is disputed*. Ownership of the Stored Wine is a fundamental predicate that must be resolved prior to approval of any sale.

27.     Nor can the Trustee point to the fulfillment construct in the APA to justify approval of the sale or in furtherance of its *bona fide* dispute contentions. While the fulfillment procedures may satisfy Customers in the near term, the end result is that all right, title and interest in any

Stored Wine that is not fulfilled, as elected by Customers, will transfer from the estates to the purchaser.  This, again, requires a finding that the Stored Wine *is* property of the estate.

28.    The propriety of any sale requires a resolution of whether the Stored Wine is property of the Debtors' estates, subject to TriplePoint's liens (which it is).

**2.    The Trustee Has Not Established that TriplePoint's Interest in the Assets to be Sold Is Subject to Any Other Provision of Section 363(f) of the Bankruptcy Code.**

29.    While the Trustee's principal argument focuses on section 363(f)(4) of the Bankruptcy Code as it relates to the Stored Wine, he fails to establish *any* other basis under section 363(f) in support of a sale free and clear of *any* of the Debtors' assets (beyond just the Stored Wine), despite such assets being subject to a blanket lien in favor of TriplePoint:[10]

- *Section 363(f)(1) is not satisfied*.  The Trustee has not identified any applicable law that permits the sale of the Stored Wine free and clear of TriplePoint's interests and TriplePoint is unaware of any such law.  Section 363(f)(1) does not serve as a basis to support the Trustee's free and clear request.

- *Section 363(f)(2) is not satisfied*.  The Trustee contends that a party's consent to the sale free and clear of its interests should be implied in the absence of an objection to the sale.  Sale Motion ¶ 29.  TriplePoint objects and does not consent to the sale free and clear of its lien.

- *Section 363(f)(3) is not satisfied*.  The consideration for the purchased assets is $600,000, which is far below the aggregate value of TriplePoint's more than $8.3 million secured claim.  The Trustee cannot invoke section 363(f)(3) of the Bankruptcy Code to sell free and clear of TriplePoint's interests.  *In re PW, LLC*, 391 B.R. 25, 40-41 (B.A.P. 9th Cir. 2008) (holding that section 363(f) of the Bankruptcy Code does not authorize the sale free and clear of a lienholder's interest if the price of the estate property is equal to or less than the aggregate amount of all claims held by a creditor who holds a lien or security interest in the property being sold); *see also In re WDH Howell, LLC*, 298 B.R. 527, 534 (D.N.J. 2003)(section 363(f)(3) requires the sale price to be greater than face value of all liens).

---

[10]    Without evidence, the Trustee contends that having all liens attach to the sale proceeds will adequately protect all parties with interests in assets being sold.  Selling over $10 million in wine inventory, intellectual property, and other assets in which TriplePoint has a valid, perfected, unavoidable and unchallenged lien for $600,000 does not adequately protect TriplePoint.  In the event the Court is inclined to approve the Sale Motion (and it should not), it should direct the Trustee to distribute all consideration to TriplePoint on account of its liens.

- ***Section 363(f)(4) is not satisfied***.  As discussed above, section 363(f)(4) is not satisfied.

- ***Section 363(f)(5) is not satisfied***.  Section 363(f)(5) allows a trustee to sell property of the estate free and clear of liens, claims, and encumbrances of an entity if that entity "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). Because the purchase price offered by the proposed purchaser is far less than the aggregate amount of TriplePoint's liens and interests, "the sale proponents must prove the existence of a legal or equitable proceeding that could compel it to accept a money satisfaction of its interest in the properties to be sold." *Ferris Properties,* 2015 WL 4600248, at *2 (internal citations omitted).  Further, the sale proponents must "do more than show that it is theoretically possible to compel a creditor to accept a money satisfaction under section 363(f)(5)." *Id.; see also PW, LLC,* 391 B.R. at 45 (holding that debtors "must demonstrate how satisfaction of the lien 'could be compelled.'"); *In re Haskell, L.P.,* 321 B.R. 1, 8-9 (Bankr. D. Mass. 2005) (rejecting the argument that debtors need only show that it is theoretically possible to compel a party under section 363(f)(5)).  The Trustee has not and cannot make this showing.

30.     No provision of Bankruptcy Code section 363(f) authorizes the Trustee to sell the assets subject to the APA free and clear of TriplePoint's liens.

**B. The Sale Motion Includes Additional, Extraordinary Relief that Cannot Be Approved.**

31.     Even if the Trustee had established that the sale was appropriate and could be approved over TriplePoint's objection (and he hasn't), the Sale Motion includes significant additional relief that can neither be granted nor justified as beneficial to the estates, based on the showing made by the Trustee in the Sale Motion:

- ***Releases of the Insider Purchaser***.  Among the extraordinary relief sought by the Trustee through the Sale Motion contemplates a release of Shaw, the owner of the purchaser and founder of the Debtors.  Insider transactions, such as these, are subject to heightened scrutiny.  *E.g.*, *In re Blixseth*, 2010 WL 716198, at *9 (Bankr. D. Mont. Feb. 23, 2010) (applying heightened scrutiny to a sale to an insider by a trustee and denying incorporated releases of claims).  The Trustee has submitted no evidence or argument in support of his proposed release of potential claims against Shaw.  And there indisputably *are potential claims*.  The Debtors and their D&O, including Mr. Shaw, are potentially responsible for misrepresentations to TriplePoint, breaches of fiduciary duties, issues related to the non-payment of sales tax, and a class action lawsuits.  The Trustee has wholly failed to justify such third-party release provisions on these facts.

12

- ***No release of successor liability***.  The proposed sale order includes numerous provisions limiting potential successor liability for the purchaser.  However, given the insider nature of this transaction, such relief is inappropriate and could effect an improper release.  To the extent the sale is approved, the sale order should be modified to remove ancillary relief related to successor liability.

- ***Good faith findings and related findings under section 363(n) of the Bankruptcy Code***.  Because the purchaser is an insider that is controlled by a person that potentially engaged in malfeasance, as discussed above, it should not be granted the protections of sections 363(m) or 363(n) of the Bankruptcy Code.  There can be no adequate showing of good faith here.

**C.  The Debtors and Their Estates Own the Stored Wine.**

32.    While the sale cannot proceed without a determination of the estates' interest in the Stored Wine, the Debtors and their estates own the Stored Wine, subject to TriplePoint's liens.

**1.  Under the Uniform Commercial Code, Title to the Stored Wine Is in the Debtors because the Stored Wine Was Never Delivered to the Customers.**

33.    Under the Uniform Commercial Code, unless otherwise explicitly agreed in writing, title to goods offered for sale passes to the buyer at the time and place at which the seller completes the performance with physical delivery of the goods.  Cal. Com. Code § 2401(2); 6 Del. C. § 2-401(2).  When there is nothing in a written agreement to establish a contrary intent, title to goods passes from the seller to the buyer only upon delivery, without regard to when payment is made or due.  *People v. Randono*, 32 Cal. App. 3d 164 (Cal. Ct. App. 1973).  If the contract requires delivery at a destination specified by the customer, then title passes on delivery at the destination.  Cal. Com. Code, § 2401(2)(b); 6 Del. C. § 2-401(2)(b).

34.    Application of these principles to the Debtors' business is straightforward.  The Customers ordered wine from the Debtors.  While the Customers paid for wine when it arrived for storage at the Debtors' Warehouse, under the UCC, title passed to the Debtors when the Debtors purchased the wine from the vintners, and remained with the Debtors unless and until the wine was received by the applicable Customer, not when it arrived at the Warehouse.  Title would pass to the Customers only when the wine was delivered to the address designated by the Customer for

delivery—this is when Debtors would have completed their physical delivery of the wine. Additionally, nothing in the ToS or elsewhere in any documentation submitted by the Trustee or the Customers (or reviewed by TriplePoint) provides, explicitly or otherwise, for title to pass other than as contemplated under the standard mechanisms of the UCC. With respect to the Stored Wine at issue here, all incidents of ownership, including the risk of loss for which the Debtors obtained insurance, remained with the Debtors until the wine was delivered to the customers, which never occurred with respect to the Stored Wine at issue here. Accordingly, title to the Stored Wine remains with the Debtors, subject to TriplePoint's liens.

35.    The title transfer mechanism under the UCC is entirely consistent with the verbal and written representations the Debtors made to TriplePoint prior to the Petition Date, as well as the Debtors' prepetition balance sheets. Prior to the Petition Date, the Debtors understood (and represented to TriplePoint) that they held title to the Stored Wine. The Debtors further represented to TriplePoint that all Collateral, including the Stored Wine, was located at the Warehouse; the Debtors included the value of the Stored Wine as "Inventory" on their balance sheets; and the Debtors agreed with TriplePoint that the Debtors, rather than the Customers, owned the Stored Wine. Only after filing chapter 7 did the Debtors' story change.

36.    Accordingly, under the Uniform Commercial Code, title to the Stored Wine would only pass to the Customers when they actually received either the wine they had ordered or, in the case of an upgrade, substituted wine. Because this never happened with the Stored Wine, title remains with the Debtors.

**2.    The Debtors Were Not "Bailees" with Respect to the Stored Wine.**

37.    The only "dispute" regarding ownership that the Customers have identified is that they contend that the Debtors held the Stored Wine as bailees while the Customers held title.[11] This interpretation of the facts and law is simply wrong.

38.    Both California and Delaware state law define a bailment as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it." *Marvel v. Clay*, No. 94C-11-002, 1995 WL 465322, at *3 (Del. Super. Ct. June 15, 1995), aff'd, 676 A.2d 905 (Del. 1996); *Gebert v. Yank*, 172 Cal. App. 3d 544, 550 (Cal. Ct. App. 1985) ("In a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men.").

39.    While state law governs, the U.S. Supreme Court has opined on whether a contract is for a sale or for a bailment:

> The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed. The transaction is a sale.

*Sturm v. Boker*, 150 U.S. 312, 329 (1893).

---

[11]    Nor are the Customers "consignors" under the UCC.  In order for the transactions at issue here to qualify as consignments under the UCC, *the Customers would have had to have held title and to deliver the wine to the Debtors for the Debtors to sell as inventory*.  U.C.C. § 9-102 ("'Consignment' means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale.").  Even under their faulty recitation of the circumstances, the Customers did not do this.  At most, in the Customers' view, the Debtors held the wine pending direction on where to ship it.  Moreover, if the transactions at issue here were true consignments, the Customers would have had to file UCC-1s financing statement in order to have priority over TriplePoint's security interest, which they did not do.  *E.g.*, *Id.* § 9-322 (establishing priority for conflicting security interests).

40.    "Accordingly, in distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form." *In re Miami Metals I, Inc.*, 603 B.R. 727, 735 (Bankr. S.D.N.Y. 2019) (discussing Florida and New York law).

41.    The Customers' contention that their relationship with the Debtors was one of bailor/bailee is belied by the facts:

- ***The wine purchased was not always the wine delivered***.  The Customers make much of the fact that in some cases, the Debtors would "upgrade" the wines that the Customers paid for.  The ToS note that "Specific vintages may not be available. If a chosen vintage is no longer available, a comparable vintage of the same wine may be substituted" and that "[s]pecific bottles may become unavailable due to vendor error, damage, poor quality, or other reasons. In these cases, our [the Debtors'] in house wine experts will use their best judgment to substitute bottles with similar wines of equal or greater value."  ToS Section 3.3, 3.4.  This is a critical fact and demonstrates that the Debtors had control over what product was ultimately delivered to the Customers.  Under the Debtors' ToS, Customers were not purchasing specific wine.  In fact, in the Sale Motion, the Trustee explains that, for the significant majority of the Stored Wine, it is stored by vintage and not by customer—further supporting the premise that Customers did not buy specific bottles.  Because the wine ordered by the Customers was not necessarily the same as the wine delivered, there was no bailment.

- ***Customers could lose their right to have wine delivered if they did not make annual purchases from the Debtors***.  Under the Debtors' ToS, in order to be eligible to use the CloudCellar, Customers had to be an "Active Member" of the Underground Cellar community.  ToS Section 6.1. "Active Membership" required annual purchases from the Debtors' website.  *Id.*  If a Customer's Active Membership expired, then such Customer forfeited its rights to receive any wine and all rights remained with the Debtors.  *Id.*  This is inconsistent with a bailment relationship or title vesting in anyone other than the Debtors.

- ***The Customers purchased wine from the Debtors, not the Vendors***.  A fundamental assumption underlying the Customers' "bailee" theory is that they purchased wine directly from Vendors.  But this is not possible for two reasons.  First, if wine had been sold directly from vendors to Customers, it would have been subject to sales tax.  Cal. Rev. & Tax. Code § 6006(a).  But, on information and belief, neither Customers, the Debtors, nor Vendors paid sales tax on the Stored Wine.  Until the Stored Wine is actually delivered to the Customers, title did not transfer, and sales tax was not owed.  Second, the Customers were not in privity with the Vendors. The Customer Motion is devoid of any evidence of any communications between Customers and Vendors, not to mention any contracts between Vendors and

16

the Customers.   The *Debtors, not the Customers,* contracted with the vendors for the acquisition of the wine that the Debtors (not the vendors) then offered for sale to the Customers on their website.   There was and is no communication or contractual relationship between the Customers and the Vendors.

42.     Fundamentally, wine purchased was not necessarily the same wine that was delivered to the Warehouse or, ultimately, to the Customers.   This fact alone precludes a finding of a bailor/bailee relationship.   Similarly, the fact the Customers did not directly contract with any of the vendors for the purchase of wine precludes a finding of a bailment.   Without owning the specific wine delivered—an impossibility under the ToS and without a contract between the subject vendor and the Customer—there was no delivery of identical and identified goods subject to a bailment.

## IV.     <u>RESERVATION OF RIGHTS</u>

43.     This Opposition is submitted without prejudice to, and with a full reservation of, all of TriplePoint's rights, claims, causes of action, defenses, and remedies, at law or in equity, under the Loan Agreement, all related documentation, and in any way with respect to the Sale, the Debtors, the Customers, Shaw, the Trustee, or otherwise, including, without limitation, the right to object to any claims submitted by any Customer or scheduled by the Debtors.   TriplePoint reserves the right to amend, modify, or supplement this Opposition in writing or orally at any hearing, to respond to any pleadings filed by any other party, and to introduce evidence at or prior to any hearing relating to the Sale Motion.

*[Remainder of page intentionally left blank]*

## V.    <u>CONCLUSION</u>

WHEREFORE, TriplePoint respectfully requests that the Court deny the Sale Motion in full and grant such other and further relief as the Court deems warranted.

Dated:    September 26, 2023
          Wilmington, Delaware

**DLA PIPER LLP (US)**

 /s/  Stuart M. Brown
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email: stuart.brown@us.dlapiper.com

-and-

Eric D. Goldberg (admitted *pro hac vice*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
Email: eric.goldberg@us.dlapiper.com

*Counsel to TriplePoint Private Venture Credit Inc.; TriplePoint Venture Growth BDC Corp.; and TriplePoint Venture Lending Fund, LLC*

## **CERTIFICATE OF SERVICE**

I, Stuart M. Brown, Esq., hereby certify that on September 26, 2023, a true and correct copy of the *Opposition of TriplePoint Capital to Trustee's Motion to Sell Assets Free and Clear* was served via CM/ECF on all parties who are registered to receive e-filing notifications in this case.

Dated:    September 26, 2023                      /s/  Stuart M. Brown
          Wilmington, DE                          Stuart M. Brown (DE 4050)