## EXHIBIT A

**(Loan Agreement)**



# PLAIN ENGLISH GROWTH CAPITAL LOAN AND SECURITY AGREEMENT

This is a **PLAIN ENGLISH GROWTH CAPITAL LOAN AND SECURITY AGREEMENT** dated as of May 18, 2022 by and between:

>(i)    UNDERGROUND ENTERPRISES, INC., a Delaware corporation (the "**Lead Borrower**"), and each other Person who executes this Agreement as a "**Borrower**" party hereto, and any other Person that executes a Joinder Agreement to become a Borrower under this Agreement,

>(ii)    the Lenders party hereto from time to time (as set forth in this Agreement), and

>(iii)    TRIPLEPOINT PRIVATE VENTURE CREDIT, INC., a Maryland corporation, in its capacity as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "**Collateral Agent**").

The words "**We**", "**Us**", and "**Our**" refer to Lenders and Collateral Agent, collectively.  Unless otherwise specified, the words "**You**," "**Your**" and "**Borrower**" refer to each of and all of the Persons identified in the preceding **clause (i)**, and not to any individual, and Borrowers shall be jointly and severally liable for any and all of Your agreements and obligations under this Agreement.  The words "**the Parties**" refers to each of and all of Lenders, Collateral Agent and Borrowers.  This Plain English Growth Capital Loan and Security Agreement may be referred to as the "**Agreement**".

The Parties agree to the following mutual agreements and conditions listed below:

| GROWTH CAPITAL LOAN FACILITY INFORMATION | |
|---|---|
| **Facility Number** | **Commitment Amount** |
| Part 1: 1493-GC-01 | Part 1:  $8,000,000, allocated among Lenders as set forth in <u>Annex A</u> |
| Part 2: 1493-GC-02 | Part 2:  $4,000,000, available Upon Request and Additional Approval following completion of the Part 2 Milestone and execution of warrant agreements in substantially the same form as the Warrant Agreement executed on the Closing Date, to be allocated among Lenders in a manner to be determined |
| Part 3: 1493-GC-03 | Part 3: up to $8,000,000, available Upon Request and Additional Approval following completion of the Part 3 Milestone and execution of a warrant agreement in substantially the same form as the Warrant Agreement executed on the Closing Date, to be allocated among Lenders in a manner to be determined |

| **Minimum Advance Amount** | **Availability Period** | **Loan Term** | **Interest Rate** |
|---|---|---|---|
| None | Part 1: Closing Date through June 30, 2023<br><br>Parts 2 and 3: Upon availability and for 6 months thereafter | See Table of Terms, "Advance Options" | See Table of Terms, "Advance Options"<br><br>(Prime Rate as published in the Wall Street Journal as adjusted and in effect from time to time; provided, however, that in no event shall the Prime Rate be less than 3.50%) |
| **Security Interest** | **End Of Term Payment** | **Facility Fee** | **Right To Invest** |
| Security interest in all Collateral | See Table of Terms, "Advance Options" | Part 1: $20,000 payable upon Closing Date and 0.75% of each Advance payable on a respective Advance Date, allocated among Lenders as set forth on Annex A<br><br>Part 2: $20,000 payable upon availability and 0.50% of each Advance payable on a respective Advance Date, to be allocated among Lenders in a manner to be determined<br><br>Part 3: up to $80,000 in the aggregate, of which $40,000 shall be due and payable upon availability; and 0.50% of each Advance payable on a respective Advance Date, to be allocated among Lenders in a manner to be determined | You grant Lenders the right to invest up to $500,000 in the aggregate for all Lenders in Your next round of equity financing per **Section 19** |

| ADVANCE OPTIONS | | |
|---|---|---|
| **Option A\*** | **Option B** | **Option C** |
| *Loan Term:* 30 Months (Months 1-12 interest only, followed by 18 months of principal and interest payments) | *Loan Term:* 33 Months (Months 1-12 interest only, followed by 21 months of principal and interest payments) | *Loan Term:* 30 Months (Months 1-18 interest only, followed by 12 months of principal and interest payments) |
| *Interest Rate:* Prime Rate plus 3.00% *(floating)* | *Interest Rate:* Prime Rate plus 3.75% *(floating)* | *Interest Rate:* Prime Rate plus 3.50% *(floating)* |
| *End of Term Payment:* 1.00% of each Advance | *End of Term Payment:* 5.50% of each Advance | *End of Term Payment:* 7.25% of each Advance |

| ADVANCE OPTIONS | | |
|---|---|---|
| *The aggregate principal amount of all Advances under this Option A shall not exceed $3,000,000 | | |
| **Option D** | **Option E** | **Option F** |
| *Loan Term:* 36 Months (Months 1-18 interest only, followed by 18 months of principal and interest payments) | *Loan Term:* 36 Months (Months 1-24 interest only, followed by 12 months of principal and interest payments) | *Loan Term:* 24 Months (1-24 Months interest only, with the remaining principal and interest due on the last Payment Date) |
| *Interest Rate*: Prime Rate plus 4.75% *(floating)* | *Interest Rate:* Prime Rate plus 5.25% *(floating)* | *Interest Rate:* Prime Rate plus 4.75% *(floating)* |
| *End of Term Payment:* 7.00% of each Advance | *End of Term Payment:* 7.50% of each Advance | *End of Term Payment:* 5.75% of each Advance |
| **Option G** | | |
| *Loan Term:* 30 Months (1-30 Months interest only, with the remaining principal and interest due on the last Payment Date) | | |
| *Interest Rate:* Prime Rate plus 5.50% *(floating)* | | |
| *End of Term Payment:* 7.00% of each Advance | | |

| OUR CONTACT INFORMATION | | |
|---|---|---|
| **Name** | **Address For Notices** | **Contact Person** |
| Collateral Agent and Lenders | 2755 Sand Hill Rd., Ste. 150 Menlo Park, CA 94025 Tel: (650) 854-2090 | Sajal Srivastava, President Tel: (650) 233-2102 Fax: (650) 854-1850 email: legal@triplepointcapital.com |
| YOUR CONTACT INFORMATION | | |
| **Customer Name** | **Address For Notices** | **Contact Person** |
| UNDERGROUND ENTERPRISES, INC., as Borrower Representative | 580 Howard Street Suite #500 San Francisco, CA 94105 | Name, Title: Jeffrey Hardy, President and Chief Operating Officer Tel: (917)-592-7885 email: hardy@undergroundcellar.com |

Capitalized terms defined in the Table of Terms shall have the meanings given to those terms in such table, and other capitalized terms not otherwise defined in the body of this Agreement are defined in **Section 22**. Any accounting term not specifically defined herein shall be construed in accordance with GAAP, and all calculations shall be made in accordance with GAAP. The term "financial statements" shall include the accompanying notes and schedules.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such

3

new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## 1.    WHAT THE PARTIES AGREE TO FINANCE; DESIGNATION OF LEAD BORROWER

**Agreement to Finance**. Provided that the conditions in **Sections 4** and **5** and elsewhere in this Agreement are met, each Lender (severally and not jointly or jointly and severally) will lend to You, as to each Part, an amount equal to the unfunded Part Commitment of such Lender with respect to such Part and You agree to use such proceeds to finance any of Your general corporate needs and repayment of Your existing Indebtedness to Silicon Valley Bank as set forth herein.  Lenders will lend to You advances (each an "**Advance**") in minimum amounts as set forth in the Table of Terms up to a maximum of the Commitment Amount for each Part as provided in the Table of Terms; provided, that each Lender's funding obligation with respect to any Advance (x) shall be several and not joint or joint and several, (y) shall be in an amount equal to its Pro Rata Share thereof, and (z) shall not exceed the amount of such Lender's individual Part Commitment for the applicable Part; provided, further, that no Advance under any Part may be in an amount in excess of the Commitment Amount for such Part. Each Lender's obligation to fund Advances under each Part of the Commitment Amount under this Agreement will end on the last day of the Availability Period noted in the Table of Terms for such Part.  To the extent, the Applicable Lender was a Qualified Lender (as defined) as of the Closing Date, such Lender shall not be obligated to make any Advance under its portion of any Commitment Amount if at the time of or after giving effect to the proposed Advance such Lender would no longer qualify as a Qualified Lender.

**Reduction of Commitment Amounts.** Upon the funding of any Advance, the Commitment Amount of the applicable Part shall automatically be reduced by the amount of such Advance (and each Lender's Part Commitment for the applicable Part shall be automatically reduced by the amount of such Advance funded by such Lender).

**Borrower Representative.** Each Borrower hereby designates the Lead Borrower as its representative and agent on its behalf ("**Borrower Representative**") for the purposes of giving and receiving all Advance Requests and all other notices and consents under this Agreement or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants and execution of amendments, waivers, consents, joinders, certificates and any other documents) on behalf of Borrowers, under this Agreement and the other Loan Documents. Lead Borrower hereby accepts such appointment.  We may regard any notice or other communication pursuant to this Agreement or any other Loan Document from Borrower Representative as a notice or communication from all of You, and may give any notice or communication required or permitted to be given to any of You hereunder to Borrower Representative on behalf of each of You.  Each of You agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on Your behalf by Borrower Representative shall be deemed for all purposes to have been made by each of You and shall be binding upon and enforceable against each of You to the same extent as if the same had been made directly by each of You.

## 2.    YOU WILL ENTER INTO MULTIPLE PROMISSORY NOTES

The Plain English Growth Capital Promissory Note in the form of **Exhibit A** (the "**Promissory Note**") is the document You will enter into in favor of each Applicable Lender each time an Advance is to be funded (it being understood that separate Promissory Notes will be issued to each Lender with respect to each Advance). The Promissory Note will contain the specific financial terms of the Advance (e.g., amount funded, interest rate, maturity date, Advance Date, payment due dates etc.) and all of the terms and conditions of this Agreement are incorporated in and made a part of each Promissory Note.  There may be multiple Promissory Notes associated with this Agreement.

## 3.    YOUR LOAN FACILITY COMMITMENT AMOUNT MAY BE DIVIDED INTO PARTS

The Commitment Amount and/or its corresponding parts (if any) will be noted in the Table of Terms ("**Parts**").  For purposes of this Agreement, references to the Commitment Amount shall mean the Part or Parts which are available and in effect.  Any single Part may subsequently be divided into more than one Part, each of which shall thereafter be a separate Part hereunder (and which may be reflected in a supplemental or amended Annex A; provided that no such supplement or amendment shall be required in order for any such division to become effective).  Certain terms or conditions associated with the availability of such Part are listed in the Table of Terms (and any such Part as to which availability is subject to conditions as set forth in the Table of Terms shall be a "**Conditioned Part**" until such time, if any, at which such conditions are satisfied).

As to any Part that is available "**Upon Request and Additional Approval**", You are required to make a request to utilize that additional Part in writing to Collateral Agent and each Applicable Lender (the "**Commitment Increase Request Notice**"), prior to Your submission of a corresponding Advance Request.  After delivery of a Commitment

Increase Request Notice as provided above, the Applicable Lenders will review the information available to them and conduct any legal and business due diligence deemed necessary by them in connection with their attempt to obtain their respective requisite credit approvals and such approval shall be in each such Lender's sole discretion, and each such Lender's agreement to consider providing the additional Part is not, and is not to be construed as, a commitment, offer, or agreement to provide such additional Part.  As to any extension, conversion, option, right or other action that is available Upon Request and Additional Approval, You are required to make a written request that we consent to such extension, conversion, option, right or other action, which consent shall be a matter of Our sole and absolute discretion and may be conditioned, withheld or delayed for any reason or no reason at all.

**Part 2 Milestone:**  The availability of the Part 2 Commitment Amount is subject to, among other things, confirmation satisfactory to the Collateral Agent that You have completed the Part 2 Milestone, as determined by the Collateral Agent in its sole discretion.

**Part 3 Milestone**:  The availability of the Part 3 Commitment Amount is subject to, among other things, confirmation satisfactory to the Collateral Agent that You have completed the Part 3 Milestone, as determined by the Collateral Agent in its sole discretion.

## 4.    HOW WILL YOU REQUEST ADVANCES

In addition to the requirements of **Section 5** set forth below, You agree to follow the procedures listed below to have Lenders extend an Advance to You:

> ⇒    You will submit to Collateral Agent (by facsimile, mail or electronic mail) a completed Advance Request in the form attached as **Exhibit B** signed by Borrower Representative's Chief Executive Officer, President or Chief Financial Officer. The Advance Request shall be irrevocable.

> ⇒    Such Advance Request must be submitted and received by Collateral Agent no later than 5:00 p.m. **five (5)** Business Days prior to the last day of the applicable Availability Period.  Any Advance Request submitted after 5:00 p.m. shall be considered received the following Business Day.

> ⇒    Each Advance Request will state a requested funding date that is at least **five (5)** Business Days after the date such Advance Request is submitted to Collateral Agent and each Applicable Lender.

After Collateral Agent checks and approves the information You provide in the Advance Request, Collateral Agent will prepare and provide to You Promissory Notes for each Applicable Lender and an amortization schedule (consistent with this Agreement) for Your signature.  Upon receipt of the Promissory Notes signed by Your authorized officer and confirmation by Collateral Agent that all conditions to funding an Advance have been met, each Applicable Lender will then advance its Pro Rata Share of the requested funds to You.

All the terms, conditions, and covenants of this Agreement shall apply to all Advances whether or not each Advance is evidenced by a Promissory Note. You agree that We may rely on, and shall be fully protected in relying upon, any notice or Advance Request given by any Person We reasonably believe to be Your authorized representative without the necessity of Our conducting an independent investigation, including Your contact person listed in the Table of Terms.

## 5.    CONDITIONS FOR US TO MAKE LOANS TO YOU

Each Lender's obligation to fund any Advance that You request under this Agreement is subject to satisfaction of each of the conditions set forth in **Sections 4** and **18** and each of the following conditions:

⇒    The representations and warranties in this Agreement and in the Warrant Agreement(s) shall be true, complete and correct in all material respects on and as of the date(s) Lenders fund each Advance with the same effect as though they were made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall remain true, complete and correct in all material respects as of such earlier date; provided, however, that such materiality qualifiers shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.  Each Advance Request will constitute Your representation and warranty on the relevant Advance Date as to the matters provided in **Sections 11** and **12** and as to the matters set forth in the Advance Request.

⇒    You shall be in compliance with all the terms and provisions set forth in this Agreement, each Promissory Note and each other Loan Document, and at the time of and immediately after such Advance: (a) no Default or Event

of Default shall have occurred and be continuing, and (b) no fact or conditions shall exist that would constitute a Default or an Event of Default under this Agreement or any other Loan Document.

⇒　　You shall provide Collateral Agent with all appropriate assignments, notices and control agreements that are necessary or desirable to perfect or maintain Collateral Agent's first priority Lien in all of the Collateral.

⇒　　You shall have paid to each Lender the entire amount of its respective portion of the Facility Fee then due and payable to such Lender as indicated in the Table of Terms relating to the Part under which such Advance is funded.

⇒　　No event or circumstance shall exist or have occurred that has had or could reasonably be expected to have a Material Adverse Effect.

⇒　　You shall have delivered to each Lender the Warrant Agreement to be issued to such Lender.

⇒　　We shall have received certificates of insurance, endorsements and other documents evidencing Your compliance with **Section 10** in form and substance reasonably acceptable to Us.

⇒　　Prior to any Advances under the Part 2 Commitment Amount, You shall have completed the Part 2 Milestone.

⇒　　With respect to the Part 2 Commitment Amount, if made available, You shall have delivered to each Applicable Lender the warrant agreement to be entered into between You and such Lender after the Closing Date with respect to the Part 2 Commitment Amount, which warrant agreements shall be for the equivalent of up to $120,000 in the aggregate for all Lenders (with $60,000 granted upon availability of the Part 2 Commitment plus an equivalent of 1.5% of any amounts advanced to You under Part 2 Commitment) and substantially in the same form as the Warrant Agreement executed on the Closing Date.

⇒　　Prior to any Advances under the Part 3 Commitment Amount, You shall have completed the Part 3 Milestone.

⇒　　With respect to the Part 3 Commitment Amount, if made available, You shall have delivered to each Applicable Lender the warrant agreement to be entered into between You and such Lender after the Closing Date with respect to the Part 3 Commitment Amount, which warrant agreements shall be for the equivalent of up to $240,000 in the aggregate for all Lenders (with $120,000 granted upon availability of the Part 3 Commitment plus an equivalent of 1.5% of any amounts advanced to You under Part 3 Commitment) substantially in the same form as the Warrant Agreement executed on the Closing Date.

⇒　　You shall submit to Us any other documents and other information that We may reasonably request.

## 6.　　YOU MAY PREPAY YOUR PROMISSORY NOTES

You may at any time prepay all Promissory Notes with respect to any Advance in full (but not in part), by (a) giving five (5) Business Days prior written notice to Us, and (b) paying: (i) the remaining outstanding principal amount and all accrued interest calculated as if the date of such prepayment occurred on the next Payment Date for such Advance, (ii) the End of Term Payment for such Advance, (iii) all other Secured Obligations, if any, that shall have become due and payable, including interest at the Default Rate with respect to any past due amounts as of the date of prepayment, and (iv) the Prepayment Fee for such Advance (the amounts payable under the foregoing **clauses (i), (ii)** and **(iv)** to be paid to each Lender based on its respective Pro Rata Share of the applicable Advance, and the amounts payable under the foregoing **clause (iii)** to be paid to each of Us as Our respective interests appear).

## 7.　　THE MAXIMUM RATE OF INTEREST; DEFAULT RATE

**Maximum Rate of Interest.**  It is not Our intent to receive interest at a rate greater than the maximum rate permissible by law, which We shall call the "maximum rate".  If a court determines You have actually paid Us interest based on a rate that exceeds the maximum rate, then We shall apply the excess as follows:  first, to the payment of the outstanding principal amount of the Secured Obligations; second, after all principal is repaid, to the payment of Our accrued interest and any other principal, interest, fees, costs or other Secured Obligations; and third, after all Secured Obligations are repaid, the excess (if any) shall be refunded to You.

**Default Interest.**  In the event that You do not pay any interest when due, delinquent interest shall be added to principal and shall bear interest on interest, compounded at the rate set forth in the Table of Terms.  Upon and during an Event of Default, all principal and interest with respect to any outstanding Advance shall bear interest at a rate per annum equal to the rate otherwise applicable to such Advance plus five percent (5%) per annum and all other Secured

Obligations shall bear interest at a rate per annum equal to the highest rate set forth in the Table of Terms plus five percent (5%) per annum (the "**Default Rate**").

You expressly agree that: (a) the Default Rate and the late charges provided for in **Section 9** are reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (b) the Default Rate and late charges shall be payable notwithstanding the then prevailing market rates at the time payment is made; (c) You have received specific consideration in exchange for Your potential future obligation to pay the Default Rate and late charges; (d) You shall be estopped hereafter from claiming differently than as agreed to in this **Section 7** and **Section 9**; (e) Your agreement to pay the Default Rate upon the occurrence of an Event of Default and to pay late charges upon a delinquent payment are material inducements to Lenders to loan money to You; and (f) the Default Rate and the imposition of late charges represent a good faith, reasonable estimate and calculation of the lost profits or damages to, and increased risk of loss assumed by, Lenders upon an Event of Default or the late payment and that it would be impractical and extremely difficult to ascertain the actual amount of damages to Lenders or profits lost by Lenders as a result of such event triggering payment of the Default Rate or late charges.

## 8.    YOU GRANT COLLATERAL AGENT A SECURITY INTEREST

As security for the prompt and complete payment and performance in full of the Secured Obligations, each of You grants to Collateral Agent, on behalf of and for the benefit of Collateral Agent and Lenders, a first priority, continuing security interest and Lien upon all of Your right, title and interest in each of the following whether now owned or hereinafter acquired and wherever located:

⇒    All Receivables;

⇒    All Equipment;

⇒    All Fixtures;

⇒    All General Intangibles;

⇒    All Intellectual Property;

⇒    All Inventory;

⇒    All Investment Property;

⇒    All Deposit Accounts;

⇒    All Cash;

⇒    All commercial tort claims, if any, as listed on **Exhibit C**;

⇒    All Goods and personal property, whether tangible or intangible and whether now or hereinafter owned or existing, leased, consigned by or to or acquired and wherever located; and

⇒    To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, rents, profits, and products of each of the foregoing.

All the above listed items will be collectively called the "**Collateral**".

All references herein or in any other Loan Document to any Lien or security interest of Collateral Agent shall be deemed to refer to the Lien of Collateral Agent on behalf of and for the benefit of itself and the Lenders.

## 9.    HOW AND WHAT YOU WILL PAY US

**Interest Accrual; Prime Rate Determination**.  The principal balance of each Advance shall accrue interest at the percentage per year applicable to such Advance as indicated in the Table of Terms, and shall be computed daily on the basis of a year consisting of 360 days for the actual number of days occurring in the period for which such interest is payable, and interest shall accrue from the Advance Date for such Advance until such Advance has been paid in full. In the event the Interest Rate for an Advance is subject to adjustment  in connection with a Prime Rate change (as set forth in this Agreement or the respective Promissory Note), the applicable rate of interest for the outstanding principal balance of the Advances shall be increased or decreased, effective as of the first day of the month following the month in which the Prime Rate changed, by an amount equal to such change in the Prime Rate.

**Payments.**

7

⇒ **Interest; Interim Interest**. Interest on each Advance shall be payable monthly in advance beginning on the First Payment Date for such Advance and on each Payment Date thereafter until such Advance has been paid in full; provided that if the First Payment Date for such Advance is not the Advance Date for such Advance, You shall make payment to Lenders on the Advance Date in an amount equal to the per diem interest for the time from the Advance Date through and excluding the First Payment Date.

⇒ **Principal**. The principal amount of each Advance shall be due and payable

⇒ If the Advance Option for such Advance does not provide for "interest only" payments at any time, in that number of monthly installments (commencing on the First Payment Date for such Advance) equal to the number of months of the Loan Term for such Advance, with the monthly principal payment amount for each such month to be determined from time to time based on Equal Monthly Payments;

⇒ If the Advance Option for such Advance provides for "interest only" payments for a portion of the Loan Term of such Advance, in that number of monthly installments (commencing on the first Payment Date after the applicable number Payment Dates for interest only payments have occurred) equal to the number of months of principal and interest payments specified in the Advance Option for such Advance, with the monthly principal payment amount for each such month to be determined from time to time based on Equal Monthly Payments; and

⇒ If the Advance Option for such Advance provides for interest only payments during the Loan Term of such Advance, in a single installment of the full amount of such Advance on the last day of the last month of the Loan Term for such Advance;

provided that, in all cases, the outstanding principal amount of each Advance shall be due and payable in full in immediately available funds on the Maturity Date (as defined in the Promissory Notes for such Advance), if not sooner paid in full.

To the extent that any Payment Date is not on a Business Day, each applicable payment required to be made on such day shall be due and payable on the immediately preceding Business Day.

**Fees.** You shall pay to Lenders (or in the case of Audits and Inspections, each of Us) the following fees and expenses:

⇒ **Facility Fees.** On or before the Closing Date, or upon availability of additional Commitment Amounts, as the case may be, the respective Facility Fee as indicated in the Table of Terms.

⇒ **End of Term Payment.** Upon the earliest of (a) the expiration of the Loan Term, (b) the date of final payment of any Advance, and (c) the acceleration of the Secured Obligations, the End of Term Payments as indicated in the Table of Terms.

⇒ **Audits and Inspections.** Field audit charges in the amount of $800 per diem per auditor (or the then prevailing rate charged by Collateral Agent or the Applicable Lender, whichever is greater) plus actual reasonable and documented out-of-pocket expenses, in connection with up to two field examinations per year (or more if a Default or Event of Default has occurred and is continuing) conducted in accordance with this Agreement. In addition, all reasonable documented legal fees and expenses incurred in connection with the annual legal review by any of Us of this Agreement, the Loan Documents and Collateral.

⇒ **Prepayment Fee.** An additional prepayment premium ("**Prepayment Fee**") shall be payable as follows for prepayment of any Advance:

(i) If prepaid in months 1-18 following the Advance Date for such Advance: one percent (1.0%) of the outstanding balance of such Advance being prepaid; and

(ii) If prepaid after month 18 following the Advance Date for such Advance, no additional prepayment premium shall be due.

**Pro Rata Payments.** All payments on account of any Advance (whether of principal, interest, interim payment, fees or otherwise) shall be payable to Lenders based on their respective Pro Rata Shares of the applicable Advance.

**Re-Borrowing.** Any amounts that You repay on the Advances may not be re-borrowed.

**Miscellaneous.** Payments are due electronically by automatic debit through Automated Clearing House (ACH) payment on or before the Payment Date (or the immediately preceding Business Day if such Payment Date is not a Business Day) for any such payment. You agree to fill out and execute the electronic funds transfer/automatic debit

authorization forms that We provide. If We do not receive any payments from You within two (2) Business Days after they are due, You will pay the applicable Persons to whom any such payment was due a late charge on the overdue amount. The late charge will be equal to five percent (5%) of the amount due for each month not paid when due and until such time as payment is received. All payments shall be free and clear of any taxes, withholdings, duties, impositions or other charges, to the end that each of Us will receive the entire amount of any Secured Obligations payable to Us under this Agreement, regardless of the source of payment.  Any interest not paid when due shall be compounded by becoming a part of the Secured Obligations, and such interest shall then accrue interest at the rate then applicable under this Agreement and the applicable Promissory Note.

## 10.    INSURANCE

So long as there are any Secured Obligations outstanding, You shall carry and maintain commercial general liability insurance, against risks customarily insured against in Your line of business.  All such insurance shall be in form, with companies, and in amounts reasonably acceptable to Us.  Such risks shall include the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability.  You must maintain a minimum of Two Million Dollars ($2,000,000) of commercial general liability insurance for each occurrence.  So long as there are any Secured Obligations outstanding, You shall also carry and maintain insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, including the perils of fire, windstorm, flood, and earthquake, in an amount not less than the full replacement cost of the Collateral.

You shall submit to Us certificates of insurance, which reflect Your compliance with Your insurance obligations in the above paragraph and the obligations contained in this Section.  Your insurance certificate shall state that We are an additional insured for commercial general liability, an additional insured and a lender loss payee for all risk property damage insurance.  Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance.

The certificates of insurance will state that the coverage evidenced is primary and non-contributory to any insurance or the self-insurance of Collateral Agent or any Lender, and will further state that a waiver of subrogation in favor of Us has been agreed to.  All certificates of insurance will provide for a minimum of thirty (30) days advance written notice to Us of cancellation or any other change adverse to Our interests.  Any failure by Collateral Agent to scrutinize such insurance certificates for compliance is not a waiver of any of Our rights, all of which are reserved.

## 11.    REPRESENTATIONS AND WARRANTIES FROM YOU

You represent and warrant that:

        **(a)      Collateral Title.**  You own all right, title and interest in and to the Collateral, free of all Liens whatsoever, except for Permitted Liens.

        **(b)      Granting of Lien.**  You have the full power and authority to, and do grant and convey to Collateral Agent, a Lien on the Collateral as security for the Secured Obligations, free of all Liens other than Permitted Liens. Except for Permitted Liens, the Collateral is not subject to any Liens. You are not presently a party to, nor bound by, any material lease, license, contract or agreement which prohibits You or any of Your Subsidiaries from granting a Lien on such lease, license, contract or other agreement (to the extent such prohibition is enforceable under applicable law).

        **(c)      Due Organization.**  You are a corporation duly organized, legally existing and in good standing under the laws of the state, and have the corporate organization number, in each case specified for You below, and are duly qualified as a foreign corporation in all jurisdictions in which the nature of Your business or location of Your properties require such qualifications and where the failure to be qualified could reasonably be expected to result in an event which, individually or together with any other event, would have a Material Adverse Effect.

| Borrower | State of Organization | Corporate Organization Number |
|---|---|---|
| UNDERGROUND ENTERPRISES, INC | Delaware | 5586268 |
| PHOENO WINE COMPANY, INC. | Delaware | 6951578 |

(d)    **Authorization, Validity and Enforceability.**  Your execution, delivery and performance of the Promissory Notes, this Agreement, all financing statements, all other Loan Documents, and all Excluded Agreements, (i) have been duly authorized by all necessary corporate action, and (ii) will not result in the creation or imposition of any Lien upon the Collateral, other than the Liens created by this Agreement and the other Loan Documents. The person or people executing this Agreement and other Loan Documents are duly authorized to do so, and the Loan Documents executed by or on behalf of any of You and each term and provision thereof are Your legal, valid and binding obligations, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization or other similar laws generally affecting the enforcement of the rights of creditors and equitable principles (regardless of whether enforcement is sought in equity or at law).

(e)    **Litigation.**  There are no actions, suits or proceedings at law or in equity or by or before any governmental authority now pending or, to the knowledge of any of You, threatened against or affecting any of You or any of the business, property or rights of any of You (i) which involve any Loan Document or Excluded Agreement or (ii) as to which there is a reasonable possibility of an adverse determination and which, if adversely determined, could, individually or in the aggregate result in an event which individually or together with any other event, reasonably be expected to result in a Material Adverse Effect.

(f)    **Compliance with Applicable Laws.**  None of You are in violation of any law, rule or regulation or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

(g)    **Conflict.**  Neither this Agreement nor any other Loan Document (i) violates any provisions of the Governing Documents of any of You, or any law, regulation, order, injunction, judgment, decree or writ to which any of You are subject or (ii) conflicts with or results in the breach or termination of, constitutes a default under or accelerates or permits the acceleration of any performance required by, any material lease, agreement or other contract to which any of You are a party or by which any of You or any of Your property is bound.

(h)    **Further Consent.**  The execution, delivery and performance of this Agreement and the other Loan Documents do not require the consent or approval of any other Person, including any regulatory authority, or governmental body of the United States or any State or any political subdivision of the United States or any state.

(i)    **Material Adverse Effect.**  No event that has had or could reasonably be expected to have a Material Adverse Effect has occurred or is continuing.

(j)    **Other Defaults.**  None of You is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which any of You are a party or by which any of You or any of the properties or assets of any of You are or may be bound, in each case where such default could result in an event which, individually or together with any other event, could reasonably be expected to have a Material Adverse Effect.

(k)    **Other Agreement.**  None of You is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(l)    **Information Correct.**  No information, report, Advance Request, financial statement, exhibit or schedule furnished by or on behalf of any of You to Us in connection with the negotiation or performance of any Loan Document contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements, in the light of circumstances under which they were, are or will be made, not misleading (it being recognized by Us that projections and estimates as to future events are not to be viewed as facts and that the actual results during the period or periods covered by any such projections and estimates may differ materially from projected or estimated results).

(m)    **Filing of Taxes.**  You have filed all required federal, state and local tax returns (or filed appropriate extensions for the filing of such returns), except to the extent such failure to file has not resulted in the creation of a Lien. Subject to **Section 12(a)(x)**, You have fully paid, or You have reserved for and are contesting in good faith, all taxes or installments (including any interest or penalties). You have fully paid, or reserved for and are contesting in good faith, all tax assessments that any of You have received for the 3 years preceding the Closing Date.

(n)    **ERISA Compliance.**  You have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. No event has occurred resulting from the failure by any of You to comply with ERISA that is reasonably likely to result in any of You incurring any liability that could reasonably be expected to have a Material Adverse Effect.

(o)     **Hazardous Waste.**  None of the properties or assets of any of You has ever been used by any of You or, to the knowledge of any of You, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the knowledge of any of You, none of the properties or assets of any of You has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no Lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by any of You; and none of You have received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by any of You resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment. You have at all times operated Your business in compliance in all material respects with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(p)     **Operation of Business.**  You own, possess, have access to, or can become licensed on reasonable terms under all patents, patent applications, trademarks, trade names, inventions, franchises, licenses, permits, computer software and copyrights necessary for the operation of Your business as now conducted, with no known infringement of, or conflict with, the rights of others.  You have taken reasonable measures to avoid liability from infringement by third parties using Your facilities, in particular that You have complied with the requirements of the Digital Millennium Copyright Act for notice and takedown. You have at all times operated Your business in compliance in all material respects with all applicable provisions of the Federal Fair Labor Standards Act, as amended.

(q)     **Trading with the Enemy Act; OFAC; Patriot Act.**  Neither You nor any of Your Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act or any enabling legislation or executive order relating thereto.  Neither You nor any of Your Subsidiaries is in violation of, or as a result of this  Agreement would cause  Us to be in violation of (i)the Trading with the Enemy Act, International Emergency Economic Powers Act, or Magnitsky Act, (ii)any of the sanctions regulations of the United States Department of the Treasury's Office of Foreign Assets Control (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (iii) the Patriot Act.

(r)     **Investment Company Act.**  Neither You nor any of Your Subsidiaries are (i) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under, the Investment Company Act of 1940, (ii) otherwise subject to any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from, or registration or filing with, any governmental authority in connection with Your or its incurrence of debt, (iii) and is not a "person" related to Us as described in Sections 57(b) or 57(e) of the Investment Company Act of 1940.

(s)     **Your Information.**  Your present name, former names (if any) used in the past five (5) years, locations, and other information are correctly and completely stated on the Certificate of Perfection.

(t)     **Intellectual Property.**  The Certificate of Perfection contains a true, correct and complete list of each of Your Patents, Trademarks, Copyrights and Licenses, together with application or registration numbers, as applicable.

(u)     **Accounts.**  The Certificate of Perfection contains a true, correct and complete list of (i) all banks and other financial institutions at which You maintain Deposit Accounts and (ii) institutions at which You maintain accounts holding Investment Property owned by You, and such Certificate of Perfection correctly identifies the name, address and telephone number of each bank or other institution, the name in which the account is held, a description of the purpose of the account, and the complete account number therefore.  None of the account debtors or other Persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute, rule, or law in respect of such Collateral.

(v)     **Sanctions.**  Neither You nor any of Your Subsidiaries is (i) listed, or is owned or controlled, directly or indirectly, by any person which is listed on an SDN List, (ii) located, organized or resident in a country or region which is the subject of sanctions by any Authority or (iii) a government agent, authority, body, or state-owned enterprise of any country which is the subject of sanctions by any Authority (including Russia).

## 12.     YOUR COVENANTS TO US

So long as the Secured Obligations have not been Paid in Full, each of You covenants to the following:

**(a)** **AFFIRMATIVE COVENANTS**.

(i)      **Legal Existence and Qualification.**  Each of You will maintain Your, and each of Your Subsidiaries', legal existence and good standing in Your and their respective jurisdictions of formation or organization, and maintain qualifications to do business in all jurisdictions in which the nature of Your and their business or location of Your and their properties require such qualifications and where the failure to be qualified could reasonably be expected to result in an event which, individually or together with any other event, would have a Material Adverse Effect.

(ii)      **Compliance with Laws.**  Each of You will, and will cause each of Your Subsidiaries to, comply with all laws (including, without limitation, environmental laws) rules, regulations applicable to, and all orders and directives of any governmental or regulatory authority having jurisdiction over, You, Your Subsidiaries or Your and their business, and with all material agreements to which You or any of Your Subsidiaries are a party, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect.  None of You nor any of Your Subsidiaries shall become an "investment company" or controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of Your important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any loan for such purpose.  None of You, nor any Your Subsidiaries shall fail to meet the minimum funding requirements of ERISA, permit a reportable event or prohibited transaction, as defined in ERISA, to occur, or fail to comply in all material respects with the Federal Fair Labor Standards Act.

(iii)      **Investment Company Act Management Rights.**  Each of You and Your Subsidiaries will permit any of Our authorized representatives and Our attorneys and accountants on reasonable notice to visit You and Your Subsidiaries and inspect Your and Your Subsidiaries' properties, inspect, examine and make copies and abstracts of Your and Your Subsidiaries' books of account and records at reasonable times and during normal business hours.  In addition, We and Our agents, attorneys and accountants will have the right to meet with the management and officers of any of You to discuss such books of account and records relating to You or Your Subsidiaries.  In addition, We will be entitled at reasonable times and intervals to consult with, make presentations to, and advise the management and officers of any of You concerning significant business issues.  Such consultations shall not unreasonably interfere with Your business operations.  Each of You represents and warrants that each Lender has offered to make available to each of You "significant managerial assistance" (as defined in Section 2(a)(47) of the Investment Company Act of 1940) and, to the extent You accept such offer from any Lender, the scope, terms and conditions of such significant managerial assistance shall be set forth in a separate agreement between You, the applicable Lender and such Lender's administrator. On the Closing Date each of You agree to execute the Managerial Assistance Acknowledgment Letter referred to in **Section 18(a)(ix)** hereto and attached as Exhibit F (or any replacement or substitution for such letter).

(iv)      **VCOC Management Rights**.  One of the lenders in this facility is intended to be a venture capital operating company (a "**VCOC** ") as defined in the regulations under the Employee Retirement Income Security Act of 1974, as amended, which applies to those of Our investors that are pension or other employee benefit plans of United States-based companies and will be identified as a "VCOC Lender" hereunder.  The VCOC Lender is seeking certain management rights in furtherance of its VCOC-related compliance efforts, and these rights, which are hereby agreed, are listed as follows:

(A)      You shall permit any authorized representatives of the VCOC Lender to discuss Your and Your Subsidiaries affairs, finances and accounts with its and their officers, all at such times as VCOC Lender may reasonably request;

(B)      The VCOC Lender or any authorized representative shall have the right to consult with and advise the management of You and Your Subsidiaries, upon reasonable notice at reasonable times from time to time, on all matters relating to the operation of You and Your subsidiaries;

(C)      You shall provide all of the following to the VCOC Lender:

(1)      all financial statements, reports and other items required to be delivered under Loan Agreement when such statements or reports are prepared;

(2)     promptly after filing, copies of all registration statements and public regular, periodic or special reports which any member of You and Your Subsidiaries may, on a non-confidential basis, make to, or file with, the SEC or other similar governmental regulatory agency;

(3)     true and correct copies of all other documents, reports, financial data and other information relating to You and Your Subsidiaries as the VCOC Lender may reasonably request; and

(4)     all documentation and other information that is provided from time to time to Your Board of Directors, including information provided in connection with board meetings within a reasonable time after same; provided that, however, board packages or materials provided to the members of Your Board of Directors  to the extent expected to cover  review and approval of the annual budget or any changes thereto, the business plan or any changes thereto, or any other matters that are material to the overall operation of You or Your Subsidiaries shall be provided at the same time as provided to members of Your Board of Directors, and the VCOC shall otherwise be entitled to board packages or materials as the VCOC Lender may from time to time request.

(D)     The VCOC Lender or an authorized representative shall be entitled to inspect Your and Your Subsidiaries' books, records and properties on reasonable notice and at reasonable times and intervals.

(E)     You shall make available to the VCOC Lender one or more board members at least once a quarter but upon reasonable notice for discussions on all matters relating to the operation of You and Your Subsidiaries.

(v)     **Additional Documents and Assurances.**   Each of You will from time to time execute, deliver and file, alone or with Us, any security agreements, or other documents reasonably necessary to perfect or give first priority (subject to Permitted Liens that are specifically designated as being senior in priority) to Collateral Agent's Lien on the Collateral.  Each of You will from time to time obtain any instruments or documents as We may reasonably request, and take all further action that may be reasonably necessary or desirable, or that We may reasonably request, to carry out the provisions and purposes of this Agreement or any other Loan Document or to confirm, perfect, preserve and protect the Liens granted to Collateral Agent.  In addition, each of You authorizes Collateral Agent to file at any time financing statements, continuation statements, and amendments thereto and applications for registration that (A) either specifically describe the Collateral or describe the Collateral as all of Your assets or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, and (B) contain any other information required by the UCC or under the relevant jurisdiction for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment or application for registration, including whether You are an organization, the type of organization and any organizational identification number (or equivalent information) issued to You, if applicable.  Each of You hereby appoint Collateral Agent as its lawful attorney-in-fact to sign Your name on any documents necessary to perfect or continue the perfection of any Lien regardless of whether an Event of Default has occurred until all Secured Obligations have been Paid in Full.  Collateral Agent's foregoing appointment as the attorney in fact for each of You, and all of Collateral Agent's rights and powers, coupled with an interest, are irrevocable until all Secured Obligations have been Paid in Full.

(vi)     **Protection of Collateral Agent's Lien.**  Each of You will take or cause to be taken all actions reasonably necessary to protect and defend Your title to the Collateral and Collateral Agent's Lien on the Collateral.  Each of You shall at all times keep the Collateral, and the assets and properties of each of Your Subsidiaries, free and clear from any legal process or Liens whatsoever (except for Permitted Liens) and shall give Us immediate written notice of any legal process affecting the Collateral or the assets and properties of Your Subsidiaries, or any Liens on the Collateral or the assets and properties of Your Subsidiaries.

(vii)     **Maintenance of Properties.**  Each of You will maintain and protect Your properties, assets and facilities (and those of Your Subsidiaries), including Your equipment and fixtures, in good working order, repair and condition (taking into consideration ordinary wear and tear) and from time to time make or cause to be made all necessary and proper repairs, renewals and replacements and shall completely manage and care for Your property in accordance with prudent industry practices.

(viii)    **Financial Statements.**  Each of You will provide monthly and yearly financial statements in accordance with **Section 18(c)** of this Agreement, and such financial statements will include reports of any material contingencies (including commencement of any material litigation by or against You) or any other occurrence that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ix)    **Audits and Inspections.**  Upon the request of Collateral Agent, each of You will, with reasonable notice, during normal business hours, make the Inventory, Equipment, other Collateral, and books and records concerning the Collateral (including software used in Your business) available to Collateral Agent for inspection at the place where it is located and shall make Your log and maintenance records pertaining to the Inventory and Equipment available to Collateral Agent for inspection.  You will take all action necessary to correctly and completely maintain such books, records, logs, and maintenance records.

(x)    **Taxes.**  Each of You will pay when due all federal income taxes, all state taxes imposed by each of Your states of organization and the state of Your principal place of business and all material taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) imposed or assessed against any of You, Us or the Collateral or upon Your ownership, possession, use, operation or disposition thereof or upon Your rents, receipts or earnings arising therefrom (excluding taxes imposed on Us based on Our net income or franchise taxes).  Each of You shall file on or before the due date all federal, state and local tax returns including personal property tax returns in respect to the Collateral on or before the due date thereof.  Notwithstanding the foregoing, each of You may contest, in good faith and by appropriate proceedings, taxes, fees and other charges for which You maintain adequate reserves in accordance with GAAP.

(xi)    **Intellectual Property.**  Each of You will:  (a) protect, defend and maintain the validity and enforceability of Your Intellectual Property; (b) promptly advise Collateral Agent in writing of any known or threatened material infringements of or any legal process affecting Your Intellectual Property; (c) not allow any Intellectual Property material to Your business to be abandoned, forfeited or dedicated to the public; and (d) give Us written notice of any applications or registrations of Your Intellectual Property, including the date of such filings and the applicable application or registration numbers within thirty (30) days after the end of each calendar quarter.

(xii)    **Subsidiaries.**  If at any time, any of You create or acquire any Subsidiary, You and such Subsidiary will promptly notify Collateral Agent of the creation or acquisition of such new Subsidiary and take all such action as Collateral Agent may reasonably require to cause such Subsidiary to become an obligor and guarantor with respect to the Secured Obligations and grant to Collateral Agent a continuing pledge and security interest in and to the assets of such Subsidiary, including by causing such Subsidiary to enter into a Joinder Agreement, and You shall grant and pledge to Collateral Agent a first priority, perfected security interest in the stock, units or other evidence of ownership of such Subsidiary.  Any such joining Subsidiary shall also join the Managerial Assistance Acknowledgment Letter referred to in **Section 18(a)(ix)** hereto and attached as Exhibit F (or any replacement or substitution for such letter).

(xiii)    **Post-Closing Undertakings**.  You agree that You shall, at Your own expense, deliver or cause to be delivered to Us the items described on <u>Schedule 2</u> attached hereto, each in form and substance reasonably satisfactory to Us, and/or take the actions described on <u>Schedule 2</u>, in a manner reasonably acceptable to Us, on or prior to the dates set forth in <u>Schedule 2</u> (or such later date or dates as may be approved by Us in Our sole discretion in writing).

**(b)**    **NEGATIVE COVENANTS.**

(i)    **Dispositions**.  None of You will nor will You permit any of Your Subsidiaries to sell, lease, sublease, or otherwise dispose of any Your or their property or assets (including, for the avoidance of doubt, any interest that You or any Subsidiary may have in a Subsidiary) other than pursuant to Permitted Dispositions.

(ii)    **Liens and Encumbrances.**  None of You will nor will You permit any of Your Subsidiaries to, grant a security interest in, hypothecate, permit or suffer to exist any Lien on or with respect to, or otherwise encumber, any portion of Your properties or assets (or those of any Subsidiary), including the Intellectual Property, either voluntarily or involuntarily, other than Permitted Liens.

(iii)    **Mergers or Acquisitions.**  Unless all Your outstanding Secured Obligations have been Paid in Full, none of You will, nor will You permit any of Your Subsidiaries to, liquidate, dissolve or enter into or consummate any Merger Event or acquire all or substantially all of the capital stock or property of another Person, except that a Subsidiary (A) may merge into any of You or another Subsidiary of You, or (B) may liquidate or dissolve, provided that its assets are transferred to You.

(iv)    **Compromise of Accounts.**  Without the prior written consent of Collateral Agent, none of You will (A) grant any material extension of the time or payment of any of the Receivables, or General Intangibles, except in the ordinary course of business and consistent with customary industry practice, (B) to any material extent, compromise, compound or settle the same for less than the full amount, except in the ordinary course of business and consistent with customary industry practice, (C) release, wholly or partly, any Person liable for the payment, or (D) allow any credit or discount whatsoever other than trade discounts granted to You in the ordinary course of Your business and consistent with customary industry practice.

(v)    **Other Indebtedness.**  None of You will, nor will You permit any of Your Subsidiaries to, incur any Indebtedness other than Indebtedness evidenced by this Agreement and the Permitted Indebtedness.

(vi)    **Investments.**  None of You will, nor will You permit any of Your Subsidiaries to, directly or indirectly make any Investment other than Permitted Investments.

(vii)    **Dividends and Distributions.**  Without the prior written consent of Collateral Agent, none of You will declare or pay any cash dividend or make a distribution on, or repurchase or redeem, any class of stock, other than (a) pursuant to repurchase plans upon an employee's, consultant's or director's death or termination of employment provided the aggregate amount of all such repurchases does not exceed One Hundred Thousand Dollars ($100,000) in any twelve-month period, and (b) dividends payable solely in shares of Your common stock.

(viii)    **Collateral Locations.**  None of You will relocate, nor will You permit any Subsidiary to relocate, Your (or such Subsidiary's) chief executive office or principal place of business or any item of the Collateral (or assets of any such Subsidiary) unless: (A) You have given Collateral Agent no less than thirty (30) days prior written notice, (B) You have obtained Collateral Agent's prior written consent, which consent shall not be unreasonably withheld; (C) such relocation shall be within the continental United States, and (D) such relocation does not adversely affect the perfection or priority of Collateral Agent's Lien in any of the Collateral.  In addition, each of You will obtain and maintain such acknowledgments, consents, waivers and agreements from: (1) the owner, Lien holder, mortgagee and landlord with respect to any real property on which Collateral is located and (2) any Person in possession of Collateral, as Collateral Agent may require, all in form and substance reasonably satisfactory to Collateral Agent.  Without limiting the foregoing, where the Collateral is covered by a negotiable Document (such as a warehouse receipt), You shall deliver to Collateral Agent possession of such Document.

(ix)    **Line of Business.**  Without the prior written consent of Collateral Agent, none of You will engage in, nor will You permit any of Your Subsidiaries to engage in, any business other than the businesses currently engaged in by You or Your Subsidiaries or reasonably related thereto or business proposed to be engaged in by You and Your Subsidiaries as disclosed to and approved by Us on the Closing Date.

(x)    **Changes of Jurisdiction, Name Etc.**  None of You will change (A) Your state of organization, (B) Your name or (C) Your type of organization, in each case without providing Collateral Agent at least 30 days' advance written notice of such change and, in the case of **clause (C)**, the prior written consent of Collateral Agent.

(xi)    **Deposit and Investment Accounts.**  None of You will maintain, nor permit any of Your Subsidiaries to maintain, any Deposit Accounts or accounts holding Investment Property owned by any of You (or such Subsidiaries) except (A) accounts identified in the Certificate of Perfection with respect to which Collateral Agent has a perfected security interest, and (B) other accounts with respect to which Collateral Agent has a perfected security interest. You will give Collateral Agent prior written notice of the creation of any Deposit Accounts or accounts holding Investment Property.

(xii)    **Transactions with Affiliates.**  Without the prior written consent of Collateral Agent, none of You will directly or indirectly enter into or permit to exist any material transaction with any of Your Affiliates except for (A) transactions that are in the ordinary course of Your business, upon fair and reasonable terms that are no less favorable to You than would be obtained in an arm's length transaction with

a non-affiliated Person, (B) equity financings with Your existing investors that are otherwise permitted under this Agreement, (C) unsecured bridge financings with Your existing investors that are otherwise permitted under this Agreement and that constitute Subordinated Indebtedness and are evidenced by a subordination agreement on terms acceptable to Collateral Agent in its sole discretion, and (D) the administrative services agreement among Borrowers, dated as of June 27, 2018, as amended, and other arrangements arising out of or related thereto made in connection with Your and Your Subsidiaries' business as conducted on the Closing Date.

(xiii)    **Indebtedness.** You will not prepay, redeem or otherwise satisfy in any manner prior to the scheduled repayment thereof any Indebtedness (other than the Advances), and You shall not make or permit any payment on any Subordinated Indebtedness, except under the terms of the subordination, intercreditor, or other similar agreement to which such Subordinated Indebtedness is subject, or amend any provision in any document relating to the Subordinated Indebtedness which would increase the amount thereof or adversely affect the subordination thereof to the Secured Obligations.

(xiv)    **OFAC and Patriot Act.** None of You will, directly or indirectly, use the proceeds of the Advances, or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person, to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is the subject of any sanctions administered by OFAC, or in any other manner that would result in a violation of OFAC sanctions by any Person, including any Person participating in any capacity in the Advances. You will not, and will not permit, allow, or neglect to prevent any of Your Subsidiaries from engaging in acts or failing to act in a matter that would (a) violate at any time to any law, regulation, order or list of any governmental authority of the United States (including the OFAC list) that prohibits or limits Us from making any Advance or extension of credit to You or from otherwise conducting business with You, or (b) fail to provide certificates or documentary or other evidence of Your identity as may be requested by Us at any time to enable Us to verify Your identity or to comply with any applicable law or regulation, including Section 326 of the Patriot Act at 31 U.S.C. Section 5318.

(xv)    **Burdensome Agreements.** None of You will, nor will You permit any of Your Subsidiaries to, enter into any agreement with any Person (other than Us) that restricts Your ability, or the ability of any of Your Subsidiaries, to transfer, sell, assign, grant a security interest in, hypothecate, permit or suffer to exist any Lien, or otherwise transfer any interest in or encumber any portion of Your properties or assets or those of any of Your Subsidiaries, including Your Intellectual Property.

(xvi)    **Sanctions**. You will ensure that no Advance will, directly or indirectly, be used or paid for the purposes of any transaction related to either (i) any person which is listed on the SDN List or another sanctions list maintained by the U.S. government, or is owned or controlled, directly or indirectly, by any person listed on the SDN List or (ii) any country or region which is the subject of sanctions by any Authority. You will not engage in any conduct which might reasonably be expected to cause You or Us to violate or become a target of any sanctions by any Authority.

## 13.    YOU AGREE TO INDEMNIFY AND PROTECT US

You agree to indemnify and hold Us, Our officers, directors, employees, agents, attorneys, representatives and shareholders (each, an "**Indemnitee**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal), that may be instituted or asserted against or incurred by any Indemnitee as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated or any actions or failures to act in connection with, or arising out of the disposition or utilization of the Collateral, excluding in all cases, claims, costs, expenses, damages and liabilities to the extent resulting from such Indemnitee's gross negligence or willful misconduct or fraud or bad faith.

## 14.    WHAT IS AN EVENT OF DEFAULT

The occurrence of any one or more of the following events shall constitute an "**Event of Default**" under this Agreement:

(a)    **Payment.**  You do not pay any principal, interest, fees, costs or other Secured Obligations under this Agreement, the Promissory Notes or any of the other Loan Documents on the due date; or

(b)    **Covenant.**

(i)    Any of You violate, breach or fail to perform any covenant, obligation or undertaking under **Section 12** or **18** of this Agreement (other than **Sections 12(a)(i), 12(a)(iv), 12(a)(v), and 14(b)(viii)**); or

(ii)    Any of You violate, breach or fail to perform any other covenant, obligation, undertaking, condition, or Secured Obligations under this Agreement, the Promissory Notes or any of the other Loan Documents, and You fail to cure such violation, breach or failure (to the extent that such violation, breach or failure is capable of being cured) within ten (10) days after the occurrence thereof; provided, however, that if after Your diligent attempts to remedy and cure such default, it cannot by its nature be cured within the ten (10) day period, and such default is reasonably likely to be cured within a reasonable time, then You shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default. Cure periods provided in this section do not apply to financial covenants or other covenants or undertakings that are required to be satisfied, completed or tested by a specific date or any of the covenants covered by clause (b)(i) above; or

(c)    **Material Adverse Effect.**  Any event or circumstance occurs that could reasonably be expected to have a Material Adverse Effect; or

(d)    **Misrepresentations.**  Any of You or any Person acting for any of You makes any representation, warranty, or other statement now or later in this Agreement, any other Loan Document, or any Excluded Agreement or in any writing delivered to Us or to induce Us to enter this Agreement, any other Loan Document, or any Excluded Agreement, and such representation, warranty, or other statement is incorrect in any material respect when made, provided, however, that such materiality qualifier shall not be applicable to any representation, warranty or statement that already is qualified or modified by materiality in the text thereof; or

(e)    **Bankruptcy; Attachment; Other.**

(i)    Any of You (A) assigns Your assets for the benefit of Your creditors, (B) becomes insolvent or becomes unable to pay Your debts as they become due, or becomes unable to pay or perform Your obligations under the Loan Documents or Excluded Agreements, (C) files a voluntary petition in bankruptcy, (D) files any petition, answer, or document seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation pertinent to such circumstances, (E) seeks or consents to or acquiesces in the appointment of any trustee, receiver, or liquidator of itself or of all or any substantial part of its assets or property, (F) ceases operation of Your business as Your business has normally been conducted, or terminates substantially all of Your employees, or (G) have Your directors or majority shareholders take any action initiating any of the foregoing actions described in this **subsection (e)(i)**; or

(ii)    Either (A) thirty (30) days shall have expired after the commencement of an involuntary action against any of You seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, without such action being dismissed or all orders or proceedings thereunder affecting Your operations or the business being stayed; or (B) a stay of any such order or proceeding shall thereafter be set aside and the action setting it aside shall not be timely appealed; or (C) any of You shall file any answer admitting or not contesting the material allegations of a petition filed against You in any such proceedings; or (D) the court in which such proceedings are pending shall enter a decree or order granting the relief sought in any such proceedings; or

(iii)    Thirty (30) days shall have expired after the appointment, without Your consent or acquiescence, of any trustee, receiver or liquidator of any of You or of all or any substantial part of the properties of any of You without such appointment being vacated; or

(f)    **Agreements with Us.**  The occurrence of any default under any other Loan Document, any Excluded Agreement, or any other agreement between any of You and/or any of Your Subsidiaries and any of Us

(other than any default embodied in or covered by any subsection of this **Section 14**) and such default continues for more than twenty (20) days after the earlier of (i) We have given notice of such default to You, or (ii) You have actual knowledge of such default; or

(g)     **Other Agreements.**  The occurrence of any default that has not been cured or waived within any applicable grace period under any lease, loan, or other agreement or obligation of any of You involving any obligation which aggregates more than One Hundred Thousand Dollars ($100,000), or which default could reasonably be expected to have a Material Adverse Effect; or

(h)     **Judgments.**  The entry of (i) any judgment or arbitration award against any of You involving a judgement or an award in excess of One Hundred Thousand Dollars ($100,000) or that could reasonably be expected to have a Material Adverse Effect that is not covered by insurance by a solvent insurance carrier that has confirmed coverage in writing, has not been, discharged, bonded or stayed on appeal within ten (10) days; or (ii) any judgment or arbitration award against You in which You are enjoined, restrained or in any way prevented from conducting all or any material part of Your business or affairs; or

(i)     **Change of Control**.  Except as otherwise permitted under this Agreement, the occurrence of any event or transaction, including the sale or exchange of outstanding shares of Your capital stock or the capital stock of any of Your Subsidiaries, or series of related events or transactions, resulting in (i) the holders of such outstanding capital stock immediately before consummation of such event or transaction, or series of related events or transactions, do not, immediately after consummation of such event or transaction or series of related events or transactions, retain, directly or indirectly, capital stock representing at least 50% of the voting power of the surviving Person of such event or transaction or series of related events or transactions, in each case without regard to whether You or any of Your Subsidiaries are the surviving Person, (ii) any Person or "group" (other than a Person that is a stockholder on the Closing Date) shall obtain "beneficial ownership" (as such terms are defined under Section 13d-3 of and Regulation 13D under the Securities Exchange Act of 1934), either directly or indirectly, of more than 25% of Your outstanding capital stock having the right to vote for the election of directors under ordinary circumstances, other than as a result of the sale of Borrower's equity securities in a public offering or to venture capital or private equity investors so long as Borrower identifies to Bank the venture capital or private equity investors at least seven (7) Business Days prior to the closing of the transaction and provides to Bank a description of the material terms of the transaction, or (iii) You cease to own and control all of the economic and voting rights associated with all of the outstanding capital stock of Your Subsidiaries; or

(j)     **Investor Support.**  Collateral Agent or any Lender has determined, in its good faith judgment, that it is the intention of Your current equity investors to not continue to fund, or arrange for the funding of, You in the amounts and timeframe reasonably necessary to enable You to satisfy the Secured Obligations as they become due and payable; or

(k)     **Officers.**  The individuals holding the offices of Your Chief Executive Officer, President, or Chief Financial Officer (if appointed) as of the Closing Date shall for any reason cease to hold such offices or be actively engaged in Your day-to-day management, unless a successor reasonably acceptable to Your board of directors is appointed within one hundred twenty (120) days of such cessation; or

(l)     **Guaranty Documents.**  (i) Any guaranty of any Secured Obligations terminates or ceases for any reason to be in full force and effect; (ii) any Guarantor does not perform any obligation or covenant under any guaranty of the Secured Obligations or any Event of Default occurs under any security agreement or other agreement between Us and any Guarantor; (iii) any event or circumstance described in **subsections (c)** through **(h)** of this **Section 14** occurs with respect to any Guarantor, or (iv) the death, liquidation, administration, winding up, or termination of existence of any Guarantor (as applicable**)**.

| 15. | WHAT HAPPENS UPON AN EVENT OF DEFAULT |
|---|---|

(a)     If an Event of Default has occurred and is continuing, Collateral Agent may, and at the direction of Requisite Lenders shall, without notice to any of You:

(i)     Terminate all outstanding Part Commitments, thereby terminating Our commitment to make any future Advances under this Agreement;

(ii)     Recover all sums due and accelerate and demand payment of all or any part of the principal, interest, fees, costs or other Secured Obligations and declare them to be immediately due and payable (provided, that upon the occurrence of a default of the type described in **Section 14(e)** (i.e. "Bankruptcy;

Attachment; Other"), the Promissory Notes and all of the principal, interest, fees, costs or other Secured Obligations shall automatically be accelerated and made immediately due and payable, in each case without any further notice or act);

(iii)    Settle or adjust disputes and claims directly with the account debtors of any of You for amounts, upon terms and in whatever order that Collateral Agent reasonably considers to be advisable;

(iv)    Enter the premises of any of You, without notice and process of law and in compliance with Your security requirements, to remove and repossess the Collateral without being liable to any of You for damages due to the repossession, except those resulting from Our or Our assignees' negligence and charge You for the cost of repossession, storing and shipping the Collateral. With respect to any premises that any of You own, You hereby grant to Collateral Agent a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Our rights or remedies provided herein, at law, in equity, or otherwise; and

(v)    Pursue any other remedy permitted by law, equity or otherwise.

(b)    Upon and after an Event of Default, the unpaid principal and accrued interest on the Promissory Notes and Advances and all outstanding principal, interest, fees, costs or other Secured Obligations, including all professional fees and expenses, shall thereafter bear interest at the Default Rate.

(c)    Collateral Agent may exercise all rights and remedies with respect to the Collateral under this Agreement or the other Loan Documents or otherwise available to it under the UCC and other applicable law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral. Each of You hereby grants to Collateral Agent a license and right, to use, without charge, the labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature of any of You, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral. In connection with Our exercise of Our rights under this Agreement and the other Loan Documents, each of the rights of any of You under all licenses and all franchise agreements shall inure to Collateral Agent's benefit. All Our rights and remedies shall be cumulative and not exclusive.

(d)    In addition to the power of attorney granted by each of You to Collateral Agent in **Section 12(a)(v)**, effective only upon the occurrence and during the continuance of an Event of Default, each of You hereby irrevocably appoints Collateral Agent (and any of its designated officers, agents, attorneys or employees) as Your true and lawful attorney to: (i) send requests for verification of Receivables or notify account debtors of its security interest in the Receivables; (ii) endorse Your name on any checks or other forms of payment or security that may come into its possession; (iii) sign Your name on any invoice or bill of lading relating to any Receivable, drafts against account debtors, schedules and assignments of Receivables, verifications of Receivables, and notices to account debtors; (iv) dispose of any Collateral; (v) make, settle, and adjust all claims under and decisions with respect to Your policies of insurance; and (vi) settle and adjust disputes and claims respecting the Accounts directly with account debtors, for amounts and upon terms which Collateral Agent determines to be reasonable. Collateral Agent's appointment as the attorney in fact for each of You, and each and every one of Collateral Agent's rights and powers, being coupled with an interest, is irrevocable until all of the Secured Obligations have been Paid in Full.

## 16.    WHAT HAPPENS IF YOU ARE IN DEFAULT AND WE EXERCISE OUR REMEDIES

If an Event of Default has occurred and is continuing, Collateral Agent may, at any time or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as it may elect. Any such sale may be made either at public or private sale at the place of business of any of You or elsewhere. Each of You agrees that any such public or private sale may occur upon Collateral Agent's ten (10) calendar days' prior written notice to You. Collateral Agent may require any of You to assemble the Collateral and make it available to it at a place it designates that is reasonably convenient to it. The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied in the following order of priorities:

First, to Us in an amount sufficient to pay in full Our costs and professionals' and advisors' fees and expenses of Collateral Agent and Lenders;

Second, to Us in an amount equal to the then unpaid amount of all the principal, interest, fees, costs or other Secured Obligations, in such order and priority as Requisite Lenders may choose in their sole discretion

(provided that all amounts applied to any category of Secured Obligations relating to the Advances shall be allocated between Lenders based on their respective Pro Rata Shares of the applicable Advances, and all amounts applied to any other category of Secured Obligations shall be applied pro rata to each of Us based on Our respective portion thereof); and

Finally, after the Payment in Full of the Secured Obligations, to any creditor holding a junior Lien on the Collateral, or to any of You or Your representatives or as a court of competent jurisdiction may direct.

---

## 17.    CROSS-GUARANTY

**Cross-Guaranty.**  Each of You hereby agrees that You are jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Us and Our respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of all Secured Obligations owed or hereafter owing to Us by the other of You.  Each of You agrees that Your guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that Your obligations under this Section shall not be discharged until Payment in Full of the Secured Obligations, and that Your obligations under this Section shall be absolute and unconditional, irrespective of, and unaffected by:

⇒    the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any other agreement, document or instrument to which any of You are or may become a party;

⇒    the absence of any action to enforce this Agreement (including this Section) or any other Loan Document or the waiver or consent by Us with respect to any of the provisions thereof;

⇒    the existence, value or condition of, or failure to perfect Collateral Agent's Lien against, any security for the Secured Obligations or any action, or the absence of any action, by Us in respect thereof (including the release of any such security);

⇒    the insolvency of any of You; or

⇒    any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each of You shall be regarded, and shall be in the same position, as principal debtor with respect to the Secured Obligations guaranteed hereunder.

**Waivers.**  Each of You expressly waives all rights any of You may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Us to marshal assets or to proceed in respect of the Secured Obligations guaranteed hereunder against the other of You, any other party or against any security for the payment and performance of the Secured Obligations before proceeding against, or as a condition to proceeding against, You.  It is agreed among each of You and Us that the waivers in this **Section 17** are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this Section and such waivers, We would decline to enter into this Agreement.

**Benefit of Guaranty.**  Each of You agrees that the provisions of this Section are for Our benefit and the benefit of Our respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Person and any of Us, the obligations of such Person under the Loan Documents.

**Waiver of Subrogation, Etc.**  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth herein, each of You hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.  Each of You acknowledges and agrees that this waiver is intended to benefit Us and shall not limit or otherwise affect Your liability hereunder or the enforceability of this Section, and that We and Our respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section.

**Election of Remedies.**  If We may, under applicable law, proceed to realize Our benefits under any of the Loan Documents giving Collateral Agent or any Lender a Lien upon any Collateral, whether owned by any of You or by any other Person, either by judicial foreclosure or by non judicial sale or enforcement, Collateral Agent may, and at the direction of Requisite Lenders shall, determine which of Our remedies or rights We may pursue without affecting any of Our rights and remedies under this Section.  If, in the exercise of any of Our rights and remedies, We shall

20

forfeit any of Our rights or remedies, including Our right to enter a deficiency judgment against any of You or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each of You hereby consents to such action by Us and waives any claim based upon such action, even if such action by Us shall result in a full or partial loss of any rights of subrogation that any of You might otherwise have had but for such action by Us. Any election of remedies that results in the denial or impairment of any right of Ours to seek a deficiency judgment against any of You shall not impair the respective obligations of the rest of You to pay the full amount of the Secured Obligations. In the event We shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, We may bid all or less than the amount of the Secured Obligations and the amount of such bid need not be paid by Us but shall be credited against the Secured Obligations. The amount of the successful bid at any such sale, whether We are or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Secured Obligations shall be conclusively deemed to be the amount of the Secured Obligations guaranteed under this Section after such sale, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which We might otherwise be entitled but for such bidding at any such sale.

**Limitation**. Notwithstanding any provision herein contained to the contrary, the liability of each of You under this Section (which liability is in any event in addition to amounts for which You are primarily liable under this Agreement) shall be limited to an amount not to exceed as of any date of determination the greater of: (a) the net amount of the amounts advanced to the other of You under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, You; and (b) the amount that could be claimed by Us from the other of You under this Section without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, Your right of contribution and indemnification from the other of You under this Section.

**Contribution with Respect to Guaranty Obligations**.

⇒ To the extent that any of You shall make a payment under this Section of all or any of the Secured Obligations (a "**Guarantor Payment**") that, taking into account all other Guarantor Payments then previously or concurrently made by such Person, exceeds the amount that such Person would otherwise have paid if each of You had paid the aggregate Secured Obligations satisfied by such Guarantor Payment in the same proportion that such Person's Allocable Amount (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of all of You as determined immediately prior to the making of such Guarantor Payment, then, following Payment in Full of the Secured Obligations, such Person shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, the other of You for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

⇒ As of any date of determination, the "**Allocable Amount**" of any of You shall be equal to the maximum amount of the claim that could then be recovered from such Person under this Section without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

⇒ This **Section** is intended only to define the relative rights of each of You and nothing set forth in this **Section** is intended to or shall impair the obligations of each of You, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including subsection "Cross-Guaranty" above. Nothing contained in this Section shall limit the liability of any of You to pay the Advances made directly or indirectly to You and accrued interest, fees and expenses with respect thereto, for which You shall be primarily liable.

⇒ The Parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Person to which such contribution and indemnification is owing.

⇒ Notwithstanding anything to the contrary herein, the rights of the indemnifying Persons against other Persons under this Section shall not be exercisable until after the Payment in Full of the Secured Obligations.

**Liability Cumulative.** The liability of each of You under this Section is in addition to and shall be cumulative with all liabilities of each of You to Us under this Agreement and the other Loan Documents to which You are a party or in respect of any Secured Obligations or obligation of each of You, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

21

**18.    DOCUMENTS YOU WILL PROVIDE US**

**(a)    You will provide Us with each of the following documents on or before the Closing Date:**

(i)    Executed originals of this Agreement, the Warrant Agreement and all other documents and instruments that We may reasonably require;

(ii)    Secretary's certificate of incumbency and authority for each of You;

(iii)    Certified copy of resolutions of each of Your boards of directors approving this Agreement, the associated Warrant Agreement(s) and the other Loan Documents and the transactions evidenced by this Agreement, the associated Warrant Agreement(s) and the other Loan Documents;

(iv)    Certified copy Article/Certificate of Incorporation/Formation for each of You, and copies of Your bylaws/operating agreement certified by your Secretary or other officer, in each case as amended through the Closing Date;

(v)    A certificate of good standing from the State of organization of each of You and each of your Subsidiaries, and similar certificates from all other jurisdictions where You and any of Your Subsidiaries do business and where the failure to be qualified, individually or collectively, could reasonably be expected to have a Material Adverse Effect;

(vi)    Payment of the Facility Fee for the Commitment Amount as denoted in the Table of Terms;

(vii)    Your budget and business plan of the current fiscal year;

(viii)    Executed Certificate of Perfection, attached as **Exhibit C**;

(ix)    Executed Managerial Assistance Acknowledgement Letter, attached as **Exhibit F**;

(x)    [reserved];

(xi)    Payoff letter for all existing Indebtedness from Silicon Valley Bank required to be repaid and which confirms that all Liens upon any of Your property will be terminated concurrently with such payment, together with UCC-3 termination statement(s) as filed in all respective jurisdictions and other Lien release documents, duly executed by You and Silicon Valley Bank;

(xii)    A favorable written opinion of Your legal counsel, addressed to Us and dated on the Closing Date, covering such matters relating to You and the Loan Documents and Warrant Agreement(s) as We shall reasonably request; and

(xiii)    Any such other documents as We may reasonably request.

**(b)    You will provide Us with the following documents after the Closing Date at or before the time specified for each such document:**

(i)    [Reserved]

**(c)    Until Payment in Full of the Secured Obligations, each of You shall provide Us with:**

(i)    **Financial Statements**.

(A)    Within thirty (30) days after the end of each month, each of You will provide Us with (1) an unaudited income statement, statement of cash flows, and an unaudited balance sheet prepared in accordance with GAAP (except for the absence of footnotes and subject to year-end adjustments) accompanied by a report detailing any material contingencies, and (2) copies of all board packages delivered to the board of directors of any of You in connection with board meetings or otherwise.

(B)    Within one hundred eighty (180) days of the end of each fiscal year end, each of You will provide Us with audited financial statements accompanied by an audit report and an unqualified opinion of the independent certified public accountants.

(C)    Within thirty (30) days prior to the end of each fiscal year, each of You will provide Us a budget and business plan for the next fiscal year.

(D)    Each of You will provide Us any additional information (including, but not limited to, tax returns, income statements, balance sheets and names of principal creditors) as We reasonably believe are necessary to evaluate the continuing ability of each of You to meet Your financial obligations to Us.

(ii)    **Other Information.**  (A) Within five (5) Business Days after the initial closing and the final closing of any equity financing, or extension of an existing round of equity financing, occurring after the Closing Date, in which You issue preferred stock or other securities You will provide Us with copies of the fully executed equity financing documents, including without limitation the related stock purchase agreement, investors rights agreement, voting agreement, amended or restated Certificates of Incorporation, current capitalization table and other related documents and (B) within thirty (30) days after completion You shall provide Us with any 409A Valuation Reports or other similar reports prepared for You.

(iii)    **Certificate of Compliance.**  Within five (5) Business Days after the end of each calendar quarter, each of You will provide Us with a Certificate of Compliance in the form attached as **Exhibit D**.

All items to be delivered to any of Us pursuant to this **Section 18(c)** shall be delivered via e-mail to Collateral Agent at **financials@triplepointcapital.com** or a secure website portal, if so directed, (and in either case, such delivery shall be deemed to satisfy the delivery requirements of this **Section 18(c)**).

| 19. | **RIGHT TO INVEST** |
|---|---|

You grant Lenders (or at any Lender's election, an Affiliate of such Lender) the right to invest up to Five Hundred Thousand and No/100 Dollars ($500,000) in the aggregate, allocated between Lenders as they may agree, in the Lead Borrower's Next Round, at each such Lender's sole discretion on the same terms and conditions as other investors in Your Next Round.  You agree to provide Us with at least twenty (20) days prior written notice of the proposed date of the Next Round, which notice shall include the final terms, conditions and pricing of the Next Round and copies of draft equity documents no later than two (2) Business Days prior to the closing of the Next Round. The foregoing Right To Invest shall survive any termination or expiration of this Agreement and be in full force and effect until the consummation of Your Next Round.

| 20. | **OTHER LEGAL PROVISIONS YOU WILL ABIDE BY** |
|---|---|

(a)    **Continuation of Security Interest.**  This is a continuing agreement and the grant of the security interest and Lien hereunder or any other Loan Document shall remain in full force and effect and all of Our rights, powers and remedies shall continue to exist until the Payment in Full of all Secured Obligations.  Our rights, powers and remedies shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein or in any other Loan Document shall not be construed as a waiver of or election of remedies with respect to any of Our other rights, powers and remedies.

(b)    **Entire Agreement; Amendments.**

(i)    This Agreement, the Notes, and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

(ii)    Except for actions expressly permitted to be taken by Collateral Agent, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by You therefrom, shall in any event be effective unless the same shall be in writing and signed by Collateral Agent and You, and by Requisite Lenders or all affected Lenders, as applicable. Except as set forth in **clauses (iii)** and **(iv)** below, all such amendments, modifications, terminations or waivers requiring the consent of any Lenders shall require the written consent of Requisite Lenders.

(iii)    No amendment, modification, termination or waiver of or consent with respect to any provision of this Agreement that waives compliance with the conditions precedent set forth in **Section 5** to the making of any Advance shall be effective unless the same shall be in writing and signed by Collateral Agent, all Applicable Lenders and You.  Notwithstanding anything contained in this Agreement to the contrary, no waiver or consent with respect to any Default or any Event of Default shall be effective for

purposes of the conditions precedent to the making of any Advance set forth in **Section 5** unless the same shall be in writing and signed by Collateral Agent, all Applicable Lenders and You.

(iv)    No amendment, modification, termination or waiver shall, unless in writing and signed by Collateral Agent and each Lender directly affected thereby:

(A)    increase the amount of any Lender's Part Commitment (which action shall be deemed to directly affect all Lenders);

(B)    reduce the principal of, rate of interest on or Fees payable with respect to any Advances of any affected Lender;

(C)    extend any scheduled Payment Date of any Advances of any affected Lender;

(D)    waive, forgive, defer, extend or postpone any payment of interest or Fees as to any affected Lender;

(E)    release any guarantee of the Secured Obligations or, except as otherwise permitted herein or in the other Loan Documents, release, or permit any of You to sell or otherwise dispose of, any Collateral with a value exceeding Five Hundred Thousand Dollars ($500,000) in the aggregate (which action shall be deemed to directly affect all Lenders);

(F)    change any provisions of any Loan Document in a manner that by its terms adversely and directly affects the rights of any single Lender materially differently than another Lender;

(G)    amend or waive this **Section 20(b)** or the definition of the term "Requisite Lenders" insofar as such definition affects the substance of this **Section 20(b)**; or

(H)    change or waive the conditions which are applicable to any Conditioned Part which cause it to be a Conditioned Part (which action shall be deemed to directly affect all Applicable Lenders).

(v)    No amendment, modification, termination or waiver affecting the rights or duties of Collateral Agent under this Agreement or any other Loan Document, including any release of any guaranty of the Secured Obligations or Collateral requiring a writing signed by all Lenders, shall be effective unless in writing and signed by Collateral Agent, in addition to Lenders required hereinabove to take such action.

(vi)    Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.  No amendment, modification, termination or waiver shall be required for Collateral Agent to take additional Collateral pursuant to any Loan Document. No amendment, modification, termination or waiver of any provision of any Promissory Note shall be effective without the written concurrence of the holder of that Promissory Note.  No notice to or demand on any or You in any case shall entitle You to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this **Section 20** shall be binding upon each holder of the Notes at the time outstanding and each future holder of the Promissory Notes.

(c)    **Headings.**  Headings used in this Agreement are for reference and convenience of the Parties only and shall have no substantive effect in the interpretation of this Agreement.

(d)    **No Waiver.**  No action taken by Us or You will be deemed to constitute a waiver of compliance with any representation, warranty or covenant contained in this Agreement or any other Loan Document.  The waiver by Us of a breach of any provision of this Agreement or any other Loan Document will not operate or be construed as a waiver of any subsequent breach.

(e)    **Survival of Obligations.**    The indemnification, obligations, representations and warranties contained in this Agreement or in any other Loan Document are for the benefit of the Collateral Agent and Lenders and survive the execution, delivery, expiration or termination of this Agreement.

(f)    **Tax Indemnification**.  Without limiting the generality of **Section 13**, You agree to pay, and to hold Us harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales, or other similar taxes (excluding taxes imposed on or measured by Our net income or franchise taxes) that may

be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(g)     **Successors and Assigns.**  The provisions of this Agreement and the other Loan Documents shall inure to the benefit of You and Your permitted assigns (if any) and shall be binding on You and any of Your assigns. None of You shall assign Your obligations under this Agreement, the Promissory Note(s) or any of the other Loan Documents, and any such attempted assignment shall be void and of no effect.  Each of You acknowledges and understands that any Lender may sell and assign all or part of its respective interests hereunder and under the Promissory Note(s) and all other Loan Documents (including its Part Commitments and its portion of any Advances). Borrower hereby acknowledges and agrees that any assignment by a Lender as contemplated in this **Section 20(g)** shall give rise to a direct obligation of Borrower to the assignee.  From and after any assignment by any Lender as contemplated in this **Section 20(g)**, the assignee shall be a "Lender" hereunder (and included within "We," "Us" and "Our").  In connection with any assignment by any Lender as contemplated in this **Section 20(g)**, Borrower shall, upon the request of Collateral Agent or such Lender, execute one or more new Promissory Notes in exchange for the Promissory Note(s), if any, being assigned.

(h)     **Consent To Jurisdiction And Venue.**  All judicial proceedings arising in or under or related to this Agreement, the Promissory Notes or any of the other Loan Documents may be brought in any state or federal court of competent jurisdiction located in the State of California.  By execution and delivery of this Agreement, each Party hereto generally and unconditionally: (i) consents to personal jurisdiction in San Mateo County, State of California; (ii) waives any objection as to jurisdiction or venue in San Mateo County, State of California; (iii) agrees not to assert any defense based on lack of jurisdiction or venue in the aforesaid courts; and (iv) irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, the Promissory Notes or the other Loan Documents.  Service of process on any Party hereto in any action arising out of or relating to this Agreement shall be effective if given in accordance with the requirements for notice set forth in this Section, and shall be deemed effective and received as set forth therein.  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of either Party to bring proceedings in the courts of any other jurisdiction.

(i)     **Mutual Waiver Of Jury Trial; Judicial Reference.**  Because disputes arising in connection with complex financial transactions are most quickly and economically resolved by an experienced and expert person and the Parties wish applicable state and federal laws to apply (rather than arbitration rules), the Parties desire that their disputes be resolved by a judge applying such applicable laws.  EACH OF THE PARTIES SPECIFICALLY WAIVES ANY RIGHT THEY MAY HAVE TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "**CLAIMS**") ASSERTED BY ANY OF YOU AGAINST US OR OUR ASSIGNEES OR BY US OR OUR ASSIGNEES AGAINST ANY OF YOU. IN THE EVENT THAT THE FOREGOING JURY TRIAL WAIVER IS NOT ENFORCEABLE, ALL CLAIMS, INCLUDING ANY AND ALL QUESTIONS OF LAW OR FACT RELATING THERETO, SHALL, AT THE WRITTEN REQUEST OF ANY PARTY, BE DETERMINED BY JUDICIAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("**REFERENCE**"). THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE.  IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.  THE REFEREE SHALL REPORT A STATEMENT OF DECISION TO THE COURT.  NOTHING IN THIS SECTION SHALL LIMIT THE RIGHT OF ANY PARTY AT ANY TIME TO EXERCISE LAWFUL SELF-HELP REMEDIES, FORECLOSE AGAINST COLLATERAL OR OBTAIN PROVISIONAL REMEDIES.  THE PARTIES SHALL BEAR THE FEES AND EXPENSES OF THE REFEREE EQUALLY UNLESS THE REFEREE ORDERS OTHERWISE.  THE REFEREE SHALL ALSO DETERMINE ALL ISSUES RELATING TO THE APPLICABILITY, INTERPRETATION, AND ENFORCEABILITY OF THIS SECTION. THE PARTIES ACKNOWLEDGE THAT THE CLAIMS WILL NOT BE ADJUDICATED BY A JURY.  THIS WAIVER EXTENDS TO ALL SUCH CLAIMS, INCLUDING CLAIMS THAT INVOLVE PERSONS OTHER THAN ANY OF YOU AND US; CLAIMS THAT ARISE OUT OF OR ARE IN ANY WAY CONNECTED TO THE RELATIONSHIP BETWEEN YOU AND US; AND ANY CLAIMS FOR DAMAGES, BREACH OF CONTRACT, SPECIFIC PERFORMANCE, OR ANY EQUITABLE OR LEGAL RELIEF OF ANY KIND, ARISING OUT OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY OF THE EXCLUDED AGREEMENTS.

(j)     **Professional Fees**.  Each of You promises to pay or reimburse on demand, any and all reasonable professional fees and expenses reasonably incurred by Us whether before or after the execution of this Agreement in connection with or related to:  the Loan Documents, the Excluded Agreements, or the Secured Obligations; the

administration, collection, or enforcement of the Secured Obligations; amendment or modification of the Loan Documents and the Excluded Agreements; any waiver, consent, release, or termination under the Loan Documents or Excluded Agreements; the protection, preservation, sale, lease, liquidation, inspection, audit or disposition of, or other action related to, the Collateral or the exercise of remedies with respect to the Collateral; or any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any of You or the Collateral, and any appeal or review thereof; and any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to any of You, the Collateral, the Loan Documents, or the Excluded Agreements, including representing Us in any adversary proceeding or contested matter commenced or continued by or on behalf of the estate of any of You, and any appeal or review thereof.  Our professional fees and expenses shall include fees or expenses for Our attorneys, accountants, auditors, auctioneers, liquidators, appraisers, investment advisors, environmental and management consultants, or experts engaged by Us in connection with the foregoing.  The promise of each of You to pay all of Our reasonable professional fees and expenses is part of the Secured Obligations under this Agreement.

      **(k)**    **Revival of Secured Obligations**.  This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any petition is filed by or against any of You for liquidation or reorganization, if any of You become insolvent or make an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of the assets of any of You, or if any payment or transfer of Collateral is recovered from Us.  The Loan Documents, the Secured Obligations and Collateral Agent's Lien on the Collateral shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to Us, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, Us or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to Us in cash.

      **(l)**    **Notices.**  Any notice, request or other communication to any of the Parties by any other will be given in writing to Us or You, at the address set out in the Table of Terms and deemed given and received upon the earliest of (i) actual receipt, (ii) three (3) Business Days after mailing if mailed postage prepaid by regular or airmail, (iii) one (1) Business Day after it is sent by courier or overnight delivery, (iv) if sent by facsimile, when sent, and (v) if sent through e-mail, upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement; provided that in the case of **clauses (iv)** and **(v)**, to the extent the applicable notice, request or other communication is sent other than during the normal business hours of the recipient, it shall be deemed to have been given and received at the opening of business on the next Business Day for the recipient.  Any Party may change its notice information hereunder by notice to the other Parties hereto given in accordance with this **Section 20(l)**.

      **(m)**    **Applicable Law.**  This Agreement and any Promissory Note and each other Loan Document will have been made, executed and delivered in the State of California and will be governed and construed for all purposes in accordance with the laws of the State of California, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

      **(n)**    **Electronic Images, Electronic Signatures, and Counterparts.**  Notwithstanding any other provision of this Agreement or any Loan Document, including without limitation a provision requiring a "writing" or "written instrument," this Agreement, any Promissory Note and any other Loan Document,  and any amendment or modification to any of the foregoing, may in the sole and absolute discretion of Collateral Agent be presented, delivered and/or executed in as many counterparts as necessary or convenient, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically, and each executed counterpart shall be deemed an original for all purposes.  All such counterparts shall constitute one and the same document.  For the avoidance of doubt: (a)  the authorization under this paragraph may include, without limitation, a manually signed paper document which has been converted into electronic form (such as scanned into PDF format or transmitted via facsimile), or an electronically signed document converted into another format, for transmission, delivery and/or retention; and (b) the exchange of email discussing or negotiating the terms of an amendment or modification, even if such email is signed, does not in and of itself constitute a signed electronic record agreeing to such an amendment or its terms.

(o)    **Confidentiality.**  All financial information and other non-public information (other than any such information contained in periodic reports filed by any of You with the Securities and Exchange Commission) disclosed by any of You to Us shall be considered confidential for purposes of this Agreement.  In handling any confidential information, We will exercise the same degree of care that We exercise for Our own proprietary information, but disclosure of information may be made (i) to Our subsidiaries or Affiliates in connection with their business with any of You, (ii) to prospective transferees or purchasers of any interest in any of Our outstanding Advances or Part Commitments or other interests hereunder (provided, however, the transferring Lender shall use best efforts in obtaining such prospective transferee's agreement of the terms of this provision and any purchaser shall be agreeing to assume the obligations hereunder and therefore agreeing to abide by the provisions hereof, including, without limitation, the provisions of this Section), (iii) as We deem necessary or appropriate to any bank, financial institution or other similar entity, provided, however, that such bank, financial institution or other similar entity agrees in writing to maintain the confidentiality of such information, (iv) to S&P, Moody's, Fitch and/or other ratings agency, as We deem necessary or appropriate, provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such, (v) as required by law, regulation, subpoena, or other order, (vi) to the extent requested by any regulatory authority, (vii) as required in connection with Our examination or audit and (viii) as We consider appropriate in connection with the exercise of remedies under this Agreement or any other Loan Document. Confidential information does not include information that either: (A) is in the public domain or in Our possession when disclosed to Us, or becomes part of the public domain after disclosure to Us; or (B) is disclosed to Us by a third party, if We do not know that the third party is prohibited from disclosing the information. Notwithstanding the above, each of You hereby consents to the use by Us of the company name and logo of any of You for advertising, promotional and marketing purposes only. Such use may reference the type of credit facility but will not indicate the amount of the credit facility without Your prior written approval.

## 21.    COLLATERAL AGENT

(a)    **Appointment of Collateral Agent.**  Each Lender irrevocably appoints TriplePoint Private Venture Credit Inc. as Collateral Agent of such Lender under this Agreement and the other Loan Documents and authorizes Collateral Agent to take such action on such Lender's behalf and to exercise such powers hereunder as are specifically delegated to Collateral Agent by the terms hereof and the other Loan Documents, together with such powers as are reasonably incidental thereto.  Collateral Agent shall have only those duties which are specified in this Agreement and any other Loan Document and it may perform such duties by or through its agents, representatives or employees. Collateral Agent shall have no duties, except those expressly set forth in this Agreement and the other Loan Documents, and no implied covenants, responsibilities, duties, obligations or liabilities shall be read into this Agreement or the other Loan Documents or otherwise exist against Collateral Agent.

(b)    **Immunity**.  Neither Collateral Agent nor its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any waiver, consent or approval given or any action taken or omitted to be given or taken by Collateral Agent or by such Person under or in connection with this Agreement or the other the Loan Documents or (ii) responsible for the consequences of any oversight or error in judgment by Collateral Agent or such Person whatsoever, except, in the case of **clauses (i)** and **(ii)**, for Collateral Agent's or such Person's own gross negligence or willful misconduct.  Collateral Agent shall not be responsible for (v) the execution, validity, enforceability, effectiveness or genuineness of this Agreement or the other Loan Documents, (w) the collectability of any amounts owing under this Agreement, the Promissory Notes or the other Loan Documents, (x) the value, sufficiency, enforceability or collectability of any collateral security therefor, (y) the failure by Borrowers to perform the Secured Obligations or (z) the truth, accuracy and completeness of the recitals, statements, representations or warranties made by Borrowers or any officer or agent thereof contained in this Agreement, the other Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Collateral Agent or any Lender in connection with, this Agreement or the other Loan Documents, whether delivered by Collateral Agent to any Lender or by or on behalf of Borrowers to any Lender.  Collateral Agent shall not have any duty or obligation (A) to ascertain or to inquire as to the observance or performance of any of the conditions, covenants or agreements in this Agreement or the other Loan Documents or in any document, instrument or agreement at any time constituting, or intended to constitute, collateral security therefor, (B) to ascertain or inquire as to whether any notice, consent, waiver or request delivered to it shall have been duly authorized or is genuine, accurate and complete, or (C) to inspect the assets or books and records of Borrowers.  In performing its duties on behalf of Lenders, Collateral Agent shall exercise the same care which it would exercise in dealing with loans made for its own account.  Collateral Agent shall not be responsible for insuring the Collateral or for the payment of any taxes, assessments, charges or any other charges or Liens of any nature whatsoever upon the Collateral or otherwise for the maintenance of the Collateral, except in the event Collateral Agent enters into possession of a part or all of the Collateral, in which event Collateral Agent

27

shall preserve the part in its possession. Neither Collateral Agent nor any of its officers, directors, employees, attorneys, representatives or agents shall be liable to Lenders for any action taken or omitted hereunder or under any of the other Loan Documents or in connection herewith or therewith unless caused by its or their gross negligence or willful misconduct. No provision of this Agreement or of any other Loan Document shall be deemed to impose any duty or obligation on Collateral Agent to perform any act or to exercise any power in any jurisdiction in which it shall be illegal, or shall be deemed to impose any duty or obligation on Collateral Agent to perform any act or exercise any right or power if such performance or exercise (1) would subject Collateral Agent to a tax in a jurisdiction where it is not then subject to a tax or (2) would require Collateral Agent to qualify to do business in any jurisdiction where it is not so qualified.

**(c)** **Reliance by Collateral Agent**.

(i) Collateral Agent may consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Collateral Agent hereunder or under any other Loan Documents in accordance therewith. Collateral Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction.

(ii) Collateral Agent may rely, and shall be fully protected in relying, acting, or refraining to act, upon any resolution, statement, certificate, instrument, opinion, report, notice request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles or electronic mail, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Collateral Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to Collateral Agent and substantially conforming to the requirements of this Agreement or any of the other Loan Documents.

(iii) Collateral Agent shall be entitled to fail or refuse, and shall be fully protected in failing or refusing, to take any action under this Agreement or the other Loan Documents unless (A) it first shall receive such advice or concurrence of Requisite Lenders, as it deems appropriate, or (B) it first shall be indemnified to its satisfaction by Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. In all cases Collateral Agent shall be fully protected in acting, or in refraining from acting, under this Agreement or the Loan Documents in accordance with a request of Requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all Lenders. Without prejudice to the generality of anything in this **Section 21**, no Lender shall have any right of action whatsoever against Collateral Agent as a result of Collateral Agent acting or refraining from acting under this Agreement or under any of the other Loan Documents in accordance with the instructions of Requisite Lenders.

**(d)** **No Responsibility for Investigation**. Each Lender expressly acknowledges that neither Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it. Each Lender agrees that it will make its own independent investigation of the financial condition and affairs of Borrowers in connection with the making of Advances pursuant to this Agreement and has made and shall continue to make its own appraisal of the creditworthiness of Borrowers. Collateral Agent shall have no duty or responsibility either initially or on a continuing basis to make any such investigation or any such appraisal on behalf of Lenders or to provide Lenders with any credit or other information with respect thereto, whether coming into its possession before the date hereof or any time or times thereafter, and shall further have no responsibility with respect to the accuracy of or the completeness of the information provided to Lenders by Borrowers. Except for notices, reports and other documents expressly required to be furnished to Lenders by Collateral Agent hereunder, Collateral Agent shall have no obligation or liability to provide any Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrowers which may come into the possession of Collateral Agent or any of its officers, directors, employees, attorneys-in-fact or affiliates.

**(e)** **Delegation of Duties**. Collateral Agent may execute any of the powers hereof and perform any duty hereunder either directly or by or through agents or attorneys-in-fact. Collateral Agent may utilize the services of such agents and attorneys-in-fact as Collateral Agent in its sole discretion reasonably determines, and all fees and expenses of such agents and attorneys-in-fact shall be paid by Borrowers on demand. Collateral Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. Collateral Agent shall not be

DocuSign Envelope ID: BE2BC2C8-A519-43CB-B324-7385D78B98F1

responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

(f)    **Events of Default**.  Unless the officers of Collateral Agent acting in their capacity as officers of Collateral Agent on Borrowers' account with respect to the transactions hereunder have actual knowledge thereof or have been notified in writing thereof by Lenders, Collateral Agent shall not be required to ascertain or inquire as to the existence or possible existence of any Event of Default.  Collateral Agent shall take such action with respect to such Event of Default as shall be directed by Requisite Lenders; provided, that unless and until Collateral Agent shall have received such directions, Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it deems advisable in the best interests of the Lenders.

(g)    **Right to Indemnity**.  Each Lender severally, but not jointly, agrees (i) to indemnify and hold Collateral Agent (and any Person acting on behalf of Collateral Agent) harmless from and against and (ii) promptly upon receipt by such Lender of Collateral Agent's statement, to reimburse Collateral Agent, according to such Lender's ratable share of the Total Exposure of all Lenders, to the extent Collateral Agent shall not otherwise have been reimbursed by Borrowers on account of, and for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including the reasonable fees and disbursements of counsel and other advisors actually incurred) or disbursements of any kind of nature whatsoever with respect to Collateral Agent's performance of its duties under this Agreement and the other Loan Documents; provided, that no Lender shall be liable for the payment to Collateral Agent of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from Collateral Agent's gross negligence or willful misconduct, and nothing in the foregoing is intended to limit the obligation of Borrowers to reimburse Collateral Agent for any amounts incurred by Collateral Agent.  If any indemnity furnished to Collateral Agent for any purpose shall, in the opinion of Collateral Agent, be insufficient or become impaired, Collateral Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.  Collateral Agent's right to indemnification shall survive termination of this Agreement.

(h)    **The Collateral Agent**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, Collateral Agent in its individual capacity (including as a Lender).  Collateral Agent, in its capacity as a Lender, shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Collateral Agent, and Collateral Agent, and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with Borrowers or any Affiliate of Borrowers as if it were not Collateral Agent hereunder.  The term "Lender" or "Lenders" or any similar term shall unless the context clearly indicates otherwise include Collateral Agent in its capacity as a Lender.

(i)    **Resignation and Appointment of Successor Collateral Agent**.  Collateral Agent may resign at any time by giving 30 days' prior written notice thereof to Lenders and Borrower Representative.  In addition, if Collateral Agent become insolvent or commits any act or omission constituting gross negligence or willful misconduct of its duties as Collateral Agent hereunder, then Requisite Lenders shall have the right to replace Collateral Agent.  In all cases, the Collateral Agent shall continue to serve until a successor Collateral Agent shall have been selected and approved pursuant to this **Section 21(i)**.  Upon any such resignation or removal of Collateral Agent, Requisite Lenders shall have the right to appoint a successor Collateral Agent from among the Lenders.  If no successor Collateral Agent shall have been so appointed by Requisite Lenders and accepted such appointment within 30 days after the retiring Collateral Agent's giving of notice of resignation, then the retiring Collateral Agent may, on behalf of Lenders, appoint a successor Collateral Agent, and which successor Collateral Agent (if not also a Lender), if no Event of Default shall have occurred and be continuing, shall be reasonably satisfactory to Borrowers.  Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, such successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Collateral Agent's resignation hereunder as Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement.

(j)    **Lenders' Representations Regarding IRS Withholding; Delivery of Tax Forms**.  To the extent Collateral Agent may hold from time to time payments for the account of Lenders, each Lender represents and agrees as follows:

(i)    It is entitled to receive any payments under the Loan Documents to which it is a party without the withholding of any tax, and will furnish to Collateral Agent such forms, certifications, statements and other documents as Collateral Agent may request from time to time to evidence such Lender's exemption from the withholding of any tax imposed by any jurisdiction or to enable Collateral Agent to comply with applicable laws or regulations relating thereto.

(ii)    Without limiting the effect of the foregoing, if it is not created or organized under the laws of the United States or any state thereof, it further represents and warrants (A)  that it is engaged in the conduct of a business within the United States and that the payments made hereunder are or are reasonably expected to be effectively connected with the conduct of that trade or business and are or will be includible in its gross income; or (B) if it is not engaged in a U.S. trade or business with which such payments are effectively connected, it is entitled to the benefits of a tax convention which exempts the income from U.S. withholding tax and that it has satisfied all requirements to qualify for the exemption from tax.

(iii)    It will, immediately upon the request of Collateral Agent, furnish to Collateral Agent Form 4224 or Form 1001 of the Internal Revenue Service, or such other forms, certifications, statements or documents, duly executed and completed by it as evidence of its exemption from the withholding of U.S. tax with respect thereto.  If it determines that, as a result of any change in applicable law, regulation, or treaty or in any official application or interpretation thereof, it ceases to qualify for exemption from any tax imposed by any jurisdiction with respect to payments made hereunder, it shall promptly notify Collateral Agent of such fact and Collateral Agent may, but shall not be required to withhold the amount of any such applicable tax from amounts paid to it hereunder.  Collateral Agent shall not be obligated to make any payments hereunder to it in respect of its Advances until it shall have furnished to Collateral Agent the requested form, certification, statement or document and may withhold the amount of such applicable tax from amounts paid to it Lender hereunder.

(iv)    It shall reimburse, indemnify and hold Collateral Agent harmless for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed upon, incurred by or asserted against Collateral Agent due to its reliance upon the representation hereby made that it is exempt from withholding of tax.  Unless Collateral Agent receives written notice to the contrary, it shall be deemed to have made the representations contained in this **Section 21(j)** in each of its subsequent tax years.

(k)    **Sharing of Payments and Set-Off Among Lenders**.  Borrowers hereby agree that, in addition to (and without limitation of) any right of set-off, banker's lien or counterclaim a Lender may otherwise have, each Lender shall be entitled, at its option, to offset balances held by it at any of its offices against any principal of or interest on its Pro Rata Share of any Advance hereunder, or any Fee payable to it, that is not paid when due (regardless of whether such balances are then due to Borrowers), in which case it shall promptly notify Borrower Representative and the other Lenders thereof, provided that its failure to give such notice shall not affect the validity thereof.  If a Lender shall effect payment of any principal of or interest on or Fees relating to any Advances held by it under this Agreement through the exercise of any right of set-off, banker's lien, counterclaim or similar right, it shall promptly purchase from the other Lenders participations in any Advances held by the other Lenders in such amounts, and make such other adjustments from time to time as shall be equitable, to the end that each Lender shall share the benefit of such payment according to its Pro Rata Share of the Advances. To such end, all the Lenders shall make appropriate adjustments among themselves (by the resale of participations sold or otherwise) if such payment is rescinded or must otherwise be restored.  Borrowers agree that any Lender so purchasing a participation in any Advances held by the other Lenders may exercise all rights of set-off, banker's lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of such Advances in the amount of such participation. Nothing contained herein shall require any Lender to exercise any such right or shall affect the right of any Lender to exercise and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of Borrowers.

(l)    **Effect of Section 21**.  Notwithstanding anything to the contrary in this **Section 21**, the rights and obligations of Borrowers shall not be affected by any provision that relates to the relationship between Lenders and between Collateral Agent and Lenders that is included in this **Section 21**.

## 22.    DEFINITIONS

Capitalized terms used in this Agreement shall have the following meanings:

**"Account"** means any "account," as such term is defined in the UCC, which any of You now own or acquire or in which any of You now hold or acquire any interest and in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) that any of You now own, receive or acquire or belongs or is owed or becomes belonging or owing to any of You (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services that any of You render or from any other transaction, whether or not the same involves the sale of goods or services by any of You (including, without limitation, any such obligation that may be characterized as an account or contract right under the UCC) and all of any of Your rights in, to and under all purchase orders or receipts now owned or acquired by any of You for goods or services, and all of any of Your rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all monies due or to become due to any of You under all purchase orders and contracts for the sale of goods or the performance of services or both by any of You or in connection with any other transaction (whether or not yet earned by performance on the part of any of You), now in existence or occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

**"Advance"** has the meaning given to it in **Section 1**.

**"Advance Date"** means, with respect to each specific Advance, the day on which We make such Advance to You.

**"Advance Request"** means any request for an Advance to be executed and delivered from time to time by You to Us in the form attached to this Agreement as **Exhibit B**.

**"Affiliate"** means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners, and members.

**"Agreement"** has the meaning given to it in the Preamble.

**"Applicable Lender"** means, when used in reference to any Part (or any Advance under any Part), each Lender having a Part Commitment or Part Exposure with respect to such Part.

**"Availability Period"** has the meaning set forth in the Table of Terms.

**"Borrower"** has the meaning given to it in the preamble.

**"Borrower Representative"** has the meaning given to it in **Section 1**.

**"Business Day"** means any day other than a Saturday, Sunday or other day on which banking institutions in the State of California are authorized or required by law or other government action to close.

**"Cash"** means all cash, money, currency, and liquid funds, wherever held, which any of You own now, hold or acquire any right, title, or interest in.

**"Certificate of Perfection"** means the Certificate of Perfection delivered on the Closing Date pursuant to **Section 18(a)**, as the same may be supplemented, amended or replaced (including in connection with the delivery of any Certificate of Compliance, Advance Request, or Joinder Agreement hereunder).

**"Chattel Paper"** means any "chattel paper," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or acquire any interest.

**"Closing Date"** means May 18, 2022.

**"Collateral"** has the meaning given to it in **Section 8**.

**"Collateral Agent"** has the meaning given to it in the preamble.

**"Commitment Amount"** has the meaning set forth in the Table of Terms (subject to reduction as provided in **Section 1**).

**"Commitment Increase Request Notice"** has the meaning given to it in **Section 3**.

31

**"Conditioned Part"** has the meaning given to it in **Section 3**.

**"Copyright License"** means any written agreement granting any right to use any Copyright or Copyright registration now owned or hereafter acquired by any of You or in which agreement You now hold or hereafter acquire any interest, whether as licensor or licensee.

**"Copyrights"** means all of the following now owned or acquired by any of You or in which any of You now hold or acquire any interest: (a) all copyrights and copyright rights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof, or of any other country, or pursuant to any convention or treaty; (b) all registrations of, applications for registration and recordings of any copyright rights in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) all continuations, renewals or extensions of any copyrights and any registrations thereof; and (d) any copyright registrations to be issued under any pending applications.

**"Default"** means any event that, with the passage of time or notice or both would, unless cured or waived, become an Event of Default.

**"Default Rate"** has the meaning given to it in **Section 7**.

**"Deposit Accounts"** means any "deposit accounts," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or acquire any interest.

**"Documents"** means any "documents," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or acquire any interest.

**"End of Term Payment"** has the meaning set forth in the Table of Terms.

**"Equal Monthly Payments"** means, for any period with respect to any Advance, payments calculated such that the aggregate amount of interest and principal payable on each Payment Date during such period (as calculated at the beginning of such period and as may be recalculated from time to time during such period based on changes to the applicable interest rate) are equal.

**"Equipment"** means any "equipment," as such term is defined in the UCC, and any and all additions, upgrades, substitutions and replacements thereto or thereof, together with all attachments, components, parts, accessions and accessories installed thereon or affixed thereto, now owned or hereafter acquired by any of You or in which any of You now hold or acquire any interest.

**"ERISA"** means the Employee Retirement Income Security Act of 1974.

**"Event of Default"** has the meaning given to it in **Section 14**.

**"Excluded Agreements"** means (a) the Warrant Agreement; and (b) any stock purchase agreement, options, or other warrants to acquire, or agreements governing the rights of, any capital stock or other equity security, or any common stock, preferred stock, or equity security issued to or purchased by Us or Our nominee or assignee**.**

**"Facility Fee"** has the meaning set forth in the Table of Terms.

**"Fees"** means the Facility Fee, the End of Term Payment and the Prepayment Fee.

**"First Payment Date"** means, as to any Advance, (a) if the Advance Date for such Advance is a Payment Date, such Payment Date, and (b) in all other cases, the first Payment Date that occurs after the applicable Advance Date.

**"Fixtures"** means any "fixtures," as such term is defined in the UCC, together with any of Your right, title and interest in and to all extensions, improvements, betterments, renewals, substitutes, and replacements thereof, and all additions and appurtenances thereto any, now owned or hereafter acquired by any of You or in which any of You now hold or acquire any interest.

**"GAAP"** means generally accepted accounting principles, consistently applied, as in effect from time to time.

**"General Intangibles"** means any "general intangibles," as such term is defined in the UCC, and, in any event, includes proprietary or confidential information (other than Intellectual Property); business records and materials (other than Intellectual Property); customer lists; interests in partnerships, joint ventures, corporations, limited liability companies and other business associations; permits; claims in or under insurance policies (including unearned premiums and retrospective premium adjustments); and rights to receive tax refunds and other payments and rights of indemnification, now owned or acquired by any of You or in which any of You may now or hereafter have any interest.

**"Goods"** means any "goods," as such term is defined in the UCC, now owned or hereafter acquired by any of You or in which any of You now hold or acquire any interest.

**"Governing Documents"** means, with respect to any Person, the certificate or articles of incorporation or formation, the by-laws or operating agreement, and/or other organizational or governing documents of such Person.

**"Guarantor"** means any Person who from time to time may guaranty or provide collateral or other credit support for all or any portion of the Secured Obligations.

**"Indebtedness"** means, of any Person, at any date, without duplication and without regard to whether matured or unmatured, absolute or contingent:

(a)     all obligations of such Person for borrowed money;

(b)     all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of property or services;

(d)     all obligations of such Person as lessee under capital leases;

(e)     all obligations of such Person to reimburse or prepay any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance, or similar instrument, whether drawn or undrawn;

(f)     all obligations of such Person to purchase securities which arise out of or in connection with the sale of the same or substantially similar securities;

(g)     all obligations of such Person to purchase, redeem, exchange, convert or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, now or hereafter outstanding, except to the extent that (i) such obligations remain performable solely at the option of such Person or (ii) any such exchange or conversion is made solely for such capital stock;

(h)     all obligations to repurchase assets previously sold (including any obligation to repurchase any accounts or chattel paper under any factoring, receivables purchase, or similar arrangement);

(i)     obligations of such Person under interest rate swap, cap, collar or similar hedging arrangements; and

(j)     all obligations of others of any type described in **clauses (a)** through **(i)** above guaranteed by such Person.

**"Indemnitee"** has the meaning given to it in **Section 13**.

**"Insolvency Proceeding"** means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the United States Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

**"Instruments"** means any "instrument," as such term is defined in the UCC, now owned or hereafter acquired by any of You or in which any of You now hold or acquire any interest.

**"Intellectual Property"** means all Copyrights; Trademarks; Patents; Licenses; source codes; trade secrets; inventions (whether or not patented or patentable); technical information, processes, designs, knowledge and know-how; data bases; models; drawings; websites, domain names, and URL's, and all applications therefor and reissues, extensions, or renewals thereof; together with the rights to sue for past, present, or future infringement of Intellectual Property and the goodwill associated with the foregoing.

**"Inventory"** means any "inventory," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or acquire any interest, and, in any event, shall include, without limitation, all Goods and personal property that are held by or on any of Your behalf for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in any of Your businesses, or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods, whether or not the same is in transit or in any of Your constructive, actual or exclusive possession or is held by others for any of Your account, including, without limitation, all property covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all such property that may be in the

possession or custody of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other Persons.

"**Investment**" means any beneficial ownership (including stock, partnership or limited liability company interest or other securities) of any Person, or any loan, advance or capital contribution to any Person.

"**Investment Property**" means any "investment property," as such term is defined in the UCC, and includes any certificated security, uncertificated security, money market funds, bonds, mutual funds, and U.S. Treasury bills and notes now owned or hereafter acquired by any of You or in which any of You now hold or acquire any interest.

"**Joinder Agreement**" means a joinder agreement in substantially the form attached as **Exhibit E**.

"**Lender**" has the meaning given to it in the preamble (for the avoidance of doubt, such term includes any assignee of any Lender as provided herein).

"**Letter of Credit Rights**" means any "letter of credit rights," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or acquire any interest, including any right to payment under any letter of credit.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or acquired by any of You or in which any of You now hold or acquire any interest and any renewals or extensions thereof.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, any lease in the nature of a security interest, and the filing of any financing statement (other than a precautionary financing statement with respect to a lease that is not in the nature of a security interest) under the UCC or comparable law of any jurisdiction.

"**Loan Documents**" means this Agreement, the Promissory Notes, all UCC Financing Statements and applications for registration in connection with the Collateral, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, including those documents described in **Section 18**, as the same may from time to time be amended, modified, supplemented or restated; provided, that the Loan Documents shall not include any of the Excluded Agreements.

"**Loan Term**" has the meaning set forth in the Table of Terms.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, properties, assets or condition (financial or otherwise) of any of You or all of You as a whole, (b) the ability of any of You to perform the Secured Obligations in accordance with the terms of the Loan Documents or Our ability to enforce any of Our rights and remedies with respect to the Secured Obligations in accordance with the terms of the Loan Documents, or (c) the Collateral or Collateral Agent's Liens on the Collateral or the priority of such Liens.

"**Merger Event**" means (a) any reorganization, consolidation or merger (or similar transaction or series of transactions) by any of You or any of Your subsidiaries, with or into any other Person; (b) any transaction, including the sale or exchange of outstanding shares of Your capital stock, or the capital stock of any of Your Subsidiaries, in which the holders of such outstanding capital stock of the affected corporation immediately before consummation of such transaction or series of related transactions do not, immediately after consummation of such transaction or series of related transactions, retain capital stock representing at least 50.0% of the voting power of the surviving corporation of such transaction or series of related transactions (or the parent corporation of such surviving corporation if such surviving corporation is wholly owned by such parent corporation), in each case without regard to whether You or any of Your subsidiaries are the surviving corporation, or (c) the sale, license or other disposition of all or substantially all of Your assets, or the assets of any of Your subsidiaries.

"**Next Round**" means the first equity financing, or extension of an existing round of equity financing, occurring after the Closing Date, in which You issue preferred stock for aggregate gross cash proceeds of at least One Million Dollars ($1,000,000) (with aggregate proceeds to include the amounts that the investors in such financing have committed to invest, in accordance with the terms of the financing documents after the initial closing under such documents and to exclude any amounts receivable upon, or attributable to, conversion or cancellation of indebtedness), whether in a single or multiple closings and whether in related or unrelated financings.

"**OFAC**" means the United States Department of the Treasury's Office of Foreign Assets Control.

**"Paid in Full"** means, with respect to the Secured Obligations, that: (a) all of such Secured Obligations (other than (i) contingent indemnification or reimbursement obligations not yet due and payable, or (ii) other obligations which, by their terms, survive termination of the documents relating to such Secured Obligations) have been paid, performed or discharged in full (with all such Secured Obligations consisting of monetary or payment obligations having been paid in full in cash or cash equivalents), regardless of whether any such amounts are allowed or allowable in any Insolvency Proceeding, and (b) no Person has any further right to obtain any Advances or other extensions of credit hereunder. **"Payment in Full"** and words of like import shall have a correlative meaning.

**"Part 2 Milestone"** means that We have received evidence acceptable to Us that Borrower Representative shall have, since the Closing Date, received at least Twelve Million Dollars ($12,000,000) of net cash proceeds in its Next Round (excluding any amounts receivable upon, or attributable to, conversion or cancellation of indebtedness or SAFE instruments).

**"Part 3 Milestone"** means that You have utilized the entire Part 1 and Part 2 Commitment Amounts.

**"Part Commitment"** means, as to any Lender and any Part as of any time of determination, the portion of the Commitment Amount with respect to such Part (as such Commitment Amount may be reduced as provided in Section 1) held by such Lender as of such time (it being acknowledged that (a) the initial Part Commitment of each Lender as to any Part that has a Commitment Amount as of the Closing Date and that is not a Conditioned Part is as set forth on Annex A and (b) the initial Part Commitment of each Lender as to any other Part shall be as set forth in a supplement or amendment to <u>Annex A</u>).

**"Part Exposure"** means, as of any time of determination with respect to any Lender with respect to any Part, the sum of (a) the Part Commitment of such Lender with respect to such Part as of such time (but without including therein any Part Commitment with respect to Conditioned Parts) plus (b) the aggregate amount of such Lender's portion of the aggregate outstanding principal amount of Advances under such Part as of such time.

**"Parts"** has the meaning given to it in **Section 3**.

**"Patent License"** means any written agreement granting any right with respect to any invention on which a Patent is in existence or a Patent application is pending in which agreement You now hold or acquire any interest, whether as licensor or licensee.

**"Patents"** means all of the following now owned or acquired by any of You or in which any of You now hold or acquire any interest: (a) all patents, or rights corresponding thereto, issued or registered in the United States or any other country,  (b) all applications for patents, or rights corresponding thereto in, the United States or any other country; (c) all reissues, reexaminations, continuations, divisions, continuations-in-part, or extensions of the foregoing patents and/or applications; (d) all patents to be issued under any of the foregoing applications; and (e) all foreign counterparts of the foregoing patents and/or applications.

**"Patriot Act"** means the USA PATRIOT Improvement and Reauthorization Act of 2005.

**"Payment Date"** means the first day of each calendar month

**"Permitted Dispositions"** means:

      **(a)**      sales of Inventory in the ordinary course of business;

      **(b)**      sales of worn-out or obsolete Equipment not financed by Us provided that the fair market value of such Equipment does not exceed Fifty Thousand Dollars ($50,000) in any fiscal year; and

      **(c)**      dispositions with the prior written consent of Collateral Agent.

**"Permitted Indebtedness"** means:

      **(a)**      Indebtedness of any of You in favor of Us pursuant to this Agreement or any other Loan Document;

      **(b)**      Indebtedness existing at the Closing Date and disclosed on **<u>Schedule 1</u>**;

      **(c)**      Indebtedness consisting of corporate credit cards opened with Silicon Valley Bank and Brex disclosed to Us in writing; provided that the aggregate maximum credit limits under such corporate credit cards (or if greater the outstanding balance owing in respect of such credit cards) do not to exceed One Million Dollars ($1,000,000) at any time, partially secured by a Lien described in **clause (i)** of the defined term "Permitted Liens";

**(d)**      unsecured Indebtedness incurred for the acquisition of services, supplies or inventory on normal trade credit in the ordinary course of business;

**(e)**      Subordinated Indebtedness; and

**(f)**      extensions, refinancings, modifications, amendments and restatements of any item of Permitted Indebtedness (a) through (e) above, provided that the principal amount thereof is not increased.

**"Permitted Investment"** means:

**(a)**      Investments that are in existence on the Closing Date and disclosed on **<u>Schedule 1</u>**;

**(b)**      Investments in domestic certificates of deposit issued by, and other domestic investments with, financial institutions organized under the laws of the United States or a state thereof, having at least One Hundred Million Dollars ($100,000,000) in capital and a rating of at least "investment grade" or "A" by Moody's or any successor rating agency;

**(c)**      Investments in marketable obligations of the United States of America and in open market commercial paper given the highest credit rating by a national credit agency and maturing not more than one year from the creation thereof;

**(d)**      so long as no Event of Default has occurred and is continuing, temporary advances to employees to cover incidental expenses to be incurred in the ordinary course of business, in an aggregate outstanding amount not to exceed Fifty Thousand Dollars ($50,000) at any time;

**(e)**      Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business; and

**(f)**      Investments made with the prior written consent of Collateral Agent.

**"Permitted Liens"** means any and all of the following:

**(a)**      Liens in favor of Collateral Agent;

**(b)**      Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, <u>provided</u> that such Liens do not have priority over any of the Liens of Collateral Agent and You maintain adequate reserves in accordance with GAAP;

**(c)**      Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of Your business and imposed without action of such parties, <u>provided</u> that the payment thereof is not yet required and that such Liens do not have priority over any of the Liens of the Collateral Agent;

**(d)**      Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder;

**(e)**      the following deposits, to the extent made in the ordinary course of Your business:  deposits under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than Liens arising under ERISA or environmental Liens) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds;

**(f)**      Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums;

**(g)**      Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods;

**(h)**      Liens in favor of financial institutions arising in connection with deposit or securities accounts held at such financial institutions, provided that such Liens only secure fees and service charges and customary chargebacks or reversals of credits associated with such accounts;

**(i)**      Liens on Deposit Accounts ending *0009, *9993 and *0013 established with Silicon Valley Bank solely for the purposes of holding amounts on deposit for use as cash collateral for credit card obligations permitted

36

by **clause (c)** of the defined term "Permitted Indebtedness" not to exceed Eight Hundred Fifty Thousand Dollars ($850,000) in the aggregate at any time;

      **(j)**      Liens existing on the Closing Date and disclosed on **Schedule 1**;

      **(k)**      Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in **clauses (a)** and **(f)** above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced (as may have been reduced by any payment thereon) does not increase; and

      **(l)**      Liens incurred with the prior written consent of Collateral Agent.

**"Person"** means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

**"Prepayment Fee"** has the meaning given to it in **Section 9**.

**"Pro Rata Share"** means, as to any Lender as of any date of determination with respect to:

      **(a)**      any outstanding Advance, the percentage obtained by dividing (i) the outstanding principal amount of such Advance held by such Lender by (ii) the aggregate outstanding principal amount of such Advance held by all Lenders;

      **(b)**      any Commitment Amount or requested Advance under any Part, the percentage obtained by dividing (i) the Part Commitment of such Lender for such Part by (ii) the aggregate amount of the Part Commitments of all Lenders with respect to such Part; and

      **(c)**      with respect to all Advances and Commitment Amounts under all Parts, the percentage obtained by dividing (i) the Total Exposure of such Lender by (ii) the aggregate Total Exposure of all Lenders (and any reference to Pro Rata Share that does not refer to Advances, Commitment Amounts or any specific Part shall be deemed to refer to the Pro Rata Share as defined in this clause (c)).

**"Proceeds"** means "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (a) any and all Accounts, Chattel Paper, Instruments, Cash or other proceeds payable to any of You from time to time in respect of the Collateral, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any of You from time to time with respect to any of the Collateral, (c) any and all payments (in any form whatsoever) made or due and payable to any of You from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), (d) the proceeds, damages, or recovery based on any claim of any of You against third parties (i) for past, present or future infringement of any Copyright, Copyright License, Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License; and (e) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

**"Promissory Note"** has the meaning given to it in **Section 2**.

**"Qualified Lender"** shall mean: (i) a "venture capital operating company" under U.S. Department of Labor Regulations Section 2510.3-101(d), Title 29 of the Code of Federal Regulations, as amended; (ii) a "business development company" under the provisions of federal Investment Company Act of 1940, as amended; or (iii) a "regulated investment company" under the provisions of the Internal Revenue Code of 1986, as amended.

**"Receivables"** means (a) all of any of the Accounts, Instruments, Documents, Cash, Chattel Paper, Supporting Obligations, letters of credit, proceeds of a letter of credit, and Letter of Credit Rights of any of You, and (b) all customer lists, software, and related business records.

**"Requisite Lenders"** means, as of any time, Lenders having Total Exposure of more than 50% of the aggregate Total Exposure of all Lenders as of such time.

**"Right To Invest"** has the meaning set forth in the Table of Terms.

DocuSign Envelope ID: BE2BC2C8-A518-43CB-B324-7385D78B98E1

"**Secured Obligations**" means Your joint and several obligations to repay to Us all Advances (whether or not evidenced by any Promissory Note), together with all principal, interest, fees, costs, professional fees and expenses, and other liabilities or obligations for monetary amounts owed by any of You to Us, including the indemnity and insurance obligations in **Sections 10**, **13** and **20** hereof and including such amounts as may accrue or be incurred before or after default or workout or the commencement of any liquidation, dissolution, bankruptcy, receivership or reorganization by or against any of You, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent, and whether allowed or allowable in any Insolvency Proceeding, and all covenants and duties of any kind or nature, present or future, arising under this Agreement, the Promissory Notes, or any of the other Loan Documents, as the same may from time to time be amended, modified, supplemented or restated, whether or not such obligations are partially or fully secured by the value of Collateral; provided, that the Secured Obligations shall not include any of the Indebtedness or obligations of any of You arising under or in connection with the Excluded Agreements.

"**Solvent**" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities (such as litigation, guaranties and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"**Subordinated Indebtedness**" means Indebtedness (a) approved by Us and (b) subordinated to the Secured Obligations on terms and conditions acceptable to Us, including without limiting the generality of the foregoing, subordination of such Indebtedness in right of payment to the prior payment in full of the Secured Obligations, the subordination of the priority of any Lien at any time securing such Indebtedness to Collateral Agent's Liens in Your assets and properties, and the subordination of the rights of the holder of such Indebtedness to enforce its junior Lien following an Event of Default hereunder, in all of the foregoing cases pursuant to a written subordination agreement approved by Us.

"**Subsidiary**" means, with respect to any Person, any Person of which more than 50% of the voting stock or other equity interests is owned or controlled, directly or indirectly, by such Person or one or more Affiliates of such Person.

"**Supporting Obligations**" means any "supporting obligations," as such term is defined in the UCC, now owned or acquired by any of You or in which any of You now hold or hereafter acquire any interest.

"**Table of Terms**" means the table entitled "GROWTH CAPITAL LOAN FACILITY INFORMATION" including the "ADVANCE OPTIONS" table which starts on Page 1 of this Agreement.

"**Total Exposure**" means, as of any time of determination with respect to any Lender, the aggregate amount of the Part Exposure of such Lender as to all Parts.

"**TPVC**" means TriplePoint Private Venture Credit Inc., a Maryland corporation.

"**TPVG**" means TriplePoint Venture Growth BDC Corp., a Maryland corporation.

"**TPVL**" or means TriplePoint Venture Lending Fund, LLC, a Delaware limited liability company.

"**Trademark License**" means any written agreement granting any right to use any Trademark or Trademark registration in which agreement You now hold or hereafter acquire any interest, whether as licensor or licensee.

"**Trademarks**" means all of the following property now owned or hereafter acquired by any of You or in which any of You now hold or hereafter acquire any interest: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof and (b) reissues, extensions or renewals thereof.

**"Trading with the Enemy Act"** means the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.).

**"UCC"** means the Uniform Commercial Code as the same is, from time to time, in effect in the State of California; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Collateral Agent's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of California, the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions. Unless otherwise defined herein or in the other Loan Documents terms that are defined in the UCC and used herein or in the other Loan Documents shall have the meanings given to them in the UCC.

**"Upon Request and Additional Approval"** has the meaning given to it in **Section 3**.

**"VCOC Lender"** means a Lender party hereto, following the Closing Date, which We designate as the VCOC Lender.

**"Warrant Agreements"** means each of the Warrant Agreements dated the date hereof between You and each Lender and issued in connection with this Agreement and any other warrant agreement between You and any Lender issued in connection with this Agreement.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "paragraph," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, paragraph, Exhibit, Annex, or Schedule in or to this Agreement. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including all Exhibits, Annexes and Schedules, and not to any particular Section, subsection, paragraph or other subdivision.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation," the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by this Agreement and the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Loan Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied. Unless otherwise specified herein or in any other Loan Document, all references herein or therein to times of day shall be references to Pacific Time (daylight or standard, as applicable).

*(Signatures to Follow)*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the day and year first above written.

**"YOU" or "BORROWER":**

**UNDERGROUND ENTERPRISES, INC.**

Signature: _____

Print Name:   Jeffrey Hardy

Title:        President and COO

**PHOENO WINE COMPANY, INC.**

Signature: _____

Print Name:   Jeffrey Shaw

Title:        Chief Executive Officer

**[SIGNATURE PAGE TO PLAIN ENGLISH GROWTH CAPITAL LOAN AND SECURITY AGREEMENT]**

Underground Enterprises, Inc._GC Loan_1493-GC

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the day and year first above written.

**Accepted in Menlo Park, California:**

**TRIPLEPOINT PRIVATE VENTURE CREDIT INC., as a Lender and as Collateral Agent**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _Kevin Thorne_
349B6408BB7B467

Print Name:   Kevin W. Thorne

Title:          Chief Operating Officer

**TRIPLEPOINT VENTURE GROWTH BDC CORP. as a Lender**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _Kevin Thorne_
349B6400BF7B407

Print Name:   Kevin W. Thorne

Title:          Chief Operating Officer

**TRIPLEPOINT VENTURE LENDING FUND, LLC as a Lender**

**By: TriplePoint Venture Lending GP, LLC, as Managing Member**

**By: TriplePoint Advisers LLC, as Sole Member**

Signature: _Kevin Thorne_
349B6400BF7B407

Print Name:   Kevin W. Thorne

Title:          Chief Operating Officer

**[SIGNATURE PAGE TO PLAIN ENGLISH GROWTH CAPITAL LOAN AND SECURITY AGREEMENT]**

Underground Enterprises, Inc._GC Loan_1493-GC

### Table of Exhibits and Schedules

Exhibit A      Promissory Note

Exhibit B      Advance Request

Exhibit C      Certificate of Perfection

Exhibit D      Certificate of Compliance

Exhibit E      Form of Joinder Agreement

Exhibit F      Managerial Assistance Acknowledgement Letter

Schedule 1      Indebtedness and Liens, Investments, Intercompany Loans

Schedule 2      Post-Closing Undertakings

Annex A      Growth Capital Loan Facility Information--Lender Allocations Etc.

<p style="text-align:center; color:#B45309"><strong>EXHIBIT A</strong></p>



<p style="text-align:center; color:#1F3864"><strong>PLAIN ENGLISH GROWTH CAPITAL PROMISSORY NOTE</strong></p>

This is a Plain English Growth Capital Promissory Note (the "**Promissory Note**") dated _____, 20__ of UNDERGROUND ENTERPRISES, INC., each other Person who executes this Promissory Note as a "Borrower" party hereto and any other Person that executes a Joinder Agreement to become a Borrower under the Loan Agreement, as Borrowers (unless otherwise specified, the words "You," "Your" and "Borrower" refer to all of the foregoing Persons and not any individual) in favor of [TRIPLEPOINT ENTITY] as lender ("**Lender**"). Each of You shall be jointly and severally liable for any and all of Your agreements and obligations under this Promissory Note.

This Promissory Note is one of the Promissory Notes referred to in, and is executed and delivered in connection with, the Plain English Growth Capital Loan and Security Agreement dated as of May 18, 2022, by and between You, Lender, and the other Parties thereto, as the same may from time to time be amended, modified or supplemented in accordance with its terms (the "**Loan Agreement**"), and is entitled to the benefit and security of that Loan Agreement and the other documents executed in connection with all principal, interest, fees or other liabilities owed by You under the Loan Agreement and other Loan Documents (as defined in the Loan Agreement).  All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein.

| PROMISSORY NOTE INFORMATION | | | |
|---|---|---|---|
| **Facility Name** | **Facility Number** | **Promissory Note Number** | **Principal Amount** |
| Growth Capital Loan Facility | 1493-GC-0_ | 1493-GC-0_-0_ | $_____ |
| **Payment Amount** | **Loan Term** | **Interest Rate** | **End of Term Payment** |
| [Months 1-XX: $_____] <br><br> [Months 1-XX: interest only; <br><br> Months XX-XX: $_____] | __ months | [Prime Rate plus ___%, provided, however, that in no event shall the Prime Rate be less than 3.50%] | $[___%] |
| **Interim Payment** | **Funding Date** | **First Payment Date** | **Maturity Date** |
| $_____ | _____, 20__ | _____, 20__ | _____, 20__ |

| CONTACT INFORMATION | | |
|---|---|---|
| **Name** | **Address For Notices** | **Contact Person** |
| TriplePoint Private Venture Credit Inc. | 2755 Sand Hill Rd., Ste. 150 Menlo Park, CA 94025 Tel: (650) 854-2090 | Sajal Srivastava, President Tel: (650) 233-2102 Fax: (650) 854-1850 email: legal@triplepointcapital.com |
| **Customer Name** UNDERGROUND ENTERPRISES, INC., as Borrower Representative | **Central Billing Address** 580 Howard Street Suite #500 San Francisco, CA 94105 | **Contact Person** Name, Title: Jeffrey Hardy, President and Chief Operating Officer Tel: (917)-592-7885 email: hardy@undergroundcellar.com |

**FOR VALUE RECEIVED**, Each of You, jointly and severally, hereby promise to pay to the order of Lender or the holder of this Promissory Note at 2755 Sand Hill Road, Ste. 150, Menlo Park, CA, 94025 or such other place of payment as the holder of this Promissory Note may specify from time to time in writing, in lawful money of the United States of America, the principal amount of _____/100 Dollars ($_____) together with interest at ___ percent (___%) per annum, subject to adjustment as set forth above and in the Loan Agreement, from the date of the Funding Date to maturity of each installment on the principal remaining unpaid, such principal and interest to be paid as stated on Page 1 of this Promissory Note and as set forth in the Loan Agreement. In addition to Your final payment, You will pay Lender an amount equal to _____ percent (____%) of the principal amount of this Promissory Note. Interest shall be computed daily on the basis of a year consisting of 360 days for the actual number of days occurring in the period for which such interest is payable.  Any payments made under this Promissory Note shall not be available for re-borrowing.

The aggregate outstanding principal balance of this Promissory Note shall be due and payable in full in immediately available funds on the Maturity Date, if not sooner paid in full.

You waive presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law.

You will not, directly or indirectly, use the proceeds of any Advance(s) under this Promissory Note, or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person, to fund any activities or business of or with any Person, or in any country, region or territory, that, at the time of such funding, is the subject of any sanctions administered by OFAC, or in any other manner that would result in a violation of OFAC sanctions by any Person, including any Person participating in any capacity in any Advance(s) under this Promissory Note.

This Promissory Note may be presented, delivered and/or executed on paper or as an electronic record and executed electronically, and if electronically executed, any copy shall be deemed an original for all purposes.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, a manually signed paper document which has been converted into electronic form (such as scanned into PDF format or transmitted via facsimile), or an electronically signed document converted into another format, for transmission, delivery and/or retention.

This Promissory Note has been negotiated and delivered to Lender and is payable in the State of California.  This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of California, excluding any conflicts of law rules or principles that would cause the application of the laws of any other jurisdiction.

*(Signatures to Follow)*

**YOU/BORROWER:**

**UNDERGROUND ENTERPRISES, INC.**

Signature: _____

Print Name:   Jeffrey Hardy

Title:        President


**PHOENO WINE COMPANY, INC.**

Signature: _____

Print Name:  Jeffrey Shaw

Title:        Chief Executive Officer


**[SIGNATURE PAGE TO PLAIN ENGLISH GROWTH CAPITAL PROMISSORY NOTE]**

**EXHIBIT B**

**ADVANCE REQUEST**

**To:**    TRIPLEPOINT PRIVATE VENTURE CREDIT INC., as Collateral Agent
2755 Sand Hill Road Ste 150
Menlo Park, CA  94025
LEGAL@TRIPLEPOINTCAPITAL.COM

UNDERGROUND ENTERPRISES, INC., in its capacity as Borrower Representative, on behalf of itself as a Borrower and each other Borrower (Borrowers being collectively referred to herein as "**We**" or "**Us**"), hereby requests from Lenders an Advance under Part [____] in the amount of _____ Dollars ($_____) on _____ _____, _____ (at least five (5) Business Days from today) pursuant to the Plain English Growth Capital Loan and Security Agreement between the Parties (the "**Loan Agreement**"; capitalized terms not otherwise defined in this Advance Request shall be as defined in the Loan Agreement).

**We instruct Lenders to please make the Advance under Advance Option _____. (Indicate Option A-G)**

**We instruct each Lender, as to its Pro Rata Share of the Advance, to please:**

Transfer Funds to Our account

Bank:
Address:
ABA Number:
Account Number:
Account Name:

(For international wires)

Bank:
Address:
IBAN:
Account Number:
SWIFT/ BIC:
Sort Code:

We represent, warrant and certify that:

(i)    No event or circumstance has occurred or exists which individually or together with any other event or circumstance, has had or could reasonably be expected to have a Material Adverse Effect;

(ii)    The representations and warranties set forth in the Loan Agreement and in the associated Plain English Warrant Agreement are and shall be true, complete and correct in all material respects on and as of the date the requested Advance is funded with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case, those representations and warranties remain true, complete and correct in all material respects as of such date), provided, however, that such materiality qualifiers shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof;

(iii)    We are in compliance with all covenants set forth in Section 12 of the Loan Agreement;

(iv)    We are in compliance with all the terms and provisions set forth in any document related to this Advance (including, without limitation, Sections 4 and 5 of the Loan Agreement);

(v)    As of the date hereof and the date of the funding of the requested Advance, no fact or condition exists that would (or, with the passage of time, the giving of notice, or both, would) constitute an Event of Default under the Loan Agreement;

DocuSign Envelope ID: BE2BC2C8-A519-43GB-B324-7385D78B98F1

(vi)    We understand and acknowledge that each Lender has the right to review the financial information supporting this representation and based upon such review in its sole discretion it may decline to fund the requested Advance; and

(vii)    Attached, is a true and correct copy of the updated and executed Certificate of Perfection.

**(Signatures to Follow)**

Dated: _____, 20__

**BORROWER REPRESENTATIVE:**

**UNDERGROUND ENTERPRISES, INC., as Borrower Representative on behalf of itself and all other Borrowers**

Signature: _____

Print Name:  Jeffrey Hardy

Title:        President

**[SIGNATURE PAGE TO ADVANCE REQUEST]**

**EXHIBIT C**

**Certificate of Perfection**

This Certificate of Perfection shall reference that certain Plain English Growth Capital Loan and Security Agreement dated as of May 18, 2022, by and between TRIPLEPOINT PRIVATE VENTURE CREDIT INC., a Maryland corporation, in its capacity as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "**Collateral Agent**"), the Lenders party thereto, UNDERGROUND ENTERPRISES, INC., a Delaware corporation (the "**Borrower Representative**"), and each other Borrower party thereto (together with the Borrower Representative in its capacity as a Borrower, collectively, the "**Borrowers**," "**We**," "**Us**," or "**Our**") (the "**Loan Agreement**").  All terms not defined in this Certificate of Perfection shall have the same meanings as in the Loan Agreement.  Pursuant to the terms of the Loan Agreement, the Borrower Representative, on behalf of itself as a Borrower and each other Borrower, hereby certifies, represents and warrants the following as of the date set forth below the signature to this Certificate of Perfection:

**1.**      Our current names and organizational status are as follows:

Name:                                    _____

Type of Organization:         _____

State of Organization:         _____

Organization File Number:  _____

Federal Employer Tax
Identification Number:        _____


Name:                                    _____

Type of Organization:         _____

State of Organization:         _____

Organization File Number:  _____

Federal Employer Tax
Identification Number:        _____


**2.**      Five (5) years prior to the date of this Certificate of Perfection, We did not do business under any other name or organization or form except the following:

Name:                                    _____

Type of Organization:         _____

State of Organization:         _____

Organization File Number: _____

Federal Employer Tax
Identification Number:
Dates of Existence: _____

**3.**   Our fiscal year ends on _____.

**4.**   Our current locations and the locations of all the Collateral are:

Chief Executive Office:

Principal Place of Business:

Locations of Collateral:

**5.**   The following is a list of any and all of Our Affiliates and subsidiaries:

Name: _____
Type of Organization:

State of Organization: _____

Organization File Number: _____

Federal Employer Tax
Identification Number: _____
Your Ownership Interest:

_____

**6.**   We and Our subsidiaries currently maintain Deposit Accounts, other accounts holding Investment Property owned by Us or such subsidiaries, and electronic accounts (such as PayPal or similar accounts) as follows:

| Bank Name/Address | Account Holder Name | Account (Type & Number) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**7.**   We currently have the following commercial tort claims: _____.

2

DocuSign Envelope ID: BE2BC2C8-A519-43GB-B324-7385D78B98F1

**8.**     Attached is a current listing of all Patents, Patent applications, Patent Licenses, Trademarks, Trademark applications, Trademark Licenses, Copyrights, Copyright applications and Copyright Licenses of any of Us.

*(Signature Page to Follow)*

**BORROWER REPRESENTATIVE:**

**UNDERGROUND ENTERPRISES, INC., as Borrower Representative on behalf of itself and all other Borrowers**

Signature: _____

Print Name:  Jeffrey Hardy

Title:        President

Date:

**[SIGNATURE PAGE TO CERTIFICATE OF PERFECTION]**

**EXHIBIT D**

**Certificate of Compliance**

This Certificate of Compliance shall reference that certain Plain English Growth Capital Loan and Security Agreement dated as of May 18, 2022, by and between TRIPLEPOINT PRIVATE VENTURE CREDIT INC., a Maryland corporation, in its capacity as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "**Collateral Agent**"), the Lenders party thereto, and UNDERGROUND ENTERPRISES, INC., a Delaware corporation (the "**Borrower Representative**"), and each other Borrower party thereto (together with the Borrower Representative in its capacity as a Borrower, collectively, the "**Borrowers**," "**We**," "**Us**," or "**Our**") (the "**Loan Agreement**").  All terms not defined in this Certificate of Compliance shall have the same meanings as in the Loan Agreement.  Pursuant to the terms of the Loan Agreement, the Borrower Representative, on behalf of itself as a Borrower and each other Borrower, certifies the following as of the date set forth below the signature to this Certificate of Compliance:

(A)    Each of Us is in compliance as of the date of this Certificate of Compliance with all required covenants unless otherwise noted and attached to this Certificate of Compliance.

(B)    Except as noted in an attached disclosure schedule, as of the date of this Certificate of Compliance all representations and warranties in the Loan Agreement are true and correct in all material respects except to the extent such representations and warranties expressly relate to an earlier date (in which case, those representations and warranties remain true as of such date).

Disclosure schedule with respect to the representations and warranties in the Loan Agreement:

\_\_\_\_\_    None

\_\_\_\_\_    See attached

(C)    Except as noted in an attached supplement to the Certificate of Perfection, the Certificate of Perfection is true and correct as of the date of this Certificate of Compliance.

Updated Certificate of Perfection:

\_\_\_\_\_    None

\_\_\_\_\_    See attached

*(Signature Page to Follow)*

**BORROWER REPRESENTATIVE:**

**UNDERGROUND ENTERPRISES, INC., as Borrower Representative on behalf of itself and all other Borrowers**

Signature: _____

Print Name:  Jeffrey Hardy

Title:        President

**[SIGNATURE PAGE TO COMPLIANCE CERTIFICATE]**

**EXHIBIT E**

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT**

THIS JOINDER AGREEMENT (the "**Agreement**") is made and entered into as of _____, 20__, by _____, a _____ _____ ("**Company**") in favor of TRIPLEPOINT PRIVATE VENTURE CREDIT INC., a Maryland corporation, in its capacity as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "**Collateral Agent**") and the Lenders party to the Loan Agreement referred to below ("**Lenders**"; collectively with Collateral Agent, the "**Lender Parties**").

**RECITALS**

A.    UNDERGROUND ENTERPRISES, INC., a Delaware corporation, as a Borrower, and each other Borrower party thereto (collectively, the "**Borrower**") and the Lender Parties have entered into that certain Plain English Growth Capital Loan and Security Agreement dated as of May 18, 2022 (including all annexes, exhibits and schedules thereto, and as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), pursuant to which Lenders are providing loans and other financial accommodations to or for the benefit of the Borrower upon the terms and conditions contained therein.  Capitalized terms used herein without definitions shall have the respective meanings provided in the Loan Agreement.

B.    The Loan Agreement requires that upon execution and delivery by Company of this Agreement, Company will become a party to the Loan Agreement as a "Borrower" party thereto, will become jointly and severally liable for payment of all Secured Obligations under the Loan Agreement and will grant to Lender a Lien in all of Company's personal property.

C.    Company has agreed to execute and deliver this Agreement in order to become a party to the Loan Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the premises and of the covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

1.    **Loan Agreement**.  By executing and delivering this Agreement to the Lender Parties, Company hereby becomes a party to the Loan Agreement as a "Borrower" thereunder with the same force and effect as if originally named therein as a Borrower and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Borrower thereunder.  Company hereby agrees to be bound by all of the terms and provisions of the Loan Agreement and the other Loan Documents, which are incorporated herein by reference as fully as though set forth herein verbatim.  Each reference to "You," "Your" or "Borrower" in the Loan Agreement and in any other Loan Document shall be deemed to include Company.  Company agrees to be jointly and severally liable with the other Borrowers under the Loan Agreement for payment of all Secured Obligations thereunder and hereby grants and joins in the grant of a Lien pursuant to Section 8 of the Loan Agreement and the cross-guaranty pursuant to Section 17 of the Loan Agreement.

2.    **Representations and Warranties**.  Company hereby represents and warrants to the Lender Parties that each of the representations and warranties contained in Section 11 of the Loan Agreement is true and correct as of the date hereof and after giving effect to this Agreement.

3.    **Conditions to Advances to Company**.  Company hereby acknowledges that Lenders' obligation to fund any Advance to Company under the Loan Agreement is subject to delivery of all of the following fully-executed documents to Collateral Agent:

(a)    this Agreement;

(b)    the executed Certificate of Perfection of Company, in the form of Exhibit C to the Loan Agreement, with respect to Company;

(d)    secretary's certificate of incumbency and authority for Company;

(e)      certified copy of resolutions of Company's board of directors or similar governing body approving this Agreement, the Loan Agreement and the other Loan Documents;

(f)      certified copy of [Certificate of Incorporation] and [By-Laws] for Company, as amended through the date hereof;

(g)      a certificate of good standing from the [State of _____], and similar certificates from all other jurisdictions where Company does business and where the failure to be qualified could reasonably be expected to have a Material Adverse Effect; and

(h)      the other documents, certificates and other information required under Section 5 of the Loan Agreement.

4.      **Recitals**.  The recitals to this Agreement shall constitute a part of the agreement of the parties hereto.

5.      **Governing Law**.  This Agreement has been made, executed and delivered in the State of California and will be governed and construed for all purposes in accordance with the laws of the State of California, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

6.      **Signatures**.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all such counterparts together constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile or transmitted electronically in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") (or, in the sole and absolute discretion of Collateral Agent, DocuSign or similar electronic form), and upon such delivery, the facsimile, TIFF, PDF or other signature, as applicable, will be deemed to have the same effect as if the original signature had been delivered to the Lending Parties.

7.      **Headings**.  The headings contained in this Agreement are for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

8.      **Loan Document**.  This Agreement is a Loan Document.

*(Signature Page to Follow)*

2

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed and delivered as of the date first above written.

**"COMPANY":**

**[COMPANY NAME]**

Signature: _____

Print Name: _____

Title: _____

**Accepted by:**

**UNDERGROUND ENTERPRISES, INC.**

Signature: _____

Print Name: _____

Title: _____

**PHOENO WINE COMPANY, INC.**

Signature: _____

Print Name: _____

Title: _____

**[SIGNATURE PAGE TO JOINDER AGREEMENT]**

**TRIPLEPOINT PRIVATE VENTURE CREDIT INC., as a Lender and as Collateral Agent:**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _____

Print Name:  Kevin W. Thorne

Title:  Chief Operating Officer

**TRIPLEPOINT VENTURE GROWTH BDC CORP. as a Lender**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _____

Print Name:  Kevin W. Thorne

Title:  Chief Operating Officer

**TRIPLEPOINT VENTURE LENDING FUND, LLC as a Lender**

**By: TriplePoint Venture Lending GP, LLC, as Managing Member**

**By: TriplePoint Advisers LLC, as Sole Member**

Signature: _____

Print Name:  Kevin W. Thorne

Title:  Chief Operating Officer

**[SIGNATURE PAGE TO JOINDER AGREEMENT]**

**EXHIBIT F**

**MANAGERIAL ASSISTANCE ACKNOWLEDGEMENT LETTER**

This MANAGERIAL ASSISTANCE ACKNOWLEDGEMENT LETTER (the "**Letter**") is acknowledged this 18th day of May, 2022, by and among TRIPLEPOINT PRIVATE VENTURE CREDIT INC., a Maryland corporation, and TRIPLEPOINT VENTURE GROWTH BDC CORP., a Maryland corporation (collectively, the "**Company**"), UNDERGROUND ENTERPRISES, INC., a Delaware corporation (the "**Lead Borrower**"), PHOENO WINE COMPANY, INC., a Delaware corporation ("**Phoeno**"), and any entity that hereafter executes a counterpart signature page hereto (collectively with the Lead Borrower and Phoeno, the "**Borrower**").

WHEREAS, the Company is an externally managed, closed-end, non-diversified management investment company that has elected to be regulated as a business development company (a "**BDC**") under the Investment Company Act of 1940, as amended (the "**1940 Act**").

WHEREAS, the Company, the other Lenders party thereto, and the Borrower have entered into the Plain English Growth Capital Loan and Security Agreement dated as of May 18, 2022 (the "**Credit Facility**").

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Letter, the Company and the Borrower acknowledge as follows:

1. *Offer to Provide Managerial Assistance.*

   As a Company which has elected to be regulated as a BDC under the 1940 Act, the Company is offering to make available to the Borrower, "significant managerial assistance" in accordance with Section 2(a)(47) of the 1940 Act.

   Should the Borrower accept the Company's offer, the Company's administrator, TriplePoint Administrator LLC (the "**Administrator**") will provide, on the Company's behalf, significant managerial assistance to the Borrower, the terms of which shall be agreed to by the Company, the Administrator and the Borrower and documented under a separate agreement.

2. *Acceptance of the Company's Offer.*

   Acceptance of the Company's offer shall be delivered pursuant to this Letter in writing (including telegraphic communication, telex, facsimile, or electronic mail) and delivered to the Company's address set forth on the signature page hereof, or as given from each party to the other in writing from time to time.

3. *Counterparts.*

   This Letter may be executed in any number of counterparts, each of which will be deemed an original, but all such counterparts together constitute one and the same instrument. This Letter may be executed and delivered by facsimile or transmitted electronically in either Tagged Image Format Files ("**TIFF**") or Portable Document Format ("**PDF**") and, upon such delivery, the facsimile, TIFF or PDF, as applicable, will be deemed to have the same effect as if the original signature had been delivered to other party.

4. *Governing Law.*

   This Letter shall be governed by, and construed in accordance with, the laws of the State of California. Notwithstanding the foregoing, nothing herein shall be construed in any manner inconsistent with the 1940 Act, or any rule, regulation or order of the SEC promulgated thereunder.

5. *Headings.*

   The headings contained in this Letter are for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Letter.

*(Signature Page to Follow)*

IN WITNESS WHEREOF, each party has caused its signature page to this Letter to be duly executed as of the date first written above.

**"BORROWER":**

**UNDERGROUND ENTERPRISES, INC.**

Signature: _____

Print Name:  Jeffrey Hardy

Title:          President

Address for Notices:

580 Howard Street, Suite #500
San Francisco, CA 94105

**PHOENO WINE COMPANY, INC.**

Signature: _____

Print Name:  Jeffrey Shaw

Title:          Chief Executive Officer

Address for Notices:

580 Howard Street, Suite #500
San Francisco, CA 94105

**"COMPANY":**

**TRIPLEPOINT PRIVATE VENTURE CREDIT INC.**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _____

Print Name:  Kevin W. Thorne

Title:  Chief Operating Officer

**TRIPLEPOINT VENTURE GROWTH BDC CORP. as a Lender**

**By: TriplePoint Advisers LLC, its investment adviser**

Signature: _____

Print Name:  Kevin W. Thorne

Title:  Chief Operating Officer

Address for Notices:

2755 Sand Hill Road, Suite 150
Menlo Park, CA 94025

**[SIGNATURE PAGE TO MANAGERIAL ASSISTANCE ACKNOWLEDGEMENT LETTER]**

## SCHEDULE 1

### INDEBTEDNESS AND LIENS, INVESTMENTS, AND INTERCOMPANY LOANS

Indebtedness and Liens:

None.

Investments:

None.

Intercompany Loans:

None.

## SCHEDULE 2

## POST-CLOSING UNDERTAKINGS

Notwithstanding the provisions of the Plain English Growth Capital and Revolving Loan and Security Agreement dated as of May 18, 2022 by and between the Parties to the contrary:

1.    On or before the date that is twenty-five (25) calendar days after the Closing Date, You shall:

   a.    have delivered evidence acceptable to Us of the termination and release of the tax lien imposed by the City and County of San Francisco on Your assets as recorded on March 6, 2019 under No. 2019-K739678-00; and

   b.    have delivered to Us evidence of the termination and release of the blanket lien in Your assets in favor of U.S. Small Business Administration ("**SBA**") under UCC-1 financing statement No. 20-7777212863 filed on May 6, 2020, provided that not later than the Closing Date, We shall have received a copy of an authenticated demand letter that You have delivered to SBA for the UCC termination in form and substance reasonably acceptable to Us.

2.    On or before the date that is thirty (30) calendar days after the Closing Date, You shall:

   a.    have delivered to Us such acknowledgments, consents, waivers and agreements duly executed by landlords with respect to Your location at 1166 Commerce Blvd Std. D American Canyon, CA 94503, in form and substance reasonably acceptable to Us.

**ANNEX A**

**GROWTH CAPITAL LOAN FACILITY INFORMATION--LENDER ALLOCATIONS ETC.**

| Lender Part Commitments | | | |
|---|---|---|---|
| | **Part Commitment** | | |
| *Lender* | *Part 1* | *Part 2* | *Part 3* |
| TriplePoint Venture Growth BDC Corp. | $6,000,000 | TBD | TBD |
| TriplePoint Private Venture Credit Inc. | $1,000,000 | TBD | TBD |
| TriplePoint Venture Lending Fund, LLC | $1,000,000 | TBD | TBD |
| **TOTAL COMMITMENT AMOUNT** | **$8,000,000** | **$4,000,000** | **$8,000,000** |

| Facility Fee Allocation | | | |
|---|---|---|---|
| | **Facility Fee** | | |
| *Lender* | *Part 1* | *Part 2* | *Part 3* |
| TriplePoint Venture Growth BDC Corp. | up to $60,000 | TBD | TBD |
| TriplePoint Private Venture Credit Inc. | up to $10,000 | TBD | TBD |
| TriplePoint Venture Lending Fund, LLC | up to $10,000 | TBD | TBD |
| **TOTAL** | **up to $80,000** | **up to $40,000** | **up to $80,000** |