## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| PHOENO WINE COMPANY, INC., *et al.,* | Case No. 23-10554 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | Hearing Date: November 7, 2023 at 1:00 p.m. (ET)<br>Objection Deadline: October 31, 2023 at 4:00 p.m. (ET) |
| | Related to D.I.: **183, 285, 286, 287, 288, 289, and 290** |

## REPLY OF TRIPLEPOINT CAPITAL IN SUPPORT OF
## TRUSTEE'S MOTION TO SELL ASSETS FREE AND CLEAR

Secured creditors TriplePoint Private Venture Credit Inc.; TriplePoint Venture Growth

BDC Corp.; and TriplePoint Venture Lending Fund, LLC (collectively, "TriplePoint") file this

reply ("Reply") in response to the various Oppositions[2] filed in opposition to the *Motion of the*

*Chapter 7 Trustee for an Order (A) Authorizing the Sale of Certain Assets Free and Clear of Liens,*

*Claims, Interests, and Encumbrances, (B) Authorizing Purchaser to Fulfill Existing Customer*

*Orders, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases, (D) Authorizing the Trustee to Serve Notice of the Motion on Customers By*

*Email, and (E) Granting Related Relief* [D.I. 183], as amended by the pleadings filed on October

---

[1]   The debtors consist of Phoeno Wine Company, Inc. ("Phoeno") and Underground Enterprises, Inc. DBA Underground Cellar ("Underground Enterprises", and together with Phoeno, the "Debtors").

[2]   The "Oppositions" refers to collectively, the *Brief of the Ad Hoc Group of Wine Customers Opposing the Revised Motion Authorizing Sale of the Assets of Debtor* [D.I. 285]; the *Joinder of Brent Beckley to the Objection of the Ad Hoc Group of Wine Customers to the Revised Motion Authorizing Sale of the Assets of Debtor* [D.I. 286]; the *Limited Objection and Reservation of Rights of Liquid Lotus Corporation and Jeffrey Shaw to the Sale of Substantially all of the Debtors' Assets and Abandonment of the Estates' Interest in Personal Property and Joinder in Other Objections to the Proposed Sale* [D.I. 287], the *Joinder of Creditor Keith McCormick in the Brief of the Ad Hoc Group of Wine Customers Opposing the Revised Motion Authorizing Sale of the Assets of Debtor* [D.I. 288], the *Objection of Rachel Dannemeyer to Motion for an Order (A) Authorizing the Private Sale of Certain Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Purchaser to Fulfill Existing Customer Orders; (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing the Trustee to Serve Notice of this Motion on Customers by email, and (E) Granting Related Relief* [D.I. 289], and the *Joinder of Robert Floyd to the Objection of the Ad Hoc Group of Wine Customers to the Revised Motion Authorizing Sale of the Assets of Debtor* [D.I. 290].  The Oppositions filed at D.I. 287 through 290 were filed after the objection deadline that was set for October 31, 2023 at 4:00 p.m. (ET).

16, 2023 [D.I. 278] (together, the "Motion").  In support of this Reply, TriplePoint respectfully

states as follows:

**REPLY**

1.    TriplePoint is the largest single creditor in these cases, with a claim of approximately

$8.3 million secured by a perfected, first priority, unavoidable lien on all assets of the Debtors'

estates.  These assets include the approximately 500,000 bottles of wine stored in a warehouse in

California ("Wine Assets"), as well as other assets subject to the proposed sale ("Non-Wine

Assets").  It is important to note at the outset, however, that while some customers claim to have

an ownership interest in the wine that they ordered, paid for, but did not receive ("Allocated

Wine"), there is no dispute that a significant portion of the Wine Assets comprises (1) wine as to

which customers obtained refunds from their credit card companies ("Charged Back Wine"); and

(2) wine held in inventory that is not associated with any customer order ("Unallocated Wine").

There is no dispute that (a) the Debtors and the Debtors alone own the Non-Wine Assets, the

Charged Back Wine and the Unallocated Wine; and (b) because the Debtors alone claim ownership

of the Non-Wine Assets, the Charged Back Wine and the Unallocated Wine, encumbered by

TriplePoint's liens that continue to attach to these assets in first position.

2.    As the Court will recall from the October 16, 2023 initial hearing on the Motion,

following an all-day auction conducted on October 13, 2023, the Trustee determined that

TriplePoint was the successful bidder for the Wine Assets and the Non-Wine Assets (together, the

"Purchased Assets").  TriplePoint's winning bid for the Purchased Assets included: (a) (i) a credit

bid of a $4.5 million portion of its secured claim, with $3 million allocated to the Wine Assets,

and $1.5 million allocated to the Non-Wine Assets, *plus* (ii) $400,000 in cash, *plus* (b) assumption

of the Assumed Liabilities, *plus* (c) the payment of $2,700 to Liquid Lotus Corporation for the

reimbursement of certain expenses.  Following the October 16 initial hearing on the Motion and

the Court's request that the parties try to reach consensus, TriplePoint, the Trustee and the Customers[3] engaged in negotiations aimed at resolving the various objections to the Motion that had been filed.

3.     The negotiations with the Customers have been fruitful.  Just before this Reply was to be filed, TriplePoint and the Customers represented by the Ad Hoc group reached a settlement that provides for substantially improved treatment of all Customers, at a cost to TriplePoint of millions of dollars.  Prior to the November 7 hearing, TriplePoint will file with the Court an update detailing the status and details of this settlement.

4.     There are still two issues that the Court will have to address regarding the Motion. The first question is whether there is any remaining legitimate dispute as to ownership of the Allocated Wine.  The second question is whether this Court can approve the modified terms of the sale and thereby bind customers that had notice of the prior (and less favorable to the customers) terms of the sale, but who elected not to object or otherwise participate in these proceedings, to those revised sale terms?  TriplePoint submits that the answer to the first question is "No," and the answer to the second question is "Yes."

5.     With respect to the question of ownership of the Allocated Wine, there is no *legitimate* dispute that all the Wine Assets, including the Allocated Wine, are property of the Debtors' estates, and thus subject to TriplePoint's valid, perfected, first-priority lien.  Under the UCC as adopted in both Delaware and California, unless otherwise agreed in writing, title passes to the customers *only upon completion of delivery to the customer*—that is, when the wine ultimately is delivered to the delivery address selected by the customer.  Because the Debtors and the Customers never modified the default title transfer mechanism under the UCC – in the Debtors' Terms of Service

---

[3] Capitalized terms not defined herein have the same meaning given to them in the *Opposition of TriplePoint Capital to Trustee's Motion to Sell Assets Free and Clear* (the "Opposition") [D.I. 218].

ACTIVE\1605017888.5

("ToS") or otherwise – title to all the Wine Assets, including the Allocated Wine previously paid for by customers, never left the Debtors.[4]

6.    No party has provided this Court with any authority that challenges this black letter law on the facts here.  Indeed, the only case that is on point, *In re Carolina Wine Co., Inc.*, 2009 WL 2399944 (Bankr. E.D.N.C. July 31, 2009),[5] in which the court approved a settlement between a trustee and the debtor's secured creditors over customer objections raising the same arguments that the Customers raise here, after adopting the exact UCC analysis that is proffered by TriplePoint here, on virtually identical facts.  There is no *legitimate* legal or factual dispute that Wine Assets are owned by the Debtors, subject to TriplePoint's first priority, perfected, unavoidable security interest.  The Customers cannot derail a valid sale process, like that conducted by the Trustee here, by manufacturing a baseless "ownership dispute," and arguing that this "ownership dispute" would require a time-consuming and expensive adversary proceeding to resolve.  To hold otherwise would give unsecured creditors like the Customers here the ability to hold the estate hostage and render Section 363 practically useless.

7.    With respect to the second issue – whether the Court may bind all customers and other third parties to the terms of the sale, courts routinely bind parties to sale terms when those parties were given notice, but do not object.  *See* 11 U.S.C. § 363(f)(2).  According to the *Certificates of Service* submitted by the Trustee, thousands of customers were served, and only a handful have chosen to participate in these cases.  With respect to those who haven't responded, their silence should be deemed consent and this Court should bind them to the terms of the sale to TriplePoint.

8.    For these reasons, TriplePoint respectfully requests that the Court approve the sale and overrule each of the objections.

---

[4]  *See* Opposition at ¶33-36.

[5]  TriplePoint previously cited this case in its *Sur-Reply in Support of Opposition of TriplePoint Capital to Trustee's Motion to Sell Assets Free and Clear* [D.I. 241-1], pg. 4, f.n.6.

4

**A. The Debtors and Their Estates Own all the Wine Assets, Including the Allocated Wine.**

9.    There is no legitimate dispute that the Debtors and their estates own all the Wine

Assets, including the Allocated Wine, all subject to TriplePoint's liens.[6]

> **1.    Under the Uniform Commercial Code, Title to the Allocated Wine Is in the Debtors because it Was Never Delivered to the Customers.**

10.    Under the Uniform Commercial Code, unless otherwise explicitly agreed in writing,

title to goods offered for sale passes to the buyer at the time and place at which the seller completes

the performance with physical delivery of the goods.  Cal. Com. Code § 2401(2); 6 Del. C. § 2-

401(2).  When there is nothing in a written agreement to establish a contrary intent, title to goods

passes from the seller to the buyer only upon delivery, without regard to when payment is made

or due.  *People v. Randono*, 32 Cal. App. 3d 164 (Cal. Ct. App. 1973).  If the contract requires

delivery at a destination specified by the customer, then title passes on delivery at the destination.

Cal. Com. Code, § 2401(2)(b); 6 Del. C. § 2-401(2)(b).

11.    This analysis was adopted on a case that is directly on point: *In re Carolina Wine Co.,*

*Inc.*, 2009 WL 2399944, at *1 (Bankr. E.D.N.C. July 31, 2009). There, an internet wine company

structured almost identically to the Debtors here filed for chapter 7. The chapter 7 trustee entered

into a settlement with the secured lender, which settlement the Court approved over the objection

of a number of customers.  The court rejected customer arguments that were nearly identical to

those raised here, finding that the wine was property of the wine-company debtor's estate under

---

[6]   TriplePoint notes that its arguments in this Reply are consistent with the arguments previously made in the Opposition.  In the Opposition, TriplePoint disputed that the Trustee could sell the Wine Assets over TriplePoint's objection because section 363(f)(4) of the Bankruptcy Code was inapplicable.  Section 363(f)(4) allows a sale free and clear of an interest if the interest is subject to bona fide dispute. The Trustee asserted that whether the Debtors or the Customers owned the Wine Assets was a bona fide dispute, but the bona fide dispute relevant under section 363(f)(4) is whether the interest holder's interest is subject to bona fide dispute, here TriplePoint. There is no dispute that the Wine Assets are subject to TriplePoint's interests, and TriplePoint has consistently argued that the Wine Assets are property of the Debtors' estates, a pre-requisite to any sale of estate property under section 363 of the Bankruptcy Code.

North Carolina General Statute section 25-2-401(2) (the North Carolina analog to Cal. Com. Code, § 2401(2) and 6 Del. C. § 2-401(2)).

12. Just like the Debtors here, the debtor in *Carolina Wine* stored wine in warehouses until customers arranged for delivery, and the wine was not segregated by customer or labeled with customers' names or orders. The principal in *Carolina Wine* would buy wine in bulk that he thought his customers would enjoy, and after purchasing the wine from a distributor, would mass-email his customers to pre-sell the wine before the debtor received possession of the wine. Once the wine arrived, the customers had the option to either pick up the wine, pay to have it shipped, or request that the debtor store the wine.

13. Regardless of the *Carolina Wine* debtor's ability to pre-sell the wine, the debtor was obligated to the purchase the wine from the distributor. Citing these facts, the court found that the debtor owned the wine, noting the significance of the fact that the risk of loss was born by the debtor. Similarly, in the case at bar, the risk of loss always remained with the Debtors here, who insured the wine (as TriplePoint required them to do) and the Debtors had the option to simply substitute the wine the Customers ordered for a different bottle from Debtors' wine at Debtors' cost. Both circumstances lead to the same conclusion; title to the Allocated Wine at issue here never passed to the Customers.

14. Application of these principles to the facts here is straightforward. The Customers ordered wine from the Debtors. While the Customers paid for wine when they placed their orders, under the UCC, title to the Allocated Wine passed to the Debtors when the Debtors purchased the wine from the vintners, and remained with the Debtors unless and until the wine was received by the applicable Customer, not when it arrived at the Warehouse.

15. Title to the Allocated Wine would pass to the Customers only when the wine actually was delivered to the address designated by the Customer for delivery—this is when the Debtors

6

would have completed their physical delivery of the wine.  Additionally, nothing in the ToS or elsewhere in any documentation submitted by any party (or reviewed by TriplePoint) provides, explicitly or otherwise, for title to pass other than as contemplated under the standard mechanisms of the UCC.  With respect to the Allocated Wine at issue here, all incidents of ownership, including the risk of loss for which the Debtors obtained insurance, remained with the Debtors until the wine was delivered to the customers, which never occurred with respect to the Allocated Wine at issue here.  Accordingly, title to the all the Wine Assets, including the Allocated Wine, remains with the Debtors, subject to TriplePoint's liens.

16.    The title transfer mechanism under the UCC is entirely consistent with the verbal and written representations the Debtors made to TriplePoint prior to the Petition Date, as well as the Debtors' prepetition balance sheets.  Prior to the Petition Date, the Debtors understood (and represented to TriplePoint) that they held title to all the Wine Assets.  The Debtors further represented to TriplePoint that all Collateral, including all the Wine Assets, was located at the Warehouse; the Debtors included the value of all the Wine Assets as "Inventory" on their balance sheets; and the Debtors represented to TriplePoint that the Debtors, rather than the Customers, owned all the Wine Assets.  Only after filing for chapter 7 did the Debtors' story change.

17.    Accordingly, under the UCC, title to the Wine Assets—including the Allocated Wine—would only pass to the Customers when they actually received either the wine they had ordered or, in the case of an upgrade, substituted wine.  Because this never happened with the Wine Assets, including the Allocated Wine, title thereto remains with the Debtors.

ACTIVE\1605017888.5

**2.    The Debtors Were Not "Bailees" with Respect to the Allocated Wine.**

18. There is no legitimate "dispute" regarding ownership: the only issue that the Customers, who have since settled these disputes, have identified[7] is that they contend that the Debtors held the Allocated Wine as bailees while the Customers held title.[8] This interpretation of the facts and law is simply wrong and should not prevent the Court from approving the sale to TriplePoint.

**a.    There Is No Bailor-Bailee Relationship Here.**

19. Both California and Delaware state law define a bailment as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it." *Marvel v. Clay*, No. 94C-11-002, 1995 WL 465322, at *3 (Del. Super. Ct. June 15, 1995), aff'd, 676 A.2d 905 (Del. 1996); *Gebert v. Yank*, 172 Cal. App. 3d 544, 550 (Cal. Ct. App. 1985) ("In a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men."). A typical example of a bailment would be a car owner dropping a car off for repair at the dealership: the person dropping the car off is the bailor, who does not transfer title to the dealership, which is the bailee. Here, the Customers are not bailees, because

---

[7] This argument was raised solely in the Customers' since-withdrawn *Motion of the Ad Hoc Group of Wine Customers for an Order Directing the Trustee to Release Non-Estate Wine and for Related Relief* [D.I. 161, withdrawn at D.I. 181] (the "Turnover Motion").

[8] Nor are the Customers "consignors" under the UCC. For the transactions at issue here to qualify as consignments under the UCC, *the Customers would have had to have held title and to deliver the wine to the Debtors for the Debtors to sell as inventory*. U.C.C. § 9-102 ("'Consignment' means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale."). Even under their faulty recitation of the circumstances, the Customers did not do this. At most, in the Customers' view, the Debtors held the wine pending direction on where to ship it. Moreover, if the transactions at issue here were true consignments, the Customers would have had to file UCC-1 financing statements in order to have priority over TriplePoint's security interest, which they did not do. *E.g.*, *Id.* § 9-322 (establishing priority for conflicting security interests).

ACTIVE\1605017888.5

they never had title to the wine when it was delivered to the Warehouse, and they never had a direct contractual relationship with the Warehouse.

20. While state law governs, the U.S. Supreme Court has opined on whether a contract is for a sale or for a bailment:

> The recognized distinction between a bailment and a sale is that, when the identical article is to be *delivered to the bailee and returned to the bailor* in the same or in some altered form, the contract is one of bailment, and the title to the property remains at all times with the bailor. On the other hand, when there is no obligation to return the specific article, and the recipient is at liberty to return another thing of comparable value, he becomes a debtor to make the return, and the title to the property is changed. The transaction is a sale.

*Sturm v. Boker*, 150 U.S. 312, 329 (1893) (alteration in original).

21. "Accordingly, in distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form." *In re Miami Metals I, Inc.*, 603 B.R. 727, 735 (Bankr. S.D.N.Y. 2019) (discussing Florida and New York law).

22. The contention made by some customers that their relationship with the Debtors was one of bailor/bailee is belied by the facts:

- ***There is a deficit in the wine in storage***. Unfortunately, in the case of the Debtors here there is a "wine deficit" because the Debtors did not acquire and place into storage wine for every order placed by a customer. A review of the Debtors' records indicates that there is a shortfall of approximately 16-19%. There can be no bailment relationship when certain wine can never be returned because it was never acquired and placed into storage at the Warehouse.

- ***The wine purchased was not always the wine delivered***. The Customers make much of the fact that in some cases, the Debtors would "upgrade" the wines that the Customers paid for. The ToS note that "Specific vintages may not be available. If a chosen vintage is no longer available, a comparable vintage of the same wine may be substituted" and that "[s]pecific bottles may become unavailable due to vendor error, damage, poor quality, or other reasons. In these cases, our [the Debtors'] in house wine experts will use their best judgment to substitute bottles with similar wines of equal or greater value." ToS Section 3.3, 3.4. This is a critical fact and demonstrates that the Debtors had control over what product was ultimately delivered to the Customers. Under the Debtors' ToS, Customers were not purchasing specific wine. In fact, in the Sale Motion, the Trustee

explains that, for the significant majority of the Wine Assets, it is stored by vintage and not by customer—further supporting the premise that Customers did not buy specific bottles.  Because the wine ordered by the Customers was not necessarily the same as the wine delivered, there was no bailment.

- ***Customers could lose their right to have wine delivered if they did not make annual purchases from the Debtors***.  Under the Debtors' ToS, in order to be eligible to use the CloudCellar, Customers had to be an "Active Member" of the Underground Cellar community.  ToS Section 6.1.  "Active Membership" required annual purchases from the Debtors' website.  *Id.*  If a Customer's Active Membership expired, then such Customer forfeited its rights to receive any wine and all rights remained with the Debtors.  *Id.*  This is inconsistent with a bailment relationship or title vesting in anyone other than the Debtors.

- ***The Customers purchased wine from the Debtors, not the Vendors***.  A fundamental assumption underlying the Customers' "bailee" theory is that they purchased wine directly from Vendors.  But this is not possible for two reasons.  First, if wine had been sold directly from vendors to Customers, it would have been subject to sales tax.  Cal. Rev. & Tax. Code § 6006(a).  But, on information and belief, neither Customers, the Debtors, nor Vendors paid sales tax on the Allocated Wine.  Until the Allocated Wine is actually delivered to the Customers, title did not transfer, and sales tax was not owed.  Second, the Customers were not in privity with the Vendors.  The Customer Motion is devoid of any evidence of any communications between Customers and Vendors, not to mention any contracts between Vendors and the Customers.  The *Debtors, not the Customers,* contracted with the vendors for the acquisition of the wine that the Debtors (not the vendors) then offered for sale to the Customers on their website.  There was and is no communication or contractual relationship between the Customers and the Vendors.

23.  Fundamentally, wine purchased was not necessarily the same wine that was delivered to the Warehouse or, ultimately, to the Customers.  This fact alone precludes a finding of a bailor/bailee relationship here with respect to the Allocated Wine.  Similarly, the fact the Customers did not directly contract with any of the vendors for the purchase of wine precludes a finding of a bailment with respect to the Allocated Wine.  Without owning the specific wine delivered—an impossibility under the ToS and without a contract between the subject vendor and the Customer—there was no delivery of identical and identified goods, and thus no bailment.

### b.    The Cases Cited by the Customers Are Distinguishable.

24.    The bailment cases cited by the Customers in the now-withdrawn Turnover Motion

(¶¶ 51-53) are each distinguishable and have no bearing on the ownership of the Allocated Wine

here:

- *Waters v. Delaware Moving & Storage, Inc.*, 300 A.3d 1 (Del. Super. Ct. 2023).   *Waters* involved a subcontractor defendant who transported and stored a plaintiff's personal property from her home following damage to Plaintiffs' home.   In storing the specific personal property from the Plaintiff's home, the court found that the subcontractor-Plaintiff contract was a bailment contract.   The customers entrusted no similar, specifically identifiable personal property to the Debtors.

- *Matter of Ralph A. Veon, Inc.*, 12 B.R. 186 (Bankr. W.D. Pa. 1981) involved bonds that were posted by third parties in support of the debtor in an effort to enable the debtor to obtain a mining permit.   The third parties and the debtor agreed that the bonds "were to remain the[ir] sole property." On these facts, the court found that the debtor held the bonds as a bailor for the third parties.   None of these facts exist here.

- *In re Guild & Gallery Plus, Inc.*, 72 F.3d 1171, 1180 (3d Cir. 1996) resolved a jurisdictional dispute that tangentially involved issues of bailment.   There, the Third Circuit found that the bankruptcy court lacked jurisdiction to hear state law claims against a trustee.   With respect to a bailment, it stands for the unsurprising notion that property held in a bailment relationship is not property of the estate, but rights under the bailment contract (*i.e.*, funds and fees related to the bailment agreement) are.

- *L C Smith & Bro Typewriter Co v. Alleman*, 199 F. 1, 2 (3d Cir. 1912) found a bailment where "Smith Company delivered to the [debtor] Franklin Company a certain typewriter, designated by factory number, for use and hire for the term of seven months."   There is no such specificity here.

- *In re STN Enters., Inc.*, 47 B.R. 315, 317 (Bankr. D. Vt. 1985) found a bailment where there was an unsigned bailment agreement for the bailor to hold a Single Action Army Colt revolver, Serial No. 8928E, in custody for the owner, and the owner arranged for delivery of the revolver to the bailor. Again, there is no such specific article or property at issue here.

25.    The circumstances of the Allocated Wine are fundamentally distinguishable from each

of these cases: unlike in *Waters* (involving personal property from the Plaintiff's home), *Veon*

(involving bonds posted in favor of the debtor and the express recognition that such bonds would

11

remain property of the pledgors), *Guild & Gallery* (involving 17 specific paintings) *Smith & Bro* (involving a typewriter designated by factory number) and *STN* (involving a Colt revolver designated by serial number), the Customers never had rights to any specific bottle of wine (and not even to any specific *type* of wine given the potential for substitution under the Debtors' ToS).

**B. This Court Can Bind Parties Who Had Notice But Did Not Appear or Otherwise Oppose the Sale.**

26. Under Section 363 of the Bankruptcy Code, sales of a debtor's assets will be free and clear of all liens and interests if one of the specified conditions under Section 363(f) occurs. 3 Collier on Bankruptcy ¶ 363.06 (16th 2023); *see also In re Elliot*, 94 B.R. 343, 345 (E.D.Pa.1988). Section 363(f) is written in the disjunctive, such that if any of the five conditions are met, a sale can be approved. *In re Elliot* 94 B.R. at 345.

27. Here, section 363(f)(2) provides that a sale can be made free and clear of any party's interest in the property if such entity consents. The silence of affected parties constitutes consent under 363(f)(2). *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) (failure to object to a notice of sale free and clear is deemed consent to the sale for purposes of § 363(f)(2)); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr.D.N.J.1994) (same); *In re Elliot*, 94 B.R. 343, 345 (E.D.Pa.1988) (same); *In re TE Holdcorp LLC*, No. 22-1807, 2023 WL 418059, at *3 (3d Cir. Jan. 26, 2023) (citing *FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (stating that "lack of objection … counts as consent")). Requiring every party who *might* have an interest in the assets to execute a formal consent before approving a sale would prove practically impossible for many sales and would increased transaction costs that would eliminate the incentive for parties to complete sales under Section 363. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d at 285–86.

28. Here, notice of the sale of the Wine Assets was given to all parties in interest, and parties had ample time to object to the sale, including the known Customers. *Certificate of Service*,

Exhibit B. [D.I. 257] and *Certificate of Service*, Exhibit B [D.I. 280]. Specifically, the Trustee served notice of the auction, the bid deadline, the sale hearing, and that TriplePoint had been named the successful bidder upon thousands of known Customers. *Id*. Moreover, the notice submitting the revised proposed order and providing that TriplePoint was the successful bidder [D.I. 269] attached as an exhibit the asset purchase agreement between the Debtors and TriplePoint, which included the Wine Assets under the definition of "Assets" found at section 1.1(7)(g). Accordingly, all parties had ample notice that not only a sale was occurring, but that the Wine Assets were also being sold. Indeed, the Trustee provided notice of the Liquid Lotus deal: and the TriplePoint transaction is indisputably better. No customer could be prejudiced under these circumstances.

29. Of those Customers served, only a select few have objected, and as discussed above, those objections have been largely, consensually resolved. Requiring the non-objecting, non-responding customers to execute a written consent is not feasible and would run counter to the provisions of section 363.

## II. RESERVATION OF RIGHTS

30. This Reply is submitted without prejudice to, and with a full reservation of, all of TriplePoint's rights, claims, causes of action, defenses, and remedies, at law or in equity, under the Loan Agreement, all related documentation, notices and recordings, and in any way with respect to the Sale, the Debtors, the Customers, the Trustee, or otherwise, including, without limitation, the right to object to any claims submitted by any Customer or scheduled by the Debtors. TriplePoint reserves the right to amend, modify, or supplement this Reply in writing or orally at any hearing, to respond to any pleadings filed by any other party, and to introduce evidence at or prior to any hearing relating to the Sale Motion.

*[Remainder of page intentionally left blank]*

## III.   <u>CONCLUSION</u>

WHEREFORE, TriplePoint respectfully requests that the Court approve the sale to TriplePoint and grant such other and further relief as the Court deems warranted.

Dated:      November 2, 2023
              Wilmington, Delaware

**DLA PIPER LLP (US)**

  /s/  Stuart M. Brown
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email:   stuart.brown@us.dlapiper.com

-and-

Eric D. Goldberg (admitted *pro hac vice*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
Email:   eric.goldberg@us.dlapiper.com

*Counsel to TriplePoint Private Venture Credit Inc.; TriplePoint Venture Growth BDC Corp.; and TriplePoint Venture Lending Fund, LLC*

ACTIVE\1605017888.5