**Exhibit 1**

**(Asset Purchase Agreement)**

ASSET PURCHASE AGREEMENT

dated as of November 7, 2023

by and between

TriplePoint Private Venture Credit Inc.

as Purchaser,

and

Don A. Beskrone, Chapter 7 Trustee of Underground Enterprises, Inc. d/b/a Underground Cellar and Phoeno Wine Company, Inc.,

as Seller

# Table of Contents

Page

**ARTICLE I INTERPRETATION** ..................................................................... **2**
1.1    Definitions ............................................................................................ 2
1.2    Headings and Table of Contents ........................................................... 7
1.3    Number and Gender .............................................................................. 7
1.4    Section and Schedule References ......................................................... 7
**ARTICLE II PURCHASE OF ASSETS** ........................................................ **7**
2.1    Agreement to Purchase and Sell .......................................................... 7
2.2    Amount and Payment of Consideration ................................................ 8
2.3    Assigned Contracts ............................................................................... 8
2.4    Excluded Assets .................................................................................... 9
2.5    Liabilities Not Assumed ....................................................................... 9
**ARTICLE III CONDITIONS TO OBLIGATION OF PARTIES AT CLOSING** ............. **10**
3.1    [Reserved] ............................................................................................ 10
3.2    Bankruptcy Court Matters .................................................................... 10
3.3    Conditions to Obligations of Purchaser ............................................... 10
3.4    Condition of Purchaser Not Fulfilled; Termination ............................. 11
3.5    Conditions to Obligations of Seller ...................................................... 11
3.6    Condition of Seller Not Fulfilled; Termination ................................... 11
3.7    Other Termination ................................................................................ 11
**ARTICLE IV CLOSING ARRANGEMENTS** ............................................. **12**
4.1    Closing .................................................................................................. 13
4.2    Delivery of Assets ................................................................................ 13
4.3    Seller's Closing Deliveries ................................................................... 13
4.4    Purchaser's Closing Deliveries ............................................................ 13
**ARTICLE V REPRESENTATIONS AND WARRANTIES** ....................... **13**
5.1    Representations and Warranties of the Seller ....................................... 13
5.2    Representations and Warranties of the Purchaser ................................. 14
**ARTICLE VI TERMINATION OF COVENANTS, REPRESENTATIONS, AND
WARRANTIES** ................................................................................................... **15**
**ARTICLE VII POST-CLOSING COVENANTS AND ARRANGEMENTS** ............ **15**
7.1    Wine Obligations ............................................**Error! Bookmark not defined.**
7.2    Further Assurances ............................................................................... 16
7.3    Further Post-Closing Obligations ........................................................ 16
**ARTICLE VIII GENERAL** ............................................................................ **16**
8.1    Expenses ............................................................................................... 17
8.2    [Reserved] ............................................................................................ 17
8.3    Public Announcements ......................................................................... 17
8.4    Notices. ................................................................................................. 17
8.5    Time of Essence ................................................................................... 19
8.6    Entire Agreement ................................................................................. 19
8.7    Severability ........................................................................................... 19
8.8    Governing Law ..................................................................................... 19

8.9     Waiver of Right to Trial by Jury........................................................................ 19
8.10    Successors and Assigns .................................................................................... 19
8.11    Counterparts...................................................................................................... 19
8.12    Cooperation and Audits .................................................................................... 19
8.13    No Presumption ................................................................................................ 20

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") dated as of November 7, 2023 is made by and between **TRIPLEPOINT PRIVATE VENTURE CREDIT INC.**, a Maryland corporation (the "<u>Purchaser</u>") and **DON A. BESKRONE**, Chapter 7 Trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of Underground Enterprises, Inc. d/b/a Underground Cellar ("<u>Underground</u>") and Phoeno Wine Company, Inc. ("<u>Phoeno</u>"; and together with Underground, the "<u>Debtors</u>").

## RECITALS

**WHEREAS**, on May 1, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 7 of title 11, United States Code ("<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), thereby commencing bankruptcy cases 23-10553 and 23-10554 (collectively the "Bankruptcy Cases");

**WHEREAS**, on May 2, 2023, the Trustee was appointed to administer the Debtors' estates (the "<u>Estates</u>").

**WHEREAS**, the Debtors' businesses (collectively, the "Business") involved the facilitation of the purchase and storage of wine for retail customers, including establishing accounts, ordering wine held by Phoeno or from third party suppliers, storing such wine at the Facility, and shipping wine to such customer when requested;

**WHEREAS**, Purchaser is the collateral agent under a loan facility ("Loan Agreement") that was entered into prior to the Petition Date by certain affiliates of the Purchaser ("Lenders") and the Debtors. The Debtors' obligations to the Lenders under the Loan Agreement are secured by perfected first-priority security interests in substantially all assets of the Debtors, including all inventory owned by the Debtors. As of the Petition Date, the Debtors were obligated to the Lenders jointly and severally in the amount of $8,342,543.61 ("Claim"), as evidenced by a proof of claim in that amount filed in each of the Bankruptcy Cases.

**WHEREAS**, Purchaser desires to purchase certain assets of the Debtors, free and clear of all claims, liens, interests, and encumbrances from the Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser such assets pursuant to the terms and conditions of this Agreement; and

**WHEREAS**, the Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the assumption and assignment of certain Assigned Contracts under Section 365 of the Bankruptcy Code.

**NOW THEREFORE**, for and in consideration of the mutual agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

## ARTICLE I
## INTERPRETATION

1.1     Definitions.  In this Agreement, the following terms shall have the meanings set out below unless the context requires otherwise:

(1)     *"Affiliate"* means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate.  A Person shall be deemed to control a Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the term "controlled" shall have a similar meaning.

(2)     *"Agreement"* means this Asset Purchase Agreement, including the Exhibits and the Schedules to this Agreement, as it or they may be amended or supplemented from time to time.

(3)     *"Ancillary Documents"* means all agreements, certificates and other instruments contemplated by or delivered pursuant to or in connection with this Agreement.

(4)     *"Applicable Law"* means, with respect to any Person, property, transaction, event or other matter, any Law relating or applicable to such Person, property, transaction, event or other matter. Applicable Law also includes, where appropriate, any interpretation of the Law (or any part) by any Person having jurisdiction over it or charged with its administration or interpretation.

(5)     "*Approval Order*" means an order of the Court, certified by the clerk of the Court as a true and correct copy of such order, reasonably satisfactory in form and substance to Purchaser, Seller and their respective counsel, approving this Agreement and the transactions contemplated herein, entered after a hearing conducted with adequate notice given relating to the sale of the Assets and the assumption and assignment of the Assigned Contracts.

(6)     *"Asset Claims"* means claims with respect to damaged, destroyed or missing Assets.

(7)     *"Assets"* means all properties, assets, interests and rights of the Debtors' estates, including the following assets (but excluding in all circumstances the Excluded Assets):

2

(a)     the Physical Assets;

(b)     the warranty claims related to the Assets and Asset Claims, including billed and unbilled amounts and submitted and unsubmitted claims against insurance companies and other third party obligors;

(c)     all rights and interests under or pursuant to all warranties, representations and guarantees, express, implied or otherwise, of or made by suppliers or others in connection with the Assets or otherwise related to the Business;

(d)     all goodwill and intangible assets related to the Business, including all intellectual property related to the Business, including all Trademarks, patents, copyrights, trade secrets, brand names, the present telephone numbers, internet addresses (domain names) and other communications numbers and addresses of the Business,  including social media accounts, all account identification information (including logins and passwords) relating to the Assets, as well as all customer lists, vendor lists, developed technology including all software code and data repositories, and advertising materials including all design and brand elements;

(e)     all Asset Claims;

(f)     all Inventory;

(g)     all wine, champagne and similar consumable alcoholic beverages owned by the Debtors, including the wine, champagne and similar consumable alcoholic beverages stored at the Facility (the "Wine");

(h)     all accounts receivable and all cash equivalents, including, but not limited to, accounts receivable, non-marketable securities and short term investments;

(i)     all deposits and all prepaid charges and expenses of Debtors, including (i) security deposits and prepayments for goods or services with third party suppliers, vendors, service providers or landlords (except for the security deposit in the amount of $105,140.00 held by Biagi Bros. Inc., as landlord, that is anticipated to be applied in satisfaction of unpaid rents due under sublease for the Facility, which shall be an Excluded Asset as defined below), and lease and rental payments, (ii) deposits in transit, (iii) rebates, (iv) tenant reimbursements, and (v) pre-payments, but excluding any Tax assets of the Debtors;

(j)     all Permits of every kind necessary to operate the Business to the extent transferrable, including, but not limited to, the CDBC License(s);

(k)     all rights of the Debtors in the Assigned Contracts;

(l)     all proceeds of any or all of the foregoing received or receivable after the Closing and any claims of Debtors against any third party, whether choate or inchoate, known or unknown, contingent or non-contingent.

3

(8)    *"Assigned Contracts"* means all contractual rights of the Debtors, whether oral or in writing, relating to the operation of the Business, that are assigned by the Seller and assumed by the Purchaser, as provided on Schedule 1.1(8) hereto.

(9)    *"Assumed Liabilities"* shall mean (a) all Cure Amounts (as defined in Section 2.3) ; (b) all liabilities under the Assigned Contracts relating to the Business accruing on or after the Closing Date; and (b) all liabilities for damages to third parties or their property arising out of the performance or operation of the Business by Purchaser on or after the Closing Date.

(10)    *"Bankruptcy Code"* shall have the meaning given to it in the recitals hereof.

(11)    *"Bankruptcy Cases"* shall have the meaning given to it in the recitals hereof.

(12)    *"Business"* shall have the meaning given to it in the recitals hereof.

(13)    *"Business Day"* means any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of Delaware.

(14)    *"CDBC License(s)"* means License Number 634167, comprising license types 08-Beer and Wine Importer, 14- Public Warehouse, 17-Beer and Wine Wholesaler and 20- Off-Sale Beer and Wine and/or any and all required California Department of Alcoholic Beverages Control (ABC) other governmental required license and/or permits, including but not limited to Alcohol and Tobacco Tax and Trade Bureau (TTB) permit required by Purchaser.

(15)    *"Closing"* means the completion of the purchase and sale of the Assets in accordance with the provisions of this Agreement.

(16)    *"Closing Date"* means the date that is the first Business Day that is at least one (1) Business Day after the conditions of Purchaser and Seller specified in Sections 3.3 and 3.5 have been satisfied or waived by the Party entitled to the benefit thereof, or at such other time and at such place as mutually agreed upon by the Parties.

(17)    *"Consents and Approvals"* means all consents and approvals required to be obtained by the Seller in connection with the execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement.

(18)    *"Court"* shall have the meaning given to it in the recitals hereof.

(19)    *"Customer"* means any retail client of one or more of the Debtors.

(20)    *"Customer With Deferred Credit"* means any Customer that has credit on an account with the Debtors based on gift card purchases and gifting to other Customers, credits for damaged shipments, credits granted to new clients to encourage their first purchase of wine, and other "good will" credits issued by the Debtors.

(21) "*Deficit Customer*" means any Customer who has paid for more wine than is currently being stored for that Customer at the Facility.

(22) "*Delivery Notice Period*" shall have the meaning given to it in <u>Section 7.1</u>.

(23) [Reserved]

(24) "Employee" means an individual who was employed by the Debtors in the Business, and, unless the context specifically requires otherwise, "Employees" means every Employee.

(25) "*Employee Plan*" means employee benefit, health, welfare, supplemental unemployment benefit, bonus, pension, profit sharing, deferred compensation, stock compensation, stock purchase, retirement, hospitalization insurance, medical, dental, legal, disability and similar plans or arrangements or practices relating to the Employees or former Employees which are currently maintained or under which the Debtors have any obligations to any Employee or former Employee.

(26) "*Excluded Assets*" means mean (a) the corporate charter, seals, minute books, stock transfer books and other documents relating solely to the organization, maintenance and existence of the Debtors as corporations; (b) all contracts which are not Assigned Contracts; (c) any rights of Seller under this Agreement and any other agreements or instruments relating to the sale or transfer of any of the Assets; (d) all books and records relating to the foregoing; (e) all claims against third parties related to the foregoing, and such other assets listed on <u>Schedule 1.1(26)</u> hereof, if any; (f) all cash held by the Debtors or their Estates including the Purchase Price, but excluding, for the avoidance of doubt, any cash held by the Debtors or their Estates related to the Assets set forth in <u>Section 1.1(7)(i)</u> and <u>Section (7)(l)</u>; (g) all claims and causes of action against any former director or officer of the Debtors, whether choate or inchoate, known or unknown, contingent or non-contingent, except as may be released by the Trustee on behalf of the Estates pursuant to the Approval Order; (h) the security deposit in the amount of $105,140.00 held by Biagi Bros. Inc., as landlord, that is anticipated to be applied in satisfaction of unpaid rents due under sublease for the Facility; and (i) all claims and causes of action held or assertable by the Trustee on behalf of the Estates arising under Chapter 5 of the Bankruptcy Code and equivalent state Law except such Chapter 5 claims as may exist against any Customers, which claims shall be transferred to the Purchaser; however notwithstanding the foregoing, any claims or causes of action for turnover of estate property taken from the Facility shall be transferred to the Purchaser; and (i) any Employee Plan.

(27) "Excluded Liabilities" means all Liabilities of the Debtors, including, but not limited to, those Liabilities specifically described in <u>Section 2.5</u>.

(28) "*Facility*" means the warehouse facility located at 1166 Commerce Blvd., Suite C & D, American Canyon, CA 94503.

5

(29)    *"Inventory"* means all the goods owned by the Debtors (including those intended for resale to their customers), other than Wine, whether sold or unsold, and whether in the Debtors' possession or the possession of any third-party.

(30)    *"Law"* means any law, rule, statute, regulation, order, judgment, decree, treaty or other requirement having the force of law.

(31)    *"Liabilities"* means all costs, expenses, charges, debts, liabilities, claims, demands and obligations, whether primary or secondary, direct or indirect, fixed, contingent, absolute or otherwise, under or in respect of any contract, agreement, arrangement, lease, commitment or undertaking, Applicable Law and Taxes.

(32)    *"Lien"* means any lien, mortgage, charge, hypothecation, pledge, security interest, prior assignment, option, warrant, lease, sublease, right to possession, encumbrance, charge, title retention, conditional sale or other security arrangement, claim, right or restriction which affects, by way of a conflicting ownership interest or otherwise, the right, title or interest in or to any particular property, including any "lien" as defined in the Bankruptcy Code.

(33)    *"Material Adverse Effect"* means a material adverse effect on the Assets or the Business, results of operation, financial condition, assets or liabilities of the Business, taken together as a whole.

(34)    *"Non-Wine Assets"* means all Assets other than Wine.

(35)    *"Notices"* means the notices required to be given to any Person under Applicable Law or pursuant to any contract or other obligation to which any Debtor is a party or by which any Debtor is bound or which is applicable to any of the Assets, in connection with the execution and delivery of this Agreement or the completion of the transactions contemplated by this Agreement.

(36)    *"Party"* means a party to this Agreement and any reference to a Party includes its successors and permitted assigns; and "Parties" means every Party.

(37)    *"Person"* is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, a limited liability company, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

(38)    *"Permits"* shall mean all permits, licenses, consents and approvals of any kind necessary to operate the Business.

(39)    "*Petition Date*" shall have the meaning given to it in the recitals hereof.

(40)    [Reserved]

(41)    [Reserved]

(42)    *"Physical Assets"* means all equipment, plant and machinery including forklifts, furniture, computers, electronics (including servers), supplies, appliances including freezers, fixtures including storage racking, and other tangible personal property owned by any Debtor, including all such tangible personal property used in connection with the Business and owned by any Debtor.

(43)    *"Purchase Price"* shall have the meaning given to it in <u>Section 2.2</u>.

(44)    *"Tax"* means any federal, state, local or foreign net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, paid-up capital, profits, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such tax.

(45)    *"Trademarks"* means all service marks, trademarks, and logos of the Debtors used in connection with the Business; including, but not limited to, "Phoeno" and "Underground Cellar" and "Underground Enterprises" and such other additional marks listed on <u>Schedule 1.1(44)</u> hereof.

1.2    <u>Headings and Table of Contents</u>. The division of this Agreement into Articles and Sections, the insertion of headings, and the provision of any table of contents are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.3    <u>Number and Gender</u>.  Unless the context requires otherwise, words importing the singular include the plural and vice versa and words importing gender include all genders.

1.4    <u>Section and Schedule References</u>.  Unless the context requires otherwise, references in this Agreement to Sections, Exhibits or Schedules are to Sections, Exhibits or Schedules of this Agreement.

## ARTICLE II
## PURCHASE OF ASSETS

2.1    <u>Agreement to Purchase and Sell</u>.  At the Closing, subject to the terms and conditions of this Agreement, the Seller shall sell, transfer, convey and/or assign and the Purchaser shall purchase and acquire all of the Debtors' and their estates' entire right, title and interest in, to and under the Assets, free and clear of all Liens and Liabilities <u>provided,</u> <u>however,</u> that the Trustee shall have no obligation to deliver any Assets which the Trustee, after good faith efforts, does

not have in his possession, control or legal authority to transfer as of the Closing Date; provided, further, however, that if the Trustee comes into possession, control or legal authority to transfer any Assets after the date of Closing, the Trustee shall reasonably promptly transfer such Assets to Purchaser, at the expense of Purchaser.  Notwithstanding anything contained in this Agreement to the contrary, on the Closing Date and by virtue of entry of the Approval Order, Purchaser will acquire the Assets free and clear of all Liens and Liabilities.  Excluded Assets shall not be included in such sale.

2.2    Amount and Payment of Consideration.  The aggregate consideration for the Assets shall be equal to: (a) (i) a credit bid of a portion of the Purchaser's secured Claim in a total amount of $4,500,000, comprised of a credit bid of $3,000,000 for the Wine, and an additional credit bid of $1,500,000 for the Non-Wine Assets (together, the "Credit Bid Consideration"), plus (ii) an amount in cash equal to $380,000 (the "Cash Consideration") (collectively, the "Purchase Price"), plus (b) Purchaser's assumption of the Assumed Liabilities, plus (c) the payment of $2,700 to Liquid Lotus Corporation for the reimbursement of certain expenses it paid.

(1)    Deposit and Payment of Cash Consideration.  Purchaser has provided to Seller an initial deposit of $100,000 (the "Deposit").  On or before the Closing Date, Purchaser shall (a) release the Deposit to Seller, and (b) wire transfer the $280,000 balance of the Cash Consideration to an account designated by Seller in writing prior to the Closing, in satisfaction of the Cash Consideration portion of the Purchase Price.  For the avoidance of doubt, Purchaser shall not be entitled to any distribution or recovery from the Cash Consideration.

(2)    Payment of the Credit Bid Consideration.  On the Closing Date, Purchaser will satisfy the Credit Bid Consideration by releasing a portion of its then-outstanding secured Claim against Debtors as of the Closing in an amount equal to the Credit Bid Consideration, which amount shall be payable by means of a dollar-for-dollar offset against the amount of such secured claims pursuant to section 363(k) of the Bankruptcy Code.  For the avoidance of doubt, Purchaser shall be entitled to an unsecured deficiency claim against Debtors that shall be equal to the difference between (a) the amount of the Credit Bid Consideration, and (b) Purchaser's total allowed secured Claim against the Debtors.

(3)    Payment to Liquid Lotus.  On or before the Closing Date, Purchaser will wire transfer to an account designated in writing by Liquid Lotus Corporation the sum of $2,700.

2.3    Assigned Contracts.  No later than the Closing Date, Purchaser shall designate all contracts that shall become Assigned Contracts, and assume and undertake to pay, perform and discharge when due or required to be performed all of the Debtors' obligations under the Assigned Contracts relating the Business and all Liabilities related thereto.  If there exists on the Closing Date any default in such Assigned Contracts, in addition to the Purchase Price, Purchaser shall be responsible to pay directly to the non-debtor party to each Assigned Contract, the cure amount ("Cure Amounts") set forth by the order of the Court as a condition to the assumption and assignment of such contract, subject to modification of such Assigned Contract

or agreement for other treatment by the Purchaser and non-debtor party to each Assigned Contract.

2.4     Excluded Assets.  Notwithstanding anything to the contrary contained herein, the Assets transferred pursuant to this Agreement shall not include and Seller shall retain all its rights, title and interests in and to, and shall not sell, transfer, assign and deliver to Purchaser, any of the Excluded Assets.

2.5     Liabilities Not Assumed. For greater certainty, the Purchaser does not and shall not assume or otherwise be responsible for any Liabilities, including without limitation any of the following liabilities or obligations of the Debtors:

(1)     Liabilities or obligations related to or arising from or in connection with Employees arising in respect of or relating to their employment with the Debtors or an Affiliate of any Seller or any Employee Plan prior to the Closing Date, including without limitation salary, bonuses, commissions, unused sick leave, vacation pay or severance entitlements;

(2)     Any liability with respect to insurance of the Assets with respect to any period prior to or on the Closing Date;

(3)     Any litigation or claim arising out of the ownership of the Assets on or prior to the Closing Date, including, but not limited to, product liability and warranty claims, tort liability and any liability for violations of any Law or breach of contract;

(4)     Liabilities with respect to Taxes of the Debtors of any and all kinds including those related to the Business and the ownership of the Assets on or before the Closing Date; and

(5)     Any indebtedness of the Seller, whether incurred under any loan agreement, indenture, stock or asset acquisition agreement or otherwise including merchant credit card fees, chargebacks or other deficit accounts, and accounts payable arising from the Business prior to or on the Closing Date;

(6)     any Liability of any Seller or its Affiliates for performance under this Agreement or the Ancillary Agreements;

(7)     any Liability for any accounts payable or other accruals related to the Business arising prior to the Closing Date, but excluding the Assumed Liabilities;

(8)     any Liability relating to the Excluded Assets;

(9)     any Liabilities relating to any Deficit Customer or Customer With Deferred Credit;

(10)    any Liabilities relating to any Customers, subject to Purchaser's obligations described in <u>Section 7.1</u> of this Agreement, and further subject to the limitation that Purchaser will not have any obligation to any Customer for wine that is not transferred to the Purchaser as part of this sale; and

(11)    any Liability relating to any environmental claim or environmental condition or other environmental liabilities relating to any operations of the Business or arising out of any ownership, use or operation of the Assets prior to the Closing.

**ARTICLE III**
**CONDITIONS TO OBLIGATION OF PARTIES AT CLOSING**

3.1    [Reserved]

3.2    <u>Bankruptcy Court Matters</u>.    This Agreement is subject to, and conditioned upon, approval of the Bankruptcy Court. Subject only to Seller's duties and obligations under the Bankruptcy Code to accept the highest and best offer for the Assets, Seller agrees to use his best efforts to obtain Bankruptcy Court approval and any other approvals and orders necessary for the consummation of the transactions contemplated hereby. Trustee further agrees to use its best efforts to obtain from the Bankruptcy Court a waiver of the fourteen-day stay period under Fed.R. Bankr. P. 6004(h).

3.3    <u>Conditions to Obligations of Purchaser</u>.    Purchaser shall not be obligated to close hereunder or perform any other obligations under this Agreement hereof unless the following conditions have been satisfied by Seller or waived by Purchaser in writing:

(1)    Seller shall have fulfilled the Seller's covenants set forth in this Agreement.

(2)    The Approval Order shall have been entered and shall have become a final non-appealable order, by the Bankruptcy Court.  Such order shall authorize the transfer of the Assets free and clear of all Liens and Liabilities in accordance with this Agreement.

(3)    The Purchaser and the landlord for the Facility shall have agreed on an assumption and assignment of the existing lease or a new commercial lease for the Facility, on substantially similar form as attached hereto as "<u>Exhibit A</u>".

(4)    The representations and warranties of the Seller contained herein shall be accurate, true and correct in all material respects on the Closing Date and the Seller shall have performed and complied with his respective agreements and undertakings hereunder.

(5)    No action, suit or proceeding by any governmental agency or other Person shall have been instituted or threatened to restrain, prohibit or otherwise challenge the legality of the transactions contemplated hereby.

(6)    Since the execution date of this Agreement, there shall not have been a Material Adverse Effect with respect to the Debtors, the Assets or the Business.

10

3.4     <u>Condition of Purchaser Not Fulfilled; Termination</u>.  If any condition in <u>Section 3.3</u> has not been fulfilled at or before the Closing Date, then the Purchaser in its sole discretion may, without limiting any rights or remedies available to the Purchaser at law or in equity, either (a) terminate this Agreement by notice to the Seller, in which event the Purchaser shall be released from its obligations under this Agreement to complete the purchase of the Assets or (b) waive compliance with any such condition without prejudice to its right of termination in the event of non-fulfillment of any other condition.

3.5     <u>Conditions to Obligations of Seller.</u>  Seller shall not be obligated to close hereunder or perform any other obligations under this Agreement hereof unless the following conditions have been satisfied by Purchaser or waived by Seller in writing:

(1)     Purchaser shall have fulfilled its pre-Closing covenants set forth in this Agreement.

(2)     The Approval Order shall have been entered by the Bankruptcy Court.

(3)     The representations and warranties of the Purchaser contained herein shall be accurate, true and correct in all material respects on the Closing Date and the Purchaser shall have performed and complied with its respective pre-Closing agreements and undertakings hereunder.

(4)     No action, suit or proceeding by any governmental agency or other person shall have been instituted or threatened to restrain, prohibit or otherwise challenge the legality of the transactions contemplated hereby.

3.6     <u>Condition of Seller Not Fulfilled; Termination</u>.  If any condition in <u>Section 3.5</u> has not been fulfilled at or before the Closing Date, then the Seller in its sole discretion may, without limiting any rights or remedies available to the Seller at law or in equity, either (a) terminate this Agreement by notice to the Purchaser, in which event the Seller shall be released from its obligations under this Agreement to complete the purchase of the Assets or (b) waive compliance with any such condition without prejudice to its right of termination in the event of non-fulfillment of any other condition.

3.7     <u>Other Termination</u>.  In addition to <u>Sections 3.4 and 3.6</u>, this Agreement may be terminated at any time prior to the Closing Date:

(1)     by mutual written consent of the Seller and the Purchaser;

(2)     by the Seller, if not in material breach of its obligations under this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Purchaser and such breach has not been cured within ten (10) days after written notice of such breach to the Purchaser;

(3)     by the Purchaser if Seller shall have accepted or selected and the Court shall have approved, the bid or bids of any Person or Persons other than Purchaser to purchase all or a substantial portion of the Assets and the Seller shall have closed the sale of all or a substantial portion of the Assets to any Person or Persons other than the Purchaser;

(4)     by the Purchaser, if not in material breach of its obligations under this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Seller and such breach has not been cured within ten (10) days after written notice of such breach to the Seller; or

(5)     by Seller or Purchaser if the Closing has not occurred on or prior to October 30, 2023 unless extended by mutual written agreement of the Parties.

In the event of termination of this Agreement as provided in this <u>Section 3.7</u> or pursuant to <u>Sections 3.3, 3.4, 3.5, or 3.6</u> this Agreement will forthwith become void and there will be no liability or obligation on the part of the Seller or the Purchaser or their respective officers, directors or shareholders, unless such termination results from the breach by a party hereto of any of its representations, warranties, covenants or agreements set forth in this Agreement. Upon such termination, the Deposit shall be refunded to the Purchaser; <u>provided</u>, that the Seller shall have the right to receive such Deposit paid by the Purchaser hereunder if such termination is pursuant to <u>Section 3.7(2)</u> hereof.

## ARTICLE IV
## <u>CLOSING ARRANGEMENTS</u>

4.1     Closing.  The Closing shall take place at 10:00 a.m. (PST) on the Closing Date at such place as may be agreed by the Seller and the Purchaser.

4.2     Delivery of Assets.  At the Closing, the Seller shall deliver or cause to be delivered to the Purchaser possession of the Assets.

4.3     Seller's Closing Deliveries.  In addition, Seller shall deliver or cause to be delivered to the Purchaser the following items at Closing:

        (1)     All deeds of conveyance, bills of sale, assurances, transfers, assignments, consents, and such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the transactions provided for in this Agreement;

        (2)     All additional documents and instruments that Purchaser may reasonably determine are necessary for the proper consummation of the transactions contemplated in this Agreement.

4.4     Purchaser's Closing Deliveries.  At the Closing, the Purchaser shall deliver or cause to be delivered to the Seller all additional documents and instruments that the Seller may reasonably determine are necessary for the proper consummation of the transactions contemplated in this Agreement.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

5.1     Representations and Warranties of the Seller. The Seller acknowledges that the Purchaser is relying on the following representations and warranties in connection with the transactions contemplated by this Agreement. The Seller represents and warrants to the Purchaser based on his review of the Debtors' schedules of assets and liabilities and other limited information provided to him, but not based on his personal knowledge, as follows:

        (1)     *Existence and Power.* The Debtors are each a corporation, duly formed under the laws of the State of Delaware, and is duly organized, validly subsisting and in good standing under such laws.

        (2)     *Due Authorization*. The Seller has all necessary power, authority and capacity to enter into this Agreement and all Ancillary Documents to be executed by it as contemplated by this Agreement and to carry out their respective obligations under this Agreement and all Ancillary Documents to which each is a party.

        (3)     *Title to Assets.* The Assets are being sold on an **"AS IS, WHERE IS" BASIS, WITH ANY AND ALL FAULTS**.

        (4)     *Consents and Approvals.*  Except for approvals by the Court, no consent or approval of any Person is required in connection with the execution and delivery of this

13

Agreement and the completion of the transactions contemplated by this Agreement or to permit the Purchaser to carry on the Business after the Closing as such business is currently carried on by the Debtors.

5.2    _Representations and Warranties of the Purchaser_. The Purchaser represents and warrants to the Seller as follows:

(1)    _Formation and Power._ The Purchaser is a corporation duly formed under the laws of the State of Maryland, and is duly organized, validly subsisting and in good standing under such laws.

(2)    _Due Authorization._ The Purchaser has been authorized by the Lenders to enter into this Agreement, and has all necessary power, authority and capacity to enter into this Agreement and all Ancillary Documents to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and all Ancillary Documents to which it is a party. The execution and delivery of this Agreement and all Ancillary Documents have been duly authorized by all necessary corporate action on the part of the Purchaser.

(3)    _Enforceability of Obligations._ This Agreement and all Ancillary Documents to which the Purchaser is a party constitute valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with their terms subject, however, to limitations on enforcement imposed by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of the rights of creditors or others and to the extent that equitable remedies such as specific performance and injunctions are only available in the discretion of the court from which they are sought.

(4)    _Consents and Approvals._ No consent or approval of any Person is required to be obtained by the Purchaser in connection with the execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement.

(5)    _Absence of Conflicting Agreements._ The execution, delivery and performance of this Agreement by the Purchaser and the completion of the transactions contemplated by this Agreement do not and will not result in or constitute any of the following: (i) a default, breach or violation or an event that, with notice or lapse of time or both, would be a default, breach or violation of any of the terms, conditions or provisions of the articles or by-laws of the Purchaser; or (ii) a material violation of any Applicable Law applicable to or affecting the Purchaser.

(6)    _Litigation._ There is no action, suit, proceeding, claim, application, complaint or investigation in any court or before any arbitrator or before or by any regulatory body or governmental or non-governmental body pending or threatened by or against the Purchaser affecting the transactions contemplated by this Agreement and there is no factual or legal basis which could result in any such action, suit, proceeding, claim, application, complaint or investigation.

## ARTICLE VI
## TERMINATION OF COVENANTS, REPRESENTATIONS, AND WARRANTIES

The covenants, representations, and warranties made by Seller and/or Purchaser herein shall terminate as of the Closing.  Purchaser shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation and/or warranty or any covenant made by Seller herein or in any other document, certificate or instrument entered into by Seller in connection herewith, except with respect to the Excluded Liabilities.  Seller shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation and/or warranty or any covenant made by Purchaser herein or in any other document, Certificate or instrument entered into by Purchaser in connection herewith, except with respect to the Article VII.

## ARTICLE VII
## POST-CLOSING COVENANTS AND ARRANGEMENTS

7.1    Storage of Records.  Purchaser shall maintain all customer records received from Seller for a period of no less than three (3) years from the Closing Date.

7.2    Wine Obligations.  Within ten (10) calendar days after the Closing Date, the Purchaser or its agent shall deliver a notice (in substantially the form attached hereto as "Exhibit B," the "Fulfillment Notice") to the Customers by first class mail and, to the extent permitted by Applicable Law, electronic mail (e-mail) to the addresses provided by the Seller.  Purchaser shall use its reasonable commercial efforts to place a copy of the Fulfillment Notice on the Debtors' website within ten (10) days of the Closing Date.  Through the Fulfillment Notice, Purchaser or its agent shall give Customers notice of their right to elect and return to Purchaser or its agent (a "Customer Election") on or before December 8, 2023 (the "Delivery Notice Period") to either (i) arrange for the Customer to have Purchaser (with Seller assistance) deliver any Wine to the Customer (at the Customer's cost charged by the Purchaser) upon the payment by Customer to Purchaser (or an Affiliate of Purchaser) of an amount equal to 21% of the price actually paid to the Debtors by the Customer (the "Customer Payment") for such Wine, or (ii) agree for the Purchaser to continue to store such Wine at such Customer's expense and for the Purchaser to make such Wine available for delivery to the Customer (at the Customer's cost charged by the Purchaser) upon the payment by Customer to Purchaser (or an Affiliate of Purchaser) of the Customer Payment for such Wine.  These options are pursuant to the terms and conditions described in the Fulfillment Notice which, upon receipt by LCC shall constitute a binding obligation between Purchaser and each Customer, the terms of which supersede any conflicting terms in this Section, and may be enforced as provided for in the Fulfillment Notice.  Any shipment or delivery of Wine to a Customer shall be subject to local and state law applicable to shipments of alcohol, and to the prepayment by the Customer of the Customer Payment and of all reasonably incurred costs for such shipment or delivery.  Upon the expiration of the Delivery Notice Period, any Wine not subject to a timely received and valid Customer Election (the "Forfeited Wine") shall thereafter be retained by Purchaser free and clear of any further rights of, or obligations to, any Customers who did not timely submit a

15

Customer Election and Purchaser shall be under no further obligation with respect to any customer who did not timely submit a valid Customer Election. Notwithstanding the foregoing, Purchaser shall only be responsible for sending the Fulfillment Notice to the addresses of Customers provided by the Seller, and Purchaser shall not be responsible for delivery, shipment, or storage of Wine (i) that Purchaser has no record of the Customer purchasing; (ii) previously ordered by such Customer that was not in the Seller's possession as of the Closing Date; (iii) as to which the Customer obtained from the Customer's credit card company a refund; (iv) for Customers that on or after February 1, 2023, obtained from their credit card company a refund equal to or 50% or more of the price paid for Wine ordered; or (v) for Customers that, prior to Feb 1, 2023, obtained from their credit card company a refund related to Wine ordered from the Debtors, unless (x) such Customer had purchased more than $25,000 in wine in aggregate from the Debtors over time, and (b) the total amount of such chargebacks does not exceed $2,000. Further, by and through the Seller's motion to approve the sale, the Seller shall specifically request a finding that, in the event that a Customer has not timely responded to the Fulfillment Notice prior to the expiration of the Delivery Notice Period, such Wine shall be property of the Purchaser free and clear of all claims, Liens, encumbrances, or interests.

7.3    <u>Further Assurances</u>. Each Party shall promptly do, execute, deliver or cause to be done, executed and delivered all further acts, documents and things in connection with this Agreement that the other Party may reasonably require, for the purposes of giving effect to this Agreement, including any assistance by the Seller that may be required by Purchaser to facilitate the transfer of the Permits and CDBC License(s); provided that the Purchaser shall be responsible for the Seller's out-of-pocket expenses and reasonable professional fees that the Seller may incur in complying with this Section 7.2 and Section 4.3 hereof.

7.4    <u>Further Post-Closing Obligations</u>.    Notwithstanding the foregoing, Purchaser understands and acknowledges that certain information contained, set forth or referenced in the Assets may be required by the Trustee for purposes of the administration of the Bankruptcy Cases, and thus Purchaser shall make such information available to the Trustee and his professionals upon the request thereof.

**ARTICLE VIII**
**<u>GENERAL</u>**

16

8.1    Expenses.   Each Party shall be responsible for its own legal and other expenses (including any Taxes imposed on such expenses) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the transactions contemplated by this Agreement and for the payment of any broker's commission, finder's fee or like payment payable by it in respect of the purchase and sale of the Assets pursuant to this Agreement.

8.2    [Reserved]

8.3    Public Announcements.   The Purchaser shall have the right to publicly announce the transaction following Closing.

8.4    Notices.

(1)    Any notice, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other similar means of electronic communication, in each case to the applicable address set out below:

if to the Seller, to:

Don A. Beskrone, Chapter 7 Trustee
P.O. Box 272
Wilmington, DE 19899
Phone: (302) 654-1888
Email: dbeskronetrustee@gmail.com

with a copy to counsel for Seller:

Gregory Taylor, Esquire
Ashby & Geddes, LLC
500 Delaware Avenue, Suite 800
Wilmington, DE 19801
Phone: (302) 654-1888
Email: gtaylor@ashbygeddes.com

if to the Purchaser, to:

Kevin Thorne
TriplePoint Private Venture Credit Inc.
2755 Sand Hill Rd Ste 150
Menlo Park, California, 94025
Email: kthorne@triplepointcapital.com

With copies, which shall not constitute notice, to:

> Eric Goldberg
> DLA Piper LLP (US)
> 2000 Avenue of the Stars
> Suite 400 North Tower
> Los Angeles, California 90067
> Phone: 310-595-3085
> Email: eric.goldberg@us.dlapiper.com

and

> Zach Zelner
> Last Call Capital
> Zach.zelner@gmail.com

(2)     Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:30 p.m. on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt.

18

8.5     Time of Essence. Time shall be of the essence of this Agreement in all respects.

8.6     Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no conditions, warranties, representations or other agreements between the Parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as specifically set out in this Agreement.

8.7     Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

8.8     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and shall be treated, in all respects, as a Delaware contract.

8.9     Waiver of Right to Trial by Jury.  Each party to this Agreement waives the right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

8.10     Successors and Assigns. This Agreement shall inure to the benefit of, and be binding on, the Parties and their respective successors (including successors by merger) and permitted assigns. Neither Party may assign or transfer, whether absolutely, by way of security or otherwise, all or any part of its respective rights or obligations under this Agreement without the prior written consent of the other party, except that Purchaser shall be permitted to assign any or all of its rights and obligations under this Agreement without the consent of the Seller if such assignment is made to (a) an Affiliate of Purchaser; or (b) Purchaser's fulfillment agent, which is Last Call Capital.

8.11     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument. Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties; provided, however, that any party providing its signature in such manner shall promptly forward to the other party an original of the signed copy of this Agreement which was so faxed.

8.12     Cooperation and Audits.  Purchaser and Seller will cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes without fee or charge.

8.13    <u>No Presumption</u>.    The parties to this Agreement agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations.  Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party or parties on the grounds that the party or parties drafted or was more responsible for drafting the provisions. References herein to "including" mean "including, without limitation."

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date hereof.

<u>**SELLER**</u>:

*Don A. Beskrone*
_____
Don A. Beskrone, solely in his capacity as Chapter 7 Trustee for Underground Enterprises, Inc. and Phoeno Wine Debtors, Inc

[Signature Page to Asset Purchase Agreement]

**PURCHASER**:

TriplePoint Private Venture Credit Inc.

By: TriplePoint Advisers LLC, its investment adviser

By: _____
      Name:  Kevin Thorne
      Its: Authorized Representative

[Signature Page to Asset Purchase Agreement]

**Schedule 1.1(8)**
<u>Assigned Contracts</u>[1]

| <u>Non-Debtor Counterparty</u> | <u>Description of Agreement</u> | <u>Proposed Cure Amount</u> |
| --- | --- | --- |
| Oracle NetSuite | ERP | $0.00 |
| Nappjo | ERP developers | $0.00 |
| Microsoft Azure | Webservers | $0.00 |
| Microsoft 365 | Email and software | $0.00 |
| Google Workspace | Collaboration and file sharing | $0.00 |
| Slack | Collaboration and chat | $0.00 |
| Klaviyo | Email marketing software | $2,700 |
| CloudFlare | Webserver infrastructure | $0.00 |
| Vercel | Webserver infrastructure | $0.00 |
| Dialpad | VOIP phone system | $0.00 |
| Zendesk | Customer support software | $0.00 |
| Liberty Mutual Insurance | Commercial Property, Inland Marine and General Liability Policy | $0.00 |
| Liberty Mutual Insurance | Commercial Umbrella | $0.00 |
| Liberty Mutual Insurance | Business Auto | $0.00 |
| Biagi Bros. Inc. | Sub-Sublease (as modified by agreement) for Warehouse located at 1166 Commerce Boulevard in American Canyon (Napa County), CA | $0.00 |
| UPS Store Mailbox | Mail receiving services | $0.00 |
| Bay Alarm | Security services regarding Warehouse | $0.00 |

---

[1] The Purchaser reserves all rights to remove any purported executory contract or unexpired lease from Schedule 1.1(8) to the APA prior to the Closing.

**Schedule 1.1(26)**

<u>Additional Excluded Assets</u>

None.

**Schedule 1.1(44)**

<u>Additional Trademarks</u>

**EXHIBIT A**

<u>Modified Sublease for Facility</u>

[*See attached*]

## FIRST AMENDMENT TO SUBLEASE FOR MULTIPLE TENANTS

THIS FIRST AMENDMENT TO SUBLEASE FOR MULTIPLE TENANTS (the "**Amendment**") is made as of November  9 , 2023, by and between Biagi Bros., Inc., a California corporation ("**Sub-Sublessor**"), and ___Last Call Capital, LLC___ , a  Delaware Limited Liability Company ("**Sub-Sublessee**").

## RECITALS

A.      Sub-Sublessor and Phoeno Wine Company, Inc., a Delaware corporation ("**Phoeno**") are parties to that certain Sublease for Multiple Tenants made effective as of October 28, 2021 (the "**Lease**"), for certain real property commonly known as 1166 Commerce Boulevard, American Canyon, CA 94503 (the "**Premises**").

B.      Phoeno has filed for bankruptcy protection, Case No. 23-10554 (KBO) Jointly Administered with Case No. 23-10553 (collectively "**Bankruptcy**"). The court overseeing the Bankruptcy proceedings shall be referred to herein as the "**Bankruptcy Court**."

C.      Contingent upon the Bankruptcy Court's approval of this Amendment (as discussed further in Section 2 below), the parties desire to amend the Lease under the terms herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and with the foregoing Recitals incorporated by reference, the parties hereto, intending to be legally bound hereby, covenant and agree as follows:

## AGREEMENT

1.      Defined Terms. Any capitalized term set forth but not defined herein shall have the meaning ascribed to such term in the Lease and the Sale Order.

2.      Contingent on Bankruptcy Court Approval. This Amendment and all of its rights and obligations shall not become effective and enforceable unless and until the Bankruptcy Court approves this Amendment in the Sale Order (the "**Approval Date**"). For the avoidance of doubt, upon entry of the Sale Order, Section 4 shall become immediately effective and enforceable as to each party and any and all third parties.

3.      Sub-Sublessee. The Sub-Sublessee in Section 1.1 shall be amended to the entity so identified above. Phoeno shall no longer be a party under the Lease.

4.      Premises. Section 1.2(a) shall be amended such that the Premises shall consist of approximately 48,000 +/- square feet. Sub-Sublessee shall have no interests whatsoever in the remainder of the approximately 58,202 square feet of warehouse and office space, and all interests in such non-leased square footage shall immediately revert to Sub-Sublessor without any further claims by Sub-Sublessee. The Premises is further depicted in Exhibit A.

5.    Rent. Section 1.5 shall be amended such that the Base Rent under the Lease shall be $52,800.00, payable on the first (1st) day of each month, *i.e.*, December 1, 2023 and January 1, 2024. Sub-Sublessee shall not be liable for any Rent accrued and not paid by Phoeno as of the Closing Date other than as set forth herein. November Rent shall be pro-rated based on the Approval Date.

5.1.    Cure Payments.   Purchaser shall pay directly to Sub-Sublessor past due rent for the months of August and September, 2023 in the aggregate amount of $241,888 on the fifteenth business day after the Approval Date.   Purchaser shall have no obligation to pay October rent.

5.2.    December and January Rent.  Commencing December 1, 2023 and January 1, 2024, Purchaser shall pay rent at $52,800 per month.  Purchaser shall also pay its Pro Rata Share of monthly OPEX for November, December and January @ $7,672.00 per month.

6.    Original Security Deposit. Sub-Sublessor currently retains $105,140.00 as Phoeno's Security Deposit under the Lease (the "**Original Security Deposit**"). Sub-Sublessee acknowledges and agrees that the Original Security Deposit is Sub-Sublessor's sole property and shall be retained by Sub-Sublessor free and clear of any claims or liens by anyone (including, but not limited to, any third party, bankruptcy estate, trustee, debtor, or court). Sub-Sublessor shall be deemed authorized by the Sale Order to immediately apply the existing security deposit in full satisfaction of July 2023 rent notwithstanding the automatic stay.

6.1.    Adequate Assurance of Future Performance.  As adequate assurance of future performance, Sub-Sublessee agrees to indemnify, defend and hold harmless Sub-Sublessor from any and all claims and lawsuits brought by any wine owner or third party. It is also understood and agreed that Sub-Sublessor is not providing any services to Sub-Sublessee including warehouse services in connection with this First Amendment unless subsequently agreed to in writing.

7.    Security Deposit. Section 1.7(b) of the Lease is amended such that the Security Deposit shall be $52,800.00. The Security Deposit shall be payable by Sub-Sublessee to Sub-Sublessor within two (2) days following the Approval Date.

8.    Abandonment of Property at End of Lease Term.  Any property, including but not limited to wine, remaining on the leased Premises after the lease term shall be deemed abandoned and Sub-Sublessor is authorized to dispose of any abandoned property in any manner without liability to anyone (including, but not limited to, any third party, bankruptcy estate, trustee, debtor, or court).

9.    Parking. Section 1.2(b) is amended such that Sub-Sublessee shall be entitled to use of five (5) unreserved parking spaces, and zero (0) reserved parking spaces.

10.     <u>Assignment, Transfer, and Sublease</u>. Sub-Sublessee shall have no right to assign, transfer, or sublease its interests under the Lease without Sub-Sublessor's prior written consent, which may be withheld in Sub-Sublessor's sole and absolute discretion.

11.     <u>No Conflicts</u>. In the event of any conflict or inconsistency between any provision of this Amendment and any provision of the Lease, this Amendment shall govern and control.

12.     <u>No Default</u>.  Each party certifies and confirms that to its knowledge the other party is not in default as of the date hereof in the performance of any obligations to be performed by the other party to date under the Lease.

13.     <u>Ratification</u>. Sub-Sublessor and Sub-Sublessee hereby ratify and confirm all the terms and conditions of the Lease as amended hereby.  All references in the Lease to "Lease" shall be deemed references to the Lease as amended by this Amendment.

13.1.     <u>Control Provisions</u>.  Notwithstanding ¶¶22, 33 and 46(b) of the Sale Order, Sub-Sublessor is not prohibited or enjoined from enforcing its rights and remedies under the First Amendment or at law or in equity.

14.     <u>Counterparts</u>. This Amendment may be executed by facsimile and in counterparts and all so executed signature pages shall constitute one agreement, binding upon all the parties, notwithstanding that all of the parties have not executed the original or the same counterpart. The parties hereby acknowledge and agree that electronic signatures that comply with the eSign Act (15 U.S.C. Ch. 96) (such as DocuSign or ZipLogix Digital Ink signatures), or signatures transmitted by electronic mail in so-called "PDF" format or by fax shall be legal and binding and shall have the same full force and effect as if an original of this Amendment had been delivered.

15.     <u>Authority</u>. Each of Sub-Sublessor and Sub-Sublessee represents and warrants to the other that it has the full power and authority to execute, deliver, and perform under this Amendment, and any documents referred to herein.

(SIGNATURES CONTAINED ON FOLLOWING PAGE)

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date set forth above.

**SUB-SUBLESSEE**:

Last Call Capital, LLC _____,
a Delaware Limited Liability Company _____

By: _Zach Zilmer_ _____
4B6A5E807CBA4A0...
President, Last Call Capital

**SUB-SUBLESSOR**:

Biagi Bros., Inc.,
a California corporation

By: _Andrea Biagi_ _____
89FD7B49B5534E4...
Andrea Biagi, President

**EXHIBIT B**

<u>Form of Fulfillment Notice</u>

[*See attached*]

**Re: Liquidation of Assets of Phoeno Wine Company, Inc. & Underground Enterprises, Inc. and Your Right to Reclaim Stored Wine**

# FAILURE TO ACT ACCORDING TO THIS NOTICE WILL RESULT IN FORFEITURE OF YOUR WINE ORDERS WITH UNDERGROUND CELLAR.

---

In connection with the bankruptcy cases of Phoeno Wine Company, Inc. and Underground Enterprises, Inc. (together, "Underground Cellar"), Last Call Capital LLC ("Purchaser," "we," or "LCC"), acting as agent for TriplePoint Capital ("TriplePoint"), which has acquired substantially all assets of the Underground Cellar, including wine inventory, wishes to inform you of the opportunity and procedures to claim your wine order under this program (the "Program"). The Program is only open for a short period of time. **This notice provides crucial information regarding the Program, for your benefit, and requires your prompt attention and action.**

---

**YOUR OPTIONS**

**1.  SCHEDULE A SHIPMENT**: After submission of a valid Customer Election form (the 3rd page of this notice) and payment of the required Surcharge and shipping and handling fee ("S&H Fee"), as described below, the Customer ("you") will be provided with more detailed procedures to arrange shipment of the wine you ordered, from the LCC warehouse located in California.

**2.  SHIPMENT**: LCC shall facilitate a shipment of the wine to an address of your choice within the United States, so long as LCC may legally ship to that address. All S&H Fees must be paid by you under the prices set forth on the last page of notice and are subject to local and state laws governing the shipment of alcohol.

**3.  CONTINUED STORAGE**: If you wish, you may request that LCC continue to store your wine instead of shipping it to you now. In addition to your Surcharge, storage charges will be in accordance with our rates, as detailed below.

**STORAGE RATES**:
- Up to 4 cases of wine: $39/mo
- Up to 8 cases of wine: $69/mo
- Any case quantity over 8 cases: $8/mo per case
Please note that these rates are waived until December 15, 2023. They are also subject to change at any time without notice.

**PROCEDURES**

**1.  VALID ELECTION**: In order to participate in the Program, you must submit with your Customer Election form and required payments, your Underground Cellar transaction records with Underground Cellar, including a list of the wines you wish to reclaimed. If you lack these records, please place a checkmark in the box labelled "I do not have this information" on the last page of this notice, and LCC will try to find your records in the Underground Cellar records it has. You may also request that LCC try to find your records and send them to you by emailing support@wineclaimsportal.com and providing the name, phone number, and email address on record with Underground Cellar, in which case LLC will provide you a complete list of all available records associated with your account within five business days. Please note that neither LCC nor TriplePoint is responsible for the accuracy or completeness of Underground Cellar's records, which were acquired from the Underground Cellar bankruptcy trustee on an "as-is, where-is" basis.

**2.  SURCHARGE**: Once your transaction records are validated, you must provide a check payable to Last Call Capital equal to 21% of the original paid-in wine charges in your request, but not including any taxes paid. This required payment is referred to as the "Surcharge." For example, if you originally purchased a bottle of wine from Underground Cellars for $100.00, you will be required to pay a Surcharge of $21.00 in order to receive your order, plus any S&H Fees and storage charges as described elsewhere in this notice.

**3.  SHIPPING PAYMENT**: When you return your Customer Election form, in addition to the applicable Surcharge, you must also include with your payment S&H Fees. Your required S&H Fee is calculated based on Exhibit A – a table on the last page of this notice showing the required charges per the recipient's ZIP code.

**4.  RESPONSE DEADLINE**: December 8, 2023
December 8, 2023 is the deadline for you to submit your Customer Election form.

- If you are submitting your form via US mail, you must include a check for the required Surcharge and S&H Fee, and **make sure that it is postmarked by December 8, 2023** to make and submit a valid Customer Election form.

- If you wish to pay by credit card, you may do so only by submitting your Customer Election form online at www.undergroundcellar.com, and do so **by midnight Pacific Time on December 8, 2023**. Note: payments by credit card will be assessed a 3% card processing fee on the total transaction.

- If you do *not* have records of the wine that you believe Underground Cellar was storing for you, then you must check the "I do not have this information" box on the Customer Election form, and **return it by December 8, 2023 via US mail or online, as described above.** However, if you check this box you will not be required to submit payment for your Surcharge and S&H Fee until LCC reviews the available records and lets you know in writing whether you are eligible to participate in this Program and what your Surcharge and S&H Fees will be.

**TERMS, CONDITIONS, AND WAIVERS**:

**A. LIABILITY WAIVER**:
By participating in this Program, you hereby release, waive, discharge, and covenant not to sue TriplePoint or LCC, and/or any of their officers, directors, stockholders, employees, owners, agents, or representatives (collectively, "Releasees"), from any and all liability, claims, demands, actions, and causes of action whatsoever arising out of or related to your orders with Underground Cellar, as well as from any loss, damage, or injury that may be sustained by the Customer, or to any property belonging to the Customer, WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES, or otherwise.

**B. SHIPPING RISKS**:
While LCC will facilitate the shipping of wines on your behalf, upon delivery of the wine to a shipping carrier, all risks related to the shipping, including but not limited to breakage, loss, misdelivery, or delay, are the sole responsibility of the Customer. You acknowledge that you bear all risk upon electing for shipment. If you wish to obtain insurance for the risk of loss to your wine after it is shipped, you may obtain insurance by selecting that option from the Underground Cellar website when you submit your customer election form. The option of obtaining insurance from the website is available only if you submit your Customer Election form and make payment online. This insurance is provided by a third party and neither LCC nor TriplePoint Capital shall have any responsibility with respect to such insurance.

**C. COMPLIANCE WITH LOCAL LAWS:**
You are responsible for ensuring that you are in compliance with all local and state laws governing the possession and shipment of alcohol. You assume all risks and liabilities related to noncompliance, and LCC shall not be held accountable for any legal repercussions or fines resulting from non-compliance. LCC shall not be required to make any shipment that it believes to be in violation of local and state law, and you will be required to provide an alternate delivery option.

**D. STORAGE TERMS:**
Wine storage with LCC after December 15, 2023 is subject to the rates mentioned in the Fulfillment Notice. After that date, rates are subject to change. If storage fees accrue and are not paid within 30 days, LCC reserves the right to, upon reasonable notice to you, dispose of, or sell, the stored wine to recover costs, without any compensation to the Customer.

**E. FORFEITURE:**
If a Customer fails to make and submit a timely and valid Customer Election form by December 8, 2023, then any wine related to that Customer shall be deemed forfeited and become the exclusive property of TriplePoint. *A Customer Election form is considered timely made only if submitted strictly in accordance with Section 3 above.*

**F. CREDIT CARD CHARGEBACKS:** Please note the following strict limitations that apply to customers that previously received from their credit card companies refunds for orders placed with Underground Cellar:

(1) if you obtained from your credit card company a refund for an order placed with Underground Cellar, you are not eligible to participate in this program for any wine as to which you received a refund;

(2) if, on or after February 1, 2023, you obtained from your credit card company a refund equal to 50% or more of the price paid for all the wine you ordered, but did not receive, then you are not eligible to participate in this programs; and

(3) if, prior to Feb 1, 2023, you obtained from your credit card company a refund related to wine ordered from Underground Cellar, then you are not eligible to participate in this program unless (a) you had purchased more than $25,000 in wine in aggregate from Underground Cellar over time, and (b) the total amount of such chargebacks does not exceed $2,000.

**F. DISCREPANCY IN RECORDS:**
If you do not have records of the wine you ordered from the Underground Cellar, or there is a discrepancy between the records you have and the records that were provided to LCC by the Underground Cellar's bankruptcy trustee, then Underground Cellar's records shall control unless otherwise agreed by LCC. Upon request, LCC shall endeavor to provide Customers with records of their outstanding wine orders but makes no representation or warranty as to its ability to do so, given the state of the records provided to LCC by the bankruptcy trustee. If LCC does not receive records from the bankruptcy trustee as to your wine holdings, LCC will allow you to submit any records in your possession, and LCC will, within its reasonable discretion, allow participation based on the records submitted. In this event, you may be required to submit additional documentation to LCC to support any claim. In the event that you submit a Customer Election form and pay the required Surcharge and S&H Fees, but LCC later determines that you are not entitled to participate in the Program with respect to all or part of your order, then you will receive from LCC a refund for all payments made to LCC associated with wine that you are not eligible to reclaim.

**G. WINE NOT AVAILABLE**
In the event LCC determines that the Underground Cellar warehouse does not have in stock the wine that you ordered from Underground Cellar, then you will have the following two options, which must be elected upon reasonable notice:

(1) A credit will be given to you for the Surcharge and S&H Fee paid to LCC for that wine. You may elect to use that credit to purchase available bottles of wine that were acquired by LCC from Underground Cellar. The cost to you of an available bottle of wine will be 21% of the average purchase price of that bottle, as determined by the records of Underground Cellar. All other terms of purchase, including the requirement to pay the S&H Fee and storage fees, will be the same as in this notice.

(2) You may receive a cash refund of the Surcharge, S&H Fee and storage fees costs paid to LCC for such unavailable wine.

In the event that under this Program there are more orders for a certain bottle or bottles wine than there are available bottles, then such orders will be allocated "first-come, first-served" based on when LCC received valid Customer Election forms and payment.

**H. LIMITATION OF DAMAGES:**
To the extent permitted by law, the liability of TriplePoint and LCC, if any, shall be limited to the amount paid to LCC by the Customer for the Surcharge, S&H Fee and storage fees. In no event shall either TriplePoint or LCC be liable for indirect, incidental, special, consequential, or punitive damages, incurred by any Customer, whether foreseen or unforeseen.

**I. WAIVER OF CLASS ACTION:**
By participating in this Program, you hereby waive any right to commence or be a party to any class or collective actions against TriplePoint and/or LCC, regardless of whether such actions are initiated by you or by a third party.

**J. DISPUTE RESOLUTION:**
Any disputes arising from or related to this notice or the Program shall be settled by arbitration in the state of Delaware, under the rules of the American Arbitration Association. The decision rendered by the arbitrator will be binding and may be entered as a judgment in any court of competent jurisdiction. The prevailing party in any arbitration shall be entitled to their attorneys' fees and costs.

**K. INDEMNITY:** You agree to indemnify, defend, and hold harmless the Releasees (defined on page 1 of this notice) from and against any and all losses, liabilities, claims, damages, costs, and expenses, including attorney's fees, arising out of or related to any breach of these terms, conditions, and waivers.

**L. GOVERNING LAW:**
This agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of law rules.

**M. ENTIRE AGREEMENT:**
These terms and conditions, combined with the Fulfillment Notice and Customer Election form, represent the entire agreement between you and LCC regarding this Program and supersede all prior negotiations, representations, or agreements, whether written or oral, including any and all agreements with Underground Cellars.

*IF YOU HAVE ANY QUESTIONS REGARDING THE PROGRAM, THIS NOTICE, OR FILLING OUT THE CUSTOMER ELECTION FORM, PLEASE CONTACT LAST CALL CAPITAL VIA EMAIL AT support@wineclaimsportal.com*

**FULFILLMENT NOTICE**
Underground Cellars

**CUSTOMER ELECTION FORM**
Please fill out in full with details on your wine order(s)

**THIS FORM MUST BE RETURNED BY DECEMBER 8, 2023 AS DESCRIBED IN MORE DETAIL IN SECTION 4 OF THIS NOTICE**

**Please provide your account information:**

FULL NAME: _____

ADDRESS: _____

PHONE NUMBER: _____

EMAIL ADDRESS: _____

**Please indicate your election (choose one):**

☐ **SHIPMENT**

CASE COUNT:       (See Exhibit A for calculation details)
CASE RATE:                  (See Exhibit A for calculation details)
CHECK AMOUNT: _____ (Case Count x Case Rate)

**Choose one:**
☐ Pay by Check (Include check payable to Last Call Capital based on below calculation & Surcharge Payment)

☐ Pay by Credit Card by filling out the credit card info below (a credit card surcharge of approximately 3% will be added by LCC to the amount otherwise due).

**or**

☐ CONTINUED STORAGE If you choose to have LCC continue to store your wine by selecting the storage option, *you must pay by credit card* by filling out the credit card info below (a credit card surcharge of approximately 3% will be added by LCC to the amount otherwise due).

| Credit Card Information |
| --- |
| Card Type:  ☐ MasterCard      ☐ VISA          ☐ Discover         ☐ AMEX          ☐ Other _____ |
| Cardholder Name (as shown on card): _____ |
| Card Number: _____    CVV: _____ |
| Expiration Date (mm/yy): _____ |
| Cardholder ZIP Code (from credit card billing address): _____ |

**You must attach to this election form the following items:**

1) A detailed Description of bottles you wish to reclaim, AND
2) Transaction records evidencing the wine you wish to reclaim.

If you do not have this information, check this box: ☐ and LCC will attempt to find records of your wine orders and send them to you using the contact information you provide above.

If you are submitting this form via mail, as opposed via the portal at www.undergroundcellar.com, send it with a check for the full amount due to:
Last Call Capital
700 Tillery Street, Unit 12-2007
Austin, TX 78702

By completing and submitting this form, you agree to the terms, conditions, waivers and releases set forth above. This document is a legally binding contract between you and Last Call Capital.

Exhibit A
**Calculating Your Shipping Cost**

The cost to ship a bottle is between $2.97 and $7.75 based on how far away your delivery address is from our warehouse in Napa. To calculate your cost, you'll need to determine two things:

1) **Case Count**: Determine how many cases will be shipped based on how many bottles you want to have delivered. Any bottles you reclaim that you don't ship now, can continue to be stored in LCC's warehouse until you're ready for them. Each case can include a maximum of 12 bottles. To determine how many cases you'll need, simply decide how many bottles you want delivered, divide by 12, and round up to the next whole number. For example, if you want 22 bottles delivered, divide that by 12 (22/12=1.833), which rounds to 2 cases. If you want 4 bottles delivered, this rounds to 1 case  (4/12=0.33). This is your case count.

2) **Case Rate**: Determine your shipping cost per case based on your delivery zip code. In the table below, look up the first 3 digits of your zip code to find your associated shipping cost per case. For example, if your zip code is 94105, your first 3 digits are 941, which is contained in the range of "936-954" in the table below, with a shipping cost per bottle of $2.97 and $35.64 as your Case Rate.

Please note:
- Large format bottles larger than a standard 750ml bottle (such as 1.5L magnums) can be accommodated for shipping but will require special handling. Please contact us for rates and availability.
- Shipping may not be available to certain states including, but not limited to: Alabama, Arkansas, Kentucky, Mississippi, and Utah, as well as PO Boxes, APO, AFT, DPO, or FPO addresses. For Shipments to Alaska and Hawaii, please contact us for rates and availability.
- Someone over 21 must be available to sign for your package.
- These rates are subject to change at any time and without notice.

## Destination Zip Code Case Rate Lookup Table

| FIRST 3 DIGITS OF ZIP CODE | SHIPPING COST PER BOTTLE | CASE RATE | | FIRST 3 DIGITS OF ZIP CODE | SHIPPING COST PER BOTTLE | CASE RATE | | FIRST 3 DIGITS OF ZIP CODE | SHIPPING COST PER BOTTLE | CASE RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 010-374 | $7.75 | $93.00 | | 680-699 | $6.11 | $73.32 | | 840-849 | $4.60 | $55.20 |
| 375-375 | $6.94 | $83.28 | | 700-704 | $7.75 | $93.00 | | 850-859 | $5.12 | $61.44 |
| 376-379 | $7.75 | $93.00 | | 705-706 | $6.94 | $83.28 | | 860-864 | $4.60 | $55.20 |
| 380-381 | $6.94 | $83.28 | | 707-709 | $7.75 | $93.00 | | 865-880 | $5.12 | $61.44 |
| 382-385 | $7.75 | $93.00 | | 710-729 | $6.94 | $83.28 | | 881-882 | $6.11 | $73.32 |
| 386-387 | $6.94 | $83.28 | | 730-732 | $6.11 | $73.32 | | 883-888 | $5.12 | $61.44 |
| 388-499 | $7.75 | $93.00 | | 733-733 | $6.94 | $83.28 | | 889-893 | $4.60 | $55.20 |
| 500-509 | $6.94 | $83.28 | | 734-738 | $6.11 | $73.32 | | 894-897 | $4.15 | $49.80 |
| 510-513 | $6.11 | $73.32 | | 739-739 | $5.12 | $61.44 | | 898-929 | $4.60 | $55.20 |
| 514-529 | $6.94 | $83.28 | | 740-745 | $6.94 | $83.28 | | 930-935 | $4.15 | $49.80 |
| 530-534 | $7.75 | $93.00 | | 746-746 | $6.11 | $73.32 | | 936-954 | $2.97 | $35.64 |
| 535-540 | $6.94 | $83.28 | | 747-762 | $6.94 | $83.28 | | 955-955 | $4.15 | $49.80 |
| 541-543 | $7.75 | $93.00 | | 763-763 | $6.11 | $73.32 | | 956-959 | $2.97 | $35.64 |
| 544-569 | $6.94 | $83.28 | | 764-767 | $6.94 | $83.28 | | 960-961 | $4.15 | $49.80 |
| 570-579 | $6.11 | $73.32 | | 768-769 | $6.11 | $73.32 | | 970-974 | $4.60 | $55.20 |
| 580-582 | $6.94 | $83.28 | | 770-787 | $6.94 | $83.28 | | 975-976 | $4.15 | $49.80 |
| 583-593 | $6.11 | $73.32 | | 788-788 | $6.11 | $73.32 | | 977-979 | $4.60 | $55.20 |
| 594-599 | $5.12 | $61.44 | | 789-789 | $6.94 | $83.28 | | 980-985 | $5.12 | $61.44 |
| 600-609 | $7.75 | $93.00 | | 790-797 | $6.11 | $73.32 | | 986-987 | $4.60 | $55.20 |
| 610-617 | $6.94 | $83.28 | | 798-832 | $5.12 | $61.44 | | 988-992 | $5.12 | $61.44 |
| 618-618 | $7.75 | $93.00 | | 833-833 | $4.60 | $55.20 | | 993-993 | $4.60 | $55.20 |
| 619-667 | $6.94 | $83.28 | | 834-835 | $5.12 | $61.44 | | 994-994 | $5.12 | $61.44 |
| 668-678 | $6.11 | $73.32 | | 836-837 | $4.60 | $55.20 | | | | |
| 679-679 | $5.12 | $61.44 | | 838-839 | $5.12 | $61.44 | | | | |

If you have any questions or need assistance with calculating your shipping cost, please contact us at support@wineclaimsportal.com